**Arrington Law Firm**
Barry K. Arrington*
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Phone:  (303) 205-7870
Email:  barry@arringtonpc.com
*Pro Hac Vice*

**Gatlin Voelker**
Sebastian D. Torres
50 E Rivercenter Boulevard #1275
Covington, Kentucky 41011
Phone: (859) 781-9100
STorres@GatlinVoelker.com

**Freedom Law Firm**
1003 Bishop Street, Suite 1260
Pauahi Tower
Honolulu, HI 96813
Phone: (808) 647-2423
Fax: (480) 857-0150
Marc J. Victor - Bar. No. 011090
Jody L. Broaddus - Bar No. 011229
Caroline M. Elliot - Bar No. 011541
Marc@AttorneysForFreedom.com
Jody@AttorneysForFreedom.com
Caroline@AttorneysForFreedom.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF HAWAIʻI**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS | Civil No. 22-cv-00404-DKW-RT |
| and | |
| RONDELLE AYAU | **MOTION FOR PRELIMINARY INJUNCTION** |
| and | |
| JEFFREY BRYANT | |
| Plaintiffs, | |
| vs. | |

1

|  |  |
|---|---|
| HOLLY SHIKADA, in her official capacity as Attorney General for the State of Hawai'i | ) ) ) ) ) |
| Defendant. |  |

Plaintiffs submit the following Motion for Preliminary Injunction against Defendant Holly Shikada (the "State").

**Certification**: The undersigned has conferred with Defendant's counsel regarding this motion. Defendant opposes this motion.

## FACTS

1. HAW. REV. STAT. § 134-1 states in relevant part:

    'Assault pistol' means a semiautomatic pistol that accepts a detachable magazine and has two or more of the following characteristics:

    (1) An ammunition magazine that attaches to the pistol outside of the pistol grip;

    (2) A threaded barrel capable of accepting a barrel extender, flash suppressor, forward hand grip, or silencer;

    (3) A shroud that is attached to or partially or completely encircles the barrel and permits the shooter to hold the firearm with the second hand without being burned;

    (4) A manufactured weight of fifty ounces or more when the pistol is unloaded;

    (5) A centerfire pistol with an overall length of twelve inches or more; or

    (6) It is a semiautomatic version of an automatic firearm;

    but does not include a firearm with a barrel sixteen or more inches in length, an antique pistol as defined in this section, or a curio or relic as those terms are used in 18 United States Code section 921(a)(13) or 27 Code of Federal Regulations section 478.11.

2. HAW. REV. STAT. § 134-8 states in relevant part:

>    (a) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of any of the following is prohibited: assault pistols, except as provided by section 134-4(e) . . .
>
>    (c) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of detachable ammunition magazines with a capacity in excess of ten rounds which are designed for or capable of use with a pistol is prohibited. This subsection shall not apply to magazines originally designed to accept more than ten rounds of ammunition which have been modified to accept no more than ten rounds and which are not capable of being readily restored to a capacity of more than ten rounds.
>
>    (d) Any person violating subsection (a) or (b) shall be guilty of a class C felony and shall be imprisoned for a term of five years without probation. Any person violating subsection (c) shall be guilty of a misdemeanor except when a detachable magazine prohibited under this section is possessed while inserted into a pistol in which case the person shall be guilty of a class C felony.

3.     HAW. REV. STAT. § 134-4(e) states:

>    After July 1, 1992, no person shall bring or cause to be brought into the State an assault pistol. No assault pistol may be sold or transferred on or after July 1, 1992, to anyone within the State other than to a dealer licensed under section 134-32 or the chief of police of any county except that any person who obtains title by bequest or intestate succession to an assault pistol registered within the State shall, within ninety days, render the weapon permanently inoperable, sell or transfer the weapon to a licensed dealer or the chief of police of any county, or remove the weapon from the State.

4.     The term "assault pistol" as defined in HAW. REV. STAT. § 134-1 is not a technical term used in the firearms industry or community. Brown Dec. ¶ 3. Instead, the term is a rhetorically charged political term[1] meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by law-abiding American citizens for lawful purposes. *Id*. Plaintiffs refuse to adopt the State's politically charged rhetoric in this Motion. Therefore, for purposes of this Motion, the term "Banned Firearm" shall have the same meaning as the term "assault pistol" in HAW. REV. STAT. § 134-1.

---

[1] *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

5.      For purpose of this Motion, the term "Banned Magazine" shall mean a magazine the manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of which is prohibited by HAW. REV. STAT. § 134-8(c).

6.      This action challenges the constitutionality of the portion of HAW. REV. STAT. § 134-8 quoted in paragraph 2 and HAW. REV. STAT. § 134-4(e), which shall be referred to herein collectively as the "Statutes."

## PLAINTIFFS HAVE STANDING

### I.  Legal Standard for Standing

The unique standing considerations in the constitutional context tilt dramatically toward a finding of standing when a plaintiff brings a pre-enforcement challenge. *Tingley v. Ferguson*, 47 F.4th 1055, 1066 (9th Cir. 2022) (internal quotations and citations omitted). *Tingley* was a First Amendment case, but that difference does not matter, because in *Bruen*, *infra*, the Supreme Court held that Second Amendment rights should be protected in the same way First Amendment rights are protected. *Id.*, 142 S. Ct. at 2130. *See also Ezell v. City of Chicago*, 651 F.3d 684, 997 (7th Cir. 2011) (court equated Second Amendment standard with First Amendment standard); and *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1113 (S.D. Cal. 2017), aff'd, 742 F. App'x 218 (9th Cir. 2018) (upholding pre-enforcement challenge to magazine ban).

The Supreme Court has dispensed with rigid standing requirements in constitutional cases and has instead endorsed pre-enforcement challenges. *Tingley*, 47 F.4th at 1067 (internal quotations and citations omitted). The chilling of the exercise of a constitutional right is, itself, a constitutionally sufficient injury. *Id.* (internal quotations and citations omitted).

To establish pre-enforcement standing,[2] a plaintiff must allege an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder. *Id.* (internal quotations and citations omitted). A three-factor inquiry helps determine whether a threat of enforcement is genuine enough to confer an Article III injury: (1) whether the plaintiff has a concrete plan to violate the law, (2) whether the enforcement authorities have communicated a specific warning or threat to initiate proceedings, and (3) whether there is a history of past prosecution or enforcement. *Id.* (internal quotations and citations omitted).

A state's refusal to disavow enforcement of a statute against a plaintiff during litigation is "**strong evidence**" that the state intends to enforce the law and that a plaintiff faces a credible threat. *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021), *cert. denied sub nom. California Trucking Ass'n, Inc. v. Bonta*, 142 S. Ct. 2903 (2022) (emphasis added).

The government's active enforcement of a statute against other persons who have engaged in the conduct plaintiffs wish to engage in demonstrates that the threat of prosecution is real. *Adult Video Ass'n v. Barr*, 960 F.2d 781, 785 (9th Cir. 1992), *as amended* (June 18, 1992), *cert. granted, judgment vacated sub nom. on other grounds Reno v. Adult Video Ass'n*, 509 U.S. 917, 113 S. Ct. 3028, 125 L. Ed. 2d 716 (1993).

## II. The Facts Clearly Show Plaintiffs Have Standing

Plaintiffs Rondelle Ayau and Jeffrey Bryant are residents of the State. Ayau Dec. ¶ 3; Bryant Dec. ¶ 3. They are law abiding citizens and but for the prohibitions of the Statutes, they

---

[2] At the preliminary injunction stage, the plaintiffs may show standing by relying on the allegations in their complaint and whatever other evidence they submit in support of their preliminary injunction motion. *LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956–57 (9th Cir. 2021).

would be entitled lawfully to manufacture, possess, sell, barter, trade, gift, transfer, or acquire Banned Firearms and Banned Magazines. *Id*.

The Statutes have chilled Plaintiffs Rondelle Ayau and Jeffrey Bryant in the exercise of their constitutional rights to keep and bear arms. Ayau Dec. ¶ 4; Bryant Dec. ¶ 4. They currently desire to acquire, possess, sell and transfer Banned Firearms and Banned Magazines and would do so but for the prohibitions of the Statutes. *Id*.

NAGR seeks to defend the right of all law-abiding individuals to keep and bear arms. Brown Dec. ¶5. NAGR has members who reside within the State. NAGR represents the interests of its members who reside in the State. *Id*. NAGR's members on whose behalf this action is brought are law abiding citizens and but for the prohibitions of the Statutes, they would be entitled lawfully to manufacture, possess, sell, barter, trade, gift, transfer, or acquire Banned Firearms and Banned Magazines. *Id*.

The Statutes have chilled NAGR's members on whose behalf this action is brought in the exercise of their constitutional rights to keep and bear arms. Brown Dec. ¶ 6. They currently desire to acquire, possess, sell and transfer Banned Firearms and Banned Magazines and would do so but for the prohibitions of the Statutes. *Id*.

The State is currently actively enforcing the Statutes. Hill Dec. ¶ 2. A person was charged with violation of the Statutes as recently as June 2022. *Id*. The State has filed amicus briefs in several cases in which other states' firearms regulations have been challenged. Hill Dec. ¶ 3. For example, in 2019 the State filed an amicus brief in a federal case challenging California's firearms regulations similar to those in the Statutes. *Id*. The State's Attorney General said he filed the amicus brief to support the State's existing laws banning magazines. *Id*.

In addition, on June 3, 2022, Hawai'i Governor David Ige signed into law H.B. 2075, which is a firearms inspection statute. The legislative findings to H.B. 2075 stated in relevant part:

> The legislature finds that . . . [a]ddressing gun violence is a key part of [its] responsibility and consequently the State has enacted **comprehensive and robust gun protection laws**. . . .
>
> The legislature finds that firearms laws in other states are often very different from the firearms laws in Hawai'i and there is an important public safety interest in discovering illegal firearms brought into Hawai'i, as well as an important government interest in doing so in a manner that minimizes unnecessary prosecution of those who unknowingly do so. For example, pursuant to sections 134–8 and 134–8.5, Hawaii Revised Statutes, assault pistols, [and] certain large capacity magazines . . . are not allowed in Hawai'i. A person who is not a licensed dealer may not be aware that the features, modifications, or accessories of their firearms are illegal in Hawai'i and may attempt to bring these firearms into the State.

FIREARMS INSPECTIONS, 2022 Hawaii Laws Act 30 (H.B. 2075) (emphasis added).

In summary, enforcement of the Statutes challenged in this action is clearly a high priority for the State. The State has a self-described comprehensive and robust gun regulation policy. The State describes the Statutes as an important part of its robust regulation system. The State supports other states' gun control regulations by filing amicus briefs in cases challenging those regulations. This year the Hawai'i legislature enacted a law with the specific purpose of assisting in the enforcement of the Statutes. The Statutes are currently being actively enforced through prosecutions. Finally, Plaintiffs requested the State to disavow enforcement of the Statutes. Brown Dec. ¶ 7. The State responded to this request but pointedly did not disavow enforcement of the Statutes. *Id*. There is little question that if Plaintiffs were to engage in conduct prohibited by the Statutes and the State became aware of such conduct, Plaintiffs would be prosecuted.

In conclusion, Plaintiffs have shown that they have an intention to engage in a course of conduct arguably protected by the Second Amendment but proscribed by the Statutes challenged in this action. The State's vigorous enforcement of the Statutes creates a credible threat of prosecution thereunder. The State has refused to disavow enforcement, which is "strong evidence" the State intends to enforce the Statutes. Therefore, Plaintiffs have established all of the elements of standing.

## STANDARD FOR GRANTING PRELIMINARY INJUNCTION

A party seeking a preliminary injunction must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Apache Stronghold v. United States*, 38 F.4th 742, 751 (9th Cir. 2022), citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Here, where 'the government opposes a preliminary injunction,' the third and fourth factors 'merge into one inquiry.'" *Id.*, n.5, *quoting Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021).

## THE GOVERNMENT BEARS THE BURDEN OF DEMONSTRATION

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court unambiguously placed on the government a substantial burden of demonstrating that any law seeking to regulate firearms is consistent with this Nation's historical tradition of firearm regulation.[3] Specifically, the Court stated:

> "To support that [its claim that its regulation is permitted by the Second Amendment], the burden falls on [the government] to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the

---

[3] "Significantly, the plaintiff need not demonstrate the absence of regulation in order to prevail; the burden rests squarely on the government to establish that the activity has been subject to some measure of regulation." *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 415 (7th Cir. 2015) (Manion, J., dissenting).

States through the Fourteenth, does not protect petitioners' proposed course of conduct."

*Bruen*, 142 S. Ct. at 2135.

In this case, the Second Amendment's plain text covers Plaintiffs' conduct in seeking to acquire bearable arms. *Bruen*, 142 S. Ct. at 2132 ("the Second Amendment extends, prima facie, to all instruments that constitute bearable arms"). Accordingly, Plaintiff's conduct is **presumptively** protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2126 ("when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"). The government may attempt to rebut that presumption by demonstrating that its law is consistent with this Nation's historical tradition of firearm regulation. If the government attempts to meet that burden in its response, Plaintiff will have an opportunity to submit rebuttal evidence in its reply.

## ARGUMENT

**I.    The Supreme Court has Reaffirmed the *Heller* Standard**

**A.    A Regulation Burdening the Right to Keep and Bear Arms is Unconstitutional Unless it is Consistent with the Text of the Second Amendment and the Nation's History and Traditions**

In *Bruen*, the Court rejected the two-part balancing test for Second Amendment challenges that several courts of appeal adopted in the wake of *Heller* and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010). Instead, it reiterated the *Heller* standard, which it summarized as follows:

> "Today, we decline to adopt that two-part approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court

>conclude that the individual's conduct falls outside the Second Amendment's unqualified command."

*Bruen*, 142 S. Ct. at 2126 (internal quotation marks omitted).

The *Bruen* court spent significant time describing how lower courts are to proceed in Second Amendment cases. As particularly relevant here, *Bruen* described the proper analysis of the term "arms." That word, *Bruen* affirmed, has a "historically fixed meaning" but one that "applies to new circumstances." *Id*. at 2132. It thus "covers modern instruments that facilitate armed self-defense." *Id*., *citing Caetano v. Massachusetts*, 577 U.S. 411, 411—412 (2016) *(per curiam)* (stun guns). Accordingly, the text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*.

The Court then explained that "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Id*. In considering history, courts are to engage in "reasoning by analogy." *Id*. This analogical reasoning requires the government to identify a well-established and representative historical analogue to the challenged regulation. *Id*. at 2133. But to be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the Court today. *Id*. at 2132. Two metrics are particularly salient in determining if a historical regulation is relevantly similar: [1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense. *Id*. at 2133. By considering these two metrics, a court can determine if the government has demonstrated that a modern-day regulation is analogous enough to historical precursors that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id*.

As noted above, the Court held that the judicial balancing of means and ends pursuant to intermediate scrutiny review plays no part in Second Amendment analysis. "*Heller* does not support applying means-end scrutiny." *Id*., 142 S. Ct. at 2127; *see also Id*., 142 S. Ct. at 2129 (inquiry into the statute's alleged "salutary effects" upon "important governmental interests" is not part of the test).

### B. Only "Dangerous and Unusual Arms" Can be Banned Consistent with Our History and Tradition

This case involves a blanket prohibition on two classes of arms. Both *Bruen* and *Heller* identified only one aspect of the nation's history and tradition that is sufficiently analogous to – and therefore capable of justifying – such a ban: the tradition, dating back to the Founding, of restricting "dangerous and unusual weapons" that are not "in common use at the time." *Bruen*, 142 S. Ct. at 2128. By contrast, where a type of arm is in common use, there is, by definition, no historical tradition of banning it. Thus, for the type of restriction at issue in this case, the Court has already analyzed the relevant historical tradition and established its scope: "dangerous and unusual" weapons may be subject to a blanket ban, but arms "in common use at the time" may not be. *Id*.

The *Heller* test is based on historical practice and "the historical understanding of the scope of the right," but with reference to modern realities of firearm ownership. *Heller*, 554 U.S. at 625; *see also Bruen*, 142 S. Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. "). In summary, in the context of blanket bans on bearable arms, the Supreme Court has already done the historical spadework, and the only restrictions of this kind that it has deemed consistent with the historical

11

understanding of the right to keep and bear arms are restrictions limited to dangerous and unusual arms that are not in common use.

This Court's task is therefore a simple one: it merely must determine whether the banned arms are "dangerous and unusual." Importantly, this is a "conjunctive test: A weapon may not be banned unless it is both dangerous and unusual." *Caetano*, 577 U.S. at 417 (Alito, J., *concurring*). An arm that is in common use for lawful purposes is, by definition, not unusual. Such an arm therefore cannot be both dangerous and unusual and therefore cannot be the subjected to a blanket ban. *Bruen*, 142 S. Ct. at 2143*; Heller*, 554 U.S. at 629.

To determine whether an arm is "unusual" the Supreme Court has likewise made clear that the Second Amendment focuses on the practices of the American people nationwide, not just, say, in this State. *See id*. at 2131 ("It is this balance – struck by the traditions of the American people – that demands our unqualified deference."); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by American society" for self-defense); *Caetano*, 577 U.S. at 420 (Alito, J., *concurring*) ("stun guns are widely owned and accepted as a legitimate means of self-defense across the country"). Therefore, the Second Amendment protects those who live in states or localities with a less robust practice of protecting the right to keep and bear firearms from outlier legislation (like the State's ban here) just as much as it protects those who live in jurisdictions that have hewed more closely to America's traditions.

Furthermore, courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that ordinary citizens have chosen to possess. While *Heller* noted several reasons that a citizen may prefer a handgun for home defense, the Court held that "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete

prohibition of their use is invalid." *Id*., 554 U.S. at 629. The Court reaffirmed that the traditions of the American people, which includes their choice of preferred firearms, demand the courts' "unqualified deference." *Id*., 142 S. Ct. at 2131.

Finally, the Second Amendment inquiry focuses on the choices commonly made by contemporary law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected," *Id*. at 582. And in *Caetano*, the Supreme Court reiterated this point, holding that arms protected by the Second Amendment need not have been in existence at the time of the Founding. 577 U.S. 411-12, *quoting Heller*, 554 U.S. at 582. The *Caetano* Court flatly denied that a particular type of arm's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id*. And *Bruen* cements the point. Responding to laws that allegedly restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

## II. The Ninth Circuit's "Two Step" Analysis is no Longer Good Law

A court's decisions must comport with the "reasoning or theory," not just the holding, of Supreme Court decisions even in the face of prior contrary Ninth Circuit precedent. *Thompson v. Hebdon*, 7 F.4th 811, 827 (9th Cir. 2021), *quoting Miller v. Gammie*, 335 F.3d 889, 893, 900 (9th Cir. 2003) (*en banc*). Such is the case here.

Following *Heller* and *McDonald*, the Ninth Circuit created a two-step framework to review Second Amendment challenges similar to tests adopted by other circuits. *Young v.*

*Hawaii,* 992 F.3d 765, 783 (9th Cir. 2021*), cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *abrogated by Bruen, supra*. In *Bruen*, the Supreme Court described the mode of Second Amendment analysis that had been adopted by several circuit courts including the Ninth Circuit:

> Since *Heller* and *McDonald*, the two-step test that Courts of Appeals have developed to assess Second Amendment claims proceeds as follows. At the first step, the government may justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the right as originally understood. The Courts of Appeals then ascertain the original scope of the right based on its historical meaning. If the government can prove that the regulated conduct falls beyond the Amendment's original scope, then the analysis can stop there; the regulated activity is categorically unprotected. But if the historical evidence at this step is inconclusive or suggests that the regulated activity is not categorically unprotected, the courts generally proceed to step two.
>
> At the second step, courts often analyze how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right. The Courts of Appeals generally maintain that the core Second Amendment right is limited to self-defense in the home. If a core Second Amendment right is burdened, courts apply strict scrutiny and ask whether the Government can prove that the law is narrowly tailored to achieve a compelling governmental interest. Otherwise, they apply intermediate scrutiny and consider whether the Government can show that the regulation is substantially related to the achievement of an important governmental interest. *Kachalsky*, 701 F.3d at 96.

*Bruen*, 142 S. Ct. at 2126–27 (cleaned up).

After describing the test developed by the courts of appeals after *Heller* and *McDonald*, the Supreme Court rejected it:

> Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* **do not support applying means-end scrutiny in the Second Amendment context**. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

*Id*, 142 S. Ct. at 2126–27 (cleaned up; emphasis added).

14

In summary, therefore, the Ninth Circuit's decision in *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 2022 WL 4393577 (9th Cir. 2022), upholding a similar ban is no longer good law.

### III. The State's Prohibition on Possession of Arms is Unconstitutional

The State's ban on certain handguns is manifestly unconstitutional under *Heller*, in which the Court noted that it was enough to hold the D.C. ban unconstitutional by observing "that the American people have considered the handgun to be the quintessential self-defense weapon." *Id.*, 554 U.S. at 629. The State seeks to evade *Heller's* clear holding by labeling the category of handguns it bans with the ominous sounding epithet "assault pistol."  But a constitutional principle cannot be evaded through the expedient of statutory semantics. Handguns are handguns no matter what the State calls them, and under *Heller* handguns are protected by the Second Amendment.  Magazines such as those banned by the State also enjoy Second Amendment protection because without them many weapons, including "quintessential" self-defense weapons like handguns would be useless.  *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020), *reh'g en banc granted, opinion vacated,* 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta,* 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated,* 142 S. Ct. 2895 (2022), and *vacated and remanded,* 49 F.4th 1228 (9th Cir. 2022).

Under *Bruen*, the State's burden on Plaintiffs' Second Amendment rights is presumptively unconstitutional.  *Id.*, 142 S. Ct. at 2126. The State may overcome this presumption only if it is able to demonstrate that its ban on a category of handguns and magazines is consistent with this Nation's historical tradition of firearm regulation. *Id.*, 142 S. Ct. at 2125. This it will be unable to do, because no such historical tradition exists.

This last point is important. The burden remains on the government to justify its regulation. "Plaintiffs do not have to shoulder the burden of proving that they are entitled to enjoy Second Amendment rights." *Rigby v. Jennings*, 2022 WL 4448220, at *7 (D. Del. 2022) (internal citation and quotation marks omitted). The Second Amendment commands that the right to keep and bear arms 'shall not be infringed.' It follows that when a citizen complains in a facial challenge that the government is infringing, then it is the government that must carry the burden of justifying its restriction of Second Amendment rights. *Id*. The correct starting orientation is that no arm may be prohibited. *Id*. If a plaintiff challenges the government's prohibition, it is the government's burden to prove the banned arm is unprotected.

## THE OTHER PRELIMINARY INJUNCTION FACTORS ARE MET

Plaintiffs will suffer irreparable injury if enforcement of the unconstitutional Statutes is not enjoined, because the deprivation of constitutional rights **unquestionably** constitutes irreparable injury. *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (cleaned up; emphasis added), *quoting Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), *quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, demonstrating that the State's policy or practice is unconstitutional satisfies the second element of the injunctive relief test. *Id*. This is because the loss of constitutional freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012), *quoting Elrod, supra*.[4] In *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017), the court stated: "Thus, it follows inexorably from the conclusion that the government's current policies are likely unconstitutional . . . that Plaintiffs have also carried

---

[4] This was a First Amendment case, but as set forth above, that difference does not matter, because in *Bruen*, the Supreme Court held that Second Amendment rights should be protected in the same way First Amendment rights are protected. *Id*., 142 S. Ct. at 2130.

16

their burden as to irreparable harm." Finally, just a few months ago in *California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022), the court held that irreparable harm is relatively easy to establish in a case involving an infringement of constitutional rights. *Id*., 29 F.4th at 482*, citing CTIA - The Wireless Ass'n v. City of Berkeley*, California, 928 F.3d 832, 851 (9th Cir. 2019). A plaintiff need only demonstrate the existence of a colorable constitutional claim. *Id*., *citing Brown v. Cal. Dep't of Transp*., 321 F.3d 1217, 1225 (9th Cir. 2003).

Plaintiffs have also satisfied the third and fourth factors for obtaining a preliminary injunction. As noted above, where the government opposes a preliminary injunction, the third and fourth factors merge into one inquiry. *Apache Stronghold v. United States*, 38 F.4th 742, 751 n.5 (9th Cir. 2022). In *Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017), the court stated: "The balance of equities and public interest favored relief, in part, because the 'government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented.'" (*quoting Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). In *California Chamber of Com., supra*, the Ninth Circuit approved of reviewing these factors together when a state is a defendant. 29 F.4th at 482. The court went on to affirm the district court's entry of a preliminary injunction, holding that "[I]t is **always** in the public interest to prevent the violation of a party's constitutional rights." *Id.* (internal quotation marks omitted; emphasis added).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to enter an order preliminarily enjoining the enforcement of the Statutes challenged in this action.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Phone:  (303) 205-7870
Email:  barry@arringtonpc.com
*Pro Hac Vice*

Gatlin Voelker
Sebastian D. Torres
50 E Rivercenter Boulevard #1275
Covington, Kentucky 41011
Phone: (859) 781-9100
STorres@GatlinVoelker.com
*Pro Hac Vice*

ATTORNEYS FOR FREEDOM LAW FIRM
1003 Bishop Street, Suite 1260
Pauahi Tower
Honolulu, HI 96813
Phone: (808) 647-2423
Fax: (480) 857-0150
Marc J. Victor - Bar. No. 011090
Jody L. Broaddus - Bar No. 011229
Caroline M. Elliot - Bar No. 011541
Marc@AttorneysForFreedom.com
Jody@AttorneysForFreedom.com
Caroline@AttorneysForFreedom.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

      I hereby certify that on November 18, 2022, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*

_____

Barry K. Arrington