ANNE E. LOPEZ                              7609
   Attorney General of Hawai'i
KIMBERLY T. GUIDRY                         7813
EWAN C. RAYNER                             10222
KALIKO'ONĀLANI D. FERNANDES                9964
NICHOLAS M. MCLEAN                         10676
   Deputy Attorneys General
Department of the Attorney
 General, State of Hawai'i
425 Queen Street
Honolulu, Hawai'i 96813
Tel:  (808) 586-1360
E-mail:  kaliko.d.fernandes@hawaii.gov

Attorneys for ANNE E. LOPEZ, in her
official capacity as Attorney General for the
State of Hawai'i

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS; RONDELLE AYAU; JEFFREY BRYANT,<br><br>        Plaintiffs,<br><br>    v.<br><br>ANNE E. LOPEZ, in her official capacity as Attorney General for the State of Hawai'i,<br><br>        Defendant. | Civil No. 1:22-cv-404-DKW-RT<br><br>**DEFENDANT ANNE E. LOPEZ'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DKT. 24); DECLARATION OF KALIKO'ONĀLANI D. FERNANDES; EXHIBITS "1" – "9"; CERTIFICATE OF SERVICE**<br><br>District Judge: Chief Judge Derrick K. Watson<br><br>Magistrate Judge: Rom Trader<br><br>Hearing: April 7, 2023 at 10:00 a.m. |

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................3

STANDARD ..........................................................................................7

ARGUMENT .........................................................................................9

I.    Plaintiffs Have Not Demonstrated Likelihood of Success on the
Merits. ..........................................................................................9

    A.   *Bruen*'s Second Amendment Standard. ................................9

    B.   Plaintiffs Have Not Demonstrated that the Challenged
Provisions Burden Conduct Covered by the Text of the
Second Amendment. ..........................................................11

        1.   LCMs Are Not "Arms" Under the Second
Amendment. ............................................................12

        2.   Assault Pistols and LCMs Are Not In Common
Use for Self-Defense. ..............................................16

            a.   Assault Pistols and LCMs Are Not Designed
For, or Most Suitable For, Self-Defense. .......................19

            b.   Neither Assault Pistols Nor LCMs Are In
Fact Commonly Used for Self-Defense. ........................25

    C.   The Challenged Provisions Are Consistent with the
Nation's Historical Tradition of Firearms Regulation. .......................27

        1.   This Case Requires a "More Nuanced" Approach. .................28

        2.   Governments Throughout the Nation's History
Have Regulated Unusually Dangerous Weapons
and Weapons Associated with Criminal Activity....................31

3.     Hawaii's Law is Relevantly Similar to the
       Historical Analogues.................................................................37

II.    Plaintiffs Have Not Satisfied the Other Preliminary Injunction
       Factors.........................................................................................40

CONCLUSION ........................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Baird v. Bonta*,
   No. 2:19-cv-00617-KJM-AC, 2022 WL 17542432,
   (E.D. Cal. Dec. 8, 2022) ...................................................................8-9, 11, 41-42

*Brown v. Maryland*,
   25 U.S. 419 (1827) ............................................................................................32

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016) ..........................................................................................18

*Coal. of N.J. Sportsmen, Inc. v. Whitman*,
   44 F. Supp. 2d 666 (D.N.J. 1999)......................................................................44

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ....................................................................................*passim*

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014).....................................................................8, 41

*Duncan v. Bonta*,
   19 F.4th 1087, 1096 (9th Cir. 2021)................6, 13, 15, 17-18, 22, 23, 24, 37, 38

*English v. State*,
   35 Tex. 473 (1872) ............................................................................................31

*Friedman v. City of Highland Park, Ill.*,
   784 F.3d 406 (7th Cir. 2015)......................................................................17, 18

*Fyock v. City of Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015)............................................................................23

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) (en banc)........................................................8, 41

*Grandinetti v. Hyun*,
   Civ. No. 16-00470 DKW-KJM, 2017 WL 239741
   (D. Haw. Jan. 19, 2017).................................................................................. 7-8

*Grandinetti v. Wes Mun*,
  Civ. No. 17-00215 DKW-KJM, 2017 WL 2312474
  (D. Haw. May 26, 2017)......................................................................7

*Haynes v. Tennessee*,
  24 Tenn. 120 (1844) .........................................................................35

*Heller v. D.C.*,
  670 F.3d 1244 (D.C. Cir. 2011)........................................................23

*Jackson v. City & Cnty. of S.F.*,
  746 F.3d 953 (9th Cir. 2014) ............................................................15

*Kolbe v. Hogan*,
  849 F.3d 114 (4th Cir. 2017) (en banc)......................................*passim*

*Maryland v. King*,
  567 U.S. 1301 (2012) ........................................................................42

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ...............................................................9, 10, 19

*New York State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022) ...................................................................*passim*

*O'Neill v. State*,
  16 Ala. 65 (1849)..............................................................................31

*Oakland Trib., Inc. v. Chron. Publ'g Co.*,
  762 F.2d 1374 (9th Cir. 1985) ..................................................... 40-41

*Ocean State Tactical, LLC v. Rhode Island*,
  No. 22-cv-246, 2022 WL 17721175
  (D.R.I. Dec. 14, 2022) .................................... 3, 6, 11, 13, 15, 26, 42, 43

*Or. Firearms Fed'n, Inc. v. Brown*,
  No. 2:22-cv-01815, 2022 WL 17454829
  (D. Or. Dec. 6, 2022).................... 11, 17, 28, 29, 30, 31, 32, 37, 39, 40

*Rupp v. Becerra*,
  No. 8:17-CV-00746-JLS-JDE, 2018 WL 2138452
  (C.D. Cal. May 9, 2018) ..............................................................41, 45

*Smith v. Biden*,
  No. 1:21-cv-19457, 2021 WL 5195688 (D.N.J. Nov. 8, 2021) ...........................41

*State v. Lanier*,
  71 N.C. 288 (1874) ..................................................................................................32

*Taylor-Failor v. Cnty. of Haw.*,
  90 F. Supp. 3d 1095 (D. Haw. 2015) ........................................................ 8, 44-45

*Tracy Rifle & Pistol LLC v. Harris*,
  118 F. Supp. 3d 1182 (E.D. Cal. 2015) .................................................... 9-10, 45

*United States v. Cox*,
  906 F.3d 1170 (10th Cir. 2018) ..............................................................................13

*United States v. Hasson*,
  No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019)...............................13

*United States v. Masciandaro*,
  638 F.3d 458 (4th Cir. 2011) ..................................................................................44

*United States v. Rowson*,
  No. 22-cr-310, 2023 WL 431037 (S.D.N.Y. Jan. 26, 2023) .................................28

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .....................................................................................................7

*Wise v. Inslee*,
  No. 2:21-cv-0288-TOR. 2021 WL 4591571
  (E.D. Wash. Oct. 25, 2021) ....................................................................................41

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019) .................................................. 17, 22-23, 26, 38, 44

**Hawaii Statutes and Legislative History**

Haw. Rev. Stat. § 134-1 ................................................................................... 3, 4-5

Haw. Rev. Stat. § 134-4 ........................................................................................3

Haw. Rev. Stat. § 134-4(e).................................................................................6, 7

Haw. Rev. Stat. § 134-8 ......................................................................................3, 7

Haw. Rev. Stat. § 134-8(a)..................................................................4, 6

Haw. Rev. Stat. § 134-8(c).............................................................. 6-7, 13

1992 Haw. Sess. Laws Act 286, at 740-42 ...........................................4

H. Stand. Comm. Rep. No. 1261-92, 1992 House Journal, at 1382.....................4, 6

Public Safety and Recreational Firearms Use Protection Act,
    H.R. Rep. No. 103-489 (May 2, 1994)...........................................3, 5

S. Rep. No. 72-575, at 5-6 (1932)........................................................36

Senate Bill ("S.B.") No. 1843 ..............................................................3

**Other State Statutes**

1783 Mass. Acts 218, ch. 13 ..............................................................33

1784 N.Y. Laws 627, ch. 28 ...............................................................32

1786 N.H. Laws 383, § 1 ...................................................................32

1832 Conn. Acts 391, ch.  25, §§ 1-2 ................................................33

1879 Tenn. Pub. Acts 81, *An Act to Preserve the Peace and to Prevent
    Homicide*, ch. 90, § 1 ..................................................................34

California Penal Code sections 25850 ................................................11

California Penal Code sections 26350 ................................................11

**Regulation**

Factoring Criteria for Firearms With Attached "Stabilizing Braces,"
    88 Fed. Reg. 6478 (Jan. 31, 2023)...............................................25

**Other Authorities**

Associated Press, *Five Children Killed as Gunman Attacks a
    California School*, N.Y. Times, Jan. 18, 1989, at A1,
    https://timesmachine.nytimes.com/timesmachine/1989/01/18/19758
    9.html?pageNumber=1 ....................................................................3

Bureau of Alcohol, Tobacco & Firearms, *Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles*, 6 (July 6, 1989), https://www.atf.gov/file/61761/download.............................................................4

Bureau of Alcohol, Tobacco, Firearms & Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2021* (2021), https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download....................................................................18

Gina Kolata & C.J. Chivers, *Wounds From Military-Style Rifles? 'A Ghastly Thing to See,'* N.Y. Times, Mar. 4, 2018, https://www.nytimes.com/2018/03/04/health/parkland-shooting-victims-ar15.html; *Why do mass shooters choose the AR-15 style rifle?*, 60 Minutes, https://youtu.be/weG-QtQx2-0..............................................43

Gun Violence Archive, Gun Violence Archive 2023, https://www.gunviolencearchive.org/ ...................................................2

https://www.usmachinegun.com/products.php?cat=13&pg=3...................................4

Matthew Green, *Gun Groups: More Than A Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED, Apr. 12, 2019, https://www.kqed.org/news/11740000/gun-groups-more-than-a-million-high-capacity-magazines-flooded-california-during-weeklong-suspension-of-ban ....................................44

Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688-89 (2016) .................31

Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone, Feb. 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/ ......................................................................21

Violence Policy Center, *Mass Shootings in the United States Involving Large Capacity Ammunition Magazines*, https://vpc.org/fact_sht/VPCshootinglist.pdf......................................................39

Violence Policy Center, *Where'd They Get Their Guns?*, https://www.vpc.org/studies/wgun840718.htm.....................................................3

**INTRODUCTION**

Hawaiʻi law prohibits assault pistols and detachable magazines capable of holding more than ten rounds of ammunition ("large-capacity magazines" or "LCMs")—military-style weapons and accessories capable of rapidly killing large numbers of people.  Plaintiffs ask the Court to preliminarily enjoin these provisions of Hawaiʻi law—over 30 years after passage by the Hawaiʻi Legislature—on the theory that they will suffer irreparable harm unless the Court permits them to acquire, possess, sell, and transfer assault pistols and LCMs while this case proceeds.  Plaintiffs' request for such extraordinary relief must be denied.

First, Plaintiffs have failed to establish that they are likely to succeed on the merits. The impetus for Plaintiffs' challenge to Hawaii's 30-year-old law is presumably the U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), but *Bruen* did not "decide anything about the kinds of weapons that people may possess," *id.* at 2157 (Alito, J., concurring).  Instead, *Bruen* announced a general Second Amendment standard—requiring a text-and-history analysis—that Plaintiffs plainly do not satisfy.  Under that standard, Plaintiffs have the burden of demonstrating that "the Second Amendment's plain text covers" their proposed conduct, *id.* at 2129-30, but Plaintiffs have made no discernable effort to carry this burden.  Nor could they even if they tried.  LCMs are not "Arms" protected by the Second Amendment,

1

and neither LCMs nor assault pistols are in common use for self-defense—the "central component of the Second Amendment right." *Id.* at 2133 (cleaned up). Even if Plaintiffs had satisfied these textual burdens, moreover, they would fail at *Bruen*'s second step:  Defendant has assembled—even at this early stage of the proceedings—a robust record proving that the provisions at issue are "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

Plaintiffs have also failed to satisfy the remaining preliminary injunction factors.  They have not shown that they will suffer irreparable harm from maintaining the 30-year status quo, which permits them many other options for self-defense while this case proceeds.  The balance of the equities and the public interest, moreover, weigh so strongly against preliminary relief that Plaintiffs' motion could be denied on that basis alone.  There have been 71 mass shootings in 2023 thus far[1] —and it is only 46 days into the year.  Surely after Columbine, Sandy Hook, Pulse Nightclub, Las Vegas, Parkland, Uvalde, and the many other horrifying mass shootings in this country, it is crystal clear why the public would be disserved—and put in harm's way—by preliminarily enjoining Hawaii's law restricting easily concealable, military combat-style weapons with an extraordinary

---

[1] Gun Violence Archive, Gun Violence Archive 2023, https://www.gunviolencearchive.org/ (last accessed Feb. 15, 2023); *id.*, https://www.gunviolencearchive.org/methodology (defining "mass shooting" as "4 or more shot or killed, not including the shooter").

"capability for lethality—more wounds, more serious, in more victims"[2]—and the LCMs that permit shooters to fire over ten rounds of ammunition without stopping to reload.  "Suffice it to say that in very real terms," Plaintiffs' alleged harm "pales in comparison to the unspeakable devastation caused by mass shooters wildly spraying bullets without end into a crowd of bystanders."  *Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175, at *24 (D.R.I. Dec. 14, 2022).  Plaintiffs' motion must be denied.

## <u>BACKGROUND</u>

In 1992, following several deadly mass shootings using semi-automatic weapons—including 21 people killed in a McDonald's in 1984 in San Ysidro, California,[3] and 5 children killed and more than 30 other individuals wounded in 1989 at an elementary school in Stockton, California[4]—the Hawai'i Legislature passed Senate Bill ("S.B.") No. 1843 (now codified at HRS §§ 134-1, 134-4, and 134-8) to address semi-automatic firearms with certain accessories and configurations, statutorily defined as "assault pistols," and detachable ammunition

---

[2] Public Safety and Recreational Firearms Use Protection Act, H.R. Rep. No. 103-489 (May 2, 1994).

[3] Violence Policy Center, *Where'd They Get Their Guns?*, https://www.vpc.org/studies/wgun840718.htm (last accessed Feb. 15, 2023).

[4] Associated Press, *Five Children Killed as Gunman Attacks a California School*, N.Y. Times, Jan. 18, 1989, at A1, https://timesmachine.nytimes.com/timesmachine/1989/01/18/197589.html?pageNumber=1.

magazines with a capacity in excess of ten rounds, often referred to as large-capacity magazines.  *See* 1992 Haw. Sess. Laws Act 286, at 740-42.  Legislative "[t]estimony indicated that semi-automatic assault pistols are particularly dangerous because they are easily concealed, can fire in rapid succession for sustained periods . . . and often accept large-capacity, detachable ammunition magazines."  H. Stand. Comm. Rep. No. 1261-92, in 1992 House Journal, at 1382.

HRS § 134-8(a), accordingly, prohibits the "manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of . . . assault pistols[.]"  "Assault pistol" is defined in HRS § 134-1 as follows:

> "Assault pistol" means a semiautomatic pistol that accepts a detachable magazine and has two or more of the following characteristics:
>
> (1) An ammunition magazine that attaches to the pistol outside of the pistol grip;[5]
> (2) A threaded barrel capable of accepting a barrel extender, flash suppressor, forward hand grip, or silencer;[6]

---

[5] A pistol grip "can be an aid in one-handed firing of [a] weapon in a combat situation[,]" and "such grips were designed to assist in controlling machineguns during automatic fire."  Bureau of Alcohol, Tobacco & Firearms, *Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles*, 6 (July 6, 1989), https://www.atf.gov/file/61761/download.

[6] A threaded barrel is a firearm barrel that is modified or "threaded" on the end to accept certain features, *see* Busse Decl. ¶ 22, like a barrel extender, flash suppressor, forward hand grip, or silencer, *see* HRS § 134-1.  A barrel extender is an additional length of barrel that can increase accuracy and dampen recoil during rapid fire.  *See* https://www.usmachinegun.com/products.php?cat=13&pg=3 (last accessed Feb. 15, 2023).  A flash suppressor is "designed to help conceal a shooter's position by dispersing muzzle flash," *Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2017) (en banc), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111,

(3) A shroud that is attached to or partially or completely encircles the barrel and permits the shooter to hold the firearm with the second hand without being burned;[7]

(4) A manufactured weight of fifty ounces or more when the pistol is unloaded;

(5) A centerfire pistol with an overall length of twelve inches or more;[8] or

(6) It is a semiautomatic version of an automatic firearm;[9]

but does not include a firearm with a barrel sixteen or more inches in length, an antique pistol as defined in this section, or a curio or relic[.]

---

thus "disguis[ing] the origin of fire and avoid[ing] detection by enemy forces," Busse Decl. ¶ 20. A forward hand grip "is designed to aid in firearm stabilization during the rapid firing of assault rifles and assault pistols," and "first gained prominence inside special operations military units where 'cluttering' from accessories and extreme heat generated from the rapid firing of rifles were problems for troops in wartime situations." *Id.* ¶ 19. A silencer is "designed to greatly reduce the sound of a gunshot[.]" *Id.* ¶ 22.

[7] Because "[g]un barrels become very hot when multiple rounds are fired through them quickly," a barrel shroud "cools the barrel so that it will not overheat, and provides the shooter with a convenient grip especially suitable for spray-firing." H.R. Rep. No. 103-489; *see also Kolbe*, 849 F.3d at 125 (same).

[8] Centerfire firearms are "chambered with centerfire ammunition, which has the primer (the component that ignites the propellant) located in the center of the base of the cartridge case (as opposed to the rim of the cartridge)." Busse Decl. ¶ 10. Centerfire cartridges are "generally much more powerful than rimfire cartridges." *Id.* "As an example, the .223, which is the most common AR-15 cartridge, fires bullets at more than 3000 feet/second, whereas a rimfire cartridge typically propels bullets at around 1100 feet/second." *Id.* The "increased centerfire velocity greatly increases the range and lethality of centerfire cartridges." *Id.*

[9] An automatic firearm, also known as a machine gun, "fires a continuous stream as long as the trigger is held down, until it has fired all of the cartridges ('rounds' or 'bullets') in its magazine (or 'clip')." H.R. Rep. No. 103-489 at n.20. "A semi-automatic gun fires one round, then loads a new round, each time the trigger is pulled until its magazine is exhausted." *Id.* Semi-automatic weapons "can be fired at rates of 300 to 500 rounds per minute, making them virtually indistinguishable in practical effect from machineguns." H.R. Rep. No. 103-489.

Through this features-based definition, the Legislature sought to identify "a list of objective physical characteristics typical of the firearms which represent[] a heightened risk of danger to our community because of their concealability and firepower while having little or no utility for sporting applications."  H. Stand. Comm. Rep. No. 1261-92, in 1992 House Journal, at 1382.[10]

LCMs are addressed in HRS § 134-8(c), which prohibits "[t]he manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of detachable ammunition magazines with a capacity in excess of ten rounds which are designed for or capable of use with a pistol[.]"[11]  This does not apply "to magazines

_____

[10] HRS § 134-8(a)'s prohibition on assault pistols is subject to HRS § 134-4(e), which provides:

> After July 1, 1992, no person shall bring or cause to be brought into the State an assault pistol.  No assault pistol may be sold or transferred on or after July 1, 1992, to anyone within the State other than to a dealer licensed under section 134-32 or the chief of police of any county except that any person who obtains title by bequest or intestate succession to an assault pistol registered within the State shall, within ninety days, render the weapon permanently inoperable, sell or transfer the weapon to a licensed dealer or the chief of police of any county, or remove the weapon from the State.

[11] A magazine "is a vehicle for carrying ammunition[,]" and "can be either integral to the gun or detachable."  *Ocean State*, 2022 WL 17721175, at *4 (cleaned up). "A magazine enables a shooter to fire repeatedly—a number of times up to the ammunition capacity of the magazine—without reloading.  Once a magazine is empty, the shooter may continue to fire only after pausing to change magazines or to reload the original magazine."  *Duncan v. Bonta*, 19 F.4th 1087, 1096 (9th Cir. 2021) (en banc), *vacated and remanded on other grounds*, 49 F.4th 1228 (9th Cir. 2022) (en banc).  The magazines barred by HRS § 134-8(c) would "thus allow a shooter to fire more than ten rounds without any pause in shooting."  *Id.* at 1097.

originally designed to accept more than ten rounds of ammunition which have been modified to accept no more than ten rounds and which are not capable of being readily restored to a capacity of more than ten rounds."  HRS § 134-8(c).

Plaintiffs here challenge HRS § 134-4(e) and the portions of HRS § 134-8 addressing assault pistols and LCMs, arguing that they violate the Second and Fourteenth Amendments facially "and/or" as applied.  Dkt. 21 at PageID # 109 (¶ 41), 110 (¶ 45).[12]  On November 18, 2022—73 days after filing their initial Complaint—Plaintiffs filed a motion for preliminary injunction.  *See* Dkt. 24.

## STANDARD

 "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Grandinetti v. Wes Mun*, Civ. No. 17-00215 DKW-KJM, 2017 WL 2312474, at *2 (D. Haw. May 26, 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  To obtain a preliminary injunction, a plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of

---

[12] Plaintiffs challenge only the portions of HRS § 134-8 that bar the "possession," "sale," "transfer," or "acquisition" of assault pistols and LCMs, and not the portions that bar "manufacture," "barter," "trade," or "gift."  *See* Dkt. 21 at PageID # 104 ("[Plaintiffs Ayau and Bryant] currently desire to acquire, possess, sell and transfer Banned Firearms and Banned Magazines[.]"); *id.* at PageID # 105 (same as to NAGR members); *id.* at PageID # 110 (requesting a declaratory judgment as to "law-abiding adults seeking to acquire, use, transfer, or possess arms that are in common use by the American public for lawful purposes").

equities tips in his favor, and [4] that an injunction is in the public interest."
*Grandinetti v. Hyun*, Civ. No. 16-00470 DKW-KJM, 2017 WL 239741, at *1 (D. Haw. Jan. 19, 2017) (quotation omitted).  "When the government is a party, the[] last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  "If a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits— then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two [preliminary injunction] factors are satisfied."  *Taylor-Failor v. Cnty. of Haw.*, 90 F. Supp. 3d 1095, 1099 (D. Haw. 2015) (cleaned up).  "Regardless of which standard applies, the movant always has the burden of proof on each element of the test."  *Id.* (cleaned up).

Where, as here, a plaintiff effectively seeks a mandatory injunction that would alter the status quo, the burden is "doubly demanding"—such a plaintiff must "establish that the law and facts *clearly favor* [their] position[.]"  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  Mandatory injunctions are "particularly disfavored," *id.*, and courts "should be extremely cautious about issuing a preliminary injunction" that goes beyond maintaining the status quo, *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1194 (E.D. Cal. 2015).[13]

---

[13] *See also Baird v. Bonta*, No. 2:19-cv-00617-KJM-AC, 2022 WL 17542432, at *8 (E.D. Cal. Dec. 8, 2022) ("[W]hen a plaintiff asks to change the status quo rather than preserve it, district courts must exercise greater caution. . . .  This case

## ARGUMENT

I.   **Plaintiffs Have Not Demonstrated Likelihood of Success on the Merits.**

  A.   ***Bruen*'s Second Amendment Standard**

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects "an individual right to keep and bear arms for self-defense." *Bruen*, 142 S. Ct. at 2125. Following *Heller*, the courts of appeals "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *Id.* In *Bruen*, the Court rejected the two-step approach, explaining that while "[s]tep one of the predominant framework is broadly consistent with *Heller*," its decisions in *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), "do not support applying means-end scrutiny in the Second Amendment context." *Bruen*, 142 S. Ct. at 2127.

The Court announced that the Second Amendment instead "demands a test rooted in the Second Amendment's text, as informed by history." *Id.* Under that test, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. If a plaintiff demonstrates that their conduct is covered by the plain text, "[t]he

---

began in 2019; California's current regime had been operative since 2012, so the existing regime is the 'status quo.'").

government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

The Court explained that the historical analysis required if a plaintiff satisfies the initial textual burden "will often involve reasoning by analogy"—in other words, "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by asking "whether the two regulations are 'relevantly similar.'" *Id.* at 2132. The Court declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it did explain that "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. Because "individual self-defense is the *central component* of the Second Amendment right," "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (cleaned up).

The Court made clear that the historical analysis is not a "regulatory straightjacket," and does not require "a modern-day regulation [to be] a dead ringer for historical precursors." *Id.* "[T]he government [must] identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*

10

The Court also reaffirmed that the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626); *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations."). And although *Bruen* clarified the Second Amendment standard, it "decide[d] nothing" about "the kinds of weapons that people may possess." *Id.* at 2157 (Alito, J., concurring).

**B.    Plaintiffs Have Not Demonstrated that the Challenged Provisions Burden Conduct Covered by the Text of the Second Amendment.**

To succeed in a Second Amendment challenge, Plaintiffs must demonstrate that "the Second Amendment's plain text covers" their proposed conduct—*i.e.*, the possession, sale, transfer, and acquisition of assault pistols and LCMs. *Bruen*, 142 S. Ct. at 2129-30.[14] This requires showing that "the 'textual elements' of the

---

[14] Plaintiffs do not appear to dispute that they bear the burden at the textual stage, and case law makes clear that the burden is theirs. *See, e.g.*, *Ocean State*, 2022 WL 17721175, at *12 ("[I]t is [plaintiffs'] burden to show that large-capacity magazines fall within the purview of the Second Amendment[.]"); *Baird*, 2022 WL 17542432, at *6 ("[F]or the first part of the preliminary injunction test, [plaintiffs] must show they are likely to prove 'the Second Amendment's plain text covers' conduct regulated by California Penal Code sections 25850 and 26350."); *Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815, 2022 WL 17454829, at *11 (D. Or. Dec. 6, 2022) ("Plaintiffs have not shown that [LCMs] are weapons 'in common use . . . for lawful purposes like self-defense' such that they fall within the plain text of the Second Amendment." (cleaned up)).

Second Amendment's operative clause—'the right of the people to keep and bear Arms . . .'"—cover the conduct at issue because: (1) the regulated instrument "constitute[s] [a] bearable arm[,]" and (2) the regulated instrument is "in common use" for self-defense.  *Id.* at 2128, 2132, 2134 (citation omitted).

Plaintiffs fail to make this showing for both assault pistols and LCMs.  Their motion offers the Court no real argument on their textual burden; they simply declare that it has been satisfied, *see* Dkt. 24 at PageID # 123, a plainly insufficient showing for preliminary relief.  But even if Plaintiffs attempted to meet their burden at the textual stage, they would not succeed.  LCMs are not "Arms," and neither LCMs nor assault pistols are in common use for self-defense.

3.   **LCMs Are Not "Arms" Under the Second Amendment.**

As the Supreme Court explained in *Heller*, and reaffirmed in *Bruen*, determining whether the Second Amendment's protections apply requires a "'textual analysis' focused on the 'the normal and ordinary' meaning of the Second Amendment's language."  *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 576-77).  And the normal and ordinary meaning of "Arms" in the 18th century "is no different from the meaning today."  *Heller*, 554 U.S. at 581.  That is, "Arms" are "weapons of offence, or armour of defence," or stated differently, "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."  *Id.* (cleaned up).

Neither magazines nor, more specifically, LCMs, are by themselves used as a means of defense or used "in wrath to *cast at or strike* another." *Ocean State*, 2022 WL 17721175, at *12; *see also Duncan*, 19 F.4th at 1096 ("On its own, a magazine is practically harmless and poses no threat to life or limb[.]").  As such, an LCM is an accessory, not a firearm, nor even an integral part of a firearm.[15]  As courts have noted regarding other accessories, such as silencers, LCMs "have no use independent of their attachment to a gun. They do not fire bullets on their own and do not contain a slide, trigger, firing pin, cartridge case, barrel, primer, or gunpowder." *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *2 (D. Md. Sept. 20, 2019).  Like a silencer, "you can't hurt anybody with a[n] [LCM] unless you hit them over the head with it." *Id.*[16]

Gun manufacturers themselves view detachable magazines, including LCMs, as "accessories."  Busse Decl. ¶ 30 ("Because a[n] [LCM] is not a required component for a firearm to operate, it is characterized as an accessory by the industry.").  That is consistent with the understanding during the Founding era, when various items of equipment necessary for militia men were commonly referred to as "arms and accoutrements"—and "arms" as a stand-alone term

---

[15] Because HRS § 134-8(c)'s prohibition extends only to *detachable* magazines, LCMs under Hawaiʻi law are, by definition, not possibly integral within a firearm.
[16] *See also United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence'). Accordingly, it can't be a 'bearable arm' protected by the Second Amendment.").

referred to *weapons*, but generally "did not include ammunition or other weapon accessories, including the historical analogue" to magazines, *i.e.*, cartridge boxes and the like.[17]  Baron Decl. ¶¶ 10, 34.  Rather, these were considered "accoutrements" that, "like the other military equipment (scabbards, belts and so forth) . . . was separate from, and did not include, arms." *Id.* ¶ 34.

The historical record, then, demonstrates that the term "Arms," which is the "object" of the Second Amendment, *see Heller*, 554 U.S. at 581, never included the historical analogue of magazines or LCMs.  Baron Decl. ¶ 78 ("[T]here is virtually no lexical data that I have found showing that 'arms' includes 'accoutrements,' 'cartridge boxes,' 'cartouch boxes,' 'magazines,' or any other parts of weapons.").  As such, the term "Arms," which retains the same meaning today as it did in the Founding era, *Heller*, 554 U.S. at 581, does not include LCMs.

Contrary to Plaintiffs' suggestion, *see* Dkt. 24 at PageID # 129, the term "Arms" cannot be extended to cover LCMs on the basis that they are necessary to operate a firearm.  Unlike ammunition, *see Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967-68 (9th Cir. 2014), a firearm can operate without an LCM, *see*

---

[17] At the time, "[t]he word 'magazine' was not typically used to refer to the compartment of a gun containing bullets." Baron Decl. ¶ 24.  Rather, a "magazine" was "a place, often a building or warehouse, to store goods and supplies," and bullets were instead kept in "cartridge boxes," "cartridge cases," or "cartouch boxes." *Id.*

*Ocean State*, 2022 WL 17721175, at *12 ("Without bullets, a firearm would be useless.  But a firearm can fire bullets without a detachable magazine, and in any event, a firearm does not need a magazine containing more than ten rounds to be useful.").  "[A]ny firearm capable of accepting a detachable magazine holding more than 10 rounds," moreover, "will also accept a magazine with a maximum capacity of ten rounds or fewer."  Yurgealitis Decl. ¶ 58; *see also* Busse Decl. ¶ 27 ("[T]here is no known firearm that requires a large capacity magazine to function as designed. . . . [A]ll firearms that can accept a large capacity magazine can also accept a magazine that holds fewer rounds and still function precisely as intended.").[18]  For these reasons, Plaintiffs' argument fails.[19]

### 4. Assault Pistols and LCMs Are Not In Common Use for Self-Defense.

Among the "important limitation[s] on the right to keep and carry arms," is the Second Amendment's protection only for weapons "'in common use . . .' for lawful purposes like self-defense," *Heller*, 554 U.S. at 624, 627; *see also Bruen*,

---

[18] Although some firearms are sold with LCMs, "the manufacturers all offer the optional purchase of 10 round or even lower capacity magazines and could easily offer magazines limited to almost any given round count."  Busse Decl. ¶ 27.

[19] This is entirely consistent with the Ninth Circuit's *en banc* decision in *Duncan*. Although *Duncan* did not directly address whether LCMs are "Arms," and proceeded on the assumption that they were, the Court found that the ban on LCMs "outlaws no weapon, but only limits the size of the magazine that may be used with firearms."  *Duncan*, 19 F.4th at 1096.  That finding "is consistent with finding a magazine an accessory, not itself a firearm."  *Ocean State*, 2022 WL 17721175, at *12 n.25.

142 S. Ct. at 2134 (addressing whether weapons are "'in common use' today for self-defense" as part of the Second Amendment's textual inquiry).

Plaintiffs acknowledge this requirement in their Complaint, *see* Dkt. 21 at PageID # 105, 107, but the Complaint's efforts to address it distort the relevant analysis.[20]  Plaintiffs reduce the "in common use" inquiry to "own[ership,]" "possess[ion,]" and even mere "existence[,]" *id.* at PageID # 105-08, but whether a weapon is in "common *use*," by its plain terms, cannot turn only on whether the weapon *exists*, or whether the weapon is commonly *owned* or *possessed*.  Each of those generally must be true for a weapon to be commonly used—a weapon that does not exist, for example, cannot be commonly used.  But determining whether a weapon is in common use for self-defense requires more than simply counting up how many units have been manufactured, bought, or sold; it requires considering the *suitability* of the weapon for self-defense and the *actual use* of the weapon for self-defense.  *See, e.g.*, *Bruen*, 142 S. Ct. at 2132 ("[T]he Second Amendment's definition of 'arms' . . . covers modern instruments that *facilitate armed self-defense*." (emphasis added)); *id.* at 2142 (referring to "the right to publicly bear arms *suited for self-defense*" (emphasis added)).  *Heller* itself followed this

---

[20] Plaintiffs' preliminary injunction motion—in which Plaintiffs must show that they are likely to succeed on the merits—fails to offer any real analysis of the textual questions included in the Second Amendment inquiry, including whether LCMs and assault pistols are "in common use" for self-defense.

approach by exploring the "*reasons* that a citizen may prefer a handgun for home defense[.]"  554 U.S. at 629 (emphasis added); [21] *see also Duncan*, 19 F.4th at 1127 (Berzon, J., concurring) ("*Heller* focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon."); *Brown*, 2022 WL 17454829, at *10 n.13 ("The Second Amendment . . . requires a court to not only consider the prevalence of a particular firearm, but also the nature of that firearm's use among civilians.").

Equating common use with common possession or common ownership, as Plaintiffs suggest, makes little sense.  Numerous courts have agreed.  *See, e.g.*, *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (explaining that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical"); *Kolbe*, 849 F.3d at 142 ("[T]he *Heller* majority said nothing to confirm that it was sponsoring the popularity test."); *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("[R]elying on how common a weapon is at the time of litigation would be circular to boot. . . . [I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned."); *see also Duncan*, 19 F.4th at 1126 (Berzon, J.,

---

[21] "It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police."  *Id.*

concurring) (agreeing with the Seventh Circuit and noting that "[t]o regard an arms-related device's popularity as the source of its own constitutionality is no less circular" (cleaned up)).

*Heller* itself indicates that weapons "most useful in military service . . . may be banned" regardless of popularity, demonstrating that popularity is not determinative.  554 U.S. at 627.  The example of machine guns is illustrative: although there are over 700,000 registered machine guns in the U.S.[22]—more than the approximately 200,000 stun guns cited in Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016)—the Court indicated that they are not protected because they are not "in common use."  *Heller*, 554 U.S. at 624.  The Court, in fact, considered a reading of the Second Amendment that could render "the National Firearms Act's restrictions on machineguns . . . unconstitutional" to be "startling[.]"  *Id.*[23]

A "popularity" test, moreover, would effectively give weapons manufacturers the keys to the constitutional kingdom.  *See Kolbe*, 849 F.3d at 141 (explaining that a weapon "would need only be flooded on the market prior to any

---

[22] Bureau of Alcohol, Tobacco, Firearms & Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2021*, at 16 (2021), https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download.

[23] *Friedman*, 784 F.3d at 408 ("During Prohibition the Thompson submachine gun (the 'Tommy gun') was all too common in Chicago, but that popularity didn't give it a constitutional immunity from the federal prohibition enacted in 1934.").

governmental prohibition in order to ensure it constitutional protection"). It would also allow the policy choices of one state to limit the options available to other states, contrary to the Supreme Court's assurance that the Second Amendment "by no means eliminates" the States' "ability to devise solutions to social problems that suit local needs and values." *McDonald*, 561 U.S. at 785.

### a. Assault Pistols and LCMs Are Not Designed For, or Most Suitable For, Self-Defense.

Neither assault pistols nor LCMs are designed for, or well-suited to, self-defense.[24] Rather, they are military-style weapons and accessories designed for offensive use—precisely what *Heller* established may be prohibited. *See Heller*, 554 U.S. at 627 (noting that "weapons that are most useful in military service—M-16 rifles and the like—may be banned").

The assault pistols prohibited under Hawai'i law—particularly AR- and AK-based pistols—"are direct developmental descendants" of military weapons "designed for use in combat." Yurgealitis Decl. ¶ 80. AR-15 pistols in particular—the most commonly sold assault pistols in the U.S.—are progeny of the Armalite Rifle (AR) model 15 rifle, developed for the U.S. military in the 1950s and later designated the M-16. Busse Decl. ¶ 33; Yurgealitis Decl. ¶¶ 27, 29-30. Field evaluations conducted in Vietnam revealed the M-16's (then the AR-

---

[24] The Court need only reach this argument as to LCMs if it finds that LCMs are "Arms" under the Second Amendment.

15) extraordinary lethality: in one instance, "[o]ne round in the head" reportedly "took it completely off," and in another instance, opponents were "instantaneous[ly]" killed by, for example, a stomach wound that "caused the abdominal cavity to explode[.]" Yurgealitis Decl. ¶ 28.

The AR-15 rifles of today are the civilian versions of the M-16. They differ from the M-16 only in that the AR-15 is semi-automatic, while the M-16 is select-fire, meaning that it is capable of firing in fully automatic or semi-automatic mode. Yurgealitis Decl. ¶ 12; Busse Decl. ¶ 14. That does not mean, however, that the AR-15 is less lethal. Soldiers are often trained to use semi-automatic fire "because it is more accurate and lethal than automatic fire" in combat, *Kolbe*, 849 F.3d at 125, as it allows "targeting of specific human targets with repeated accurate shots rather than inaccurate, indiscriminate 'spray.'" Busse Decl. ¶ 36.

AR-15 pistols are essentially shortened, more easily concealable AR-15 rifles. Busse Decl. ¶¶ 11-12. They are "near direct copies" of AR-15 rifles[25] that can have the "same performance characteristics" as the M-16. Busse Decl. ¶ 11; Yurgealitis Decl. ¶ 80. Like the M-16 and the AR-15 rifle, the assault pistols regulated under Hawaiʻi law are "unquestionably most useful in military service."

---

[25] The two notable differences are: (1) a barrel under 16 inches, "which means the gun in rifle form would be deemed illegal under the 1934 [National Firearms Act] which regulates 'SBRs' or 'Short Barreled Rifles,'" and (2) the lack of a rear stock, which is "the portion of a rifle used to stabilize the firearm[] against a shoulder while firing" and would, if present, render the firearm a rifle. Busse Decl. ¶ 11.

*Kolbe*, 849 F.3d at 137.  The features that qualify a weapon as an assault pistol serve military functions and are characteristic of offensive use, not self-defense.[26] *See, e.g.*, Busse Decl. ¶¶ 16-20; H.R. Rep. No. 103-489; *Kolbe*, 849 F.3d at 137 ("The very features that qualify a firearm as a banned assault weapon—such as flash suppressors, barrel shrouds, folding and telescoping stocks, pistol grips, . . . and the ability to accept bayonets and large-capacity magazines—'serve specific, combat-functional ends.'").

Similarly, LCMs were "not initially designed or intended for the civilian marketplace" and "can be traced directly to a military heritage."  Yurgealitis Decl. ¶ 59.  When the AR-15 was first manufactured for the military, for example, it was issued with a twenty-round magazine even though the "civilianized" semi-automatic version was sold only with two five-round magazines.  Yurgealitis Decl. ¶ 60; *see also* Busse Decl. ¶ 32 (noting that the AR-15 was designed to satisfy "clearly stated military requirements," including that it be "high-capacity-

---

[26] This is consistent with the way the firearms industry markets AR-15 style weapons.  *See, e.g.*, Busse Decl. ¶ 47 (noting that "marketing within the firearms industry admits to, and capitalizes on, the AR-15-style weapons as a military weapon," and citing as an example an ad picturing a soldier and an assault weapon along with the slogan, "USE WHAT THEY USE"); Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone, Feb. 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/ ("[C]onsumer gun marketing played up the battlefield appeal of these weapons, including tag lines such as: 'The closest you can get without having to enlist.'").

capable"); *Duncan*, 19 F.4th at 1102 (LCMs "have limited lawful, civilian benefits, whereas they provide significant benefits in a military setting"); *Kolbe*, 849 F.3d at 137 (LCMs "are particularly designed and most suitable for military and law enforcement applications" (quotation marks omitted)).

While LCMs and assault pistols may be well-suited to "achieve their principal purpose—'killing or disabling the enemy' on the battlefield," *id.* at 125, neither are suitable for self-defense.  Assault pistols, as defined under Hawaiʻi law, are "a poor choice" for this purpose.  Yurgealitis Decl. ¶¶ 71, 79.  "Projectiles travelling at velocities found in AK & AR pistols pose a serious risk of over-penetration in most home construction materials," *id.* ¶ 73, threatening the safety of family members, neighbors, and other bystanders.  *See Worman*, 922 F.3d at 37 (semi-automatic assault weapons "can fire through walls, risking the lives of those in nearby apartments or on the street"); *Kolbe*, 849 F.3d at 127 ("[A]ssault weapons further pose a heightened risk to civilians in that 'rounds from assault weapons have the ability to easily penetrate most materials used in standard home construction, car doors, and similar materials.'").  This is not surprising given that "[a]ssault weapons were designed to be effective at battlefield ranges of up to 500 yards," not the "dozens of feet" typical of self-defense situations.  Yurgealitis Decl. ¶ 73.  Simply put, "wielding [assault] weapons for self-defense within the

home is tantamount to using a sledgehammer to crack open the shell of a peanut." *Worman*, 922 F.3d at 37.

The assault pistols prohibited under Hawai'i law also generally "require two hands to effectively aim and shoot," Yurgealitis Decl. ¶ 79, unlike the handguns *Heller* identified as the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629 (noting, among the "reasons that a citizen may prefer a handgun for home defense," that "it can be pointed at a burglar with one hand while the other hand dials the police"); *see also* Yurgealitis Decl. ¶ 79 (the need for two hands to effectively operate an assault pistol "would also preclude the homeowner from utilizing their 'non gun hand' to pick up or guide a small child or vulnerable / handicapped adult").  These features render assault pistols ill-suited to self-defense.  *See Kolbe*, 849 F.3d at 127 ("The State has . . . underscored the lack of evidence that the banned assault weapons . . . are well-suited to self-defense.").

LCMs, too, are "dangerous in self-defense situations because 'the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders.'" *Heller v. D.C.*, 670 F.3d 1244, 1263-64 (D.C. Cir. 2011); *see also Duncan*, 19 F.4th at 1105 ("[T]he use of [LCMs] results in more gunshots fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries." (quoting *Fyock v. City of Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015))).  The increased killing

capacity of LCMs is unnecessary for self-defense because "[h]ome defense and / or self-defense situations are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire." Yurgealitis Decl. ¶ 73. As such, it is extremely rare for an individual to need to fire more than 10 rounds for defensive purposes. *See Duncan*, 19 F.4th at 1105 ("[T]he record here, as in other cases, does not disclose whether the added benefit of a[n] [LCM]—being able to fire more than ten bullets in rapid succession—has *ever* been realized in self-defense in the home."); *id.* at 1104 (noting that "[e]xperts in this case and other cases report that 'most homeowners only use two to three rounds of ammunition in self-defense,'" and concluding that the necessity of firing "more than ten bullets in defense of the home is 'rare,' or non-existent" (citation omitted)).

And, finally, the dangers of using military equipment like assault weapons and LCMs for self-defense are only amplified when the two are used together. *See* Colwell Decl. ¶ 12 ("Assault weapons, especially when equipped with large capacity magazines that can hold 30, 50, or even 100 rounds of ammunition, can fire more shots without reloading, causing more injuries per victim (and thus more complications), and many of the most devastating injuries I have managed in my over 25 years of experience treating gunshot wound victims.").

Thus, assault pistols and LCMs are precisely the type of military combat-style equipment designed for offensive use that *Heller* established may be

prohibited. *See Heller*, 554 U.S. at 627; *see also Kolbe*, 849 F.3d at 137 ("Because the banned assault weapons and [LCMs] are clearly most useful in military service, we are compelled by *Heller* to recognize that those weapons and magazines are not constitutionally protected.").

> **b.     Neither Assault Pistols Nor LCMs Are In Fact Commonly Used for Self-Defense.**

Plaintiffs also make no effort to demonstrate that either assault pistols[27] or LCMs[28] are actually commonly used for self-defense. This is fatal to their motion.

---

[27] The most Plaintiffs offer regarding assault pistols is their Complaint's assertion that because an estimated three million "stabilizing braces" have been sold since 2013, that means "at least three million AR-15 pistols or similar firearms are in existence," which "meets the 'commonly held' standard." Dkt. 21 at PageID # 106 (¶ 32). The first problem with this argument is its misidentification of the proper standard. To warrant Second Amendment protection, a weapon must be commonly *used* for self-defense, not simply "commonly held." The second problem is Plaintiffs' faulty logic. For starters, Plaintiffs do not explain why there would be a connection between the number of stabilizing braces sold, and the number of assault pistols "in existence." And even if Plaintiffs are instead trying to connect the number of stabilizing braces sold to an alleged number of assault pistols *possessed*, the connection is flawed given that individuals could own more stabilizing braces than they do assault pistols. Moreover, as the ATF has noted, the same person is likely to own "more than one 'stabilizing brace' or firearm with an attached 'stabilizing brace.'" Factoring Criteria for Firearms With Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6560 (Jan. 31, 2023).
[28] The most Plaintiffs offer regarding LCMs is their vague assertion that "millions and millions of Americans" own LCMs because LCMs "come standard with many of the most popular handguns and long guns on the market, and Americans own roughly 115 million of them." Dkt. 21 at PageID # 107 (¶ 37). This, too, is faulty logic. The number of firearms that "come standard" with LCMs is not determinative of the number of LCMs in use because even for those firearms, "the manufacturers all offer the optional purchase of 10 round or even lower capacity magazines and could easily offer magazines limited to almost any given round

*See Worman*, 922 F.3d at 37 ("Equally as important is what the record does not show: it offers no indication that the proscribed weapons have commonly been used for home self-defense purposes.").  And this is far from the first case in which plaintiffs have failed to demonstrate that assault weapons and LCMs are commonly used for self-defense.  *See, e.g.*, *Ocean State*, 2022 WL 17721175, at *14 ("There is simply no credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense[.]"); *Worman*, 922 F.3d at 37 ("[W]hen asked directly, not one of the plaintiffs or their six experts could identify even a single example of the use of an assault weapon for home self-defense, nor could they identify even a single example of a self-defense episode in which ten or more shots were fired."); *Kolbe*, 849 F.3d at 127 ("Neither the plaintiffs nor Maryland law enforcement officials could identify a single incident in which a Marylander has used a military-style rifle. . . or needed to fire more than ten rounds, to protect herself.").

Plaintiffs here and in other cases cannot make this showing because self-defense does not call for weapons and instruments designed for military combat.  Accordingly, the typical and best-suited arms for self-defense are not assault

---

count."  Busse Decl. ¶ 27.  Plaintiffs' allegations do not take into account that many of the firearms that "come standard" with LCMs are likely being used *without* LCMs.

pistols or weapons equipped with LCMs, but rather handguns or shotguns without LCMs.  *See* Busse Decl. ¶ 29; *see also* Yurgealitis Decl. ¶¶ 71-79.

For these reasons, Plaintiffs fail to demonstrate that assault pistols and LCMs fall within the plain text of the Second Amendment.  Neither are designed for or well-suited to self-defense, and there is no evidence establishing that they are actually used for self-defense.  To the contrary, assault pistols and LCMs are offensive instruments "most useful in military service—M-16 rifles and the like" that *Heller* explicitly establishes "may be banned."  554 U.S. at 627; *accord Kolbe*, 849 F.3d at 135.

## C.   The Challenged Provisions Are Consistent with the Nation's Historical Tradition of Firearms Regulation.

Even if Plaintiffs had met their textual burden, their Second Amendment challenge would fail.  Throughout history, state and local governments have regularly enacted restrictions on certain weapons, weapon features, and accessories viewed to be particularly dangerous or associated with criminal activity.  These laws are relevantly similar to Hawaii's law: by restricting weapons and devices unsuitable for self-defense while permitting more suitable alternatives, Hawaii's law imposes a comparably minor, and comparably justified, burden on the right to armed self-defense.

### 1.    This Case Requires a "More Nuanced" Approach.

*Bruen* establishes that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to the historical inquiry.  142 S. Ct. at 2132.  That is the case here.  Hawaii's law addresses a dramatic technological change: the development of semi-automatic weapons and extended magazines.  And it responds to an unprecedented societal concern: mass shootings.  As a result, the Court should conduct "a broader search for historical analogies." *United States v. Rowson*, No. 22-cr-310, 2023 WL 431037, at *24 (S.D.N.Y. Jan. 26, 2023).

Modern society has produced "a bewildering assortment of firearms whose lethality would have been almost unimaginable to the Founding generation," Cornell Decl. ¶ 30, and that includes modern semi-automatic firearms and LCMs.

The muskets and fowling pieces available to citizens during the colonial and Founding eras could not fire multiple shots without reloading, and had numerous other limitations that severely restricted their use as murder weapons.  *See* Roth Decl. ¶ 16; Cornell Decl. ¶¶ 24-25.  Multi-shot weapons were curiosities until the late 19th century.  Firearms capable of firing more than 10 rounds, such as the Puckle Gun patented in 1718 in London, the Jennings introduced in 1821 in New York, and the Girandoni developed in Austria, were "experimental, designed for military use, rare, defective, or some combination of these features." *Brown*, 2022

WL 17454829, at *12 & n.17; *see* Spitzer Decl. ¶¶ 38-41; *see also id.* ¶ 36 ("The guns of 1830 were essentially what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles.").

The multi-shot weapons that emerged in the late 19th century (such as the Colt, Winchester, and Henry), were not comparable to the semi-automatic weapons of today. They were not semi-automatic or capable of rapid fire, and they were not widely used by civilians. Instead, they were intended for military use. Spitzer Decl. ¶¶ 44-48. Semi-automatic and automatic weapons capable of rapid fire and reloading only became commercially available to citizens after World War I, with the development of weapons like the Thompson submachine gun. *Id.* ¶¶ 13, 49; Roth Decl. ¶¶ 44-46.

Assault weapons are a purely modern phenomenon. The first assault rifle was not developed until World War II. Yurgealitis Decl. ¶ 20. The AR-15 (later the M-16) was not designed until the mid-1950s, and even then, was designed solely for military use. *Id*. ¶ 27. AR-15s did not begin to sell in significant numbers among the civilian public until the late 2000s—particularly after the 2012 Sandy Hook Elementary shooting. Busse Decl. ¶14. LCMs, too, are a modern phenomenon with military roots—part and parcel of the dramatic change in commercially available weapons technology. Yurgealitis Decl. ¶¶ 59-60; Busse Decl. ¶ 40.

The AR-15 and other modern assault weapons—especially when equipped with LCMs—are extraordinarily lethal, far beyond what was conceivable at the Founding, or even in the early 20th century.  *See, e.g.*, Cornell Decl. ¶ 28; Busse Decl. ¶¶ 10, 44-45; Roth Decl. ¶¶ 12, 53 ("The danger these firearms pose is intrinsically different from past weaponry.").  And this dramatically increased lethality has contributed to a modern crisis of mass shootings unparalleled in the Nation's history.  *See Brown*, 2022 WL 17454829, at *12-13.  During the Founding era, homicide rates were low, and "[g]uns were not the weapons of choice in homicides that grew out of the tensions of daily life" because of the practical limitations of the heavy, single-shot manually loaded firearms of the time. Roth Decl. ¶¶ 14-17; Cornell Decl. ¶ 26.  As a result, the Founding generation was never confronted with the kind of gun violence that plagues modern America. Cornell Decl. ¶ 27; *see* Roth Decl. ¶ 41.

In fact, from 1776 to 1949, there were no mass shootings involving ten or more fatalities.  Klarevas Decl. ¶¶ 17.  After the first such mass shooting in 1949, a few others occurred from the mid-1960s to early-1980s, but after a spike in the 1980s, the federal assault weapons and LCM ban slowed the trend.  *Id.* ¶¶ 18 & Table 6, Figures 9 & 10, 19-21.  Since that law expired in 2004, however, there have been at least 20 mass shootings with double-digit fatalities, *id.* ¶ 20, and that number continues to climb.  Because high-fatality mass shootings are strongly

correlated with assault weapons and LCMs, and mass shootings involving assault weapons and/or LCMs result in a substantially higher loss of life, assault weapons and LCMs pose an extraordinary threat to the safety of American society—a threat that did not exist in 1791 or 1868.  Klarevas Decl. ¶¶ 10, 12.

This case, therefore, implicates "unprecedented societal concerns" and "dramatic technological changes," warranting a "more nuanced approach" to the search for historical analogues.  *Bruen*, 142 S. Ct. at 2132.

> **2.      Governments Throughout the Nation's History Have Regulated Unusually Dangerous Weapons and Weapons Associated with Criminal Activity.**

The Nation's history makes clear that governments may regulate the "dangerous and unusual weapons" of the day.[29]  *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627); *see, e.g.*, *Brown*, 2022 WL 17454829, at *12-14 & n.20 (LCM ban "consistent with the Nation's historical tradition of firearm regulation"

---

[29] *Heller* referred to both "dangerous *and* unusual weapons" and "dangerous *or* unusual weapons."  554 U.S. at 623, 627.  There are notable historical references—including by Blackstone—to "dangerous *or* unusual weapons."  *See* Cornell Decl. ¶ 9 & n. 9; *see also O'Neill v. State*, 16 Ala. 65, 67 (1849); *State v. Lanier*, 71 N.C. 288, 289 (1874); *English v. State*, 35 Tex. 473, 476 (1872).  It is "also possible that the phrase was an example of an archaic grammatical and rhetorical form hendiadys," Cornell Decl. ¶ 9 & n.9, "in which two terms separated by a conjunction work together as a single complex expression," and "their meanings are melded"—here, meaning an unusually dangerous weapon.  Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688-89 (2016).

given historical regulations on "Bowie knives, blunt weapons, slingshots, and trap guns"). Indeed, "new technologies bred new laws," Cornell Decl. ¶ 63; *see* Spitzer Decl. ¶¶ 8, 11, and Hawaii's law restricting assault pistols and LCMs fits squarely within that tradition; it is "part of a pattern in America's history of legislative restrictions on particular weapons stretching back centuries." Spitzer Decl. ¶ 11.

**Clubs and Blunt Objects.** The first restrictions on weapons used for criminality, rather than self-defense, were restrictions on clubs and other blunt instruments. Prior to the Founding, and as early as 1664, states enacted regulations banning or restricting the carry of clubs, including bludgeons, billy clubs, slingshots, and sand clubs. Spitzer Decl. ¶¶ 75-82. Restrictions of slingshots, for example, arose mainly in the 1800s, in response to their frequent use by criminals and gang members. *Id.* ¶ 79. By the 19th century, every state in the Nation had such blunt-weapon restrictions. *Id.* ¶¶ 75-82 & Ex. C.

**Gunpowder.** In the early republic, states and localities played a role in regulating "every aspect of the manufacture, sale, and storage" of gun powder. Cornell Decl. ¶ 44. These regulations were meant to protect public safety—a traditional part of the States' police power retained after ratification of the Constitution. *Id*. ¶¶ 42-43; *Brown v. Maryland,* 25 U.S. 419, 443 (1827). New York and New Hampshire, for example, limited the amount of gunpowder a citizen could store in his home. 1784 N.Y. Laws 627, ch. 28; 1786 N.H. Laws 383, § 1.

Massachusetts forbade any person to "take into any Dwelling-House, Stable, Barn, Out-House, Warehouse, Store, Shop, or other Building, within the Town of Boston, any … Fire-arm, loaded with, or having Gun-Powder." 1783 Mass. Acts 218, ch. 13. Other states, like Connecticut, went further, allowing local officials to determine whether the "quantity of gun powder" in possession of a private citizen "may endanger the persons or dwellings of any individuals whatsoever." 1832 Conn. Acts 391, ch. 25, §§ 1-2. If so, officials could order the owner to move their gun powder. *Id*.

**Trap Guns.** As weapons technology became more advanced, legislatures began to target specific types of dangerous or concealable weapons, used more often for criminal activity than self-defense, including the trap gun. Designed to protect residences or businesses while the owner was absent, trap guns were rigged to fire remotely, typically by a string or wire that caused the firearm to discharge when tripped. Spitzer Decl. ¶ 84. While designed to defend property from trespassers, the nature of trap guns made it impossible to distinguish between criminals and innocent individuals, shifting public opinion against these weapons. *Id.* ¶ 85. As early as 1771, states began to ban or restrict the use of trap guns. *Id.* ¶¶ 84, 87. In all, 16 states enacted trap gun laws from the late 18th century through the 20th century. *Id.* ¶ 87 & Exs. B, F.

33

**Concealable Weapons.**  In the 19th century, technological development in firearms and knives continued to increase—as did murder rates.  Roth Decl. ¶¶ 23-24, 28-34.  In response, states further regulated weapons that were particularly dangerous and susceptible to criminal activity.  Cornell Decl. ¶ 32; Spitzer Decl. ¶¶ 71-72, 74.  Many of these regulations focused on restricting access to weapons—including pistols—that were easily concealable.  For example, technological advances in the 1820s allowed for the development of so-called pocket pistols, which were designed to be easily hidden in a coat or pocket.  Roth Decl. ¶¶ 24-27; Spitzer Decl. ¶ 82.  Tennessee, for example, prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols."  1879 Tenn. Pub. Acts 81, *An Act to Preserve the Peace and to Prevent Homicide*, ch. 90, § 1; Cornell Decl. ¶ 34, n.67; Roth Decl. ¶ 36, n.82.  Multi-shot revolvers, which allowed for reloading via individual cartridges, were similarly regulated following the Civil War.  Criminals increasingly used these more efficient revolvers "in interpersonal assaults."  Roth Decl. ¶ 34.  As a result, many states began regulating multi-shot revolvers, often by amending prior regulations focused on concealable pistols.  *Id.* ¶¶ 35-40; Spitzer Decl. ¶ 49.

**Bowie Knives.**  In addition to regulations on concealable firearms, many states imposed restrictions on Bowie knives.  Spitzer Decl. ¶¶ 63-72; Roth Decl. ¶¶

25-26.  Bowie knives have a long blade and hand guard, specifically designed for fighting, and were used frequently in duels and other criminal activities in the 19th century.  Spitzer Decl. ¶ 64.  Forty-nine states and D.C. restricted the use of these weapons; 15 states banned individuals from carrying them in public.  Spitzer Decl. ¶ 71, Ex. H.  In upholding a conviction for carrying a Bowie knife, the Tennessee Supreme Court remarked that "[t]he design, meaning, and intent [of the restriction] was to guard against the destruction of human life, by prohibiting [weapons] the only use of which is to kill."  Spitzer Decl. ¶ 67 (quoting *Haynes v. Tennessee*, 24 Tenn. 120, 123 (1844)).

**Semi-Automatic and Automatic Weapons and LCMs.**  In the 20th century, the advent of automatic and semi-automatic weapons created—for the first time—concern with mass shootings perpetrated by one shooter.  As these new technologies of unprecedented lethality "began to spread in civil society and be used for criminal or other dangerous purposes," regulations followed.  Spitzer Decl. ¶ 20.  The first fully automatic machine gun was developed during World War I to create devastation on the battlefield.  *Id*. ¶ 12.  Then a lighter, handheld machine gun—the Tommy gun—was invented and quickly became a preferred tool for criminals.  *Id.* ¶ 13.  The threat of violence posed by these newly accessible machine guns caused state legislatures to quickly enact laws restricting them.

Between 1925 and 1934, at least 32 states enacted laws targeting automatic and semi-automatic weapons.  Spitzer Decl. ¶ 23, Exs. B, D.

In 1928, the National Conference of Commissioners on Uniform State Laws published a model law prohibiting possession of "any firearm which shoots more than twelve shots semi-automatically without reloading."  Spitzer Decl. ¶ 22.  In 1932, Congress banned certain automatic and semiautomatic weapons—"any firearm which shoots automatically or semiautomatically more than twelve shots without reloading"—in D.C.  *Id.* ¶ 23.  The NRA endorsed D.C.'s ban and suggested it could be "used as a guide throughout the states of the Union."  *Id.* (quoting S. Rep. No. 72-575, at 5-6 (1932)).  With D.C., as many as 10 other states enacted new laws restricting automatic and semi-automatic weapons.  *Id.* ¶ 28, Exs. B, D.  And in 1934, Congress enacted the National Firearms Act, which heavily regulates automatic weapons.[30]  *Id.* ¶ 24; Roth Decl. ¶ 47.

During the same period, at least 23 states restricted ammunition magazines or round capacity.  Spitzer Decl. ¶¶ 30-32, Table 1.  Ten states and D.C. regulated semi-automatic and fully automatic weapons.  *Id.* ¶ 31, n.43, Ex. D.  Eleven states regulated only fully automatic weapons, but defined the regulation by the number of rounds that could be fired without reloading or the ability to use ammunition

---

[30] The National Firearms Act imposed similar restrictions on other weapons that were frequently used in criminality but had no legitimate self-defense purpose, such as sawed-off shotguns and silencers.  Spitzer Decl. ¶ 24.

feeding devices.  *Id.* ¶ 31, n.44., Ex. D.  And 4 states restricted all firearms capable of receiving ammunition or round feeding mechanisms and firing them continuously.  *Id.* ¶ 31, n.45, Ex. D.  These bans on automatic and semi-automatic weapons were the latest iteration of a historical tradition of restricting unusually dangerous weapons not well-suited, or frequently used, for self-defense.  *See Heller*, 554 U.S. at 627; *Duncan*, 19 F.4th at 1122 (Berzon, J., concurring).

In sum, these earlier restrictions disallowed certain weapons with particularly dangerous features or unique lethality, while leaving other arms available for self-defense.  Hawaii's law falls well within this tradition.

### 3.   Hawaii's Law is Relevantly Similar to the Historical Analogues.

Hawaii's restrictions on assault pistols and LCMs impose a minimal burden on the right of armed self-defense that is comparable to, or even lesser than, the burdens imposed by the historical analogues above.  *See Brown*, 2022 WL 17454829, at *14 (LCM prohibition imposed "minimal" burden and "d[id] not impose a greater burden on the right to self-defense than did analogous historical regulations"); *see also Duncan*, 19 F.4th at 1104 (LCM prohibition "impose[d] only a minimal burden on . . . the Second Amendment right").[31]

---

[31] Despite Plaintiffs' efforts to paint Hawaii's law as a "blanket prohibition on two classes of arms," *see* Dkt. No. 24 at PageID # 123, the challenged provisions do not, in fact, ban any "entire class of arms" at all.  Hawai'i law prohibits only a subset of arms and magazines, *i.e.*, only "magazines of a particular capacity[] and

The gunpowder laws enacted by states in the early Republic similarly affected the right of self-defense by preventing the keeping of loaded guns or limiting where and how much gunpowder could be kept in the home. *See* Cornell Decl. ¶¶ 42-44. Indeed, gunpowder laws imposed a greater burden than the LCM prohibition because, unlike Hawaii's law, they restricted the total amount of ammunition an individual could own or access. And Hawaii's law is likewise similar to the sweeping regulations restricting the carrying and at times the sale and possession of concealable weapons like Bowie Knives and pocket pistols, as well as the restrictions on blunt weapons and trap guns. These regulations, which date back to the Founding, have served to protect the public from highly dangerous weapons that were, or still are, of little use for self-defense.

---

semiautomatic assault [pistols] that have certain combat-style features." *Worman*, 922 F.3d at 37; *see also Duncan*, 19 F.4th at 1107 (LCM law "bans merely a subset (large-capacity) of a part (a magazine) that some (but not all) firearms use"). And Plaintiffs themselves acknowledge that it is only "certain semi-automatic firearms" that they are prohibited from owning under Hawaiʻi law. Dkt. 21 at Page ID # 101. As a result, Hawaiʻi law burdens Plaintiffs' alleged Second Amendment rights far less than the handgun restrictions at issue in *Heller* and *Bruen*, because it does not restrict *any* "entire class of 'arms,'" let alone one that is "overwhelmingly chosen by American society" for the purpose of self-defense. 554 U.S. at 628. *See supra* Part I.B.2 (discussing how both assault pistols and LCMs are unsuitable for and rarely used for self-defense); *see also Duncan*, 19 F.4th at 1104 (holding that a ban on LCMs imposes only a "minimal burden" on the right to self-defense in part because it does not limit the amount of firearms, bullets, or magazines an individual can possess); *id.* at 1115 (Graber, J., concurring) (finding that "a ban on large capacity magazines leaves open ample alternative means of self-defense).

38

Hawaii's law is also comparably justified.  It is driven by the same concern that motivated regulations of weapons throughout our Nation's history: the need to protect public safety—specifically against the threat of unusually lethal weapons susceptible to criminal misuse.  The states that regulated gunpowder possession and storage, the states that regulated concealable weapons, and the states that regulate semi-automatic weapons and LCMs today have all responded to emerging threats to public safety by regulating particularly dangerous weapons.  Today's urgent threat is the rise in mass shootings facilitated by modern weapons technology, and studies show that prohibitions on assault weapons and LCMs reduce the incidence and impact of mass shootings, thereby saving lives.  *See* Klarevas Decl. ¶¶ 30-45; *see Brown*, 2022 WL 17454829, at *14.  Assault weapons with LCMs have tragically played a central role in many of the deadliest mass shootings our Nation has experienced,[32] *see* Yurgealitis Decl. ¶ 80, and Hawaiʻi has justifiably acted in response to this pressing public safety concern—the same kind of concern that motivated comparable historical restrictions.

---

[32] The mass shootings committed with assault pistols include: the 1999 Columbine High School shooting (13 fatalities, 23 wounded); the 2019 Dayton, Ohio shooting (9 fatalities, 27 wounded); the 2021 Boulder, Colorado shooting (10 fatalities); and last month's shooting at a Monterey Park, California dance studio (11 fatalities, 9 wounded).  Violence Policy Center, *Mass Shootings in the United States Involving Large Capacity Ammunition Magazines* (last updated Feb. 7, 2023), https://vpc.org/fact_sht/VPCshootinglist.pdf.

## II.   Plaintiffs Have Not Satisfied the Other Preliminary Injunction Factors.

Plaintiffs must affirmatively establish that they satisfy each of the preliminary injunction factors, but their motion makes virtually no effort to carry their burden on irreparable harm, the balance of the equities, and the public interest.  Instead, Plaintiffs baldly assert that they have satisfied those factors because they have demonstrated a constitutional violation.  Dkt. 24 at PageID # 130-31.  But even accepting Plaintiffs' reduction of the entire preliminary injunction analysis to the first factor—which is contrary to Ninth Circuit authority, *see Brown*, 2022 WL 17454829, at *18—Plaintiffs' analysis fails because they have not actually shown that they are likely to succeed on the merits, as explained above.

Plaintiffs' motion also fails based on an independent analysis of the non-merits preliminary injunction factors.  As to irreparable harm, Plaintiffs' case is undercut by the passage of time.  Plaintiffs seek to preliminarily enjoin provisions that the Hawaiʻi Legislature passed in 1992—*30 years* before Plaintiffs filed suit.  Plaintiffs also waited an additional 73 days after filing suit to seek a preliminary injunction, undermining any assertion that the extraordinary remedy of a preliminary injunction is necessary to prevent irreparable harm.  *See, e.g.*, *Oakland Trib., Inc. v. Chron. Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and

irreparable harm.").[33]  The irreparable harm to the State, by contrast, is clear: "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (cleaned up).[34]

The balance of the equities and the public interest also overwhelmingly favor the State.[35]  "The Ninth Circuit instructs that when balancing the hardships 'of the public interest against a private interest, the public interest should receive greater weight.'"  *Rupp v. Becerra*, No. 8:17-CV-00746-JLS-JDE, 2018 WL 2138452, at *13 (C.D. Cal. May 9, 2018) (quotation omitted).  Here, it is so clear that the public interest outweighs Plaintiffs' private interests—and that the public interest does *not* favor an injunction—that Plaintiffs' motion could readily be denied on that basis alone.  *See, e.g.*, *Baird*, 2022 WL 17542432, at *6 (denying a

---

[33] *See also Garcia*, 786 F.3d at 746 ("Garcia waited months to seek an injunction . . . ; she did not seek emergency relief when the film first surfaced on the Internet."); *Smith v. Biden*, No. 1:21-cv-19457, 2021 WL 5195688, at *9 (D.N.J. Nov. 8, 2021) ("[T]he fact that Plaintiffs waited nearly two (2) months to seek relief dispels any claim of irreparable harm.'"); *Wise v. Inslee*, No. 2:21-cv-0288-TOR, 2021 WL 4951571, at *6 (E.D. Wash. Oct. 25, 2021) (approximately two-month delay in seeking emergency injunctive relief "'implies a lack of urgency and irreparable harm'").
[34] Even if Plaintiffs were to argue that their ability to engage in self-defense would suffer absent an injunction, that would not satisfy the irreparable injury requirement.  The provisions at issue cover only assault pistols and LCMs, a *small fraction* of the firearms and magazines potentially available to Plaintiffs to defend themselves.
[35] "When the government is a party, the[] last two factors merge."  *Jewell*, 747 F.3d at 1092.

41

preliminary injunction motion based solely on the plaintiffs' failure to satisfy the balance of harms and public interest factors).

Assault pistols and LCMs present grave public safety concerns.  It is well-documented that assault weapons and LCMs are disproportionately used in mass shootings, *see, e.g.*, Klarevas Decl. ¶ 12, which "have become a weekly—and sometimes daily—event," *Ocean State*, 2022 WL 17721175, at *18.  The public safety concerns with frequent mass shootings are particularly acute with respect to assault weapons—including assault pistols—given their capacity for mass destruction and devastation.  These weapons have military features that "pose heightened risks to innocent civilians and law enforcement officers—certainly because of the capability to penetrate building materials and soft body armor, but also because of an amalgam of other capabilities that allow a shooter to cause mass devastation in a very short amount of time." *Kolbe*, 849 F.3d at 139.  The injuries caused by assault weapons—including assault weapons equipped with LCMs—can be devastating.  As noted by Dr. Christopher Colwell, a physician at the scene of the Columbine High School shooting, "assault weapons—including assault pistols—tend to cause far greater damage" than non-assault weapons "to the muscles, bones, soft tissue, and vital organs," which are "too often shredded

beyond repair." Colwell Decl. ¶ 9.[36]  Assault weapons have caused "many of the most devastating injuries" Dr. Colwell has managed in his "over 25 years of experience treating gunshot wound victims.  *Id.* ¶ 12.

LCMs also have the capacity to increase lethality and cause mass devastation by "enabl[ing] shooters to inflict mass casualties while depriving victims and law enforcement officers of opportunities to escape or overwhelm the shooters while they reload their weapons." *Kolbe*, 849 F.3d at 127; Klarevas Decl. ¶ 27 ("LCMs increase kill potential").  Even the potentially brief pause caused by "[a] gunman's need to reload twice using three ten-round magazines instead of a single thirty-round magazine . . . saves lives." *Ocean State*, 2022 WL 17721175, at *19.  This is not "mere[] conjecture"; it is borne out by "society's experience with what is now a catastrophic number of these incidents," including, for example, the "eleven children who escaped the Sandy Hook massacre during an apparent reloading[.]" *Id.* at *19, *21; *see also* Klarevas Decl. ¶¶ 30-31.

The laws Plaintiffs challenge—passed following several deadly mass shootings—are intended to help protect the public, including law enforcement, from these potential harms.  *See, e.g.*, Yurgealitis Decl. ¶ 82; Klarevas Decl. ¶¶ 39,

---

[36] *See also* Gina Kolata & C.J. Chivers, *Wounds From Military-Style Rifles? 'A Ghastly Thing to See,'* N.Y. Times, Mar. 4, 2018, https://www.nytimes.com/2018/03/04/health/parkland-shooting-victims-ar15.html; *Why do mass shooters choose the AR-15 style rifle?*, 60 Minutes, https://youtu.be/weG-QtQx2-0.

42. They have such a clear connection to public safety that it cannot possibly be in the public interest to preliminarily enjoin them. *See Worman*, 922 F.3d at 37 ("[T]he use of semiautomatic assault weapons implicates the safety of the public at large. After all, such weapons can fire through walls, risking the lives of those in nearby apartments or on the street."); *Coal. of N.J. Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 686 (D.N.J. 1999) ("The rational link between public safety and a law proscribing possession of assault weapons is so obvious that it would seem to merit little serious discussion.").

Even a preliminary injunction of short duration could have a tremendous impact on the public. For starters, it would allow assault pistols and LCMs to suddenly flood the market.[37] As other courts have noted, the resulting risks to the public are serious. *See, e.g.*, *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) (noting that "miscalculat[ion] as to Second Amendment rights" could result in "some unspeakably tragic act of mayhem"); *Tracy Rifle*, 118 F. Supp. 3d at 1193 ("The costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be

---

[37] *See* Matthew Green, *Gun Groups: More Than A Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED, Apr. 12, 2019, https://www.kqed.org/news/11740000/gun-groups-more-than-a-million-high-capacity-magazines-flooded-california-during-weeklong-suspension-of-ban (noting that "[m]ore than a million [LCMs] flooded into California during a one-week window created when a federal judge temporarily threw out the state's ban" in what the Gun Owners of California president characterized as a "frenzy").

grave.").  Under these circumstances—and given that the very objective of the

provisions at issue is public safety—a preliminary injunction is plainly not in the

public interest, and therefore may not issue.  *See Rupp*, 2018 WL 2138452, at *13.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court

deny Plaintiffs' motion for preliminary injunction.

DATED:  Honolulu, Hawaiʻi, February 15, 2023.

*/s/ Kalikoʻonālani D. Fernandes*
KIMBERLY T. GUIDRY
EWAN C. RAYNER
KALIKOʻONĀLANI D. FERNANDES
NICHOLAS M. MCLEAN

Attorneys for Defendant ANNE E. LOPEZ,
in her official capacity as Attorney General
for the State of Hawaiʻi