IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS; RONDELLE AYAU; JEFFREY BRYANT, | Civil No. 1:22-cv-404-DKW-RT |
| Plaintiffs, | **DECLARATION OF SAUL CORNELL** |
| v. | |
| ANNE E. LOPEZ, in her official capacity as Attorney General for the State of Hawai'i, | |
| Defendant. | |

**DECLARATION OF SAUL CORNELL**

I, Saul Cornell, declare under penalty of law that the following is true and correct:

1.    I have been asked by the Department of the Attorney General of the State of Hawai'i to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution.  In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence.  This modality of

# EXHIBIT "4"

constitutional analysis requires that courts analyze history and evaluate the

connections between modern gun laws and earlier approaches to firearms

regulation in the American past.  My declaration explores these issues in some

detail.  Finally, I have been asked to evaluate the statute at issue in this case,

particularly regarding its connection to the tradition of firearms regulation in

American legal history.

2.     This declaration is based on my own personal knowledge and

experience, and if I am called to testify as a witness, I could and would testify

competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.     I am the Paul and Diane Guenther Chair in American History at

Fordham University.  The Guenther chair is one of three endowed chairs in the

history department at Fordham and the only one in American history.  In addition

to teaching constitutional history at Fordham University to undergraduates and

graduate students, I teach constitutional law at Fordham Law School.  I have been

a Senior Visiting research scholar on the faculty of Yale Law School, the

University of Connecticut Law School, and Benjamin Cardozo Law School.  I

have given invited lectures, presented papers at faculty workshops, and

participated in conferences on the topic of the Second Amendment and the history

of gun regulation at Yale Law School, Harvard Law School, Stanford Law School,

UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

    4.    My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2]  My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals.  I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3]  Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined.  I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No.

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* **Exhibit A**.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

2018 CV 30581 (Colo. D. Ct., Boulder Cty.), *Zeleny v. Newsom*, No. 14-cv-02850

(N.D. Cal.), and *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*,

3:19-cv-01226-L-AHG (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.);

*Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-

01537-BEN-JLB (S.D. Cal.); *Worth v. Harrington*, No. 21-cv-1348 (D. Minn.);

and *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.).

## RETENTION AND COMPENSATION

5.      I am being compensated for services performed in the above-entitled

case at an hourly rate of $750 for reviewing materials, writing, research,

participating in meetings, and preparing reports; $1,000 per hour for depositions

and court appearances; and an additional $500 per day for travel time.  My

compensation is not contingent on the results of my analysis or the substance of

any testimony.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

6.      The opinion I provide in this declaration is based on my review of the

amended complaint filed in this lawsuit, my review of the state laws at issue in this

lawsuit, my education, expertise, and research in the field of legal history.

Additionally, my conclusions draw on a detailed review and analysis of the

primary sources, secondary sources, and other materials cited in the footnotes and

text of this report.  The opinions contained herein are made pursuant to a

reasonable degree of professional certainty.

## SUMMARY OF OPINIONS

7.      In *Bruen*, the Supreme Court underscored that text, history, and

tradition are the foundation of modern Second Amendment jurisprudence.

Understanding text, history, and tradition require a sophisticated grasp of historical

context.  One must canvass the relevant primary sources, secondary literature, and

jurisprudence to arrive at an understanding of the scope of permissible regulation

consistent with the Second Amendment.

8.      It is impossible to understand the meaning and scope of Second

Amendment protections without understanding the way it fits within the larger

context of American law, including the ways in which Americans in the Founding

era approached legal questions and rights claims.  In contrast to most modern

lawyers, the members of the First Congress who wrote the words of the Second

Amendment and the American people who enacted the text into law were well

schooled in English common law ideas.  Not every feature of English common law

survived the American Revolution, but there were important continuities between

English law and the common law in America.[4]  Each of the new states, either by

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776,

statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[5]  No legal principle was more important to the common law than the concept of the peace.[6]  As one early American justice of the peace manual noted:  "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7]  Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[8]

9.    In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of Blackstone's authority as a guide to how early Americans understood their inheritance from England. Specifically, Justice Kavanaugh stated in unambiguous terms that there was a "well established historical tradition of prohibiting the

---

DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

carrying of dangerous and unusual weapons."[9] The dominant understanding of
the Second Amendment and its state constitutional analogues at the time of their
adoption in the Founding period forged an indissoluble link between the right to
keep and bear arms with the goal of preserving the peace.[10]

10.    "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined
with the scope they were thought to have when the people adopted them."[11]
Included in this right was the most basic right of all: the right of the people to

---

[9] *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008), and n. 26.
Blackstone and Hawkins, two of the most influential English legal writers
consulted by the Founding generation, described these types of limits in slightly
different terms.  The two different formulations related to weapons described as
dangerous and unusual in one case and sometimes as dangerous or unusual in the
other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the
Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB.
L.J. 1695 (2012).  It is also possible that the phrase was an example of an archaic
grammatical and rhetorical form hendiadys, see Samuel Bray, *'Necessary AND
Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA
L. REV. 687 (2016).

[10] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF
LIBERTY (1775).  The modern terminology to describe this concept is "ordered
liberty."  *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937).  For a more recent
elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN,
ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University
Press, 2013).  On Justice Cardozo and the ideal of ordered liberty, see *Palko v.
Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty:
Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell,
*Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569
(2017).

[11] *Heller*, 554 U.S. at 634–35; William J. Novak*, Common Regulation:
Legal Origins of State Power in America,* 45 HASTINGS L.J. 1061, 1081–83 (1994);
Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the
Constitution,* 20 J. POL'Y HIST. 47 (2008).

regulate their own internal police.  Although modern lawyers and jurists are accustomed to thinking of state police power, the Founding generation viewed this concept as a right, not a power.[12]  The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms.[13]  Pennsylvania's Constitution framed this estimable right succinctly:  "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."  Thus, if Justice Scalia's rule applies to the scope of the right to bear arms, it must also apply to the scope of the right of the people to regulate their internal police, a point that Chief Justice Roberts and Justice Kavanaugh have each underscored.  The history of gun regulation in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this important point.

11.     In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased.  Indeed, the individual states

---

[12] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015); *see also* MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[13] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

exercised their police powers to address longstanding issues and novel problems created by firearms in American society.  In particular, the states regulated and when appropriate prohibited categories of weapons deemed to be dangerous *or* unusual.

## I.   THE HISTORICAL INQUIRY REQUIRED BY *BRUEN, MCDONALD,* AND *HELLER*

12.    The United States Supreme Court's decisions in *Heller*, *McDonald*[14], and *Bruen* have directed courts to look to text and history for guideposts in evaluating the scope of permissible firearms regulation under the Second Amendment.  In another case involving historical determinations, Justice Thomas, the author of the majority opinion in *Bruen*, has noted that judges must avoid approaching history, text, and tradition with an "ahistorical literalism."[15]  Legal texts must not be read in a decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts.[16]

13.    Following the mandates set out in *Heller, McDonald* and more recently in *Bruen*, history provides essential guideposts in evaluating the scope of

---

[14] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).
[15] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (Thomas, J.) (criticizing "ahistorical literalism").
[16] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

permissible regulation under the Second Amendment.[17]  Moreover, as *Bruen* makes clear, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[18]  The Court acknowledged that when novel problems created by firearms are issue the analysis must reflect this fact:  "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Bruen* differentiates between cases in which contested regulations are responses to longstanding problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

14.     In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[19]  Indeed, such research is still ongoing: new materials continue to emerge; and in the months since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[20]

---

[17] *Bruen*, 142 S. Ct. 2111.

[18] *Id*.

[19] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[20] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495

15.    Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence:  "Like most rights, the right secured by the Second Amendment is not unlimited.  From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Crucially, the Court further noted that "we do think that *Heller* and *McDonald* point toward at least two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense."[21]

16.    One overarching principle regarding firearms regulation does emerge from this period and it reflects not only the common law assumptions familiar to the Founding generation, but it is hard-wired into the Second Amendment itself. As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of interest balancing undertaken by the people themselves in framing the federal Constitution and the Bill of Rights. Although "free-standing balancing" is precluded by *Heller*, the plain meaning of the text recognizes a role for regulation explicitly and further underscores that actions inimical to a free state fall outside of the scope of the right instantiated in

---

(2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).
  [21] *Bruen*, 142 S. Ct. at 2132–33.

the text.[22]  Thus, from its outset the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state.  An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment.  Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complementary.  Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear.  The First Amendment prohibits "abridging" the rights it protects.  In standard American English in the Founding era, to "abridge" meant to "reduce."  Thus, the First Amendment prohibits a diminishment of the rights it protects.  The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[23]  In Founding-era American English, the word "infringement" meant to "violate" or "destroy."  In short, when read with the

---

[22] *Heller*, 554 U.S. at 626–28.

[23] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation:  "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201.  This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text.  Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long such regulations did not destroy the underlying *right*.

17.    John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law.  Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature.  True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.[24]

18.    Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[25]  And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[26]  Samuel Johnson's *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to

---

[24] *Liberty,* A NEW LAW DICTIONARY (1792) *See  also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[25] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[26] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

break laws or contracts" or "to destroy; to hinder."[27]  Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[28]  And Noah Webster's *An American Dictionary of the English Language* (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[29]  Although today the two terms are  conflated by some, the meanings of abridge and infringe were and remain distinct. The Founding generation was far more nuanced in distinguishing between the differences between these two terms.

19.     Regulation, including robust laws, were not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[30]  As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution:  "True liberty consists, not in having *no government*, not in a

---

[27] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[28] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[29] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

[30] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions); Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

*destitution of all law*, but in our having an equal voice in the formation and

execution of the laws, according as they effect [*sic*] our persons and property."[31]

By allowing individuals to participate in politics and enact laws aimed at

promoting the health, safety, and well-being of the people, liberty flourished.[32]

20.     The key insight derived from taking the Founding era conception of

rights seriously and applying the original understanding of the Founding era's

conception of liberty is the recognition that regulation and liberty were not

antithetical to one another.  The inclusion of rights guarantees in constitutional

texts was not meant to place them beyond the scope of legislative control.  "The

point of retaining natural rights," originalist scholar Jud Campbell reminds us "was

not to make certain aspects of natural liberty immune from governmental

regulation.  Rather, retained natural rights were aspects of natural liberty that could

be restricted only with just cause and only with consent of the body politic."[33]

---

[31] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

[32] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

[33] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate*

Rather than limit rights, regulation was the essential means of preserving rights, including self-defense.[34]  In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[35]  The individual states also imposed loyalty oaths, disarming those who refused to take such oaths.  No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties. Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were

---

*Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016) *s* (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[34] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017).  Campbell's work is paradigm-shifting, and it renders Justice Scalia's unsubstantiated claim in *Heller* that the inclusion of the Second Amendment in the Bill of Rights placed certain forms of regulation out of bounds totally anachronistic.  This claim has no foundation in Founding-era constitutional thought, but reflects the contentious modern debate between Justice Black and Justice Frankfurter over judicial balancing; on Scalia's debt to this modern debate, *see generally* SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

[35] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[36]

21.     In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.  As long as such laws did not destroy the right of self-defense, the individual states enjoyed broad latitude to regulate arms. [37]

## II.   FROM MUSKETS TO PISTOLS: CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION

22.     Guns have been regulated from the dawn of American history.[38]  At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[39] Fortunately, a burgeoning body of scholarship has illuminated both topics,

---

[36] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999).

[37] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[38] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[39] *Id.*

deepening scholarly understanding of the relevant contexts needed to implement *Bruen*'s framework.[40]

23.    The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework.  The entire body of the common law was designed to preserve the peace.[41]  Statutory law, both in England and America functioned to further secure the peace and public safety.  Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[42]  To deny such an authority would be to convert the Constitution into a suicide pact and not a charter of government. The Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[43]

24.    *Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a

---

[40] Ruben & Miller, *supra* note 19, at 1.

[41] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[42] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

[43] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[44]  Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[45]

25.    Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment.  A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment.[46]

26.    The surviving data from New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early American gun policy and relate it to early American gun culture.[47]  Levels of

---

[44] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).
[45] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006).
[46] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).
[47] It is important to recognize that there were profound regional differences in early America.  *See* JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL

gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America. These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the tribal populations of the region. The data presented in Figure 1 is based on the pioneering research of Ohio State historian Randolph Roth. It captures one of the essential facts necessary to understand what fears motivated American gun policy in the era of the Second Amendment. The pressing problem Americans faced at the time of the Second Amendment was that citizens were reluctant to purchase military-style weapons which were relatively expensive and had little utility in a rural society. Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[48] Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life. Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy,

---

DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF AMERICAN CULTURE (1988). These differences also had important consequences for the evolution of American law. *See generally* David Thomas Konig, *Regionalism in Early American Law*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

[48] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.[49]

27.   Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period.  Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes.  Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge.  Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth, as many today assume.  As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded.  Why do they always show the gun over the fireplace?  Because that's the warmest, driest place in the house."[50]  Similar problems also limited the utility of muzzle-loading pistols as practical tools for self-defense or criminal offenses.  Indeed, at the time of the

---

[49] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW REPUBLIC (2001).

[50] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

Second Amendment, over 90% of the weapons owned by Americans were long guns, not pistols.[51]

**Figure 1**



Figure 2.3  Unrelated-adult homicide rates in New England by race, 1677–1797 (per 100,000 persons per year).

28.     As Roth's data makes clear, there was not a serious homicide problem looming over debates about the Second Amendment.  Nor were guns the primary weapon of choice for those with evil intent during this period.[52]  The skill and time required to load and fire flintlock muzzle loading black powder weapons meant that they were less likely to be used in crimes of passion.  The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge.

---

[51] Sweeney, *supra* note 48.
[52] HAAG, *supra* note 44.

29.     The Founding generation did not confront a gun violence problem similar in nature or scope to the ills that plague modern America. The Founding generation faced a different, but no less serious problem: American reluctance to purchase the type of weapons needed to effectively arm their militias. Despite repeated efforts to exhort and legislate to promote this goal, many states were failing to adequately equip the militia with suitable firearms that could withstand the rigors of the type of close-quarters hand-to-hand combat required by military tactics. A gun had to be able to receive a bayonet and serve as a bludgeon if necessary. The lightweight guns favored by the overwhelmingly rural population of early America were well designed to put food on the table and rid fields of vermin, but were not well suited to eighteenth-century ground wars. When the U.S. government surveyed the state of the militia's preparedness shortly after Jefferson took office in 1800, the problem had not been solved. Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[53]

30.     Government policy, both at the state and federal level, responded to these realities by requiring a subset of white citizens, those capable of bearing arms, to acquire at their own expense a military-quality musket and participate in

---

[53] Sweeney, *supra* note 48.

mandatory training and other martial activities.  Gun policy in the Founding era
reflected these realities, and accordingly, one must approach any analogies drawn
from this period's regulations with some caution when applying them to a modern
heterogeneous industrial society capable of producing a bewildering assortment of
firearms whose lethality would have been almost unimaginable to the Founding
generation.[54]  Put another way, laws created for a society without much of a gun
violence problem enacted at a time of relative gun scarcity, at least in terms of
militia weapons, have limited value in illuminating the challenges Americans face
today.

31.     Another aspect of Founding era gun policy that needs to be
acknowledged is the active role that government took in encouraging the
manufacturing of arms.  The American firearms industry in its infancy was largely
dependent on government contracts and subsidies.  Thus, government had a vested
interest in determining what types of weapons would be produced.[55]

32.     Government regulation of the firearms industry also included the
authority to inspect the manufactures of weapons and impose safety standards on

---

[54] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022).
[55] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

the industry.[56]  Western Massachusetts emerged as the leading small arms producer in America on the eve of the War of 1812.[57]  The federal armory in Springfield, Massachusetts began producing muskets in 1794 and took a leading role, serving as a spur to technological innovation in the region. In 1805 Massachusetts enacted a law requiring all guns to be inspected.  The law also required all guns sold to be marked and stamped by an inspector.

33.    Maine imposed a similar requirement on firearms in 1821 and continued the practice through the end of the century.[58]  These laws persisted throughout the nineteenth century. [59]

---

[56] 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . .. . ."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.")
[57] Lindsay Schakenbach Regele, MANUFACTURING ADVANTAGE: WAR, THE STATE, AND THE ORIGINS OF AMERICAN INDUSTRY, 1776–1848 (2019) at 63-65.
[58] The Revised Statutes of the State of Maine, Passed Janurary 25, 1871 326 (1871).
[59] 1 The General Statutes of the Commonwealth of Massachusetts: Enacted December 28, 1859, to Take Effect June 1, 1860 (2d ed., William A. Richardson & George P. Sanger, eds.) 255 (1873).

34.     The federal armory in Springfield, Massachusetts began producing muskets in 1794 and Western Massachusetts emerged as the leading small arms producer in America on the eve of the War of 1812.  The Springfield armory, a federal entity, was governed by federal law (not Massachusetts law) but it nonetheless extensively scrutinized and inspected all arms made at its facilities and any private gunsmiths under government contract.  This feature meant that such weapons were highly valued and were much sought after when any government surplus guns were sold to consumers.[60]

35.     In short, the market for firearms in early America shared very few features with the contemporary world of firearms commerce.  Gun shows, gun supermarkets, and internet sales are a few of the many ways Americans acquire firearms today.  Although estimates vary, there are now more guns than people in contemporary America.  Today's Americans are awash in sea of guns and have a myriad of choices when they wish to acquire a firearm.  Early America firearms production in the era of the Second Amendment, in contrast, was dominated by artisan production.  Local gun smiths, not big box stores such as Walmart, were responsible for selling firearms.  Most sellers and buyers of firearms in early

---

[60] Lindsay Schakenbach Regele, MANUFACTURING ADVANTAGE: WAR, THE STATE, AND THE ORIGINS OF AMERICAN INDUSTRY, 1776–1848 (2019) at 63-65.

America were members of the same community and needed to maintain an on-

going relationship with their local gun smith to keep their guns in good working

order.  These informal ties of kin and community that defined the close-knit

communities of early American meant that individuals were effectively vetted and

monitored by their neighbors in ways that share little with the largely anonymous

world of modern firearms commerce.  In addition, early American firearms were in

need of frequent repair, so much so that many gunsmiths devoted most of their

time to repair, not the manufacture or assembly of arms.[61]

36.   Although much of the supervision of this market was achieved

through these informal means, governments in early American did regulate the sale

of firearms and ammunition in multiple ways.[62]

37.   The calculus of individual self-defense changed dramatically in the

decades following the adoption of the Second Amendment.[63]  The early decades of

the nineteenth century witnessed a revolution in the production and marketing of

guns.[64]  The same technological changes and economic forces that made wooden

---

[61] Scott Paul Gordon, *The Ambitions of William Henry*, 136
PENNSYLVANIA MAGAZINE OF HISTORY AND BIOGRAPHY  253 (2012).
Pennsylvania was one of the main regions of early American gunsmithing, M.L.
Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY
AND TECHNOLOGY, 1492-1792 (1980).
[62]  Supra note 37.
[63] Cornell, *supra* note 3, at 745.
[64] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American*

clocks and other consumer goods such as Currier and Ives prints common items in many homes also transformed American gun culture.[65]  These same changes also made handguns and a gruesome assortment of deadly knives, including the dreaded Bowie knife, more common.  The culmination of this gradual evolution in both firearms and ammunition technology was the development of Samuel Colt's pistols around the time of the Mexican-American War.[66]  Economic transformation was accompanied by a host of profound social changes that gave rise to America's first gun violence crisis.  As cheaper, more dependable, and easily concealable handguns proliferated in large numbers, Americans, particularly southerners, began sporting them with alarming regularity.  The change in behavior was most noticeable in the case of handguns. [67]

38.    The response of states to the emergence of new firearms that threatened the peace was a plethora of new laws.  In sort, when faced with changes in technology, consumer behavior, and faced with novel threats to public safety, the individual states enacted laws to address these problems.  In every instance

---

*Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018).

[65] Sean Wilentz, *Society, Politics, and the Market Revolution*, in THE NEW AMERICAN HISTORY (Eric Foner ed., 1990).

[66] WILLIAM N. HOSLEY, COLT: THE MAKING OF AN AMERICAN LEGEND (1st ed. 1996).

[67] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 124-128 (2015).

apart from a few outlier cases in the Slave South, courts upheld such limits on the

unfettered exercise a right to keep and bear arms.  The primary limit identified by

courts in evaluating such laws was the threshold question about abridgement: did

the law negate the ability to act in self-defense.[68]  In keeping with the clear

imperative hard-wired into the Second Amendment, states singled out weapons

that posed a particular danger for regulation or prohibition.  Responding in this

fashion was entirely consistent with Founding-era conceptions of ordered liberty

and the Second Amendment.

  39. Not all guns were treated equally by the law in early America.  Some

guns were given heightened constitutional protection and others were treated as

ordinary property subject to the full force of state police power authority.[69]  The

people themselves acting through their legislatures retained the fundamental right

to determine which dangerous weapons were exempted from the full protection of

the constitutional right to keep and bear arms. The antebellum case law examined

by *Heller* makes clear that the metric used by courts to evaluate laws was simple

and reflected the concept of infringement. Laws that undermined the right of self-

---

[68] *Id.*

[69] Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 HASTINGS CONST. L.Q. 145 (2022).

defense were generally struck down, regulations that limited but did not destroy the right were upheld.[70]

40.     Some states opted to tax some common weapons to discourage their proliferation.[71] In particular, not all handguns were created equal in the eyes of the law.  During Reconstruction a number of states prohibited guns that were deemed to pose a particular risk because they were easily concealed.[72]

## III.   THE POLICE POWER AND FIREARMS REGULATION

41.     The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole,

---

[70] The best illustration of this rule is *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

[71] 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15. ("The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.").  Anderson Hutchinson, Code of Mississippi: Being an Analytical Compilation of the Public and General Statutes of the Territory and State, with Tabular References to the Local and Private Acts, from 1798 to 1848: With the National and State Constitutions, Cessions of the Country by the Choctaw and Chickasaw Indians, and Acts of Congress for the Survey and Sale of the Lands, and Granting Donations Thereof to the State (1848) at 182. *See also* 1866 Ga. Law 27, An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same.

[72] 1879 Tenn. Pub. Acts 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; 1881 Ark. Acts 192, An Act to Preserve the Public Peace and Prevent Crime, ch. XCVI (96), § 3.

exclusive and inherent right of governing and regulating the internal police of the same."[73]  The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[74]  By the early nineteenth century, the term "police" was a fixture in American law.[75]  Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[76]  The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

     42.     The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local

---

[73] PA. CONST. OF 1776, Ch. I, art iii.

[74] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[75] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[76] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[77]  The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers.  Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today.  Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority, including the authority to regulate guns and gunpowder.[78]

43.  Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible.  Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[79]  Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress."  States, he assured the American people during ratification, would continue to legislate on all matters

---

[77] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[78] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[79] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[80]  State police power authority was at its pinnacle in matters relating to guns or gunpowder.[81]

44.    Every aspect of the manufacture, sale, and storage of gunpowder was regulated. Firearms were also subject to a wide range of regulations, including laws pertaining to the manufacture, sale, and storage of weapons.[82]

45.    Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[83]  New York City even granted broad power to the government to search for gunpowder and transfer powder to the public magazine for safe storage:

> it shall and may be lawful for the mayor or recorder, or any two
> Alderman of the said city, upon application made by any inhabitant or
> inhabitants of the said city, and upon his or their making oath of
> reasonable cause of suspicion (of the sufficiency of which the said
> mayor or recorder, or Aldermen, is and are to be the judge or judges)
> to issue his or their warrant or warrants, under his or their hand and

---

[80] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[81] CORNELL, *supra* note 33.

[82]  Cornell and DeDino, *supra* note 37; public carry by contrast was limited by common law and criminal statutes, see, Cornell, *supra* note 43.

[83] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[84]

46.     The power to regulate firearms and gunpowder was therefore at the very core of the police power and inheres in both states and local municipalities. The application of the police power to firearms and ammunition was singled out as the quintessential example of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*.[85]  This was so even though gunpowder was essential to the operation of firearms at that time and gun powder regulations necessarily affected the ability of gun owners to use firearms for self-defense, both inside the home and outside.

47.     A slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning with the Marshall Court and continuing with the Taney Court.[86]

---

[84] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 191-2 (Thomas Greenleaf, ed., 1792).

[85] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

[86] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief overview, *see* "The Marshall Court, 1801-1835", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-

48.     Nor was Chief Justice John Marshall unique in highlighting the centrality of this idea to American law. [87]   The ubiquity of the police power framework for evaluating the constitutionality of legislation regarding firearms reflected the centrality of this approach to nearly every question of municipal legislation touching health or public safety in early America.[88]   Massachusetts Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger*, a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power.   Shaw described the police power in the following manner:

---

court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years 1836-1864. See "The Taney Court, 1836-1864", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/.

[87] In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN LAW (340) 464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[88] FREUND, *supra* note 75, at 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005); DUBBER, *supra* note 12; GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN GOVERNMENT, FROM THE FOUNDING TO THE PRESENT (Princeton Univ. Press, 2015).

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same.  It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise.  There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[89]

49.     In short, there was unanimous agreement among leading antebellum jurists, at both the federal and state level, that the regulation of arms and gunpowder was at the core of the police power enjoyed by legislatures.  Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[90]  A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gunpowder:

> Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the

---

[89] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851).  For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[90] CORNELL, THE POLICE POWER, *supra* note 34.

provisions of this Act, first having obtained a search warrant therefore according to law.[91]

50.      No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance.  Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged.  This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[92]  Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[93]  This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and

---

[91] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.

[92] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN AMERICA, 190-1900: LEGAL THOUGHT BEFORE MODERNISM (2013).

[93] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

where it shall cease, must mainly depend upon the evil to be remedied.[94]

51.     One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[95]  The case is a classic example of antebellum police power jurisprudence.  The Supreme Court of Alabama evaluated the statute by focusing on the scope of state police power authority over guns. "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[96]  In the court's view, the regulation of arms was at the very core of state police power.[97]  The judicial determination was straight forward: was the challenged law a legitimate exercise of the police power or not?

## IV.   RECONSTRUCTION AND THE EXPANSION OF STATE POLICE POWER TO REGULATE FIREARMS (1863-1877)

---

[94] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

[95] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

[96] *Id.* at 616.

[97] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms.  For a useful discussion of *Bliss* in terms of the police power, *see* FREUND, *supra* note 66, at 91.

52.      Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms.  These two rights were separate in the Founding era but were mutually reinforcing:  both rights were exercised in a manner that furthered the goal of ordered liberty.  Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the two together as one single constitutional principle.  This change reflected two profound transformations in American politics and law between 1776 and 1868. First, the judicial concept of police power gradually usurped the older notion of a police right grounded in the idea of popular sovereignty.  As a result, state constitutions no longer included positive affirmations of a police right.  Secondly, the constitutional "mischief to be remedied" had changed as well.[98]  Constitution writers in the era of the American Revolution feared powerful standing armies and

---

[98] The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng. Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and legislation had intended to remedy — continued to shape Anglo-American views of statutory construction, and legal interpretation more generally, well into the nineteenth century.  For Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra* note 8, at *61.  The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1 ZEPHANIAH SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S. Converse 1822).  For a modern scholarly discussion of the rule, *see* Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

sought to entrench civilian control of the military. By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists. In place of these ancient fears, a new apprehension stalked Americans: the proliferation of especially dangerous weapons and the societal harms they caused.[99]

53. The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the venerable right codified in 1776, linking the right to bear arms inextricably with the states broad police power to regulate conduct to promote health and public safety.[100] For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[101] Nor was Texas an outlier in

---

[99] *See McDonald*, 561 U.S. at 767–68

[100] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2022).

[101] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The

this regard.  Sixteen state constitutions adopted during this period employed

similarly expansive language.[102]  Millions of Americans living in the newly

organized western states and newly reconstructed states of the former confederacy

adopted constitutional provisions that reflected this new formulation of the right to

bear arms.  Thus, millions of Americans were living under constitutional regimes

that acknowledged that the individual states' police power authority over firearms

was at its apogee when regulating guns.[103]

54.     This expansion of regulation was entirely consistent with the

Fourteenth Amendment's emphasis on the protection of rights and the need to

regulate conduct that threatened the hard-won freedoms of recently free people of

the South and their Republican allies.  The goals of Reconstruction were therefore

intimately tied to the passage and enforcement of racially neutral gun

regulations.[104]

---

people have the right to bear arms for their security and defense; but the legislature
shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6
("[T]he people have the right to bear arms for their security and defense, but the
legislature may regulate the exercise of this right by law.").
   [102] Cornell, *supra* note 100, at 75–76.
   [103] *Id.*
   [104] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND
RECONSTRUCTION REMADE THE CONSTITUTION (2019); Brennan Gardner Rivas,
*Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS
L. REV. 2603 (2022).

55.     Reconstruction ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety.  Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gunpowder.  In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power.  As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[105]

56.     Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not lose their police power authority to the federal government.  The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[106]  As long as state

---

[105] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (20052006).

[106] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L.

and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good. [107]

57.     Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms.  Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[108] Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[109]

58.     Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[110] Indeed, even the most ardent critics of the police power, such as conservative legal

---

REV. 1043, 1058 (2010).
        [107] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).
        [108] *See* Spitzer, *supra* note 38, at 59–61 tbl. 1.
        [109] *Id.*
        [110] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

scholar Christopher G. Tiedeman, acknowledged that "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[111]

59.   In keeping with the larger goals of Reconstruction, Republicans sought to protect the rights of African-Americans to bear arms but were equally insistent on enacting strong racially neutral regulations aimed at public safety. Violence directed against African-Americans, particularly the campaign of terror orchestrated by white supremacist para-military groups prompted Republican dominated legislatures in the Reconstruction South to pass a range of racially neutral gun regulations.[112]   The racially neutral gun laws enacted by Republicans were in part a reaction to the discriminatory black codes passed by neo-confederate legislatures earlier in Reconstruction.   The Black Codes violated the Second Amendment, but the wave of firearms legislation passed by Republican controlled state legislatures in the South were consciously crafted to honor the Second Amendment and protect individuals from gun violence.[113]

---

[111] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

[112] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

[113] *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment,*

60.     The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns.   American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

61.     Another important change relevant to understanding firearms regulation in the Reconstruction era derives from changes in firearms technology, specifically the increased lethality of modern weapons.  The change in firearms technology between the era of the Second Amendment and Fourteenth Amendment was profound.  Firearms became more deadly, lighter, easier to use, more accurate, and required far less training to be effective than did the muskets of the eighteenth century.  Although comparisons of weapons from different eras is inherently subjective, one effort to compile a comparative lethality index for military weapons is instructive.  Military historian and defense analyst Trevor Dupuy's theoretical lethality index captures the exponential growth in the lethality of

---

*and Fractal Originalism,* 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

firearms between the era of the Second Amendment and the Fourteenth.  Of course, the lethality index, an intellectual construct developed to compare weapons on the battlefield offers an imperfect gauge for the increased lethality of modern weapons in a civilian context.  An attack on a school with an eighteenth-century musket could easily result in no casualties given the difficulty of using such weapons and the likelihood of misfiring.  The attack on Sandy Hook Elementary School and the scores of mass shootings in recent years would have been impossible using common eighteenth-century firearms.  The improvements associated with weapons in the Civil War era were significant, but they pale in comparison to the carnage that that modern semi-automatic weapons can inflict in densely populated areas and sensitive places.  Thus, Dupuy's innovative and useful scale, designed for battlefield comparisons invariably understates the increase in the level of destruction today's weapons can inflict upon a civilian population. [114]

---

[114] Darrell Miller and Jennifer Tucker, *Common Use Lineage, and Lethality* 55 U.C DAVIS. L. REV 2495, 2509 (2022).

**Dupuy's Theoretical Lethality Index[74]**

| Weapon | TLI |
|---|---|
| Sword, pike, etc. | 23 |
| Longbow | 36 |
| 17th c. musket | 19 |
| 18th c. flintlock | 43 |
| Early 19th c. rifle | 36 |
| Mid-19th c. rifle/conoidal bullet | 102 |
| Late 19th c. breech-loading rifle | 153 |
| Springfield Model 1903 rifle (magazine) | 495 |
| World War I machine gun | 3,463 |
| World War II machine gun | 4,973 |

Another important insight derived from Dupuy's work concerns the increased lethality of guns in the late nineteenth century. The expansion of gun laws after the Civil War, in part, reflects the improvements in firearms lethality and their wider availability to the civilian population. The ease of use of these weapons compared to earlier firearms also increased their popularity. The rise of easily concealed weapons, especially pocket pistols, contributed to rising urban crime and violence. In response to these developments states and localities enacted laws to regulate the baneful consequences of arms proliferation as they had done time and again in the decades following the adoption of the Second Amendment and its state analogs.[115]

## V.   *BRUEN*'S FRAMEWORK AND the Scope of Permissible Regulation

---

[115] *Supra* note 38.

47

62.     The power to regulate and in some cases prohibit dangerous or
unusual weapons has always been central to the police power authority of states
and localities.  At different moments in American history communities have
deemed particular categories of weapons to be especially dangerous and have
regulated them, and when it appeared necessary enacted bans on some types of
weapons.  Such determinations were not made based on technological features in
isolation but reflected the ancient common law tradition of singling out weapons
capable of producing a terror or that posed a particular threat to public safety.
Such weapons undermined the peace. As the Second Amendment's text makes
clear, weapons that undermine the security of a free state are not within the scope
of its protections.  Defining exactly which category of weapons have fallen outside
of the scope of constitutional protection has shifted over time as society has
addressed new developments in firearms technology, evolving societal norms, and
other changes.  In short, social and economic transformation were always
accompanied by legal transformation.  Put another way, as times change, the law
changes with them.[116]

63.     Political scientist Robert Spitzer's overview of the history of firearms
regulation underscores a basic point about American law:  "The lesson of gun
regulation history here is that new technologies bred new laws when circumstances

---

[116] Spitzer, *supra* note 38.

warranted."[117]  States and localities have regulated gunpowder and arms, since the earliest days of the American Republic.  The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present.  This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day.[118]  The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

64.    The metric used by courts to adjudicate questions about the scope of permissible regulation has remain constant over the long arc of American history. To constitute an infringement of the right the law must burden the right of self-defense to such a degree that it effectively negates it. As long as laws stay within this threshold they have been held to be constitutional.

/

/

/

/

/

---

[117] *Id.*
[118] Gerstle, *supra* note 88.

Executed on February  15, 2023 at Redding, CT.

_Saul Cornell_

_____

Saul Cornell