

# ASSAULT WEAPONS AND ACCESSORIES IN AMERICA

Firearms Policy Project
of the
Violence Policy Center

1834 18th Street, NW
Washington, D.C. 20009
(202) 265-1920

**EXHIBIT D (Klarevas)**

# Assault Weapons and Accessories in America

Josh Sugarmann

Executive Director
Violence Policy Center

September 1988

This study was funded in part by a grant from the
Educational Fund to End Handgun Violence.

Copyright 1988
Violence Policy Center

## TABLE OF CONTENTS

Introduction                                              p.   1

Assault Weapons Violence                                  p.   2

Drug Traffickers, Paramilitary Groups...                  p.   5

And Just Plain Folk                                       p.   8

Assault Weapons Marketing                                 p.   9

Assault Weapon Look-Alikes:  Airguns and Toy Guns         p.  10

Publications                                              p.  11

Accessories                                               p.  14

Paramilitary Training Camps and Combat Schools            p.  19

The Assault Weapons Debate                                p.  21

Conclusion                                                p.  26

Appendix I                                                p.  30

Appendix II                                               p.  32

Footnotes                                                 p.  34

## INTRODUCTION

Across America, the firepower in the hands of gun owners of varying stripes is increasing dramatically. The reason: assault weapons. Drug traffickers are finding that assault weapons--in addition to 'standard issue' handguns--provide the extra firepower necessary to fight police and competing dealers. Right-wing paramilitary extremists, in their ongoing battle against the "Zionist Occupational Government," have made these easily purchased firearms their gun of choice. And rank and file gun aficionados--jaded with handguns, shotguns, and hunting rifles--are moving up to the television glamour and movie sex appeal of assault weapons. The growing market for these weapons--coupled with a general rising interest in the non-sporting use of firearms--has generated an industry of publications, catalogs, accessories, training camps, and combat schools dedicated to meeting its needs.

Assault weapons are growing in popularity for a variety of reasons. For manufacturers, assault weapons are a necessary new product line in the wake of the mid-1980s decline in handgun sales. Yet, manufacturers didn't create a market, they recognized one. For criminals, the weapons look intimidating, have increased firepower, and can be purchased under the same controls as a hunting rifle or shotgun: that is, virtually none. For survivalists who envision themselves fending off a horde of desperate neighbors from their bomb shelters, the high ammunition capacity and other anti-personnel capabilities of assault weapons are exactly what is needed. And for fans of Rambo and "Miami Vice," assault weapons offer the look and feel of the real thing. Not surprisingly, this shift to increased firepower--in both criminal and law-abiding hands--has law enforcement worried.

The assault weapons threat is exacerbated by the fact that the weapons are difficult to define in legal terms. Legislators and members of the press have proposed placing increased restrictions on all semi-auto firearms, which would include some hunting rifles. Whether these proposals are merely the result of ignorance of the wide variety of firearms that are semi-automatic, or misguided efforts in the face of definitional problems, they only lend credence to the gun lobby's argument that restrictions on assault weapons are merely the first step toward banning all semi-automatic guns.

Assault firearms are semi-automatic (firing one bullet per trigger pull) and fully automatic (the weapon will keep on firing as long as the trigger is depressed) anti-personnel rifles, shotguns, and handguns that are designed primarily for military and law enforcement use. With muzzle velocities that are often greater than standard long guns, and high-capacity ammunition magazines, assault weapons are built to kill large numbers of human beings quickly and efficiently. In tests at their firing range, San Jose, California police found that a fully automatic UZI could fire its 30-round magazine in slightly less than two seconds. A semi-automatic version of the weapon required only five seconds for the magazine to be emptied.[1] Most assault weapons have no legitimate hunting or sporting use. Assault rifles and shotguns often have pistol grips and folding stocks, and are typically lighter and more concealable than standard long guns. Some assault pistols have threaded barrels for the easy attachment of silencers. Many assault weapons are merely semi-automatic versions of military machine guns, making them easier to convert to fully automatic machine guns.

The number of assault weapons in civilian hands--both criminal and law abiding--is estimated to be in the hundreds of thousands, perhaps millions.[2] No exact figures are available. An unknown number of these weapons have been illegally converted to full-auto. (For an explanation of the different categories and types of firearms, please see Appendix I.)

## ASSAULT WEAPONS VIOLENCE

o     October 1984. San Jose, California police officer Joe Tamarett is shot and wounded with an UZI carbine.[3]

o     January 1988. Virginia resident Michael Anthony Eberhardt is arrested in Washington, D.C., for allegedly purchasing 72 guns in Virginia during an 18-month period and then smuggling them into D.C. for sale to drug dealers. According to The Washington Post, "Many of the weapons were the semi-automatic TEC-9s favored by local drug dealers."[4]

o     April 1986. Two FBI agents are killed with a Ruger Mini-14 in a shootout in Miami, Florida.[5]

o     April 1984. Dennis Cresta, dressed in camouflage fatigues and carrying a Ruger Mini-14 and Colt AR-15, opens fire in Oakland, California, after being questioned by a policeman. No one is hit.[6]

o     July 1987. An elderly woman and her three sons kill three police officers who come to their motel room in Inkster, Michigan, to serve a warrant for a $286.40 bad check. One of the weapons used to slay the officers is a Heckler & Koch assault rifle.[7]

o    September 1988.  Samuel Eloud holds 11 people hostage in a Richmond, Virginia shopping center with a semi-automatic AK-47 and handgun in order to bring "peace to Lebanon."[8]

o    June 1984.  Denver, Colorado radio show personality Alan Berg is gunned down with a silenced MAC-10 by right-wing extremists.[9]

o    July 1984.  James Huberty goes "hunting for humans" with an UZI, a handgun, and a shotgun in a San Ysidro, California McDonald's.  Twenty-one die; 19 are injured.[10]

o    December 1985.  Portland, Connecticut eighth-grader Floyd Warmsley kills school janitor David Bengston with his father's TEC-9, then holds a classroom of children hostage.[11]

o    July 1988.  Manassas, Virginia, police officer John Conner is gunned down with a Colt AR-15 by a man whose wife had recently left him.[12]

o    April 1987.  William B. Cruse opens fire with a Ruger Mini-14 outside a Palm Bay, Florida shopping center, killing six and injuring 10.[13]

o    March 1988.  An arsenal that includes a Chinese-made semi-automatic AK-47, a hand grenade, 14 other semi-automatic guns, 32-round ammunition magazines, and a handgun outfitted with a laser sight is seized from five men in New York City's Port Authority bus terminal.[14]

o    February 1988.  At a press conference decrying the increase in assault weaponry, Prince Georges County (Maryland) Police Chief Michael J. Flaherty states, "The real issue is the safety of our officers."  Holding up a TEC-9, he adds, "It's not used for hunting, and it's not used for sporting events.  In my opinion, they should not be sold in the United States."[15]

These events are not isolated incidents.  Although no comprehensive, nationwide statistics are available on the misuse of assault weapons specifically, police organizations, police departments, government agencies, and handgun restriction organizations agree that the sale and misuse of assault weapons has escalated dramatically during the 1980s.  (Most law enforcement reporting systems are set up only to separate handguns from long guns. The federal Bureau of Alcohol, Tobacco and Firearms (ATF), the government agency charged with enforcing federal firearms laws, will soon begin breaking out assault weapons from standard long guns.[16])

"There has been an increase in [assault] weapons by all walks of life--gang members, drug dealers, your next door neighbor, even police officers," states Detective Bohannon of the

3

Los Angeles Police Department Gun Detail.  In Los Angeles, assault weapons have turned up increasingly in gang violence and drive-by shootings.  Says Bohannon, "These are not sporting weapons.  They're designed for one purpose and one purpose only, and that's to kill people." (Bohannon stresses that his opinions are personal and do not reflect the view of the Los Angeles Police Department.) According to Bohannon, essentially the same models of weapons are being seen on the streets by police:  "Your least expensive weapons are your MACs and TECs.  In the middle you've got your AK-47s and your UZI.  At the top level are going to be your AR-15s....[and others]."[17]

During fiscal year 1987, almost a third of the firearms seized by agents of the Drug Enforcement Agency (DEA)--the leading federal agency charged with enforcing America's federal drug laws--from drug traffickers were semi-automatic and fully automatic. (These figures include non-assault semi-automatic pistols.  Figures on solely assault rifles and pistols are not available.)  Sixteen percent were fully automatic.  On a daily basis, DEA agents seized automatic weapons that included M-16s, AK-47s, MAC-10s, MAC-11s, and UZIs.[18]

From January 1 to February 10, 1988, of the 388 guns seized by District of Columbia police, the vast majority were either semi-automatic or fully-automatic.  Only seven such weapons were seized during the first six months of 1987, six in 1986, one in 1985, and two in 1984.[19]

In neighboring Prince George's County, Maryland, from July 1987 through February 1988, police seized 140 semi-automatic or automatic weapons, including a TEC-9 and several UZI submachine guns, some equipped with silencers.[20]

In 1986, ATF seized 2,854 illegal machine guns.  These weapons were either converted illegally or illegally possessed. In 1985, the number of illegal weapons seized was 2,042.  In 1984, 539.[21]

The most popular assault weapons are the AK-47, AR-15A2, MAC-10, MAC-11, Ruger Mini-14, TEC-9 and UZI.  (For a description and brief history of each weapon, as well as select advertising information, please see Appendix II.)  Recognizing the strong market for high-capacity, concealable assault weapons that are painted black and look threatening, America's firearms industry continues to introduce new models.  Two of the latest are:

    o  The Calico M100P pistol, manufactured by American Industries in Bakersfield, California.  With its futuristic lines and black finish, this .22 caliber weapon is the Darth Vader of handguns.  Composed of a lightweight alloy frame, it has a "helical feed" 100-round capacity plastic magazine.  A 50-round magazine is also available.  The weapon also comes in

a carbine (a short-barreled, lightweight rifle) version with a folding stock. Under the headline "Durable, Accurate, Light, Versatile," an ad for the gun shows an intimidating M100P pistol with an optional "Klear-Vue" magazine (a see-through magazine that gives the shooter "complete visibility of rounds remaining in the magazine") and laser sight.[22]

The pistol version of the weapon is 17 inches long with the 100-round magazine, and weighs 3.75 pounds. The carbine version, with its stock retracted and the 100-round magazine, is 29.8 inches long. In November 1988, Calico will introduce a 9mm version of the weapon.[23]

o    The Street Sweeper is a 12-gauge riot shotgun with a revolving cylinder that rotates with each trigger pull. Able to fire 12 rounds in less than three seconds, the weapon is manufactured by SWD, Inc. (manufacturers of the MAC-11). An ad for the weapon reads, "It's a Jungle Out There! There Is A Disease And We've Got the Cure." It invites the reader to "Make you [sic] streets safe and clean with the help of 'The Street Sweeper'!" With its folding stock retracted, the weapon has an overall length of 25 5/8 inches.[24] The SWD weapon is modeled on a shotgun used by South African security personnel, the Striker 12. Efforts had been made to import the Striker, but the weapon was the first long gun ever to fail the sporting-use test that ATF applies to imported long guns. (Domestically produced firearms do not have to meet any sporting use standard.)

## DRUG TRAFFICKERS, PARAMILITARY GROUPS...

Because of their ease of purchase, effectiveness, convertibility, and mystique, assault weapons have become increasingly popular among people involved in the drug trade. Or as one DEA spokesman put it, "There's a machismo to carrying the biggest, ugliest, and most powerful weapon available."[25]

According to DEA Special Agent Maurice Hill, drug dealers in Miami began to switch over from revolvers to higher capacity pistols in the early 1970s. By the end of the decade, they had begun using shoulder-carried weapons, and by the early 1980s had upgraded to weapons like the UZI. Since then, criminals nationwide have expanded into a broad category of assault weapons. Regarding assault weapons, Special Agent Maurice Hill says, "They're all over now."[26]

Noting that drug traffickers "seem to like the AR-15s, AK-47s, TEC-9s," ATF spokesperson Tom Hill concurs: "We've seen a proliferation because of the drug trade. More and more people

5

want to have increased firepower and the status of having the semi-automatic assault type weapon. It looks dangerous. Most assault weapons used in criminal acts were initially purchased legally. Some are stolen, some come from over the counter through straw purchases, some are from people who fill out the forms illegally."[27]

In 1987, ATF traced weapons seized from two members of a Jamaican drug gang (known as "posses") in Tampa, Florida. The trace found that 149 weapons had been purchased over the counter from Tampa-area dealers. The majority of the weapons were TEC-9s, MACs, AR-15s, and Glock 17 handguns, "all preferred weapons of the Jamaican posses."[28] (The Glock 17, the first handgun to incorporate plastic into its structural design, is not considered an assault weapon.) As the result of this increased criminal firepower, police departments are beginning to abandon their six-shot revolvers for higher-capacity semi-automatic handguns.

Assault weapons have also become the weapon of choice for a different category of criminal: America's right-wing paramilitary extremists. In his book, Armed and Dangerous: The Rise of the Survivalist Right, author James Coates describes the scene outside the 224-acre compound of the paramilitary extremist organization, The Covenant, Sword and Arm of the Lord (CSA), located in Three Brothers, Arkansas, prior to a raid by law enforcement officials in 1985:[29]

"[A]ll visitors were greeted by a group of roughly half a dozen obviously frightened and surly young men carrying Mini-14s, MAC-10s and other automatic and semi-automatic weapons. Other armed CSA soldiers were clearly visible in a fifty-foot-tall guard tower overlooking the front gate, from which they pointed machine guns at reporters. Noble [a CSA member], wearing a Bowie knife strapped to one leg and cradling a converted AR-15 automatic rifle in his arm, repeatedly came to the gate to spar verbally with the nervous news media."[30]

Until recently, police had believed that the CSA--after its members were subjected to increased government prosecution, its compound deserted, and its leader, James Ellison, imprisoned for crimes that included the manufacture of automatic weapons-- had disbanded. But in May of 1988, CSA member Londell Williams was charged with conspiring to assassinate presidential candidate Jesse Jackson. Police recovered a converted AR-15 from Williams.[31]

Other paramilitary organizations that favor assault weapons and have been known to convert them to fully automatic machine guns include the Posse Comitatus, Aryan Nations, and The Order.

Although many drug traffickers and members of paramilitary organizations are convicted felons, they are often able to

illegally buy these weapons from retail sales outlets.  In every state, assault rifles and shotguns are sold under the same lax restrictions that apply to hunting rifles and shotguns.  Assault pistols are sold under the same laws that apply to handguns, which vary from locality to locality.

Some states do require that the purchaser of any firearm first receive an owner's ID card or permit, while other states have a waiting period for all firearms.  Yet most states' standards for the sale of long guns are no more severe than the federal law, which requires only that the purchaser be 18 years old and fill out a federal form 4473.  On this form, the purchaser swears that he is not a convicted felon, drug addict or alcoholic, and that he does not have a history of mental illness.  Most purchases are cash and carry, and long guns can be purchased interstate, with no limit on the number of weapons that can be purchased.[32]

The federal standards for handguns are essentially identical to that of long guns, except that they cannot be sold interstate, the purchaser must be 21 years old, and multiple purchases (more than one handgun purchased within five working days) must be reported to ATF.[33]

(In 1986, Congress outlawed the future production of machine guns for civilian use.  Currently, there is a pool of more than 187,000 machine guns that citizens can legally purchase.[34]  To obtain a machine gun, a citizen must be fingerprinted, photographed, submit to a background check, wait five to six months, and a $200 transfer tax must be paid.  These same standards must be met to possess silencers, sawed-off rifles and shotguns, and military weaponry, such as hand grenades, land mines, grenade launchers, and other weapons and accessories restricted under the National Firearms Act of 1934.[35])

The most restrictive handgun laws are on the state and local level, and assault pistols would be sold under these standards.  Handgun laws in America range from Morton Grove, Illinois, which has banned the sale and private possession of handguns, to the state of Florida, which operates essentially under only the federal standards.[36]

Because many assault weapons--such as the AR-15A2, M100P carbine, Ruger Mini-14, Street Sweeper, and UZI carbine--can be purchased as standard long guns by virtually anyone who is willing to lie on the form, they are a boon to criminals.  Assault pistols can be purchased easily by criminals in states with lax handgun laws such as Texas, Virginia, and Florida.  From there, these weapons can then be sold to criminals in cities and states with more restrictive laws.

## AND JUST PLAIN FOLK

Although much attention has been focused on drug traffickers and paramilitary extremists, many assault weapons are purchased by "just plain folk." These people run the gamut from survivalists who want to be ready "just in case" to gun owners who want the thrill of owning the latest high-tech weapons.

A 1986 Defense Monitor on "Militarism in America," published by the Center for Defense Information (CDI), in Washington, D.C., notes an increasing "fascination for paramilitary weapons and training" among the general public.[37]

Television shows such as "The A-Team," first broadcast on ABC in 1983, "Miami Vice," first broadcast on NBC in 1984, and other action/adventure/police dramas have acted as a showcase for new weaponry. In effect, these shows supply free advertising for assault weapons manufacturers.

The Center for Media and Public Affairs, based in Washington, D.C., monitored 620 television programs throughout the past 30 years, revealing a noticeable shift toward military-style assault weapons.[38]

According to Daniel Amundson, research director for The Center, "There certainly is a greater number of automatic weaponry," and this is "partly reflecting news from the front pages and partly reflecting artistic embellishment." Noting that guns have been "ever present" in television, Amundson adds, "The presence hasn't changed, but which ones are present has. 'Miami Vice' requires very sleek and modern weapons. This shows a reflection of the headlines. If drug lords are using more UZIs and MAC-10s, you're going to see it in 'Miami Vice' six to nine months later."

According to Amundson, television has a "tremendous potential to act as a marketplace for anything: weapons, violence, soap, attitudes toward blacks and women. Television has helped the average person to identify weapons more than we'd ever thought, expanded our knowledge, terminology, of the types of guns available. UZI, MAC-10 is no longer jargon for firearms specialists; and that tells us a great deal."[39]

Meanwhile, in movie theaters, the .44 magnum handgun of Clint Eastwood pales in comparison to the weapons of Rambo and his ilk. Throughout the 1980s, Sylvester Stallone films such as the Rambo series and "Cobra," Chuck Norris movies such as the "Missing in Action" series and "Invasion USA," and Arnold Schwarzenegger movies such as "Terminator," "Predator," and "Commando" have helped popularize paramilitary weapons and accessories.

## ASSAULT WEAPONS MARKETING

The marketing of assault weapons throughout this decade is in large part due to the slump in handgun sales that has afflicted the industry since 1982.  Handgun production dropped from a high of 2.7 million that year to less than 1.7 million in 1984--a decrease of nearly 40 percent.  In 1986, production increased to 1.9 million, a level still well below that of the early 1980s.[40]  (Because handgun manufacturers will not release sales figures, and are not required to do so by law, production figures are the only available gauge of the market.)  With an estimated 35 to 40 million handguns in American hands,[41] the slump is apparently the result of saturation of the primary market--white males--and the increasing resale of used handguns.

In their marketing of assault weapons, manufacturers often focus on their police or military functions, their ruggedness and dependability, and the cache of a lone man and his gun against the elements, crime, or the unstated threat of post-nuclear survival.

Colt Industries has even developed an ad aimed directly at survivalists.  The 1985 ad features a handsome rancher looking across his land.  He has leather patches on the elbows of his flannel shirt and an AR-15A2 in one hand.  The headline reads: "Survival means different things to different people.  For a rancher in the high country of Wyoming, being self-sufficient can mean keeping varmints from his sheep.  For a rugged individual in the wilderness, it means being prepared for any eventuality.  For both these men, and thousands like them, there's only one gun.  The Colt AR-15A2.  The reasons are as simple as they are plentiful.  First, it's the rifle they're already familiar with.  The AR-15A2 Sporter II is the civilian version of the battle proven and recently improved U.S. military M-16A1..."[42]

This survivalist sales pitch is echoed in an ad for Heckler & Koch's HK 91 semi-automatic assault rifle.  The ad's headline reads, "When you're determined to survive, you leave nothing to chance.  In a survival situation, you want the most uncompromising weapons that money can buy.  The HK 91 Semi-Automatic Assault Rifle from Heckler & Koch."  The ad ends with the tag line, "In a world of compromise, some men don't."[43]

An ad for the FIE/Franchi LAW-12 shotgun--which comes in standard hunting and assault configurations--urges the reader to "Take the 'LAW' Into Your Own Hands.  Whether you patrol the birdlands when the sun is rising...or patrol the boonies when the sun sets...the FIE/Franchi LAW-12 is the LAW of the land!  All the LAW you need!  Situation – The sun has set, it's now midnight, you're called to a Code 3 situation!  Your backup is deployed to another sector.  You're all alone, left to handle a tough situation...What do you do?  Take the LAW-12 into your hands – A possible 9 rounds of heavy hitting 12 guage [sic] "00"

Buck - All 9 rounds can be emptied on target in less than 3 seconds...operation successful..."[44]

## ASSAULT WEAPON LOOK-ALIKES: AIRGUNS AND TOY GUNS

Paramilitary enthusiasm has not been limited to the firearms market. America's manufacturers of non-powder firearms (such as BB guns and pellet guns) and toy guns have been quick to realize that assault weaponry is in. These manufacturers' role models are no longer hunting rifles and Western-style six-shooters, but machine guns and large-caliber handguns. This shift has been accompanied by a keener eye to detail and advances in plastic molding. The result: non-powder firearms and toy guns that are virtually indistinguishable from their more lethal counterparts.

Daisy Manufacturing was one of the first to recognize this potential market. The company introduced its paramilitary line of imported Softair guns in 1986. Softair guns are working replicas, down to the point of expelling spent shells and firing plastic pellets. They retail for approximately $60. "So accurate in detail you'll swear it's the real thing!...a 'must have' for paramilitary enthusiasts of all ages," reads the catalog description for a replica of the UZI Assault pistol. Copy for a replica of the KG9-SP (predecessor of the TEC-9) boasts that it's "an authentic reproduction of the American-made semiautomatic defense weapon used by anticommunist guerrillas in Angola." A replica of a Heckler & Koch weapon is described as being "without a doubt the most exciting paramilitary airgun on the market today! Styled after the semiautomatic firearm carried by the German police and made famous in the motion picture, 'Rambo: First Blood, Part II,' the Model 15 has the look and feel of the real thing."[45]

Rival manufacturer Crosman has its own UZI look-alike (which fires metal projectiles) and a reproduction of Colt's M-16 machine gun dubbed the A.I.R. 17. Crosman guarantees that "it looks just like the real thing," down to a detachable pellet clip and flash guard on the muzzle of the gun.[46]

Larc International, located in Longwood, Florida, offers-- by mail--the M19-A BB submachine gun. "Imagine--a 3,000 BB per minute cycle rate with an effective range of over 50 yards-- That's some AWESOME Fire Power!!!" With a magazine capacity of 3,000 BBs, the weapon also comes in a pistol version. Each sells for $39. On the ordering coupon, the purchaser must promise that he or she is 18 years or older.[47]

The Para-Ordnance M-85 is a full-auto paint ball "splat gun" MAC-11 machine pistol replica that fires 1,200 rounds per minute at 440 feet per second. The 24-round magazine can be emptied in 1.2 seconds. It sells for $299.50.[48]

Far more common than paramilitary non-powder firearms are plastic-molded toy assault weapons.  In addition to such staples as M-16s, AK-47s, UZIs, and KG-9s, Daisy, the self-proclaimed leader in the field, offers toy silenced MAC-10 pistols (the Alan Berg murder weapon) and bolt action machine guns.[49]

The International Association of Chiefs of Police (IACP), located in Gaithersburg, Maryland views look-alikes as a unique threat to public safety.  As criminal misuse of assault weapons increases, police are more likely to assume that look-alikes are in fact real firearms.  People who thoughtlessly display or brandish look-alikes run the risk of finding themselves in a deadly face-off with a police officer who must make a split-second decision on whether to draw a weapon and fire.  According to the IACP, incidents involving airguns, highly detailed toy guns, and paint "splat guns" are increasing dramatically.[50]

In May 1988, as an amendment to a bill dealing with the threat posed by non-detectable "plastic" firearms, Congress voted to require that every look-alike sold in America be clearly marked with an orange stripe or other color to distinguish it from its real counterpart.  The bill is awaiting presidential signature, which is expected.  On the state and local level, laws have been introduced and enacted regarding the sale, production, and brandishing of look-alikes.

But even prior to the bill, various companies, reacting to the growing debate over look-alikes and the increasing negative publicity their sales generated, began to shift their product lines and mark their products to help distinguish them from real firearms.  In late 1987, Daisy stopped the sale of its SoftAir guns, which had been imported from Japan.  A spokesman for the company noted, however, that the decision was "90 percent financial.  The guns just weren't selling."[51]

Critics of the marking concept point out that the markings can be easily painted over and will do little good in the dark, while criminals can paint similar markings on real guns.

What makes look-alikes so appealing--that they look just like the increasingly popular assault weapons--is precisely what makes them so dangerous.

## PUBLICATIONS

The growing fascination with assault weapons has been accompanied by a growth in the number of publications dedicated to the non-sporting use of firearms.

Firepower, published by Everett Moore out of Cornville, Arizona, is the only magazine in America dedicated to full-auto and high-capacity firearms and has a circulation of 90-95,000.

(Prior to the 1986 machine gun ban, the magazine had been devoted exclusively to full-auto.)  Each issue of the magazine is filled with weapon, ammunition, and accessory reviews.  Virtually all of the weapons reviewed are assault weapons.

According to Moore, "We jokingly refer to them as black and wicked-looking types of guns.  They fill a need in the consumer market for people...who cannot afford the automatic version of the same weapon."  Moore acknowledges that violence involving these weapons is "a legitimate concern.  It's reality and you can't deny that."  He adds, though, that, "it seems like any time we go to disarm the criminal, we end up disarming the legitimate, honest civilian."[52]

American Survival Guide is "the magazine for safer living."  Published by McMullen Publishing in Anaheim, California, articles are listed under headings that include "Survival Weapons," "Survival Gear," and "Survival How To."[53]  It also contains the "Survivalist Directory," a post-apocalypse personals column that offers a "confidential listing of survivalists who wish to become known to others of like mind."  Personal ads in the August issue include:

o    "Melbourne, Florida.  Teenage military organization that does U.F.O. research would like to recruit members.  Also would like to set-up [sic] information exchange and meet others in this area for training.  All races and sexes are welcome.  Ages 12 and over only.  No racists or religious fanatics need apply."

o    "Northern Arkansas.  Young, conservative male seeks correspondence with other survivalists in area.  Special interest is nuclear survival.  No liberals, atheists, druggies or alcoholics.  Females welcome.  All ages reply."

o    "Baltimore, Maryland.  Urban group which meets biweekly is looking for interested local survivalists wishing to exchange information.  We are not Rambos, racists, or extremists, but family-oriented and interested in workable, realistic solutions to short and long term survival scenarios."[54]

Published since 1979, Survival Guide has a circulation of between 30,000 and 70,000.[55]

In addition to his mainstay, the monthly Combat Handguns, New York-based Stanley Harris also publishes such annuals as Guns & Survival and Special Weapons.  Another Harris publication, Eagle, which had promised its readers "violent combat action," has ceased publication.  An October 1983 issue of the magazine featured an article entitled, "The Amazing Soft Drink Silencer -- I'm a Pepper, You're a Dead Man."  The article outlined the ease

with which a two-liter plastic soft-drink container could be used as a silencer for a MAC-10.  Eagle found it to be "the best suppressor found in today's supermarkets.  It's cheap, effective, and mixes well at parties.  What more could you want?"[56]

The Special Weapons annual offers "The Newest Ideas in Guns and Equipment as Well as Combat-Proven Tactics."[57] Articles in Special Weapons include:  "Colt Delta HBAR--Boasting sniper rifle accuracy we compare this new Colt to the combat-proven Galil"; "The Search for Compact Firepower--We compare submachine guns to short assault rifles"; "The Offensive Handgun--It's the tool of the assassin"; "How to Buy Automatic Weapons--Latest prices and availability of Class III firearms"; and the "Assault Rifle Buyer's Guide."[58]

"The Offensive Handgun" is a how-to piece on assassination.  The article advises that "single shots are preferred.  The head, neck, and spine are the best targets."[59] Recognizing that sometimes "an unsuppressed pistol may be the only one available," the article advises that, "the sound can be muffled by shooting through...a potato or pillow.  If the muzzle is held against the target this also may muffle the sound, but it can also cause him to react in unexpected ways, besides presenting the possibility of the pistol jamming from bits of clothing or flesh caught in the muzzle or chambers."[60]  The article notes that the speed and capacity of a modern machine pistol are "important when shooting a number of people at once."[61]

Soldier of Fortune, published out of Boulder, Colorado, describes itself as "The Journal of Professional Adventurers." In a disclaimer on its title page (a trait many of these magazines share), it warns readers that the magazine "does not verify validity of every advertisement and/or the legality of every product contained herein.  Soldier of Fortune magazine does not intend for any product or service to be used in any illegal manner."[62]  The magazine has been published since 1975 by National Rifle Association board member Robert K. Brown.

In addition to various "you are there" articles such as "Sandinista Staredown" and "Bum Trip in Bolivia,"[63] the magazine contains weapon reviews and combat tactics.  Soldier of Fortune had also carried classified ads for mercenaries for hire.  This practice has since been discontinued as the result of a lawsuit filed by the family of a victim whose murderer was hired as the result of an ad placed in the September 1984 issue of the magazine.  The ad read:  "Ex-marines.  67-69 Nam Vets.  Ex-DI, weapons specialist--jungle warfare.  Pilot.  ME.  High risk assignments.  US or overseas."

In 1984 Robert Black hired John Wayne Hearn to kill his wife.  Hearn did so in February 1985.  It had been Hearn's third murder in 19 days.  As the result of this, the victim's parents and son sued Soldier of Fortune for $21 million, arguing that the

magazine was aware of the implication contained in the ad.[64]  In March 1988, a Colorado jury found that the magazine should have known that the ad was offering the services of a hired killer and ordered it to pay $9.4 million.  The decision is currently being appealed.[65]  (Soldier of Fortune refused to answer any questions for this report, including circulation and initial date of publication, on advice of their legal counsel pending outcome of the suit.)

New Breed, "the magazine for military adventure,"[66] is published by Harry S. Belil, out of Nanuet, New York.  Though the magazine focuses more on military action, it does contain articles on assault weaponry and tactics.  The August 1988 issue also contains a review of the 1988 SHOT (Shooting, Hunting, Outdoor Trade) show, the annual trade show of the firearms industry, held last January.  In the piece, the author notes that "there were plenty of assault rifles at the show."[67]

Shotgun News describes itself as "The Trading Post for anything that shoots."  Published three times a month out of Hastings, Nebraska, the 200-page, tabloid-style magazine has a circulation of nearly 190,000.[68]  The magazine is crammed with classified and display ads for firearms and accessories, most of which are geared to firearms dealers.

In addition to a cavalcade of gun ads, Shotgun News carries ads for a variety of accessories (including Nazi memorabilia such as coffee mugs with swastikas[69]), firearms, and publications, including The Turner Diaries, the "bible of right-wing extremists."  In the book, "Earl Turner and his fellow patriots...are forced underground when the U.S. government bans the private possession of firearms and stages the mass Gun Raids to round up suspected gun owners.  An all-out race war occurs as the struggle escalates.  Turner and his comrades suffer terribly, but their ingenuity and boldness in devising and executing new methods of guerrilla warfare lead to a victory of cataclysmic intensity and worldwide scope.  If the government had the power to ban books, The Turner Diaries would be at the top of their list.  Order your copy today."  The $5.95 book is offered by the neo-Nazi National Vanguard located in Arlington, Virginia.[70]

## ACCESSORIES

Not only do these publications supply information, but they also contain advertisements for various catalogs and products.  The Survival Systems book catalog describes itself as offering "the most unusual and controversial books you've ever seen in your life."[71]  In a disclaimer, the company notes, "Certain of the books in this catalog deal with activities and items which could be in violation of various laws if actually performed or constructed.  We do not advocate the breaking of any law.  Our books are sold for entertainment purposes only and only to adults!"[72]

With a toll-free number for credit-card orders, the catalog contains books on revenge, fraud, dirty tricks, firearms conversion, home construction of firearms and explosives, and murder techniques.

Books offered by Survival Systems include:

o   How to Build Silencers: An Illustrated Manual. "A complete manual for the construction of silencers at home with simple tools.  Build in less than one hour. $5.95."[73]

o   Improvised Weapons of the American Underground. "This book makes other 'cookbooks' things for Sunday School picnics.  This collection of original articles covers: Making of Nitroglycerin; Plastic Explosives; Detonators and Primers; Fuses; Impact Ignition Incendiary Devices; and Construction of Various Types of Silencers; and Complete Plans for a Home Made Machine Gun which can be built for less than $20.00. An absolutely incredible manual. $7.50."[74]

o   Full Auto. "A completely illustrated modification manual on selective fire conversions for the following weapons:  Mini-14; AR-15; HK-91-93; MAC 10-11; and the M1 Carbine.  With this new edition, you can convert all five weapons into their full-automatic configurations with ease, as all procedures are thoroughly explained in an easily understood, fully illustrated, step-by-step manner. Without a doubt, this is the finest conversion manual on the market. $12.00."[75]

Robert K. Brown's Paladin Press offers a 47-page, glossy catalog that includes sections on sniping, revenge and humor, survival, weapons, explosives and demolitions, guerrilla warfare, silencers, new ID and personal freedom, locksmithing, and terrorism.  In an essay entitled "New Age Survival," readers are reassured that "We don't want to alarm you into heading for the hills today--but will help you become prepared to do so tomorrow."[76]

Books offered in the catalog include:

o   Anarchist Handbook. "For the modern anarchist, all you need to know to construct an impressive selection of improvised weapons, including "an expedient silencer; a pipe hand grenade; plastic explosive; and a rocket launcher.  For each weapon, the author supplies a list of materials easily acquired from drug or hardware stores, hobby shops, supermarkets or even junk piles; step-by-step procedures; simple diagrams and how-to-use instruction for certain weapons. $7.00."[77]

o   <u>The Mini-14 Exotic Weapons System</u>.  "Convert your
     Mini into a full-auto, silenced, SWAT-type weapon
     that is capable of field clearing firepower.  Note
     that this conversion process requires no machining or
     special tools.  Once completed it takes just five
     minutes to drop in the Automatic Connector (the
     book's secret!) or remove it as needed.  It's that
     simple! $15.00"[78]

o   <u>Improvised Explosives--How to Make Your Own</u>.  "Ten
     simple but powerful formulas for explosives and
     incendiaries" that gives the reader the ability "to
     construct actual bombs, booby traps and mines.
     Learn how to obtain or make all the necessary
     chemicals or get acceptable substitutes.  Various
     fuses, detonators, and chemical and electrical
     timers are covered, as are pipe bombs, plastic bottle
     bombs, jerry can bombs and tamperproof bombs.  With
     ease, you can construct such devices as a package
     bomb, booby-trapped door, auto trap, sound-
     detonated bomb, or pressure mine--to name just a
     few. $10.00"[79]

o   <u>How to Kill</u> (volumes one through six).  "[M]akes no
     moral judgments, but merely describes what has been
     known for years by the professionals who are part of
     the shadowy world of international espionage and
     intrigue.  As the author states in his preface, 'My
     only premise is that there are times when one must
     attack with complete ruthlessness and fight with
     lethal fury.  This fury and ruthlessness must be
     harnessed and directed to the gravest possible
     damage--to kill.'"  Priced at $8 per volume, the
     catalog notes that no book in the <u>How to Kill</u> series
     is available in Canada due to legislation by the
     Canadian solicitor general.[80]

     In addition to operating a 24-hour-a-day, toll-free order
line and offering a "no questions asked" money-back guarantee,
Paladin Press also offers gift certificates, which "make
excellent gifts for you to send to friends and relatives."[81]

     <u>Firepower</u>'s Everett Moore also runs a mail-order
publications house.  Moore's Desert Publications offers many of
the same publications as his competitors under headings that
include: weapons and firearms, specialized warfare, police
science, survival, self-defense, full-auto, suppressors, and
improvised munitions.[82]  Moore, who sells between 2,000 and 5,000
copies of specific titles a year, refers to the publications as
"big boy toys," adding, "I haven't known a man yet who didn't
like [to know how] to pick a lock."[83]

The catalog of Phoenix Systems, Inc., located in Evergreen, Colorado, offers its buyers "The Right Stuff," which includes:

- o   U.S. Military Practice Grenades "with ALL the mechanical parts IN THE FUSE ASSEMBLY!!! -- NO EXPLOSIVES." The ad warns that "ACTIVATION OF THESE DEVICES REQUIRES PRIOR BATF APPROVAL. $19.95 each."[84]

- o   Booby Trap Firing Device (M-1), "Standard U.S. Military PRESSURE RELEASE firing device used to initiate detonation of explosive charges in BOOBY TRAP applications or remote firing of Claymore mines. EXCELLENT training device because it is RELOADABLE with new primer caps (when not coupled DIRECTLY TO AN EXPLOSIVE CHARGE). Hundreds of applications -- can be screwed directly into an explosive charge for instantaneous detonation or coupled to detonator cord for remote firing. $14.95 each."[85]

- o   The Ballistic Knife--The Knife That Shoots. "CONGRESS OUTLAWED THE SPRINGS--BUT YOU CAN STILL BUY THE KNIFE!" The knife "can be fired up to an effective range of 30 feet. The typical penetration of this knife is about three times that of a manual stab. Extra blades and flight stabilizer available. $79.95 each." Under the heading "ATTENTION COLLECTORS AND SPORTSMEN," the ad notes, "Due to recent Federal regulation, the Ballistic Knife may no longer be sold with the projection spring. The Ballistic Knife, IN LEGAL KIT FORM, that we are now able to sell, is identical to the original knife without the spring included." The ad adds, "WE SELL NO SPRINGS."[86]

- o   "FULL AUTOMATIC FIRE FOR YOUR AR-15. The drop-in auto sear is the KEY component in converting an AR-15 to M-16 selective fire capability (semi or full automatic) and is the ONLY part for this conversion that is now required to be registered if CURRENTLY manufactured. OUR auto sears were manufactured prior to 11/1/81 when it was NOT required to have a serial number stamped on this part. COMPLETELY LEGAL TO PURCHASE." With the purchase of "five other commonly available M-16 replacement parts," the conversion can be made "in SECONDS without tools." The ad urges readers to "Act now while it is still legal to purchase these auto sears. When existing supplies are exhausted, THERE WILL BE NO MORE!! $175.00 each."[87]

The recommended reading list of the catalog includes books on silencers; on UZI, MAC-10, and AR-15 conversions; and on home munitions.  Other products available through ads placed in these magazines include:

o   The BMF Activator, a hand crank that can be attached to a rifle, boasts the "newest crank-operated rapid fire capability since the gatling gun!! Legally fire up to 1200 rounds per minute on your semi-automatic .22 rifle.  Imagine the sensation of firing a truly rapid fire rifle.  Since each turn of the crank handle fires the rifle four times, it is capable of pulling the trigger many times faster than you can." The advertising flyer for the activator includes a copy of a letter from ATF stating that "a manually operated device of this type is not subject to any of the provisions of the Gun Control Act of 1968."[88]

o   The Tri Burst Trigger Activator, distributed by Orpheus Industries, offers "legal firepower."  It "allows a 3-round burst from your AR-15...mounts in seconds" and fits "all makes" of AR-15 rifles.  It sells for a "special introductory price" of only $34.95.[89]

o   "The Ultimate" trigger activator derides its competitors as "the rapid fire plastic gizmo and the sheet metal device."  With models available for the AR-15, Mini-14 and 30, M-1 Carbine, and AK models, The Ultimate allows the user to "fire individual rounds, 3 shot bursts or 50 round bursts at your instant discretion."  The ad notes that "all federal laws (if any) will apply.  The ATF has ruled this device is not regulated by federal law."  It retails for $129.95.[90]

o   The API Predator Laser Target Designator is equipped with "helium neon lasers" that "project an intense, narrow beam of red light" with "an effective range" of up to 500 meters.  Laser sights give their users point-and-shoot assassination capability. "Generally, the only visible element of the laser beam is a spot on a solid object that reflects light back to the operator.  The beam itself is invisible in clear air."  Priced at $495, the API laser sight is only one of many laser sights on the market, with some costing hundreds of dollars less.[91]

o   An ad for Kephart Publications offers plans for such exotic weapons as:  hand, rifle, and shotgun grenades; L.A.W., RPG-7, Bazooka, Pod, Pocket, Shotgun, and T.O.W. rockets; claymore and land mines; flame throwers; and others.  The ad guarantees "these plans are legal to own and make according to

18

BATF provisions" and promises that the "basic information is complete and all WILL work. All devices are simple to make and very inexpensive. Only common material and hand tools required. NO MACHINE SHOP WORK." The ad offers any 10 plans for $55.00.[92]

o   The "Deadly Weapons--Firearms & Firepower" video tape advertisement features an assassination kit of a silenced MAC-10 in a briefcase. The ad asks, "Do you know which bullets will penetrate a car door? A windshield? Just how quiet is a real silencer? How effective is full auto fire?" Purchasers of the tape can "SEE & Learn the Answers to these questions and much more!" The tape sells for $49.95.[93]

o   The "Ninety Rounder" is a circular "assault magazine" that can hold 90 rounds of ammunition "for people who want real firepower!" Offered by the MWG Company it promises "LMG [light machine gun] Type Firepower From a Semi Auto Rifle." It retails for 49.95.[94]

o   For the leisure hours, "Rock N' Roll #3--Sexy Girls and Sexy Guns, The Video" offers "14 outrageous, southern California beauties...firing some of the sexiest machine guns ever produced. And you're probably wondering about the girls. What can I tell you? They're hot. 14 different girls in string bikinis and high heels blasting UZIs, MAC-10s, M-16s, MP-5s, AK-47s, M-14s and more. It's something you just have to see."[95]

## PARAMILITARY TRAINING CAMPS AND COMBAT SCHOOLS

Those interested in assault weapons and combat techniques do not need to rely solely on book knowledge. Around the United States, training centers--from the paramilitary training camps of right-wing extremists to commercial combat schools--offer training in the use of weapons, explosives, and combat skills.

According to testimony offered before the Subcommittee on Security and Terrorism in September 1985, paramilitary/mercenary training camps can be broken down into three categories:

o   Franchises or commercial establishments that offer training to law enforcement or security firms worldwide;

o   Paramilitary and survivalist organizations that offer training in the use of small arms, map reading, and survival under extreme circumstances (those operated by the Covenant, Sword and Arm of the Lord, for example). According to the Anti-Defamation League of

B'nai B'rith, many of these camps also include an indoctrination of race hatred.

o     Mercenary training camps, the goal of which is to offer the knowledge and skills necessary to be a soldier-for-hire.[96]

In 1984, paramilitary training camps garnered media attention when the FBI revealed that several Sikh students had attended a two-week session at the Merc School in Dolomite, Alabama, with the intention of using their new-found knowledge to assassinate Indian Prime Minister Rajiv Ghandi.[97]

At the time, the Merc School's owner, Frank Camper, stated that he operated strictly within the law and was merely training people to survive in combat situations.[98] Said Camper, "If someone were to train with me and to go away and perform an act of terrorism, then I'm not responsible for that person's actions. They are responsible for themselves."[99] (Camper, however, apparently did inform on the Sikh students to the FBI, helping lead to their arrest.)

Critics of the camps argue that those run by survivalist and paramilitary organizations are turning out terrorists. The ADL states in the fall issue of its 1986 Law Report, "ADL Paramilitary Training Statute: A Response to Extremism," that in many camps, "'combat' training is interspersed with the indoctrination of hatred and totalitarianism in preparation for anticipated civil strife, the rationale being the vision of a 'coming race war.'"[100]

In 1980 such camps were uncovered in Alabama, California, Connecticut, Illinois, North Carolina, and Texas.[101] Daniel M. Hartnett, ATF Acting Deputy Associate Director, Law Enforcement, stated at the 1985 hearings that camps run by extremists have shown "a willingness to commit violent crimes to further their cause and support their movement."[102]

A 1985 raid conducted by law enforcement officials at a compound run by the Posse Comitatus outside of Rulo, Nebraska, yielded a cache of weapons that included assault rifles and 13 fully automatic pistols and rifles, including modified AR-15s.[103]

In 1986, the ADL formulated model state legislation that would ban paramilitary training "aimed at provoking civil disorder."[104] In drafting the model bill, the ADL specifically stated that the statute must not violate First Amendment freedoms of speech and association. Another objective was to draft the statute narrowly so that it would not prohibit legitimate lawful activities such as target shooting and other sporting events. This was important, the ADL stated, for "minimizing opposition to the bill by powerful special interest groups."[105] Laws based on the statute have passed in Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Michigan,

Missouri, Nebraska, New Jersey, North Carolina, Oregon, Pennsylvania, Rhode Island, Virginia, and West Virginia.[106]

In a statement opposing legislation restricting paramilitary training camps, America's leading pro-gun organization, the National Rifle Association (NRA), based in Washington, D.C., states that such "legislation is objectionable because it makes the mere possession of firearms a crime, therefore undermining the right to keep and bear arms" and that "the constitutionality of such legislation is questionable at best, and could not, in all probability, withstand a court challenge based on violation of First Amendment rights."[107]

The controversy has faded since the 1985 hearings, although camps and schools continue to operate. The FBI currently has no figures on the numbers of camps and schools operating in the United States. One such school, Brigade Security Forces, located in Mooreville, North Carolina, offers six-day courses in "commando tactics." It offers "absolutely the best firearms training available with numerous NATO and COMMUNIST firearms." One can also enroll in a special 30-day course "designed for the adventurer that demands it all in one course." Counter terrorist, sniper, and covert operations are some of the areas covered. Brigade also offers private instruction for "Individuals or Groups who desire Total Secrecy and Special Training. NO COMMUNISTS, GAYS, ATHIESTS [sic]!!!" are allowed, and one must be at least 16 years old to attend.[108]

### THE ASSAULT WEAPONS DEBATE

Not surprisingly, the increasing number and subsequent misuse of assault weapons has resulted in a growing debate over their place in American society. The battle lines mirror those drawn over other such "gun control" issues as waiting periods for handgun purchases, bans on armor-piercing bullets, and restrictions on the sale of "plastic" firearms. On one side of the debate is America's gun lobby. The other side consists of handgun restriction advocates and various police organizations.

America's gun lobby--composed of pro-gun organizations, manufacturers, and various publications--staunchly opposes any restrictions on the sale or availability of assault weapons. The leading voice of dissent belongs to the NRA. With 2.7 million members and a budget of more than $71 million, the NRA is America's largest and most powerful pro-gun organization.[109]  In 1987 the organization published a pamphlet entitled Semi-Auto Firearms--The Citizen's Choice. A year later the organization published Semi-Auto Rifles: Data and Comment, a collection of articles on semi-automatics that had appeared in the NRA's magazine, The American Rifleman.

In both the pamphlet and the book, the NRA presents the controversy over assault weapons as a broader attack on all semi-

automatic firearms, including hunting rifles with semi-automatic mechanisms. By framing the debate as one concerning all semi-autos, as opposed to a specific category of semi-auto, the NRA is able to present efforts to restrict assault weapons as a threat to hunters. The NRA recognizes the fact that it is far easier to mobilize its membership and non-NRA outdoorsmen with images of banning their trusted hunting rifles as opposed to UZIs or TEC-9s.

The cover of Semi-Auto Firearms--The Citizen's Choice features a duck hunter, duck call in mouth, silhouetted against a bright orange sunrise. In his hand he appears to hold a shotgun. On the first page of the pamphlet, the NRA offers its view of the debate: "The national media and organized 'gun control' groups have advanced from demanding prohibitions on certain handguns and ammunition, to calls for banning semi-automatic firearms. The pattern is obvious, and the strategy has long been clear--isolate certain types of firearms, label them as inherently 'evil' or 'crime prone,' and then try to segregate and drive a wedge between firearms owners...[110] Fully automatic and high-tech firearms often seen on television programs, and in popular yet violent movies, perpetuate the myth that 'semi-autos' are frequently used for criminal purposes...[111] Even to experts, admittedly, semi-automatic target or sporting rifles such as the AR15 and M1A look like the full-automatic military M16s and M14s. Why not? A civilian jeep looks like a military jeep, a civilian tent looks like a military tent and a civilian shooter at the national Matches at Camp Perry looks very much like his military counterpart."[112]

(The NRA's stand on assault weapons is not surprising considering the fact that it has labeled repeal of the 1986 federal ban on the future production of machine guns for civilian use a "high priority."[113] In outlining its position on machine guns, the organization states, "Sporting events involving automatic firearms are similar to those events such as silhouette shooting and other target-related endeavors and deserve the same respect and support."[114] The NRA promises that it "will take all necessary steps to educate the public on the sporting uses of automatic firearms"[115] and explains that "The Second Amendment is not limited by its language to the type of arms that the people have the right to own."[116] The organization supports "the right of any law abiding individuals to own any firearms, including automatic firearms."[117]) (Although the NRA was asked to answer questions regarding its stand on assault firearms, the appropriateness of Soldier of Fortune publisher Robert K. Brown being on its board of directors, paramilitary accessories, and paramilitary training camps, a spokesman, after reviewing the questions, stated that the NRA was "declining to provide information for this report.")

While the NRA struggles to turn the assault weapons debate into a semi-auto debate for public relations purposes, legislators and members of the press have been making it into one

inadvertently. Neither of America's national handgun restriction organizations has come out in favor of restricting or banning all semi-autos, and have only recently begun dealing with long guns (there is no national organization calling for restrictions on all guns). Yet in discussions of assault firearms, those urging restrictions on these weapons have used the terms assault, paramilitary, and semi-automatic weapon interchangeably. This misusage apparently stems from an unfamiliarity with weapons terminology and a lack of understanding of the wide range of weapons covered by the term semi-automatic. As the result of this lack of knowledge, and the difficulties in defining assault weapons in legal terms, laws have been proposed on the state level that would place waiting periods on all semi-auto weapons. In August 1988, The New York Times ran two editorials in favor of such a law on the federal level, as well as urging a ban on the sale of assault weapons.[118]

According to John Hosford, executive director of the Citizens Committee for the Right to Keep and Bear Arms (CCRKBA), a 500,000 member pro-gun organization located in Bellevue, Washington, the issue of paramilitary weapons will be addressed at the organization's board meeting in September 1988. Says Hosford, "It would be safe to say that we will take an aggressive position in support of these." Founded in 1971, the CCRKBA favors a repeal of the Gun Control Act of 1968 and has lobbied against gun control ordinances on the local, state, and federal level.[119]

The 100,000 plus-member Gun Owners of America (GOA), located in Springfield, Virginia, views the assault weapons debate as part of a long-range plan by handgun restriction advocates to disarm America. Says GOA Director of Government Affairs Craig Markva, "The goal was to target the machine guns first, then the semi-autos, and right along with the handguns. The whole premise [of handgun restriction organizations] has been based upon the fact that the Second Amendment is a hunting right." But Markva argues, "the whole idea of the Second Amendment is self-defense. The goal of the anti-gunner is to isolate different categories of firearms for control or banning, and them move on. The slippery slope is alive and well and continues rolling on."

America's handgun restriction movement has been cautious in its response to the assault weapons debate. Their reticence is understandable. By moving against a category of firearm that is not only a long gun, but difficult to define, they run the risk of appearing to prove the gun lobby right: that is, that handgun restrictions are merely the first step down the aforementioned slippery slope.

In the past, the "gun control" debate was easily defined. "Good" guns were long guns that were used for hunting and sporting purposes, while "bad" guns were easily concealable handguns that had limited sporting use and were prone to misuse.

Previously, the standard for restricting weapons involved
concealability and a cost/benefit analysis:  Is the harm done by
a given category of firearm outweighed by any possible benefit?
Yet, although assault weapons are frequently misused and many are
more concealable than standard long guns, a new standard is
emerging:  For what purpose was this weapon designed?  The first
application of this standard came in 1986, when Congress voted to
outlaw the future production of machine guns for civilian use.
The number of criminal incidents involving legally owned machine
guns prior to the ban had been few.  Yet, Congress saw no reason
for this category of weapon to remain in civilian hands.

Handgun Control Inc. (HCI), based in Washington, D.C., is
America's leading handgun restriction organization.  The
organization has more than 180,000 dues-paying members and an
annual budget of more than $4 million.  Its vice-chair is Sarah
Brady, wife of White House press secretary James Brady, who was
injured in the March 1981 assassination attempt on President
Reagan.  In its organization brochure, HCI calls for the
"restriction on the sale of UZI-type assault weapons, the
weapons of war like that used in the 1983 McDonald's massacre in
California."  The organization adopted this stand in 1983.
Recently, HCI has run newspaper ads calling for unspecified
restrictions on assault weapons, labeling them "drug guns."  In
addition, HCI came out in favor of banning the Striker-12 from
import.  In addition to its stand on "UZI-type assault weapons,"
the organization favors a waiting period with background check
for all handgun purchases, a ban on the sale of snub-nosed
handguns, and a ban on the production and sale of plastic
handguns.[120]

The National Coalition to Ban Handguns (NCBH), based in
Washington, D.C., is a coalition of 31 national religious,
professional, educational, and public health organizations that
favors banning the sale and private possession of handguns in
America.  Exceptions to this would include possession by police,
military personnel on active duty, target shooters who keep and
use their handguns at bona fide shooting clubs, and federally
licensed collectors.  NCBH has approximately 20,000 members and
an annual budget of $400,000.  Prior to 1985, the organization
dealt only with handguns.  But in May of that year, its board
voted to work to ban the sale and private possession of machine
guns.  Currently, its board is considering whether to endorse
banning the sale and private possession of assault weapons.  It
is scheduled to reach a decision at its November 1988
meeting.[121]

The Law Enforcement Steering Committee is the leading
voice of law enforcement on the gun control issue.  The Committee
consists of:  the Federal Law Enforcement Officers Association;
the International Association of Chiefs of Police; the Fraternal
Order of Police; the International Brotherhood of Police
Officers; the National Association of Police Organizations; the
Police Executive Research Forum; the Police Management

Association; the Police Foundation; the Major Cities Chief
Administrators; the National Organization of Black Law
Enforcement Executives; and the National Troopers Coalition.[122]
As of September 1988, none of the members of the Committee have
adopted an official stand on assault weapons, although the topic
is scheduled to be discussed in the future.[123]

On the federal level, no bills dealing with assault
weapons have yet been introduced in Congress.  It is expected
that such a bill will be introduced sometime during 1989.

On the state level, the first proposed law restricting the
availability of assault weapons was introduced by California
State Representative Art Agnos (Dem., San Francisco) in 1985.
(Agnos was elected mayor of San Francisco in 1987.)  The law,
which would have banned the sale and possession of specific
assault weapons--such as the UZI, MAC, and AR-15--failed to pass.
In 1988, Assemblyman Michael Roos (Dem., Los Angeles) introduced
a measure that also would have banned specific assault weapons.
The bill was later amended to require instead a 15-day waiting
period with background check for all semi-automatic weapons.  The
amended version of the bill failed to pass.  Roos expects to file
a bill next year that would place a waiting period on specific
assault weapons.[124]

In addition, product liability lawsuits have been filed
against manufacturers of assault weapons.  Such suits are based
on the legal theory that the manufacturers of these weapons know
that their products are inherently dangerous and prone to
criminal misuse.  Therefore, they should be held responsible for
the resulting death and injury.  One of the first product
liability suits dealing with an assault weapon was filed on April
22, 1987, against Intratec USA, manufacturers of the TEC-9.  The
suit was filed by the estate of David L. Bengston of Connecticut.
Bengston, a high school janitor, was fatally shot by an eighth
grader on December 10, 1985, with a TEC-9 that belonged to the
student's father.  The student later held a classroom of children
hostage until his father came and convinced him to turn over the
weapon.   In their complaint, attorneys for Bengston argued that
the TEC-9 is in fact a super Saturday Night Special.  The case is
currently awaiting trial.[125]

The first victory for proponents of the legal theory that
some handguns are inherently defective because of specific design
characteristics occurred on October 3, 1985, when the Maryland
Court of Appeals ruled in Kelley v. R. G. Industries that
manufacturers of Saturday Night Specials could be held liable for
their criminal misuse.  The case stemmed from a March 1981
robbery in which the plaintiff, Olen J. Kelley, was shot in the
chest with a Rohm handgun.[126]  (As part of the law outlawing the
sale of Saturday Night Specials passed in Maryland in 1988, the
Maryland legislature--as part of a compromise with the gun lobby-
-added a component that would in effect nullify the Kelley
decision.)

The signs are increasing of a growing awareness that America has an assault weapons "problem." At the end of its July 1988 documentary on handgun violence in America, "Guns, Guns, Guns," NBC reporter Connie Chung notes the increasing misuse of assault weapons like the UZI.[127] In his speech at the Democratic National Convention, Democratic presidential candidate Jesse Jackson, states of drug dealers, "They say, 'We don't have Saturday Night Specials any more.' They say, 'We buy AK-47s and UZIs, the latest lethal weapons. We buy them across the counter on Long Beach Boulevard.' You cannot fight a war on drugs unless and until you are going to challenge the bankers and the gun sellers...."[128]

**CONCLUSION**

Assault weapons are increasingly being perceived by legislators, police organizations, handgun restriction advocates, and the press as a public health threat. As these weapons come to be associated with drug traffickers, paramilitary extremists, and survivalists, their television and movie glamour is losing its lustre to a violent reality.

Because of this fact, assault weapons are quickly becoming the leading topic of America's gun control debate and will most likely remain the leading gun control issue for the near future. Such a shift will not only damage America's gun lobby, but strengthen the handgun restriction lobby for the following reasons:

o    It will be a new topic in what has become to the press and public an "old" debate.

Although handguns claim more than 20,000 lives year, the issue of handgun restriction consistently remains a non-issue with the vast majority of legislators, the press, and public. The reasons for this vary: the power of the gun lobby; the tendency of both sides of the issue to resort to sloganeering and pre-packaged arguments when discussing the issue; the fact that until an individual is affected by handgun violence he or she is unlikely to work for handgun restrictions; the view that handgun violence is an "unsolvable" problem; the inability of the handgun restriction movement to organize itself into an effective electoral threat; and the fact that until someone famous is shot, or something truly horrible happens, handgun restriction is simply not viewed as a priority. Assault weapons--just like armor-piercing bullets, machine guns, and plastic firearms--are a new topic. The weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semi-automatic assault weapons--anything that looks like a machine gun is assumed to be a machine gun--can only increase the chance of public support for restrictions on these weapons. In

addition, few people can envision a practical use for these weapons.

o   <u>Efforts to stop restrictions on assault weapons will only further alienate the police from the gun lobby</u>.

Until recently, police organizations viewed the gun lobby in general, and the NRA in particular, as a reliable friend.  This stemmed in part from the role the NRA played in training officers and its reputation regarding gun safety and hunter training.  Yet, throughout the 1980s, the NRA has found itself increasingly on the opposite side of police on the gun control issue.  Its opposition to legislation banning armor-piercing ammunition, plastic handguns, and machine guns, and its drafting of and support for the McClure/Volkmer handgun decontrol bill, burned many of the bridges the NRA had built throughout the past hundred years.  As the result of this, the Law Enforcement Steering Committee was formed.  The Committee now favors such restriction measures as waiting periods with background check for handgun purchases, and a ban on machine guns and plastic firearms.  If police continue to call for assault weapons restrictions, and the NRA continues to fight such measures, the result can only be a further tarnishing of the NRA's image in the eyes of the public, the police, and NRA members.  The organization will no longer be viewed as the defender of the sportsman, but as the defender of the drug dealer.

o   <u>Efforts to restrict assault weapons are more likely to succeed than those to restrict handguns</u>.

Although the majority of Americans favor stricter handgun controls, and a consistent 40 percent of Americans favor banning the private sale and possession of handguns,[129] many Americans do believe that handguns are effective weapons for home self-defense and the majority of Americans mistakenly believe that the Second Amendment of the Constitution guarantees the individual right to keep and bear arms.[130]  Yet, many who support the individual's right to own a handgun have second thoughts when the issue comes down to assault weapons.  Assault weapons are often viewed the same way as machine guns and "plastic" firearms--a weapon that poses such a grave risk that it's worth compromising a perceived constitutional right.

Although the opportunity to restrict assault weapons exists, a question remains for the handgun restriction movement: How?  Defining an assault weapon--in legal terms--is not easy.  It's not merely a matter of going after guns that are "black and wicked looking."  Although those involved in the debate know the weapons being discussed, it's extremely difficult to develop a

legal definition that restricts the availability of assault weapons without affecting legitimate semi-automatic guns. Most likely, any definition would focus on magazine capacity, weapon configuration, muzzle velocity, the initial purpose for which the weapon (or its full-auto progenitor) was developed, convertibility, and possible sporting applications. Any law based on this definition would, however, need to have a clause to excuse legitimate semi-automatic weapons that would inadvertently fall under it. And although legislation could be passed that would ban specific weapons, the world's arms manufacturers are expert at producing weapons that follow the letter, but not the intent, of the law. This often results in products that are virtually identical to the restricted weapon, yet different enough to remain on the market.

Yet, the framework for restricting assault weapons already exists. On the federal level, ATF currently excludes from import handguns recognized as Saturday Night Specials. This is done by application of criteria designed by the agency that takes into account such things as barrel length, caliber, quality of materials, safety devices, and other factors. Any gun that does not meet the importation threshold cannot be sold in the United States. Any manufacturer whose product is refused for import can challenge the decision in federal court. Criteria to identify and categorize assault weapons could be developed by ATF and applied toward restricting the availability of both foreign- and domestically-produced assault weapons.

The state of Maryland has taken a similar approach in banning the sale of Saturday Night Specials. The 1988 Maryland law established a nine-member board responsible for creating a roster of permitted handguns. The nine members of the board include: the superintendent of the state police; representatives of the Maryland States' Attorney's Association, Maryland Association of Chiefs of Police, Marylanders Against Handgun Abuse, the National Rifle Association, and a Maryland gun manufacturer; and three citizen board members to be determined by the governor. After January 1, 1990, the law requires that no person in Maryland may: manufacture a handgun not on the Handgun Roster, or sell or offer to sell any handgun not on the Handgun Roster that was manufactured after January 1, 1985. In determining whether a handgun has a legitimate use and can therefore be placed on the roster, the board will consider: concealability; ballistic accuracy; weight; quality of materials; quality of manufacture; and reliability as to safety, caliber, and detectability by standard security devices used at airports and courthouses.[131] States could develop similar rosters to ban the sale of assault weapons.

Since passage of the Maryland law, the NRA has collected enough signatures of Maryland residents to bring the measure to referendum on the November 1988 ballot. The NRA's opposition to such a panel is not surprising. The organization fears giving the government, at any level, the power to restrict the

availability of firearms--conjuring up images of a "gun czar."
And although such proposals would solve the definitional problems
posed by assault weapons, it would guarantee fierce opposition
from the gun lobby.

The success of any proposed legislation to restrict
assault weapons and their accessories depends not only on
whether the American public pays attention to the topic, but
agrees that these products are dangerous.  Obviously, some
aspects of America's fascination with assault weapons and their
accessories are here to stay.  Publications are clearly protected
under the First Amendment of the Constitution.  Yet the weapons
themselves, and accessories such as laser sights and grenades
requiring only the explosive charge, can be restricted and even
banned at the local, state, or federal level.  The fact that
assault weapons are increasingly being equated with America's
drug trade may play a major role in motivating the public to call
for their restriction.  Yet, recognizing the country's
fascination for exotic weaponry and the popular images and myths
associated with guns, it may require a crisis of a far greater
proportion before any action is taken.

## APPENDIX I

According to law enforcement officials, federal agencies, and handgun control organizations, the assault weapons of choice appear to be the following (all models are semi-automatic versions):

**AK-47**--The Kalashnikov rifle, also known generally as the AK-47, was developed in the Soviet Union in 1947 by Mikhail T. Kalashnikov. Semi-automatic versions of a Chinese model--the Model 56--are currently imported into the United States, as are models developed by other countries. The Chinese AK-47 produced by POLY Technologies and distributed in the United States by PTK International, Inc., is 34 3/8 inches long. With a folding stock, the weapon has an overall length of 34 5/8 with the stock extended, and approximately 30 inches folded. The weapon can accept 20-, 30-, 40-, and 75-round magazines.[132] Semi-automatic versions of the AK-47 retail for as little as $300.[133]

**AR-15A2**--The AR-15A2, commonly known as the AR-15, is manufactured by Colt Industries of Hartford, Connecticut. It is the civilian version of the company's M-16 machine gun. The AR-15A2 rifle has an overall length of 39 inches. The Government Model Carbine comes with a folding stock. Its overall length with the stock folded is 35 inches, 32 closed. In 1987 the company introduced the Delta HBAR, a sniper rifle version of the rifle. The weapon comes with a 5-round magazine, but can accept a variety of high-capacity magazines.[134] The AR-15A2 retails for approximately $680.

**MAC-10, MAC-11**--The MAC-10 machine pistol was originally developed by Gordon Ingram at Military Armaments Corporation (MAC) in 1969. Soon thereafter, the MAC-11 was marketed and subsequently semi-auto versions of both were developed. MAC went bankrupt in 1978. Currently, the rights for the MAC-10 are owned by a Stephensville, Texas, company which took the Military Armaments Corporation name. Manufacturing rights for the MAC-11 now belong to various corporate entities operated by Sylvia and Wayne Daniels of Georgia.[135] An ad placed in Shotgun News for the semi-auto 9mm M11/9 produced by the Daniels, describes it as "The Gun That Made the '80's' Roar" and characterizes it as being as "American as God, Mom, and Apple Pie!"[136] The 9mm MAC-11 is 12.15 inches long. It comes with a 32-round magazine. The 9mm MAC-10 has a length of 10.5 inches with its stock folded and comes with a 32-round magazine. Both have threaded barrels for the attachment of silencers and barrel extensions.[137] The MAC-11 can retail for as little as $200.

**RUGER MINI-14**--The Ruger Mini 14 is manufactured by Sturm, Ruger & Company, Inc. of Southport, Connecticut, and was introduced into the civilian market in 1975. With a folding stock, the weapon has an overall length of 37.75 inches, 27.5 with the stock closed. The gun comes with a standard 5-round magazine, but magazines have been developed for it that can hold up to 40 rounds.[138] The Mini-14 retails for approximately $330.

**TEC-9**--The 9mm TEC-9 assault pistol was originally developed by Interdynamics AB of Sweden and produced in the U.S. by F.I.E. of Florida. The original version, the KG-9, was easily converted to full auto and was subsequently reclassified as a machine gun by ATF in 1982. Soon after, the weapon was redesigned to sell as a semi-auto and reclassified the KG-99. Subsequently, a Hong Kong company bought the rights to the weapon from Interdynamics AB and a new company, Intratec USA, was formed in the United States to manufacture the weapon, now dubbed the TEC-9. In November of 1987, Intratec USA reorganized to become Intratec. Twelve and a half inches long, the lightweight TEC-9 comes with a 36-round magazine. The TEC-9M, a smaller version of the weapon, is 10.5 inches long. Both have threaded barrels so that they can accept silencers and barrel extensions. High-impact plastic is used for the gun's receiver, magazine well, and pistol grip.[139] Promotional material for the guns describe them as being "high-spirited" and "weapons that are as tough as your toughest customers."[140] The TEC-9 retails for approximately $250.

**UZI**--Manufactured by Israeli Military Industries, the 9mm UZI was designed in the early 1950s by Army Major Uziel Gal. In 1979, a semi-automatic version was first imported to the United States for civilian sale by Action Arms of Philadelphia. The UZI semi-auto carbine has an overall length of 24.4 inches with its stock folded, 31.5 with the stock open, and comes with a standard 25-round magazine. In 1984, the company introduced the UZI pistol, which has an overall length of 9.45 inches. In 1987, Israeli Military Industries introduced the Mini-UZI carbine, which with its stock folded has an overall length of 26.1 inches, 35.75 with the stock unfolded.[141] A 1988 Action Arms ad for the UZI exclaims, "When the going gets tough...the tough get an UZI. Whether for a backwoods camp, RV or family home, don't trust anything less. The UZI Carbine is the perfect choice for the sportsman who wants unfailing reliability and top performance in a rugged, compact size." With a kit that will allow the weapon to use .22 ammunition, the gun becomes "an inexpensive plinker."[142] The UZI carbine retails for approximately $700, the pistol for $510.

**APPENDIX II**

Paramilitary weapons are just the latest topic in the ongoing debate over the role of specific categories of firearms in American society.  Unfortunately, there is often confusion among the press and public--and even among handgun restriction advocates--regarding the various types of firearms.  In an article published in the April 1987, <u>American Rifleman</u>, National Rifle Association staff member Paul Blackman writes, "When a reporter calls a semi-automatic rifle, pistol or shotgun a "submachine gun"...He may just not know any better."  Blackman's right.  He points out that <u>The Associated Press Stylebook and Libel Manual</u> incorrectly defines a "submachinegun" as "A lightweight automatic or semiautomatic gun firing small arms ammunition."[143]

Recognizing this, descriptions of the various categories of firearms are as follows:

Firearms refer to weapons that use a powder charge to fire a projectile.  (Airguns such as BB and pellet guns use a burst of air to fire their projectiles and hence are not considered firearms, although they are capable of inflicting severe or fatal injuries.)

Firearms have been broken down into essentially two groups: long guns and handguns.  Long guns are weapons designed to be fired from the shoulder.  According to ATF standards, to qualify as a rifle, the shoulder-fired weapon must have a barrel length of 16 inches, 18 inches for a shotgun.[144]  Handguns are firearms designed to be fired from a single hand and are usually defined as having an overall length of less than 18 inches.[145]  Repeating firearms are those that allow the shooter, by operating a mechanism on the gun, to load another round into the gun after a shot has been fired.  Manually operating the bolt, lever, pump, or other mechanism extracts and ejects the empty case after the cartridge has been fired.  It then reloads a fresh shell or cartridge from the magazine into the chamber and cocks the gun.  Semi-automatic guns do this automatically when they fire.  With each squeeze of the trigger the semi-automatic repeats the process of firing, ejecting, and reloading.[146]  Although a semi-automatic will fire only one cartridge per trigger pull, an automatic will continue to fire cartridges as long as the trigger is pulled.  An automatic is also known as a machine gun.  More than 119 million rifles and shotguns have been produced in the U.S. since 1899.[147]  It is estimated that the majority of these weapons remain in circulation.

Handguns can be either revolvers or semi-automatic pistols.  Revolvers have a round cylinder that is actually the magazine and acts as a chamber when properly aligned with the barrel.  In double-action revolvers, each time the trigger is pulled the weapon fires and the cylinder advances to the next chamber.  Single-action revolvers require that the hammer be

manually cocked before each shot.  A revolver's cylinder usually holds six cartridges.  Instead of a revolving cylinder, a semi-automatic handgun (also known as a pistol) carries its extra cartridges in a magazine usually located in the handle of the handgun.  Spring pressure forces the cartridges upward in the magazine.  Each time the weapon is fired, a new cartridge is moved up and is loaded into the chamber.  Pistol magazines usually hold between 14 and 17 cartridges.[148]  Pistols are often known as "automatics" although they do require a separate trigger pull for each shot.  Pistols that are fully-automatic, that is, that will continue to fire as long as the trigger is pulled, are known as machine pistols.

Handguns with barrel lengths of three inches or less are known as "snubbies."  Snubbies are preferred by criminals because of their increased concealability.  A subcategory of snubbies are Saturday Night Specials--inexpensive, inaccurate snubbies made of inferior materials.  Because of their low quality and inaccuracy, these weapons have no sporting purpose and are best suited for criminal use.  There are an estimated 35 to 40 million handguns in America.[149]

Assault firearms are semi-automatic (firing one bullet per trigger pull) and fully automatic (the weapon will keep on firing as long as the trigger is depressed) anti-personnel rifles, shotguns, and handguns that are designed primarily for military and law enforcement use.  With muzzle velocities that are often greater than standard long guns, and high-capacity ammunition magazines, assault weapons are built to kill large numbers of human beings quickly and efficiently.  Most assault weapons have no legitimate hunting or sporting use.  Assault rifles and shotguns often have pistol grips and folding stocks, and are typically lighter and more concealable than standard long guns.  Some assault pistols have threaded barrels for the easy attachment of silencers.  Many assault weapons are merely semi-automatic versions of military machine guns, making them easier to convert to fully automatic machine guns.

1.   McNamara, Joseph D., "Developing a Rational, National Firearms Policy," The Police Chief, (March 1988), p. 26.

2.   It was estimated by the National Coalition to Ban Handguns in 1985 that there were more than 500,000 assault weapons in civilian hands, an unknown number of which had been converted to fully automatic machine guns, a figure which the Bureau of Alcohol, Tobacco and Firearms concurred with.  Recent estimates in the press (See footnote #5) have put the figure at between 650,000 and two million. Because of the fact that manufacturers are not required to release sales figures and there is no differentiation between standard long guns and assault weapons in reporting, there are no totally reliable figures on America's assault weapons population.

3.   McNamara, p. 26.

4.   "Virginia Man Held for Transporting Guns," The Washington Post, (January 30, 1988), p. A7.

5.   "The Arms Race in Your Own Back Yard," U.S. News & World Report, (April 4, 1988), p. 24.

6.   "Machine Gun U.S.A.," Newsweek, (October 14, 1985), p. 50.

7.   "Three Officers Slain Serving Routine Warrant," United Press International, July 10, 1987.  Additional information obtained from the Inkster, Michigan, police department, August 1988.

8.   "11 Hostages Held at Virginia Shopping Mall," The Washington Post, (September 15, 1988) p. A22.

9.   Coates, James, Armed and Dangerous:  The Rise of the Survivalist Right, Hill and Wang, New York, (1987), p. 8.

10.   Fox, James Alan and Levin, Jack, Mass Murder: America's Growing Menace, Plenum Press, New York and London, (1985), p. 63.

11.   Interview with David W. Cooney, attorney for the estate of David Bengsten, August, 1988.

12.   "Manassas Mourns 1st Officer Slain in 115 Years," The Washington Post, (July 26, 1988), p. A1, A9.

13.   "Florida Gunman Charged With Killing 6," The New York Times, (April 25, 1987), p. A9.

14.   "Seized Arsenal Tied to "Crack Dealers," <u>The Washington Post</u>, (March 8, 1988), p. A6.  Additional information obtained from ATF New York office, September, 1988.

15.   "Arms Race Escalates," <u>The Washington Post</u>, (February 23, 1988), p. B5.

16.   .Interview with ATF spokesperson Tom Hill, July 1988.

17.   Interview with Detective Bohannon, July 1988.

18.   Lawn, John C., "Drug Dealers' Sophisticated Weaponry Poses Continuing Threat," <u>The Police Chief</u>, (March 1988), p. 47.

19.   "D.C. Police to Boost Drug War Firepower," <u>The Washington Post</u>, (February 10, 1988), p. A1, A12.

20.   "Arms Race Escalates,"  p. B5.

21.   Interview with ATF spokesperson Tom Hill, August 1988.

22.   American Industries advertisement, <u>Firepower,</u> (September 1988), inside back cover.

23.   Information obtained from American Industries, 405 East 19th Street, Bakersfield, California, August 1988.

24.   Street Sweeper advertisement, <u>Shotgun News</u>, (January 20, 1988), p. 154, 155.

25.   "The Arms Race in Your Own Back Yard," p. 24.

26.   Interview with DEA spokesperson Maurice Hill, July 1988.

27.   Interview with ATF spokesperson Tom Hill, July 1988.

28.   McGuire, Phillip C., "Jamaican Posses:  A Call for Cooperation Among Law Enforcement Agencies," <u>The Police Chief</u>, (January 1988), p. 22.

29.   Coates, p. 136.

30.   Coates, p. 143.

31.   "Suspect Denies Having Role in Plot to Kill Jackson," <u>Detroit Free Press</u>, (May 19, 1988), p. 16A.

32.   Information obtained from the National Coalition to Ban Handguns.

33.   Information obtained from Bureau of Alcohol, Tobacco and Firearms.

34.   Information obtained from the Bureau of Alcohol, Tobacco and Firearms.

35.   Information obtained from the National Coalition to Ban Handguns.

36.   Information obtained from the National Coalition to Ban Handguns.

37.   "Militarism in America," _The Defense Monitor_, Volume XV, Number 3, p. 1.

38.   Interview with Daniel Amundson, September 1988.

39.   Interview with Daniel Amundson, July 1988.

40.   Production figures obtained from the Bureau of Alcohol, Tobacco, and Firearms by the Educational Fund to End Handgun Violence under the Freedom of Information Act.

41.   Information obtained from the National Coalition to Ban Handguns.

42.   Colt Industries advertising flyer.

43.   Heckler & Koch advertising flyer.

44.   F.I.E. advertisement, _Firepower_, (September 1988), inside front cover.

45.   Daisy 1986 Airguns, Ammo and Accessories Catalog. Obtained from Daisy Manufacturing Company, Inc., Rogers, Arkansas, 72757-0220.

46.   Crosman Airguns 1987 catalog.  Obtained from Crosman Airguns, Routes 5 & 20, East Bloomfield, New York, 14443.

47.   Larc International advertisement, _Shotgun News_, (January 20, 1988), p. 114.

48.   Command Post, Inc., _Firepower_, (September 1987), p. 63.

49.   Daisy 1988 Toy Gun catalog.  Obtained from Daisy Manufacturing Company, Inc., Rogers, Arkansas, 72757-0220.

50.   Interview with IACP spokesperson Wendy Howe, July 1987.

51.   Interview with Daisy spokesperson David Lewis, August 1988.

52.   Interview with Everett Moore, July 1988.

53.   _American Survival Guide_, (August 1988), p. 4.

54.   _American Survival Guide_, p. 66.

55. Interview with Amerian Survival Guide spokesperson, July 1988.

56. Adair, James B., "The Amazing Soft-Drink Silencer," Eagle, (October 1983), p. 14, 15.

57. Special Weapons, (1988 annual), inside front cover.

58. Special Weapons, p. 2.

59. Steele, David, "The Offensive Handgun," Special Weapons, (1988), p. 68.

60. Steele, p. 69.

61. Steele, p. 70.

62. Soldier of Fortune, (August 1988), p. 1.

63. Soldier of Fortune, p. 1.

64. "Soldier of Fortune Magazine is Sued Over Slaying," New York Times, (February 14, 1988), p. 27.

65. "Magazine is Ordered to Pay $9.4 Million," The New York Times, (March 4, 1988), p. A12.

66. New Breed, (July/August 1988), p. 5.

67. Haire, Chad A., "Shot Show 1988," New Breed, (July/August 1988), p. 16.

68. Information obtained from the National Coalition to Ban Handguns.

69. J. Bird Manufacturing advertisement, Shotgun News, (July 20, 1988), p. 78.

70. National Vanguard Books advertisement, Shotgun News, (January 20, 1988), p. 84.

71. Survival Systems book catalog, #701, (1988), p. 2. Obtained from Survival Systems, P.O. Box 30309, Phoenix, Arizona, 85046.

72. Survival Systems, p. 2.

73. Survival Systems, p. 12.

74. Survival Systems, p. 12.

75. Survival Systems, p. 19.

76. _Paladin Press_ catalog, Vol. 18, No. 1, p. 24.  Obtained from Paladin Press, P.O. Box 1307, Boulder, Colorado, 80306.

77. _Paladin Press_, p. 20.

78. _Paladin Press_, p. 23.

79. _Paladin Press_, p. 26.

80. _Paladin Press_, p. 34.

81. _Paladin Press_, p. 14.

82. Desert Publications advertisement, _Firepower_, (July 1987), p. 99.

83. Interview with Everett Moore, July 1988.

84. _The Right Stuff_, Phoenix Systems Inc., p. 14.  Catalog obtained from Phoenix Systems Inc., P.O. Box 3339, Evergreen, Colorado, 80439.

85. _The Right Stuff_, p. 15.

86. _The Right Stuff_, p. 18.

87. _The Right Stuff_, p. 27.

88. BMF Activator advertising literature.  Literature received from BMF Activator, P.O. Box 262364, Houston, Texas, 77207.

89. Orpheus Industries advertising literature.  Literature received from Orpheus Industries, P.O. Box 1415, Montrose, Colorado, 81402.

90. Firearms Systems and Design, Inc. advertisement, _Shotgun News_, (June 1, 1988), p. 97.

91. API Marketing Inc. advertising literature.  Literature received from API Marketing Inc., 1600 Monrovia Avenue., Newport Beach, California, 92663.

92. Kephart Publications advertisement, _Shotgun News_, (June 20, 1988), p. 166.

93. The Anite Co. advertisement, _Firepower_, (January 1988), p. 91.

94. MWG Company advertisement, _Shotgun News_, (June 1, 1988), p. 148.  Pricing information obtained from MWG Company, Miami, Florida, September, 1988.

95.    Mail Order Video advertisement, <u>Firepower</u>, (January 1988), p. 3.

96.    Gilbert, Wayne R., Deputy Assistant Director, Criminal Investigative Division, Federal Bureau of Investigation, opening statement before the Subcommittee on Security and Terrorism, Committee on the Judiciary, United States Senate, (October 2, 1985).  Obtained from the Center for Defense Information, 1500 Massachusetts Ave., NW, Washington, D.C., 20036.

97.    Denton, Jeremiah, U.S. Senator, statement before the Subcommittee on Security and Terrorism, Committee on the Judiciary, United States Senate, (October 2, 1985).  Obtained from the Center for Defense Information, 1500 Massachusetts Ave., NW, Washington, D.C., 20036.

98.    "Combat Schools Sprout in America's Backwoods," <u>U.S. News & World Report</u>, (October 14, 1985), p. 72.

99.    "Combat Schools Sprout in America's Backwoods,"  p. 73.

100.   "ADL Paramilitary Training Statute:  A Response to Extremism," <u>ADL Law Report</u>, (Fall, 1986), p. 1.  Obtained from the Anti-Defamation League of B'nai B'rith, 823 United Nations Plaza, New York, NY, 10017.

101.   "ADL Paramilitary Training Statute:  A Response to Extremism," p. 1.

102.   Hartnett, Daniel M., Acting Deputy Associate Director, Law Enforcement, Bureau of Alcohol, Tobacco and Firearms, statement before Subcommittee on Security and Terrorism, Committee on the Judiciary, United States Senate, (October 2, 1985).  Obtained from Center for Defense Information, 1500 Massachusetts Avenue, NW, Washington, DC, 20036.

103.   "ADL Paramilitary Training Statute:  A Response to Extremism," p. 3.

104.   Press Release, Anti-Defamation League of B'nai B'rith, (October 30, 1986).

105.   "ADL Paramilitary Training Statute:  A Response to Extremism," p. 4.

106.   "ADL Paramilitary Training Statute:  A Response to Extremism," p. 7-12.  Additional information obtained from ADL, July, 1987.

107.   "Paramilitary Training Legislation" fact sheet, National Rifle Association, p. 1.  Received from the National Rifle Association Institute for Legislative Action, 1600 Rhode Island Avenue, NW, Washington, D.C., 20036.

108.  Brigade Security Forces pamphlet.  Literature received from Brigade Security Forces, P.O. Box 1237, Mooresville, North Carolina, 28115.

109.  Information obtained from the National Coalition to Ban Handguns.

110.  Semi-Auto Arms--The Citizen's Choice, National Rifle Association Institute for Legislative Action, (June 1987), p. 1.

111.  Semi-Auto Firearms--The Citizen's Choice, p. 11.

112.  Semi-Auto Firearms--The Citizen's Choice, p. 17.

113.  "NRA to Fight Machine Gun Ban," Monitor, Volume 13, Number 13, (August 15, 1986), p. 1.  The Monitor is a publication of the National Rifle Association's Institute for Legislative Action.

114.  "NRA to Fight Machine Gun Ban," p. 3.

115.  "NRA to Fight Machine Gun Ban," p. 3.

116.  "NRA to Fight Machine Gun Ban," p. 3.

117.  "NRA to Fight Machine Gun Ban," p. 1.

118.  "Drug Thugs and Rambo Guns," The New York Times, (August 1, 1988), p. A14; "War on Drugs, War on Guns," The New York Times, (August 28, 1988), p. 22.

119.  Interview with Citizens Committee for the Right to Keep and Bear Arms Executive Director John Hosford, July 1988. Additional information obtained from staff member Jan Grant, September 1988.

120.  Handgun Control Inc. organization brochure, obtained from Handgun Control Inc., 1225 I Street, NW, Suite 1100, 20005.  Additional information obtained from HCI Communications Director Barbara Lautman.

121.  Interview with National Coalition to Ban Handguns President Michael K. Beard, September, 1988.

122.  Interviews with Arnetta Porter, Police Foundation, 1001 22nd Street, NW, Suite 200, 20037, August 1988, September 1988.

123.  Interview with Martha Plotkin, Police Executive Research Forum, 2300 M Street, NW, Suite 910, Washington, D.C., 20037, August 1988.

124.  Interview with Helen Mansfield, office of California
      Assemblyman Michael Roos, August 1988.

125.  Interview with David Cooney, attorney for the estate of
      David Bengston, August 1988.

126.  "Maryland Court Ruling Could Ban Handguns," The Banner,
      (1985), p. 1.  The Banner is the newsletter of the
      National Coalition to Ban Handguns.

127.  "Guns, Guns, Guns," NBC News documentary, July 5, 1988.

128.  "Jackson Talks of Hope, Dreams As He Weaves 'Quilt of
      Unity,'" Congressional Quarterly, (July 23, 1988),
      p. 2059.

129.  "Public Continues to Favor Stringent Curbs on Handguns,"
      The Gallup Poll, (May 11, 1986).

130.  Information obtained from the National Coalition to Ban
      Handguns.

131.  "The Maryland Handgun Roster Law," press release, issued
      by the Office of the Attorney General, Baltimore,
      Maryland.

132.  Long, Duncan, Assault Pistols, Rifles and Submachine Guns,
      Citadel Press, Secaucus, (1986), p. 89-98.  Additional
      information obtained from PTK International, Inc., 2814
      New Spring Road, Suite 340, P.O. Box 724827, Atlanta,
      Georgia, 30339.

133.  All prices quoted are based on information received from
      Virginia and California gun stores.

134.  Information obtained from Colt Industries, P.O. Box 1868,
      Hartford, CT, 06101.

135.  Long, p. 21-24.  Additional inform from firearms product
      liability attorney D. Michael Hancock, September 1988.

136.  Cobray advertisement, Shotgun News, (July 1, 1988),
      p. 143.

137.  Long, p. 21-24.

138.  Information obtained from Sturm, Ruger & Company,
      Southport, Connecticut, 06490.

139.  Long, p. 41-43.  Additional information obtained from
      Intratec, 11990 S.W. 128 Street, Miami, Florida, 33186.

140.   Intratec advertising brochure.  Obtained from Intratec, 11990 S.W. 128 Street, Miami, Florida, 33186.

141.   Long, p. 48-51.  Additional information obtained from Action Arms, P.O. Box 9573, Philadelphia, Pennsylvania, 19124, August 1988.

142.   Action Arms advertisement, Gun World, (April 1988), p. 35.

143.   Blackman, Paul, "Mugged by the Media," American Rifleman, (April 1987), p. 34.

144.   Information obtained from Bureau of Alcohol, Tobacco and Firearms.

145.   Information obtained from the National Coalition to Ban Handguns.

146.   Hunting Safety and Conservation Program, National Rifle Association, (1973, revised 1976), p. 19.

147.   Information obtained from Bureau of Alcohol, Tobacco and Firearms.

148.   Hunter Safety and Conservation Program, p. 20.

149.   Information obtained from the National Coalition to Ban Handguns.