Jennifer Loeb*
Freshfields Bruckhaus Deringer US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
jennifer.loeb@freshfields.com

Christopher D. Thomas (#8203)
1001 Bishop Street, Suite 2925
Honolulu, Hawai'i 96813
(808) 261-7710
cthomas@hawaiianfamilylaw.com

*Attorneys for Amici Curiae*
Giffords Law Center, Brady, and March for Our Lives

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, ET AL., | Civil No. 1:22-cv-00404-DKW-RT |
| Plaintiffs, | BRIEF OF [PROPOSED] AMICI CURIAE GIFFORDS, BRADY, AND MARCH FOR OUR LIVES |
| v. | IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION |
| ANNE E. LOPEZ, *in her official capacity as the Attorney General for the State of Hawai'i,* | |
| Defendant. | |

## BRIEF OF [PROPOSED] *AMICI CURIAE*
## GIFFORDS LAW CENTER, BRADY, AND MARCH FOR OUR LIVES
## IN SUPPORT OF DEFENDANT'S OPPOSITION TO
## PLAINTIFFS'MOTION FOR A PRELIMINARY INJUNCTION

*\*Pro hac vice*

**TABLE OF CONTENTS**

I.    INTEREST OF *AMICI CURIAE* ....................................................................1

II.   INTRODUCTION ...........................................................................................2

III.  ARGUMENT...................................................................................................3

    A.  The Challenged Provisions Do Not Implicate the Second Amendment Because They Impose No Burden on the Right to Self-Defense. .............3

        1.  Assault Pistols Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment. ..................................................................4

            (a)  *Detachable Magazines (HRS § 134-1)*.............................5

            (b)  *Forward Hand Grips (HRS § 134-1(2))*...........................6

            (c)  *Flash Suppressors (HRS § 134-1(2))* ...............................6

            (d)  *A Weight of Fifty Ounces or More (HRS § 134-1(4))*.......7

        2.  Regulation of LCMs Likewise Imposes No Burden on Self-Defense. ....................................................................................8

    B.  In Any Event, the Challenged Provisions Are Analogous to Historical Regulations of Firearms and Are Therefore Constitutional Under the Second Amendment..............................................................................10

        1.  *Bruen*'s Nuanced Analysis Effectively Requires the Consideration of Empirical Research When Evaluating Historical Analogues. ............................................................11

        2.  The Challenged Provisions Address Unprecedented Social and Technological Conditions. .....................................................12

            (a)  *The Frequency and Lethality of Premeditated Public Mass Shootings Is, Itself, A Novel Societal Concern*.......12

i

(b) *The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns, Which the Founders Could Never Have Imagined.* ..........................................13

(i) <u>Social Media</u>...............................................13

(ii) <u>Urbanization</u>.................................................15

(c) *Advances In Gun Technology Have Combined with These Societal Changes to Create the Perfect Storm for Mass Shootings.* .......................................................16

3. The Challenged Provisions Are Analogous to Historical Firearms Restrictions that Did Not Unconstitutionally Burden the Right of Armed Self-Defense...........................................18

(a) *Excessively Dangerous Weapons* ...................................19

(b) *Concealed Carry* .........................................20

4. The Challenged Provisions Are "Relevantly Similar" to Historical Laws Restricting Weapons Capable of Firing Repeatedly Without Reloading. .............................................23

IV. CONCLUSION..................................................................25

# Table of Authorities

**Cases**                                                                            **Page(s)**

*Andrews v. State,*
    50 Tenn. 165 (1871)............................................................................20

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal,*
    No. 17-CV-10507, 2018 WL 4688345 (D.N.J. Sept. 28, 2018)....................9, 10

*Duncan v. Bonta,*
    19 F.4th 1087 (9th Cir. 2021) ...........................................................10

*English v. State,*
    35 Tex. 473 (1871)............................................................................20

*Heller v. D.C.,*
    670 F.3d 1244 (D.C. Cir. 2011) ..............................................*passim*

*Kolbe v. Hogan,*
    849 F.3d 114 (4th Cir. 2017) ................................................................8

*McDonald v. City of Chicago, Ill.,*
    561 U.S. 742 (2010).............................................................................3

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022).........................................................*passim*

*O'Neill v. State,*
    16 Ala. 65 (1849) .............................................................................19

*Oregon Firearms Fed'n, Inc. v. Brown,*
    No. 22-CV-1815, 2022 WL 17454829 (D. Or. Dec. 6, 2022).....................9, 23

*State v. Buzzard,*
    4 Ark. 18 (1842)...............................................................................21

*State v. Chandler,*
    5 La. Ann. 489 (1850)........................................................................21

*State v. Jumel,*
    13 La. Ann. 399 (1858).......................................................................22

*State v. Mitchell*,
  3 Blackf. 229 (1833) .......................................................................20

*State v. Reid*,
  1 Ala. 612 (1840) ............................................................................21

*Ex parte Thomas*,
  97 P. 260, 265 (Okla. Sup. Ct. 1908)...............................................20

*Worman v. Healey*,
  922 F.3d 26, 37 (1st Cir. 2019) .......................................................10

**Statutes**

Act of Apr. 8, 1933 Ohio Laws 189, 189, § 12819-3 ............................24

Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, §§ 1, 4 ........24

Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess 245, 245, § 1 ...............24

Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650,
  652...................................................................................................24

Act of June 2, 1927 Mich. Pub. Acts 887, 888, § 3 .............................24

Hawai'i Revised Statutes §§ 134-1, 134-4, 134-8 ...........................*passim*

Haw. Sess. Laws Act 286 ....................................................................12

**Other Authorities**

Alejandro De La Garza and Michael Zennie, *Dayton Shooting Lasted
  Just 32 Seconds and Left 9 Dead. Here's the Latest on the
  Tragedy*, TIME (Aug. 9, 2019) https://tinyurl.com/4wem6j5e ...........16

Allen Rostron, *Style, Substance, and The Right to Keep and Bear
  Assault Weapons*, CAMPBELL L. REV. 301, 321 (2018).......................7

Anthony Foster, *How Heavy is a Gun? Average Weights of Pistols
  and Rifles*, ANTHONY ARMS (Nov. 6, 2022),
  https://tinyurl.com/2p92bwc9 .........................................................7

Bonnie Berkowitz & Chris Alcantara, *Mass Shooting Statistics in the United States*, WASH. POST, (May 9, 2021), https://tinyurl.com/537ww9z4 ............................................................13

Chris Baker, *How Much Ammo Capacity Is Enough?* LUCKY GUNNER (Sep. 2, 2016), https://tinyurl.com/47kz2tsh .......................................9

Christopher Ingraham, *What 'Arms' Looked Like When The 2nd Amendment Was Written*, WASH. POST (June 13, 2016), https://tinyurl.com/3r97vnmj ..........................................................16

Claude Werner, *The Armed Citizen - A Five Year Analysis*, GUNS SAVE LIVES (Mar. 12, 2012), https://tinyurl.com/tadt7wez.................................9

Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, MILITARY FACTORY, (Mar. 12, 2019), https://tinyurl.com/p88kcaye.................17

David Workman, *Handgun Vs AR Pistol: What's the difference?*, CROSSBREED HOLSTERS, https://tinyurl.com/bdcv7v4e ......................................7

EDUC. FUND TO STOP GUN VIOLENCE, *Assault Weapons and Large Capacity Magazines*, https://tinyurl.com/yjmaba4k ............................................6

Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, FORBES (Feb. 15, 2017), https://tinyurl.com/2hudma2t................................................................17

FLA. DEP'T OF L. ENF'T, *Marjory Stoneman Douglas High School Public Safety Commission Report* 34 (Jan. 2, 2019), https://tinyurl.com/bdf9n2vk ...............................................................8

GUNCRITIC, Winchester Model 1866 Yellow Boy, https://tinyurl.com/2p8j76xe..........................................................17

GUN VIOLENCE ARCHIVE, *Mass Shooting Data from 2020, 2021, and 2022*, https://tinyurl.com/bdrp2snp....................................................13

H. Stand. Comm. Rep. No. 1261-92, in 1992 House Journal, at 1382..............22, 23

James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, MINUTEMAN REVIEW (Feb. 7, 2023), https://tinyurl.com/5n9as9ye.............................................................16

v

Josh Keller, et al., *Why the Orlando Shooting Was So Deadly*, NY TIMES (June 12, 2016), https://tinyurl.com/35j3dfbz ........................................16

Joshua Horwitz, *Killing Machines: The Case for Banning Assault Weapons*, EDUC. FUND TO STOP GUN VIOLENCE (Sep. 2003) ..............................6

Kenzie Fitzpatrick, *The Best AR Pistols*, AM. FIREARMS (Mar. 16, 2022), https://tinyurl.com/c5a6nx6f .....................................................................7

Kevin Michalowski, *The Statistically Perfect Gunfight*, U.S. CONCEALED CARRY ASS'N (Feb. 25, 2019), https://tinyurl.com/3upbexr9....................................................................9

Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, *1990-2017*, 109 AM. J. PUB. HEALTH 1754, 1754-55 (2019)............................................................................8

Maria Hammack, "A Brief History of Mass Shootings," BEHIND THE TOWER (2016), https://tinyurl.com/yc85z9pn.....................................................13

Michael Jensen et al., *Use of Social Media By US Extremists*, NAT'L CONSORTIUM FOR STUDY TERRORISM AND RESPONSES TO TERRORISM (2019), https://tinyurl.com/3s9nmbbc .............................................14

NECKBONE ARMORY, *Are Ar-15 Magazines Interchangeable?* https://tinyurl.com/hppuzpb2 ..............................................................................16

OFF. N.Y. ST. ATT'N GEN., *Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022* (Oct. 18, 2022) .....................................................................................................14

Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, CAMBRIDGE UNIV. PRESS (Aug. 24, 2020), https://tinyurl.com/bdds6wf9................................................................................14

Sam Bocetta, *The Complete History of the AR-15 Rifle*, SMALL WARS JOURNAL (July 12, 2017), https://tinyurl.com/2jwemryz .....................................5

Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27 ...........................8

Sara Swann, *The History of the AR-15 and How it Became a Symbol of American Gun Culture*, POYNTER (June 29, 2022), https://tinyurl.com/5bffkafr..................................................................................5

Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, ROLLING STONE (Feb. 22, 2018), https://tinyurl.com/4nedm6fa.................................................................5

Tim Reid, *'Copycat' Mass Shootings Becoming Deadlier, Experts Warn After New York Attack*, REUTERS (May 15, 2022), https://tinyurl.com/bdzbf8us.............................................................15

Tom McHale, *What You Need to Know About AR Pistol Caliber Choices and Ballistics*, OUTDOORHUB (Jan. 29, 2019) https://tinyurl.com/26bnej7f ............................................................17

UBERTI USA, 1866 Yellowboy Rifle History, https://tinyurl.com/3x2wjth3...............................................................17

U.S. CENSUS BUREAU, POP CULTURE: 1800 (Dec. 9, 2022), https://tinyurl.com/78cxvafx..............................................................15

U.S. CONCEALED CARRY ASS'N, *AR Pistol*, https://tinyurl.com/4dk3ycvz ............................................................5

Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes Investigation*, NPR (Jan. 29, 2019), https://tinyurl.com/3v2aycdk ..................16

WINCHESTER GUN STORE, *Winchester Model 1866 Short 38 Special Lever Action Rifle*, https://tinyurl.com/yc3cv2zc ...............................17

## I.      INTEREST OF *AMICI CURIAE*

*Amici curiae* are national gun violence prevention organizations with an acute interest in ensuring that firearms are regulated in ways that will reduce the staggering incidence and toll of gun violence in this country. *Amici* also wish to ensure that litigation concerning the constitutionality of firearms regulations is appropriately informed by relevant empirical research, authorities, and factual information of the sort addressed in this brief.

Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities.

Brady is the nation's longest-standing non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action.

March for Our Lives ("MFOL") is a youth-led non-profit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies that will save lives.

Through partnerships with researchers, public health experts, and community organizations, *amici* conduct research for, draft, and defend laws, policies, and programs proven to reduce gun violence. *Amici* also advocate for the interests of gun

1

owners and law enforcement officials who consider that Second Amendment rights are (and have always been) consistent with limitations found in gun safety legislation and for community violence prevention. Giffords Law Center, Brady, and MFOL have filed numerous *amicus* briefs in cases involving the constitutionality of firearms regulations, and courts have often cited the organizations' research and expertise.

## II.    INTRODUCTION

Hawai'i Revised Statutes §§ 134-1, 134-4, and 134-8 (the "Challenged Provisions") restrict the possession and use of assault pistols and detachable magazines capable of holding more than ten rounds of ammunition ("LCMs"). This conduct is not protected by the plain text of the Second Amendment both because the weapons, features, and accessories governed by the Challenged Provisions are uniquely dangerous, and because they are not quintessentially used for self-defense. Rather, these weapons and features are designed to kill large numbers of people quickly, making them significantly more lethal than other firearms currently available and not of the variety needed or used for self-defense.

The Challenged Provisions are also constitutional under the second prong of the new test set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* dictates that if a law regulates conduct covered by the plain text of the Second Amendment, a court evaluating the law must determine if it "is

2

consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Here, the Challenged Provisions, which were designed to address unprecedented social and technological conditions, are constitutional because they are relevantly similar to historical regulations that were designed to address the pressing public safety concerns of the time. *See Bruen*, 142 S. Ct. at 2132-2133.

### III.   ARGUMENT

**A.   The Challenged Provisions Do Not Implicate the Second Amendment Because They Impose No Burden on the Right to Self-Defense.**

*Bruen* holds that "the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." 142 S. Ct. at 2125; *see also id.* at 2133 ("As we stated in *Heller* and repeated in *McDonald*, 'individual self-defense is "the central component" of the Second Amendment right.'" (quoting *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)))). The Court's entire analysis in *Bruen* is centered on the "individual right to armed self-defense," *id.* at 2128—and its test is whether "modern and historical regulations impose a comparable burden on the right of armed self-defense," *id*. at 2133. *See also id.* at 2156 ("The constitutional right to bear arms in public for self-defense.").

In this case, the Challenged Provisions do not implicate the Second Amendment because they are entirely attenuated from self-defense. Also, the

Challenged Provisions regulate weapons and features that are uniquely dangerous (step one of the *Bruen* analysis).

> **1.    Assault Pistols Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment.**

The Supreme Court has held that the Second Amendment right to bear "arms" protects the right of law-abiding, responsible citizens to possess a handgun—the "quintessential self-defense weapon"—in and outside the home for self-defense. *Heller*, 554 U.S. at 629; *Bruen*, 142 S. Ct. at 2119. The Court cautioned, however, that the Second Amendment should not be understood as conferring a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," and explicitly endorsed the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 626–27.[1]

Plaintiffs argue that the Challenged Provisions are unconstitutional by equating them with *Heller*'s categorical ban on handguns, claiming there are only "semantic[]" differences between the two regulatory regimes.[2] But far from the D.C. statute involved in *Heller*, which "totally ban[ned] handgun possession," 554 U.S. at 628, the Challenged Provisions here regulate only a narrow subset of pistols with features that turn them into dangerous military-style firearms. As the State describes

---

[1] *Bruen* makes clear that many regulations implicating Second Amendment rights will survive scrutiny under the Court's analytical framework. *See Bruen*, 142 S. Ct. at 2133–34 ("[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check.").

[2] Pls.' Mot. For Prelim. Inj. at 15.

in its Opposition to Plaintiff's Motion for Preliminary Injunction ("Opposition"),
assault pistols (such as the AR-15 pistol) "are essentially shortened, more easily
concealable AR-15 rifles."[3] These weapons trace their origins to a military-grade
rifle designed in the late 1950s.[4] Indeed, it is the AR-15's "phenomenal lethality"
that has made versions of it the U.S. military's standard-issue assault rifle since the
Vietnam War.[5]

More specifically, the features regulated by the Challenged Provisions— such
as (1) forward hand grips; (2) flash suppressors; and (3) a manufactured weight over
50 ounces—render pistols that accept detachable magazines and have any two of
these features uniquely dangerous and significantly distinct from the "quintessential
self-defense weapons" at issue in *Heller*. Moreover, a pistol does not require these
features to be a functional weapon for self-defense.

(a) *Detachable Magazines (HRS § 134-1)*

Detachable magazines equip firearms with a drastically higher ammunition
capacity because the number of rounds a detachable magazine can hold is not limited

---

[3] Def.'s Opp'n to Mot. for Prelim. Inj. at 20. The U.S. Concealed Carry Association
describes the AR-15 pistol as merely "a pistol-length AR-15." U.S. CONCEALED
CARRY ASS'N, *AR Pistol*, https://tinyurl.com/4dk3ycvz.

[4] Def.'s Opp'n to Mot. for Prelim. Inj. at 19. *See* Sam Bocetta, *The Complete History
of the AR-15 Rifle*, SMALL WARS JOURNAL (July 12, 2017),
https://tinyurl.com/2jwemryz; Sara Swann, *The History of the AR-15 and How it
Became a Symbol of American Gun Culture*, POYNTER (June 29, 2022),
https://tinyurl.com/5bffkafr.

[5] Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters'
Weapon of Choice*, ROLLING STONE (Feb. 22, 2018), https://tinyurl.com/4nedm6fa.

by the size of the gun.[6] Detachable magazines also allow shooters to replace an empty magazine with a pre-loaded, full magazine in one or two seconds, with little practice.[7] When combined with other features listed in HRS § 134-1, detachable magazines thus render weapons uniquely dangerous. They are especially lethal when used in combination with firearms that have "features that allow for enhanced control while firing multiple rounds."[8]

(b)     *Forward Hand Grips (HRS § 134-1(2))*

Forward hand grips (such as those found on AR-15 pistols) give shooters such "enhanced control." The forward grip allows shooters to place the non-shooting (support) hand beneath the gun.[9] This allows the shooter to exert leverage on the gun with both hands and maintain greater control and aim during periods of rapid, sustained firing.[10] The enhanced control and aim increase the weapon's lethality, especially during prolonged episodes of rapid fire.[11]

(c)     *Flash Suppressors (HRS § 134-1(2))*

Flash suppressors render pistols more accurate at large distances, and thus

---

[6] *See* EDUC. FUND TO STOP GUN VIOLENCE, *Assault Weapons and Large Capacity Magazines*, https://tinyurl.com/yjmaba4k.

[7] *See id.*

[8] *See id.*

[9] *See* Declaration of Ryan Busse ¶ 19, *Nat'l Ass'n for Gun Rights v. Lopez*, 22-CV-404 (D. Haw. Feb. 15, 2023) (ECF No. 36-4).

[10] *See id.*

[11] *See* Joshua Horwitz, *Killing Machines: The Case for Banning Assault Weapons*, EDUC. FUND TO STOP GUN VIOLENCE (Sept. 2003), at 9.

more lethal, because they "reduce the extent to which a shooter's vision will be impaired by muzzle flash at night."[12] Flash suppressors also render shooters more dangerous because they help conceal a shooter's location.[13]

### (d)    *A Weight of Fifty Ounces or More (HRS § 134-1(4))*

Finally, assault pistols such as the AR-15 pistol, or others that exceed the weight requirement of Hawai'i Revised Statute § 134-1(4), are not the "quintessential self-defense weapon[s]" identified in *Heller* because they are significantly heavier than the standard handgun.[14] These weapons are front-heavy, which typically requires firing with both hands.[15] As the State notes in its Opposition, this precludes a homeowner from using a free hand to dial the police or guide others away from imminent danger while continuing to handle the firearm in an effective manner.[16]

For these reasons, assault pistols with any two of these characteristics,

---

[12] Allen Rostron, *Style, Substance, and The Right to Keep and Bear Assault Weapons*, Campbell L. Rev. 301, 321 (2018).

[13] *See id.*

[14] *See* David Workman, *Handgun Vs AR Pistol: What's the difference?,* CROSSBREED HOLSTERS, https://tinyurl.com/bdcv7v4e ("AR pistols are a fair bit heavier, and firing with a single hand is difficult. The balance of an AR pistol is a bit front-heavy, and a handgun tends to be more balanced."). *Compare* Anthony Foster, *How Heavy is a Gun? Average Weights of Pistols and Rifles*, ANTHONY ARMS, https://tinyurl.com/2p92bwc9 ("On average, a handgun weighs 1.5lb (0.7kg) when loaded.") *with* Kenzie Fitzpatrick, *The Best AR Pistols*, AM. FIREARMS (Mar. 16, 2022), https://tinyurl.com/c5a6nx6f (AR Pistols weigh 5.5 lbs. to 6.2 lbs.).

[15] *See* Workman, *supra* note 14..

[16] *See* Def.'s Opp'n to Mot. for Prelim. Inj. at 23.

7

including AR-15 pistols, are ill-suited for self-defense.

### 2.    Regulation of LCMs Likewise Imposes No Burden on Self-Defense.

"Evidence suggests that firearms equipped with LCMs are involved in a disproportionate share of mass shootings."[17] This is no surprise: LCMs are designed to perpetrate devastation on a massive scale by enhancing an already uniquely dangerous firearm's ability to fire more than ten rounds in rapid succession without the need to reload. LCMs thus increase the lethality of attacks by eliminating the time required for a gunman to reload, which could otherwise enable the gunman's targets to escape or disarm him.[18] For this reason, Professor Michael Siegel of Boston University found that states that have restricted access to LCMs—usually defined to have a ten-round limit—experience 63% fewer mass shootings.[19]

Moreover, empirical research demonstrates that the ability to fire more than ten rounds without reloading does not aid in self-defense.[20] For example, the

---

[17] Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017*, 109 AM. J. PUB. HEALTH 1754, 1754-55 (2019). LCMs are especially useful in military applications, allowing gunmen "to hit multiple human targets very rapidly," *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017).

[18] That the pause is critical is evident from, for example, the 2018 Parkland, Florida, shooting, where the shooter's 13-second pause to reload a new magazine enabled a teacher and ten students to flee. FLA. DEP'T OF L. ENF'T, *Marjory Stoneman Douglas High School Public Safety Commission Report* 34 (Jan. 2, 2019), https://tinyurl.com/bdf9n2vk.

[19] Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27.

[20] *See* Def.'s Opp'n to Mot. for Prelim. Inj. at 23–24 (the necessity for firing more than ten bullets in defense of the home is rare, or non-existent (quotations omitted)).

National Rifle Association's Armed Citizen database shows that, across more than seven hundred self-defense incidents, less than one half of one percent involved the firing of more than ten shots. *See Oregon Firearms Fed'n, Inc. v. Brown*, No. 22-CV-1815, 2022 WL 17454829, at *14 (D. Or. Dec. 6, 2022). Far from it, the database shows that, on average, the number of shots fired by civilians in self-defense is approximately two.[21] Likewise, based on FBI statistics, the U.S. Concealed Carry Association reports that "the average gunfight includes three rounds fired."[22]

Numerous federal and state courts have similarly found no evidence that firing more than ten bullets without reloading is necessary or even beneficial for self-defense.[23]

---

[21] *See* Claude Werner, *The Armed Citizen - A Five Year Analysis*, GUNS SAVE LIVES (Mar. 12, 2012), https://tinyurl.com/tadt7wez (average of 2.2 defensive shots fired per incident from 1997–2001); Decl. of Lucy P. Allen at ¶ 17, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal*, No. 17-CV-10507, 2018 WL 4688345, at *4 (D.N.J. Sept. 28, 2018) (average of 2.34 shots fired per incident from 2011 to 2017).

[22] Kevin Michalowski, *The Statistically Perfect Gunfight*, U.S. CONCEALED CARRY ASS'N (Feb. 25, 2019), https://tinyurl.com/3upbexr9. Additionally, online gun retailer Lucky Gunner reported: "In the overwhelming majority of the incidents where an armed civilian fires a shot in self-defense, probably 70 to 90% of them are able to resolve the situation within 3 or 4 rounds, and usually closer to one or two rounds. Every once in awhile [sic], the good guy fires more like 5 to 8 rounds." Chris Baker, *How Much Ammo Capacity Is Enough?*, LUCKY GUNNER (Sep. 2, 2016), https://tinyurl.com/47kz2tsh.

[23] *See, e.g.*, *Duncan v. Bonta*, 19 F.4th 1087, 1105 (9th Cir. 2021) (no indication that "the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession—has *ever* been realized in self-defense in the home" (emphasis in original)); *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) ("[N]ot one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired."); *Grewal*, 2018 WL

* * *

In sum, because the Challenged Provisions regulate weapons and features that are uniquely dangerous and that are unnecessary for individual self-defense, they do not implicate the Second Amendment,[24] and the Court's analysis "can stop there." *Bruen*, 142 S. Ct. at 2126 ("If the government can prove that the regulated conduct falls beyond the [Second] Amendment's original scope, then the analysis can stop there; the regulated activity is categorically unprotected.").

**B.    In Any Event, the Challenged Provisions Are Analogous to Historical Regulations of Firearms and Are Therefore Constitutional Under the Second Amendment.**

If the Court proceeds to step two under *Bruen*, it must then determine whether there are "historical regulations [that] impose a comparable burden on the right of armed self-defense," and "whether that burden is comparably justified." *Id*. at 2132–33. The Supreme Court has made clear that this Court's analysis at that point must involve "nuance," because society and technology have changed significantly in

---

5724371 (Defendant's Proposed Findings of Fact and Conclusions of Law) (noting that "a firearms instructor and range master for the New Jersey Division of Criminal Justice, . . . testified, based on his more than 30 years of experience in law enforcement, that it would be unwise for an untrained civilian to use a firearm with an LCM in self-defense because . . . [u]ntrained civilians are not likely to be good shots").

[24] Additionally, the Challenged Provisions do not implicate the Second Amendment because the features listed in HRS § 134-1 and the LCMs regulated in HRS § 134-8 are accessories, not arms, as they are not used by themselves as a means of defense or "to cast at or strike another." *Heller*, 554 U.S. at 581; *see also* Def.'s Opp'n to Mot. for Prelim. Inj. at 12–13.

relevant ways since the Nation's founding. This nuanced analysis requires the consideration of empirical research to accurately contextualize modern and historical laws.

Here, a proper analysis of historical laws demonstrates conclusively that the Challenged Provisions are consistent with the nation's history of firearms regulation.

### 1. *Bruen*'s Nuanced Analysis Effectively Requires the Consideration of Empirical Research When Evaluating Historical Analogues.

The Court in *Bruen* pointed to two important—but non-exclusive—considerations for lower courts when performing the required, nuanced historical analysis: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphasis added).

Comparing the motivations (the "whys") and the implementations (the "hows") of modern and historical laws requires courts to consider relevant empirical research regarding the prevailing conditions in modern and historical American society. Such research helps courts properly contextualize the prevailing social backdrop against which modern and historical laws were passed, inquiries that are critical under *Bruen*.

*Bruen* thus created a new test for determining constitutionality under the Second Amendment, one that turns to historical precedent while leaving room for flexibility and nuanced analysis in the context of unprecedented circumstances.[25]

---

[25] *See* Def.'s Opp'n to Mot. for Prelim. Inj. at 28.

**2.      The Challenged Provisions Address Unprecedented Social and Technological Conditions.**

Over the past two hundred years, unprecedented societal changes have accompanied advances in firearms technology, which have been followed by a dramatic rise in the frequency and lethality of mass shootings. This uniquely modern danger motivated Hawai'i to adopt the Challenged Provisions, which like many regulations spanning our nation's history, were designed to protect the public.[26]

(a)      *The Frequency and Lethality of Premeditated Public Mass Shootings Is, Itself, A Novel Societal Concern.*

The United States has experienced a skyrocketing trend in the frequency of public mass shootings. *Amici* have found only two instances of mass shootings[27] in America throughout all of the 18th and 19th centuries: both occurred in 1891 and neither involved a fatality (likely due to the gun technology of the time).[28] From 1900-1965, one scholar estimates that 25 mass shootings occurred.[29] By contrast,

---

[26] In 1992, in response to several deadly mass shootings using semiautomatic weapons, the Hawai'i Legislature passed Senate Bill No. 1841 (now codified as HRS §§ 134-1, 134-4, and 134-8—the Challenged Provisions herein) to address semiautomatic firearms with certain accessories and features. Def.'s Opp'n to Mot. for Prelim. Inj. at 4 (citing Haw. Sess. Laws Act 286, at 740–42).

[27] As used here, a "mass shooting" is a shooting in which four or more people (other than the perpetrator(s)) are injured and/or killed, where victims are selected indiscriminately, and where the murders are not attributable to any other underlying criminal activity or circumstance.

[28] *See* Maria Hammack, "A Brief History of Mass Shootings," BEHIND THE TOWER (2016), https://tinyurl.com/yc85z9pn.

[29] *See* Bonnie Berkowitz & Chris Alcantara, *Mass Shooting Statistics in the United States*, WASH. POST (May 9, 2021), https://tinyurl.com/537ww9z4.

more than ***600 mass shootings have been reported in each of the last three years***
(611 in 2020, 690 in 2021, and 648 in 2022).[30] The phenomenon of mass shootings
is therefore strikingly more prevalent in today's America than it was at any point in
the prior 200 years.

<p style="margin-left: 3em;">(b)   <em>The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns, Which the Founders Could Never Have Imagined.</em></p>

Significant modern social phenomena coincide with this dramatic increase in
mass shootings over the 21st century, making firearms regulation especially
imperative. The proliferation of social media platforms and transformative
urbanization are two salient examples.

<p style="text-align: center;">(i)   <u>Social Media</u></p>

Social media platforms, through which users can share public and private
information instantaneously, create a means of communication that is exponentially
faster, farther-reaching, and more difficult to regulate than anything the Founders
could have imagined. Numerous studies correlate social media usage with increases
in anti-social behavior, political, religious, and social extremism, mental health
disorders and, ultimately, mass shootings. Social media has specifically been shown

---

[30] *See* Gun Violence Archive, *Mass Shooting Data from 2020, 2021, and 2022,*
https://tinyurl.com/bdrp2snp.

to play an important role in the radicalization of American extremists,[31] as a mounting body of evidence shows that content-ranking algorithms can limit users' exposure to contrary viewpoints, creating "echo chambers" that intensify pre-existing biases.[32]

Amid such violent and frenetic discourse, many perpetrators of mass shootings have been inspired by what they read online. One example of many is the May 2022 Buffalo supermarket shooting. The 18-year-old gunman published a racist, violent manifesto online before broadcasting the shooting live on social media.[33] According to an investigation by the New York Attorney General, the gunman's "path towards becoming a white supremacist terrorist began upon viewing on the 4chan [social media] website a brief clip of a [previous] mass shooting."[34] The shooter also posted material on a different social media platform, *Discord*, "with the explicit goal of provoking future mass shootings."[35] A *Reuters* article observed that the shooting "appear[ed] to be the latest in a line of 'copycat' gunmen carrying out

---

[31] *See, e.g.,* Michael Jensen et al., *Use of Social Media By US Extremists,* NAT'L CONSORTIUM FOR STUDY TERRORISM AND RESPONSES TO TERRORISM (2019), https://tinyurl.com/3s9nmbbc.

[32] *See* Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, CAMBRIDGE UNIV. PRESS (Aug. 24, 2020), https://tinyurl.com/bdds6wf9.

[33] *See* OFF. N.Y. ST. ATT'N GEN., *Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022* (Oct. 18, 2022).

[34] *Id*. at 3.

[35] *Id*.

deadlier mass shootings inspired by previous attackers."[36]

<div align="center">(ii)   <u>Urbanization</u></div>

In addition to social media, urbanization has radically transformed society since the Founding. In 1800, the United States averaged 6.1 people per square mile.[37] By 2020, this increased by a staggering 1500% to an average of 93 people per square mile.[38]

This explosion in population density has profoundly changed the way people associate. People gather in large groups more frequently than would have been possible before urbanization and mass industrialization, including in schools that accommodate thousands of students, tightly packed commuter trains and buses, large office buildings, and crowded nightclubs, concerts, movie theaters, malls, and parades. These gatherings create "sitting duck" situations in which mass shooters can efficiently injure or kill large numbers of people in a single event before the gunmen can even be located by law enforcement.[39]

---

[36] Tim Reid, *'Copycat' Mass Shootings Becoming Deadlier, Experts Warn After New York Attack*, REUTERS (May 15, 2022), https://tinyurl.com/bdzbf8us.

[37] U.S. CENSUS BUREAU, POP CULTURE: 1800 (Dec. 9, 2022), https://tinyurl.com/78cxvafx.

[38] Because these figures are an average of the population density of all areas of the country, the much lower density in rural areas means that the numbers drastically understate the impact of the population density in *urban* areas, where most mass shootings occur.

[39] *See, e.g.*, Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes Investigation*, NPR (Jan. 29, 2019), https://tinyurl.com/3v2aycdk (reporting that the Las Vegas shooting lasted only 11 minutes but killed 58 concertgoers and injured

<div align="center">15</div>

(c)   *Advances In Gun Technology Have Combined with These Societal Changes to Create the Perfect Storm for Mass Shootings.*

Against the backdrop of these societal changes, advances in gun technology allow even an inexperienced shooter to kill more people—and to do so more quickly—than ever before.

The typical Revolutionary-era musket in use at the time of the Founding: (i) could hold just one round at a time; (ii) had a maximum accurate range of 55 yards; and (iii) had a muzzle velocity of approximately 1,000 feet per second.[40] By contrast, a typical AR-15 pistol: (i) can hold 30 rounds (30 times more);[41] (ii) can shoot accurately from around 400 yards[42] (7 times as far); and (iii) attains a muzzle velocity of around 2,600 feet per section (over 2.5 times faster), which leads to vastly

---

nearly 1,000 more); Alejandro De La Garza and Michael Zennie, *Dayton Shooting Lasted Just 32 Seconds and Left 9 Dead. Here's the Latest on the Tragedy*, TIME (Aug. 9, 2019), https://tinyurl.com/4wem6j5e (reporting that a gunman with an AR-15 assault rifle and 100-round drum magazine killed nine people and wounded twenty-seven on a crowded street in Dayton, Ohio in thirty-two seconds); Josh Keller, et al., *Why the Orlando Shooting Was So Deadly*, NY TIMES (June 12, 2016), https://tinyurl.com/35j3dfbz (reporting that the police did not shoot the gunman, armed with an AR-15 rifle at Pulse nightclub in Orlando, Florida, until three hours after the assault began, after 49 people were killed and 53 more were wounded).

[40] Christopher Ingraham, *What 'Arms' Looked Like When The 2nd Amendment Was Written*, WASH. POST (June 13, 2016), https://tinyurl.com/mu5ety64. "Muzzle velocity" is the speed of a projectile when leaving the muzzle of a gun, and is a general measure of the power and lethality of a firearm. *Id.*

[41] AR-15 pistols use the same magazines as AR-15 rifles, *see* NECKBONE ARMORY, *Are Ar-15 Magazines Interchangeable?*, https://tinyurl.com/hppuzpb2, which come in a standard size of 30 rounds, Ingraham, *supra* note 40.

[42] James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, MINUTEMAN REVIEW (Feb. 7, 2023), https://tinyurl.com/5n9as9ye.

16

more serious wounds.[43]

Even the most advanced firearms of the Civil War era were a far cry from modern weapons like AR-15 pistols. For example, the 1866 Winchester rifle had a magazine capacity of 11 to 15 rounds,[44] a maximum effective range of approximately 100 yards (about one-fourth of an AR-15 pistol), a muzzle velocity of 1,100 feet per second (roughly one-third of an AR-15 pistol),[45] and could fire only 10 shots per minute.[46]

Increased firing power, coupled with advanced ballistics,[47] have made modern firearms far more deadly and fundamentally different from their historical predecessors. We have all been forced to recognize that in our modern world, a lone individual acting completely independently can easily carry out mass murder in an extremely short period of time. This situation would have been entirely foreign to the generation that ratified the Second Amendment in 1791.

---

[43] Tom McHale, *What You Need to Know About AR Pistol Caliber Choices and Ballistics*, OUTDOORHUB (Jan. 29, 2019) https://tinyurl.com/26bnej7f.

[44] WINCHESTER GUN STORE, *Winchester Model 1866 Short 38 Special Lever Action Rifle*, https://tinyurl.com/yc3cv2zc.

[45] Dan Alex*, Winchester Model 1866 Lever-Action Repeating Rifle*, MILITARY FACTORY (Mar. 12, 2019), https://tinyurl.com/p88kcaye.

[46] GUNCRITIC, Winchester Model 1866 Yellow Boy, https://tinyurl.com/2p8j76xe; UBERTI USA, 1866 Yellowboy Rifle History, https://tinyurl.com/3x2wjth3 ("The gun's . . . rate of 10 or more shots per minute was a game changer.").

[47] *See, e.g*., Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, FORBES (Feb. 15, 2017), https://tinyurl.com/2hudma2t.

17

* * *

In passing the Challenged Provisions, the Hawai'i legislature was forced to contend with realities that legislatures of the past did not, primarily the increase in mass shootings, shifts in our society, and advances in gun technology. These drastic societal and technological changes mean that, under *Bruen,* the Court must employ a nuanced analysis when comparing the "hows" and "whys" of the Challenged Provisions with those of historical laws. 142 S. Ct. at 2132.

### 3.     The Challenged Provisions Are Analogous to Historical Firearms Restrictions that Did Not Unconstitutionally Burden the Right of Armed Self-Defense.

Against this backdrop, the Challenged Provisions are "relevantly similar" to historical laws that restricted the use and carry of firearms without burdening the right of armed self-defense. *Bruen*, 142 S. Ct. at 2132.

At the time of the Founding, and the period surrounding ratification of the Fourteenth Amendment in 1868, states enacted numerous restrictions on what arms could be possessed and the manner in which they could be carried. These laws included limitations on the type of arms individuals could lawfully have, and prohibitions on the concealed carry of arms. Some of these laws were enacted shortly after ratification of the Fourteenth Amendment, but the "public understanding" of the scope of the Second Amendment can be properly discerned from statutes adopted by legislatures shortly before or after they ratified the Fourteenth Amendment. *See*

*id.* at 2128 (noting that the "public understanding of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation" (quotations omitted)).

Applying the *Bruen* standard, the Challenged Provisions are "relevantly similar" to these historical laws because they impose a "comparable burden" on the right of armed self-defense. *Id*. at 2132–33. Unlike the regulations addressed in *Bruen* and *Heller*, which the Supreme Court held entirely prevented the exercise of the right to armed self-defense, *see id.* at 2156 (New York's "proper-cause" requirement); *Heller*, 554 U.S. at 635–36 (District of Columbia's restriction on handgun possession in the home), the Challenged Provisions do not prevent armed self-defense. For that reason, the Challenged Provisions are "relevantly similar" to their historical analogues. *Bruen*, 142 S. Ct. at 2132–33.

        (a)    *Excessively Dangerous Weapons*

States have historically regulated weapons deemed excessively dangerous, and courts have consistently upheld these laws, reasoning that such arms are not necessary for self-defense. For example, in Alabama in 1849, an individual possessing "deadly or unusual weapons for the purpose of an affray . . . may be guilty of this offence, without coming to actual blows." *O'Neill v. State*, 16 Ala. 65, 67 (1849). Shortly after the Civil War, the Tennessee Supreme Court upheld the constitutionality of a statute making it unlawful "for any person to publicly or

19

privately carry a dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver." *Andrews v. State,* 50 Tenn. 165, 171 (1871). The court wrote: "[a]dmitting the right of self-defense in its broadest sense, still on sound principle every good citizen is bound to yield his preference as to the means to be used, to the demands of the public good." *Id*. at 188.

That same year, the Texas Supreme Court upheld a law that regulated, and in some cases prohibited, the carrying of pistols, dirks and certain other "deadly weapons" against a challenge under the Second Amendment. *English v. State,* 35 Tex. 473, 474, 477 (1871). The court held that the law did not interfere with the right to self-defense because the law "makes all necessary exceptions, and points out the place, the time and the manner in which certain deadly weapons may be carried as means of self-defense, and these exceptional cases, in our judgment, fully cover all the wants of society." *Id*. at 477.

(b)    *Concealed Carry*

States have regulated the concealed carry of firearms for more than two centuries, and courts have repeatedly upheld these laws because they impose no burden on self-defense. *See, e.g.*, *State v. Mitchell*, 3 Blackf. 229, 229 (1833) (upholding a state concealed carry law against a Second Amendment challenge); *Ex parte Thomas*, 97 P. 260, 265 (same, against a challenge under the state

20

constitutional analogue).[48] In 1840, the Alabama Supreme Court upheld a concealed carry conviction against a challenge under a state constitutional analogue to the Second Amendment, concluding that "[t]here was no evidence . . . that the defendant could not have defended himself as successfully, by carrying the pistol openly, as by secreting it about his person." *State v. Reid*, 1 Ala. 612, 614, 621 (1840).

Two years later, the Arkansas Supreme Court upheld the state's concealed carry statute, which prohibited the "wear[ing] [of] any pistol . . . concealed as a weapon, unless upon a journey." *State v. Buzzard*, 4 Ark. 18, 18 (1842) (divided opinion). The chief justice, writing the opinion of the court, stated that the Second Amendment creates "no such immunity as exempts it from all legal regulation and control." *Id*. at 22 (Ringo, C.J.). Another justice similarly found that the rights protected by the Second Amendment were "not in the slightest degree encroached upon by the legislative enactment of this State prohibiting the wearing of concealed weapons." *Id*. at 31 (Dickinson, J., concurring).

In 1850, the Louisiana Supreme Court upheld the constitutionality of a concealed carry statute, writing that the law "interfered with no man's right to carry arms" and was "absolutely necessary to . . . prevent bloodshed and assassinations." *State v. Chandler*, 5 La. Ann. 489, 489–90 (1850). Eight years later, the Louisiana Supreme Court reaffirmed the constitutionality of a substantially similar provision,

---

[48] *See* Def.'s Opp'n to Mot. for Prelim. Inj. at 34–35.

holding that the statute did "not infringe the right of the people to keep or bear arms," but rather restricted "only a particular mode of bearing arms which is found dangerous to the peace of society." *State v. Jumel*, 13 La. Ann. 399, 399–400 (1858).

These regulations demonstrate that states have a broad and deep tradition of regulating the manner of carrying firearms, and that courts have consistently upheld such laws when they imposed little or no burden on the right of armed self-defense. The Challenged Provisions are relevantly similar to these historical restrictions because they likewise do not burden the right of armed self-defense articulated in *Bruen* and *Heller*.[49]

The Hawai'i Legislature, itself, confirms that the Challenged Provisions are similar to historical concealed carry regulations. The legislative history for the Challenged Provisions reflects the Legislature's concern with lethality and concealability. Legislative "[t]estimony indicated that semi-automatic assault pistols are particularly dangerous because they are easily concealed, can fire in rapid succession for sustained periods . . . and often accept large-capacity, detachable ammunition magazines." H. Stand. Comm. Rep. No. 1261-92, in 1992 House Journal, at 1382. By implementing a features-based definition for assault pistols, the Legislature's intent was to identify "a list of objective physical characteristics typical of the firearms which represent[] a heightened risk of danger to our community

---

[49] *See* Def.'s Opp'n to Mot. for Prelim. Inj. at 38.

because of their concealability . . ." *Id.* The Challenged Provisions prohibit the sale and possession of AR-15 pistols, which "are essentially shortened, more easily concealable AR-15 rifles."[50]

### 4. The Challenged Provisions Are "Relevantly Similar" to Historical Laws Restricting Weapons Capable of Firing Repeatedly Without Reloading.

As *Bruen* recognizes, and as described above, courts must adopt a "more nuanced approach" in light of "dramatic technological changes" in firearms technology. 142 S. Ct. at 2132. There may inherently be no comparable regulation from the Colonial Period or Antebellum Era when the technology now at issue simply ***did not exist***. *See Oregon Firearms Fed'n, Inc.*, 2022 WL 17454829, at *12.[51] As *Bruen* acknowledged, "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." 142 S. Ct. at 2132.

More to the point, as civilians gained more widespread access to weapons capable of firing repeatedly without reloading, Congress and the states ***did respond*** by passing laws regulating these weapons. For example, in 1927, Rhode Island passed a law prohibiting "any weapon which shoots automatically and any weapon

---

[50] Def.'s Opp'n to Mot. for Prelim. Inj. at 20.

[51] *See* Def.'s Opp'n to Mot. for Prelim. Inj. at 28–31 ("Modern society has produced 'a bewildering assortment of firearms whose lethality would have been almost unimaginable to the Founding generation'" (quoting Declaration of Saul Cornell ¶ 30, *Nat'l Ass'n for Gun Rights v. Lopez*, No. 22-CV-404 (D. Haw. Feb. 15, 2023) (ECF No. 36-8))).

which shoots more than twelve shots semi-automatically without reloading."[52] That same year, Michigan prohibited any firearm that fired more than sixteen times without reloading.[53] In 1932, Congress passed a law prohibiting "any firearm" in the District of Columbia "which shoots automatically or semiautomatically more than twelve shots without reloading" – a prohibition that has existed in some regulatory form ever since.[54] In 1933, Ohio outlawed any firearm that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading," while South Dakota banned firearms "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine."[55]

In total, between 1925 and 1934, at least 31 states and the District of Columbia restricted access to certain weapons capable of firing repeatedly without reloading,[56] and at least 22 states plus the District of Columbia restricted ammunition magazines

---

[52] Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, §§ 1, 4.

[53] Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888, § 3.

[54] Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652; *see also Heller v. D.C.*, 670 F.3d 1244, 1248 (D.C. Cir. 2011), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

[55] Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189, § 12819-3; Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245, 245, § 1.

[56] *See* Declaration of Robert Spitzer ¶ 23, *Nat'l Ass'n for Gun Rights v. Lopez*, No. 22-CV-404 (D. Haw. Feb. 15, 2023) (ECF No. 36-26). Although most of these laws restricted access to fully automatic weapons, at least seven and as many as ten states, plus the District of Columbia, restricted semi-automatic weapons. *Id.* ¶ 29.

24

or similar feeding devices, and/or had round capacity limits.[57]

In short, unlike the handgun regulations addressed in *Bruen* and *Heller*, for which the Supreme Court looked to historical antecedents limiting the right of armed self-defense, under *Bruen* a "more nuanced approach" is required when evaluating restrictions on firearms technology that did not exist before 1791 or 1868. 142 S. Ct. at 2132. Applying that "more nuanced approach," these early 20th century laws demonstrate a clear history and tradition of regulating firearms that can fire repeatedly without reloading.[58] And they reflect a recognition that such regulations do not impinge on any legitimate needs for armed self-defense, but are instead intended to reduce the carnage that can result when many rounds can be fired without reloading.

## IV.   CONCLUSION

For the reasons set forth above and those pressed by Hawai'i in its Opposition, the Challenged Provisions are constitutional, and the Court should deny Plaintiffs' Motion for Preliminary Injunction.

[Signature block on following page]

_____

[57] *See id*. ¶ 32.
[58] *See also* Def.'s Opp'n to Mot. for Prelim. Inj. at 35–37.

25

Dated: February 22, 2023        Respectfully submitted,

/s/ *Jennifer Loeb*
Jennifer Loeb*
Freshfields Bruckhaus Deringer US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
Tel: 202 777 4500
jennifer.loeb@freshfields.com

Aaron Marcu*
Lee Rovinescu*
Freshfields Bruckhaus Deringer US LLP
601 Lexington Ave., 31st Floor
New York, NY 10022
Tel: 212 277 4000
aaron.marcu@freshfields.com
lee.rovinescu@freshfields.com

Christopher D. Thomas (#8203)
American Savings Bank Tower
1001 Bishop Street, Suite 2925
Honolulu, Hawai'i 96813
Tel: 808 261 7710
cthomas@hawaiianfamilylaw.com

*Attorneys for Amici Curiae*
Giffords Law Center to Prevent Gun Violence,
Brady, and March for Our Lives

*\*Pro hac vice*

26

## CERTIFICATE OF SERVICE

I certify that, on February 22, 2023, a true and correct copy of the foregoing was filed with the Clerk of the United States District Court for the District of Hawai'i via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated: February 22, 2023

/s/   *Jennifer Loeb*
Jennifer Loeb

*Attorney for Amici Curiae*
Giffords Law Center to Prevent Gun Violence, Brady, and March for Our Lives