Arrington Law Firm
Barry K. Arrington
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Phone:  (303) 205-7870
Email:  barry@arringtonpc.com
*Pro Hac Vice*

Gatlin Voelker
Sebastian D. Torres
50 E Rivercenter Boulevard #1275
Covington, Kentucky 41011
Phone: (859) 781-9100
STorres@GatlinVoelker.com

ATTORNEYS FOR FREEDOM LAW FIRM
1003 Bishop Street, Suite 1260
Pauahi Tower
Honolulu, HI 96813
Phone: (808) 647-2423
Fax: (480) 857-0150
Marc J. Victor - Bar. No. 011090
Jody L. Broaddus - Bar No. 011229
Caroline M. Elliot - Bar No. 011541
Marc@AttorneysForFreedom.com
Jody@AttorneysForFreedom.com
Caroline@AttorneysForFreedom.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS | ) ) ) | Civil No. 22-cv-00404-DKW-RT |
| and | ) ) | |
| RONDELLE AYAU | ) ) | **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| and | ) ) ) | |
| JEFFREY BRYANT | ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) | |

ANNE E. LOPEZ, in her official capacity as )
Attorney General for the State of Hawaiʻi )
)
       Defendant. )
)

# TABLE OF CONTENTS

**Page**

I.     The State's Handgun Ban is Manifestly Unconstitutional Under *Heller* ............1

II.    Justice Thomas: Laws Like the Hawaii Statute are Clearly Unconstitutional.....1

III.   *Heller* Rejected the State's Central Premise ........................................................2

IV.    This Case is Very Simple...................................................................................4

V.     The Legal Analysis Controlling This Case is Indistinguishable from *Heller*......5

       A.    The Characteristics of the Arms are the Same ........................................5

       B.    The "Societal Problem" is the Same........................................................6

       C.    The Technological Advances are the Same .............................................7

VI.    The Banned Arms Are Commonly Possessed by Law-Abiding Citizens............8

       A.    The Banned Firearms Are in Common Use.............................................8

       B.    The Banned Magazines are in Common Use...........................................9

VII.   The State Misapprehends the Nature of the Historical Inquiry .........................10

VIII.  The State Cannot Identify a Historical Tradition of Absolute
       Bans of Commonly Held Arms........................................................................11

       A.    Clubs and Blunt Objects ......................................................................11

       B.    Gunpowder...........................................................................................12

       C.    Trap Guns.............................................................................................12

       D.    Concealed Carry Regulations ...............................................................13

       E.    Bowie Knifes .......................................................................................14

       F.    Twentieth Century Regulations ............................................................14

       G.    Summary...............................................................................................15

IX.    Magazines Are Arms ......................................................................................15

X.     The Court Should Reject the State's Efforts to Distort the
       *Heller/Bruen* "Common Use" Analysis..........................................................19

XI.    The State's Effort to Distort the Common Use Metric Fails .............................20

XII.   *Heller's* Reference to "Weapons Most Useful in Military Service"
       Does not Change the Analysis ..........................................................................21

i

XIII.   The State's Position is Contrary to *Caetano* ........................................................23

XIV.   Plaintiffs have Established the Other Elements for a Preliminary Injunction .....23

TABLE OF AUTHORITIES

**CASES**                                                                                          **Page**

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ..................................................... 9, 11, 21-24

*D.C. v. Heller*, 554 U.S. 570 (2008) ...............................................................*passim*

*Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019) ...........................................2

*Duncan v. Becerra ("Duncan IV")*, 970 F.3d 1133 (9th Cir. 2020)...............................21

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...................................................5

*Fisher v. Kealoha*, 2012 WL 2526923 (D. Haw. 2012) ................................................24, 25

*Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) ......................................2, 8, 21

*Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014) ...............................15, 16

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) .........................................................15

*Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011) ...............................................................8

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ...............................................................21

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ................16, 17

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) .............................................................9, 10, 23

*Luis v. United States*, 578 U.S. 5 (2016).........................................................................17

*Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021) .................................................9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)..................*passim*

*Ocean State Tactical, LLC v. St. of Rhode Island*, 2022 WL 17721175 (D.R.I. 2022)...17, 18

*Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829 (D. Or. 2022) .................18

*Osborne v. State*, 92 S.W. 853 (Tenn. 1906) ...............................................................13

*People v. Webb*, 2019 IL 122951, 131 N.E.3d 93 ).........................................................5

*Staples v. United States*, 511 U.S. 600 (1994)..............................................................8, 9

*Yukutake v. Conners*, 554 F. Supp. 3d 1074 (D. Haw. 2021 .........................................1, 11

**STATUTES**

1763-1775 N.J. Laws 346, ch. 539, § 10 ......................................................................12

HRS § 134-8(a) ...............................................................................................................1

**OTHER AUTHORITIES**

Ben Williamson, *The Gunslinger to the Ivory Tower Came:*
*Should Universities Have A Duty to Prevent Rampage Killings?*,
60 Fla. L. Rev. 895, 895–96 (2008) .......................................................... 3

Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223 ........................... 3, 5, 6, 7

Craig R. Whitney, *A Liberal's Case for the Second Amendment*,
31 T.M. Cooley L. Rev. 15 (2014) ........................................................... 3

David Kopel, *Bowie Knife Statutes 1837-1899* ...................................... 14

Grant Arnold, *Arming the Good Guys: School Zones*
*and the Second Amendment*, 2015 B.Y.U. Educ. & L.J. 481 (2015)....................... 3

*Merriam-Webster's Collegiate Dictionary* 525 (10th ed. 2001) ........................... 1

National Shooting Sports Foundation, Inc.,
2021 Firearms Retailer Survey Report ................................................... 9

William English, *2021 National Firearms Survey: Updated Analysis*.................. 10

## I.      The State's Handgun Ban is Manifestly Unconstitutional Under *Heller*

*Heller's* central holding is that banning handguns from the home violates the Second

Amendment. *D.C. v. Heller*, 554 U.S. 570, 628-29 (2008). *See also Yukutake v. Conners*, 554 F.

Supp. 3d 1074, 1081 (D. Haw. 2021) (*Heller* "explained that an outright ban of firearms in the

home violates the Second Amendment under any level of scrutiny."). Therefore, the State's

handgun ban is indefensible under *Heller*.

The State admits the challenged Statutes ban certain handguns. Resp. 4. To be sure, the

State tries to evade *Heller's* clear holding by labeling the category of handguns it bans with the

ominous-sounding epithet "assault pistol." But the term "pistol" is synonymous with

"handgun." *Merriam-Webster's Collegiate Dictionary* 525 (10th ed. 2001). Adding the word

"assault" to "pistol" gets the State nowhere. The ominous descriptor does not change the

fundamental reality. The State bans pistols (i.e., handguns) in the home, and a constitutional

principle cannot be evaded through semantics. Therefore, with respect to HRS § 134-8(a) at

least, the Court's analysis could end here. The statute is manifestly unconstitutional.[1]

## II.     Justice Thomas: Laws Like the Hawaii Statute are Clearly Unconstitutional

Even aside from the fact that the State's handgun ban is manifestly unconstitutional

under *Heller*, this is not a close case. The Second Amendment protects arms that are "typically

possessed by law-abiding citizens for lawful purposes." *D.C. v. Heller*, 554 U.S. 570, 625

(2008). Justice Thomas, the author of *Bruen* (joined by Justice Scalia, the author of *Heller*),

provided a roadmap to the resolution of this matter in his dissent from denial of certiorari in

---

[1] Plaintiffs will go on to present a detailed *Heller/Bruen* analysis of the handgun ban, but they emphasize that such an analysis is not necessary because on its face the ban cannot be reconciled with *Heller*.

1

*Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015). Justice Thomas examined an arms ban similar to the one challenged in this case. He noted that the arms in question were commonly possessed by law-abiding citizens for lawful purposes, including self-defense and target shooting. *Id*. (Thomas, J., dissenting from denial of cert.). "**Under our precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons**." *Id*. (emphasis added).

The State has hired numerous experts and submitted hundreds of pages of material in an effort to make this case seem complicated. It is not. This case turns on *Heller's* simple rule to which Justice Thomas alluded. Is the firearm hardware commonly owned by law-abiding citizens for lawful purposes? "If the answer[ is] "yes," the test is over." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019) (emphasis added).[2] Here, the answer is unquestionably "yes." The test is over. The State has categorically banned weapons commonly possessed by law-abiding citizens for lawful purposes. The law is unconstitutional. It is just that simple.

## III.     *Heller* Rejected the State's Central Premise

The Central Premise of the State's argument is that when it decided *Heller*, the Supreme Court surely never intended to extend Second Amendment protection to a category of arms that can be used in mass shootings. Resp. 28. The State's Central Premise rests on a fundamental misunderstanding of *Heller* and is therefore false. On April 16, 2007, Seung Hui Cho

---

[2] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 213 L. Ed. 2d 1109, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022), *and rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).

committed a mass shooting at Virginia Tech University.[3]  At the time, Cho's crime was the worst mass shooting in American history. *Id*. Cho fired 174 rounds, killed 32 people, and wounded around 17 others.[4] Aside from the first two murders, Cho was able to do all of this in only a few minutes. *Id*. Cho used two semi-automatic handguns (not substantially different from the semi-automatic handguns banned by the State) to commit his crimes.[5]

*Helle*r was argued less than one year later on March 18, 2008,[6] and D.C. made sure the Court was aware that the worst mass shooting in U.S. history up until then had recently been committed with handguns like those banned by its ordinance. It wrote in its brief: "In the recent Virginia Tech shooting, a single student with two **handguns** discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223, 53 (emphasis added). Thus, when it decided *Heller*, the Supreme Court was keenly aware that semiautomatic handguns could be used in mass shootings. The Court nevertheless struck down D.C.'s handgun ban, writing "[w]e are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution," but the constitution "necessarily takes certain policy choices off the table," including an absolute ban on a category of commonly held arms. *Heller*, 554 U.S. at 636. In summary, the Virginia Tech shooter committed his crimes with semi-automatic handguns. Yet only months later the Supreme Court held that those same weapons were protected by the Second Amendment. It follows that the

---

[3] Ben Williamson, *The Gunslinger to the Ivory Tower Came: Should Universities Have A Duty to Prevent Rampage Killings?*, 60 Fla. L. Rev. 895, 895–96 (2008).
[4] Grant Arnold, *Arming the Good Guys: School Zones and the Second Amendment*, 2015 B.Y.U. Educ. & L.J. 481, 500–01 (2015).
[5] *Craig R. Whitney, A Liberal's Case for the Second Amendment,* 31 T.M. Cooley L. Rev. 15, 19 (2014).
[6] *Id*., 554 U.S. at 570.

State's Central Premise is false. The fact that a weapon can be used in mass shootings does not disqualify it from Second Amendment protection.

## IV.    This Case is Very Simple

As noted above, this is a very simple case. The two-part *Heller/Bruen* test states:

[T]he standard for applying the Second Amendment is as follows:

[Step One:] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.

[Step Two:] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.*, 142 S. Ct. at 2129–30.

The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*, 142 S.Ct. at 2132, *quoting Heller*, 554 U.S. at 582. Thus, the Second Amendment's plain text covers Plaintiffs' conduct – i.e., possessing certain bearable arms. Therefore, "the Constitution presumptively protects that conduct." *Id.*, 142 S. Ct. at 2126. Thus, Plaintiffs have met their burden under step one.[7]

Turning to step two (history and tradition), it is impossible for the State to carry its burden. The reason for this is apparent from *Heller* itself – there is no historical analogue to such a ban. "[A]fter considering 'founding-era historical precedent,' including 'various restrictive laws in the colonial period,' and finding that none was analogous to the District's

---

[7] The State argues that Plaintiffs must show common use to meet their burden under Step One. This is not accurate. Plaintiffs have met their burden as set forth above. It is true than an absolute ban of a commonly used firearm is "categorically" or "necessarily" unconstitutional. That means that if Plaintiffs do show that the banned arms are in common use (which they have), the State cannot meet its burden under step two and the statute is "necessarily" unconstitutional. It does not mean that Plaintiffs must show this in the first instance to meet their burden under step one.

ban, *Heller* concluded that the handgun ban was unconstitutional." *Bruen*, 142 S. Ct. at 2131. Here, the State, like D.C. in *Heller*, has been unable to identify a regulation analogous to its absolute ban on a category of guns that is in common use by law-abiding citizens for lawful purposes. The complete absence of regulations analogous to D.C.'s absolute ban allowed *Bruen* to characterize the *Heller* historical inquiry as "relatively simple." *Id.*, 142 S. Ct. at 2132. It was simple because, under *Heller*, absolute bans of commonly held firearms are, in the words of the Seventh Circuit, "categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right – like the handgun bans at issue in those cases … are categorically unconstitutional."). *See also People v. Webb*, 2019 IL 122951, 131 N.E.3d 93 (absolute bans are "necessarily" unconstitutional).[8] The Statute cannot withstand constitutional scrutiny because the State cannot carry its burden under step two of the *Heller/Bruen* test.

**V.     The Legal Analysis Controlling This Case is Indistinguishable from *Heller***

   **A.     The Characteristics of the Arms are the Same**

   The State suggests that it may ban the firearms "because they are easily concealed, can fire in rapid succession for sustained periods . . . and often accept large-capacity, detachable ammunition magazines." Resp. 4. This is an odd argument, because every one of these characteristics was also true of the handguns D.C. banned in *Heller*, and D.C. could have made the same argument. In fact, D.C. **did** make the same argument in practically identical terms. In its *Heller* brief, D.C. identified the "harms posed by handguns" it was seeking to address. Brief

---

[8] In that case, the Court held that a commonly held bearable arm may not be "subjected to a categorical ban." *Id.*, 2019 IL 122951, ¶ 21, 131 N.E.3d 93, 98. And since the Illinois statute in question constituted a categorical ban "that provision **necessarily** [could not] stand." *Id.* (emphasis added).

of Petitioners, *D.C. v. Heller*, *supra*, 49-55. Among those harms were the guns' "concealability and capacity to fire multiple rounds in quick succession." *Id.*, at 53. Thus, the State's attempt to justify its ban fails for the same reason D.C.'s attempt failed. Concealability, rapid fire capability, and the capacity to accept detachable magazines play no role in the *Heller* test.

### B.  The "Societal Problem" is the Same

In *Bruen*, the Court stated: "In some cases, [the historical] inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.*, 142 S. Ct. at 2131. "The District in *Heller* addressed a perceived societal problem … and it employed a regulation – a flat ban on the possession of handguns in the home – that the Founders themselves could have adopted to confront that problem." *Id.* And since none of the laws adopted by the Founders "was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional." *Id.*

The State has identified mass shootings as the societal problem it seeks to address with its arms ban. Resp. 28. But the State admits that mass killings were not unknown in the founding era.[9] Thus, the problem the State has identified is, in *Bruen's* words, "a general societal problem that has persisted since the 18th century." In addressing a societal problem, the State has employed a regulation – a flat ban on the possession of certain arms – that the

---

[9] *See* Roth Dec. attached to Resp. 40 (noting that mass killings existed in the founding era, though they were rare, and providing examples).

Founders themselves could have adopted to confront that problem. And since none of the laws adopted by the Founders are analogous to the State's ban, the ban is unconstitutional.

The State seems to believe that even though the general problem of mass casualty events was familiar to the Founders, the logic of *Heller* does not apply to the specific problem of mass shootings. But the State's focus on this subset of gun violence does not distinguish this case from *Heller*, because again the District of Columbia made an identical argument. D.C. asserted that one of the problems caused by handguns was their use in mass shootings. Brief of Petitioners, *D.C. v. Heller*, *supra*, 53. (specifically identifying the single shooter incident at Virginia Tech as an example of the harm it was seeking to address). But the mass shooting problem D.C. identified did not change the result. The Court held, even in the face of this issue, that D.C. was required to demonstrate a historical tradition comparable to its absolute firearms ban. There is no such tradition and the law was declared unconstitutional.

### C.     The Technological Advances are the Same

The thrust of the State's argument appears to be that even if there is no founding era precedent analogous to its ban, the ban is nevertheless constitutional because of the increase in firearms' lethality compared to firearms of the founding era. Resp. 28-31. But the State's argument once again runs headlong into *Heller*. The modern handguns at issue in *Heller* were the product of exactly the same sort of technological innovation described by the State. Nevertheless, the Supreme Court held that D.C.'s ban was an extreme historical outlier, *Heller*, 554 U.S. at 629, and for that reason the ban was unconstitutional.

The flaw in the State's argument is that it believes that merely identifying advances in firearm technology satisfies its burden. But *Bruen* flatly states it does not: "Just as the First

7

Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*, 142 S.Ct. at 2132, *quoting Heller*, 554 U.S. at 582.

In summary, the issue before the Court is whether historical precedent from the founding era evinces a comparable tradition of regulation with the purpose of controlling the societal problem identified by the State. *Id.* 142 S. Ct. at 2131-32 (internal citations and quotation marks omitted). Like D.C., the State cannot point to a single founding-era law (far less a national tradition) that prohibited the mere possession of an entire class of commonly held firearms. Therefore, the State's law, like D.C.'s, is unconstitutional.

## VI.   The Banned Arms Are Commonly Possessed by Law-Abiding Citizens

### A.      The Banned Firearms Are in Common Use

The State asserts that the firearms it bans are "near direct copies of AR-15 rifles." Resp. 20 (internal quotation omitted). And it seems to think it can ban them for that reason. Resp. 19. Just the opposite is true. As Justice Thomas noted in *Friedman*, *supra*, AR-15s are commonly possessed by millions of citizens for lawful purposes and are therefore protected under *Heller*. *Id.* (Thomas, J., dissenting from denial of cert.). *See also Heller v. D.C.*, 670 F.3d 1244, 1287 (D.C. Cir. 2011), *abrogated on other grounds by Bruen* (Kavanaugh, J., dissenting) (AR-15 protected by Second Amendment because it is one of the most popular firearms in America).

Moreover, the State's argument runs headlong into *Staples v. United States*, 511 U.S. 600 (1994). In that case, the Court stated that it is not lawful for a civilian to possess a machine

gun like an M-16, and it contrasted that with semi-automatic weapons (like the AR-15 at issue in that case) which "**traditionally have been widely accepted as lawful possessions**." *Id.*, 511 U.S. at 612 (emphasis added).

AR-15s are perfectly legal to build, buy, and own under federal law and the laws of over 40 states. *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (S.D. Cal. 2021), *vacated and remanded on other grounds*, (9th Cir. 2022). These firearms are the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. *See* National Shooting Sports Foundation, Inc., *2021 Firearms Retailer Survey Report*, 9, available at https://bit.ly/3gWhI8E (last visited Jan. 30, 2023). See also Declaration of James Curcuruto ¶ 7 (more than 20 million AR-platform rifles are owned by millions of persons in the United States). Thus, if the banned firearms are, as the State asserts, merely modified AR-15s, for that very reason it cannot ban them, because AR-15s are surely commonly possessed for lawful purposes.

Even considered as a separate category, the banned firearms meet the common use test. A very conservative estimate places the number of firearms of the type banned by the State manufactured in the United States from 2016-2021 at well over 1 million. Declaration of Chris Arnet ¶ 10. *Compare Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (arms category consisting of 200,000 arms meets common use test).

**B.     The Banned Magazines are in Common Use**

The banned magazines are also in common use. In his dissent in *Kolbe v. Hogan*,[10] Judge Traxler addressed magazines such as those banned by the State.  He wrote:

---

[10] *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), *abrogated on other grounds by Bruen*.

> **The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens,** as there are more than 75 million such magazines owned by them in the United States.  These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds.  Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds.

*Id.*, 849 F.3d at 154 (Traxler, J. dissenting) (internal citations and quotation marks omitted; emphasis added).

In 2021, a professional survey firm conducted a comprehensive assessment of firearms ownership and use patterns in America. William English, *2021 National Firearms Survey: Updated Analysis* 1, available at https://bit.ly/3yPfoHw (last visited Jan. 30, 2023). The survey was administered to a representative sample of approximately 54,000 U.S. residents aged 18 and over, and it identified 16,708 gun owners. *Id.* According to the survey, 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to hundreds of millions of such magazines have been owned. *Id.* at 20. *See also* Declaration of James Curcuruto ¶ 7 (at least 150 million magazines with a capacity greater than ten rounds are owned by law-abiding American citizens, who use those magazines for lawful purposes). Thus, the State cannot reasonably dispute that the banned magazines are arms that are commonly possessed for lawful purposes.

## VII.    The State Misapprehends the Nature of the Historical Inquiry

The State misapprehends the historical inquiry. First, the Court should reject the State's attempt to rewrite the *Heller* test in the disjunctive (i.e., it may ban arms that are dangerous **or** unusual). *See* Resp. 31, n.29. The Supreme Court held that the Nation's historical tradition of firearms regulation supports banning weapons that are "dangerous and unusual." *Heller*, 554

U.S. at 627 (emphasis added). Importantly, "this is a conjunctive test: A weapon may not be banned unless it is **both** dangerous **and** unusual." *Caetano*, 577 U.S. at 418 (Alito, J. concurring) (emphasis in the original). An arm that is commonly possessed by law-abiding citizens for lawful purposes is, by definition, not unusual. Thus, such an arm cannot be both dangerous and unusual and therefore it cannot be subjected to a categorical ban. *Heller*, 554 U.S. at 629.

Second, in *Bruen*, the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have **when the people adopted them**.'" *Id.*, 142 S.Ct at 2136, *citing Heller*, 554 U.S. at 634- 35 (emphasis in the original). The Second Amendment was adopted in 1791. Importantly, *Bruen* held that 20th century laws (such as many of the laws cited by the State) are irrelevant to the historical inquiry. *Id.*, 142 S. Ct. at 2154, n. 28 (stating the Court would not address 20th century historical evidence because it did not provide insight into the scope of the Second Amendment). *See also Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1082 (D. Haw. 2021) ("But a handful of similar laws from the 1930s, without more, is insufficient to establish that the State of Hawaii's law belongs to a 'longstanding' historical tradition of 'presumptively lawful' firearm prohibitions.").

## VIII.   The State Cannot Identify a Historical Tradition of Absolute Bans of Commonly Held Arms

### A.      Clubs and Blunt Objects

The State's expert, Professor Spitzer, states that various types of clubs and other blunt weapons were regulated in American history. Spitzer Dec. ¶ 75. Though he admits that "most" were anti-carry laws, which also generally encompassed pistols and knives. *Id*. If by "most" Spitzer means "all," he is correct. None of the early laws he identified bans possession as

opposed to carry. Spitzer identifies two 20th century laws that he says banned possession. But this analysis ignores the Supreme Court's holding in *Bruen* that such late evidence did "not provide insight into the meaning of the Second Amendment." *Id*. 142 S. Ct. at 2154, n. 28. In summary, none of the "Clubs and Blunt Objects" laws identified by Spitzer bans possession at all. At best, Spitzer has identified laws that prohibited carrying concealed or with the intent to injure. Thus, none of the regulations is analogous to a categorial ban on possession of a commonly possessed arm.

## B.   Gunpowder

The State argues that regulation of gunpowder storage is analogous to a ban on commonly held arms. Resp. 32. It is hard to understand why the State would advance this argument, because the Supreme Court rejected an identical argument. In *Heller*, Justice Breyer advanced the same type of gunpowder analogues advanced by the State. *Id*., 128 S. Ct. at 2849 (Breyer, J., dissenting). The majority rejected Justice Breyer's appeal to gunpowder storage laws, stating that such laws "do not remotely burden the right of self-defense as much as an absolute ban on handguns." *Id*., 554 U.S. at 632 (emphasis added).

## C.   Trap Guns

As Spitzer states, a trap gun is a device rigged to fire without the presence of a person. Spitzer Dec. ¶ 84. But Spitzer's chart cites only one founding-era restriction on the setting of "trap guns." Spitzer Dec. Ex. B. (referring to 1763-1775 N.J. Laws 346, ch. 539, § 10). It was not until the late 19th century that such restrictions appeared elsewhere. *Id*. More importantly, these laws did not ban any class of arms. Rather, they regulated the manner of using them. That is, they banned setting loaded, unattended guns to prevent unintended discharges. In other

12

words, these laws did not ban possession of the guns used in the traps. Rather, they prohibited the use of the guns in a trap. Because "trap gun" laws are use regulations and not bans on possession, they are not constitutionally relevant analogues to the State's ban on possession.

**D.    Concealed Carry Regulations**

The State mentions that by the end of the 19th century most states banned concealed carry. Resp. 34. Again, the State's point is unclear. Laws banning concealed carry are use regulations, not bans of possession of commonly held arms. And *Heller* acknowledged that such use regulations are constitutional even as bans on possession are not. *Id*., 554 U.S. at 627-28. Indeed, if laws regulating concealed carry were analogous to laws categorically banning arms commonly possessed by law-abiding citizens for lawful purposes, *Heller* would have said so and upheld D.C.'s ban. It did not, because they are not.

The State cites a particular 1879 Tennessee statute[11] as analogous to its ban on possession. Resp. 34. This is odd, because the Tennessee Supreme Court held that statute does not prohibit possession. *Osborne v. State*, 92 S.W. 853, 853 (Tenn. 1906). Specifically, the court held that the statute does not prevent the owner of the listed arms from keeping them "in his residence or place of business for his protection." *Id*. Thus, this statute, which does not ban the possession of any arm, is not analogous to a statute that bans the possession of commonly possessed arms.

---

[11] Besides not being analogous, the statute is not a founding-era statute and is thus irrelevant to the constitutional analysis.

### E.    Bowie Knifes

Spitzer summarizes the Bowie knife regulations he found in paragraph 72 of his declaration. Again, none of the regulations bans any weapon whatsoever. The regulations banned concealed carry, contained sentence enhancers, imposed taxes, etc. Spitzer identifies no regulation that banned possession of an arm for self-defense, because there were none. Law professor David Kopel, whose work was cited favorably in *Bruen,* reviewed Spitzer's work on this issue and came to the same conclusion. See David Kopel, *Bowie Knife Statutes 1837-1899*, available at bit.ly/3RNRpQD (last visited Feb. 10, 2023). After an exhaustive review of all nineteenth century state and territorial statutes, Kopel concluded: "As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words 'bowie knife' or variant. … At the end of the 19th century, **no state prohibited possession of Bowie knives**." *Id*. (emphasis added). Kopel concluded that the history of Bowie knife law is no stronger in creating historical precedents for banning common firearms or magazines than that which was examined in *Heller* and *Bruen*. *Id*.

### F.    Twentieth Century Regulations

The State points to 20th century regulations in support of its ban. Resp. 35-37. The point of this discussion is unclear. As noted above, in *Bruen* the Court ignored the 20th century statutes advanced by New York, because they did "not provide insight into the meaning of the Second Amendment." *Id*. 142 S. Ct. at 2154, n. 28. The Court should similarly ignore the 20th century statutes advanced by Hawai'i.

14

**G.    Summary**

None of the statutes identified by the State is analogous to its absolute ban on possession of arms commonly possessed by law-abiding citizens for lawful purposes. Thus, it has failed to meet its burden under step two of the *Heller/Bruen* test. The Court could end its analysis here.

**IX.    Magazines Are Arms**

The State asserts magazines are not arms. In *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014), the Court rejected an identical argument because magazines "are integral components to vast categories of guns." *Id*. at 1276. The Ninth Circuit affirmed in *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015). In that case, the Court held that "to the extent that certain firearms capable of use with a magazine – e.g., certain semiautomatic handguns – are commonly possessed by law-abiding citizens for lawful purposes, **our case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines** necessary to render those firearms operable." *Id*. 779 F.3d at 998 (emphasis added). Subsumed within that holding is that magazines are a category protected by the Second Amendment.

Nevertheless, the State attempts to define an entire class of arms out of existence. Resp. 12. The State's expert, Professor Baron, states that in the founding era "magazine" referred to a kind of building. Baron Dec. ¶ 24. Therefore, Baron applied his "corpus linguistics" approach to the term "cartridge boxes" and concluded that in the founding era, a box containing cartridges was considered an "accoutrement." Baron Dec. ¶ 34. And since a modern magazine is like a cartridge box, it is also an accoutrement. *Id*. No one disputes that

everyone in the founding era understood a box containing ammunition was an accoutrement and not itself an arm. But Baron goes off the rails when he asserts that a modern magazine, like a cartridge box, is also nothing but an "ammunition container" (*Id*., ¶ 55) and therefore it is an accoutrement. If a magazine were merely a box containing ammunition, no one would argue that it is an arm. But the very source Baron cites states that it is more than merely a container. It performs an essential function, i.e., feeding ammunition. The OED, which Baron cites, states that a magazine **feeds ammunition** into the breech of a firearm. *Id*., ¶ 55 (emphasis added). Even the State admits that a magazine has an active function and is not a mere box. Resp. 14 (magazine holds "ammunition **and** feeds it into firearms" (emphasis added)). Thus, Baron's methods lead him to conclusions that have been expressly rejected by the Ninth Circuit. According to Baron, the term arms does not include ammunition or critical parts of firearms like the trigger. Baron Dec. ¶ 9, 78. Under Baron's analysis, the State could ban the sale and possession of ammunition and firearms parts essential for firearms to function without violating the Second Amendment because it would not have banned any "arm" as the Founders understood the word. This conclusion is absurd. *See Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014) (ammunition protected by Second Amendment); *see also Fyock v. City of Sunnyvale*, *supra*, 25 F. Supp. 3d at 1276 (If magazines are not arms, "any jurisdiction could effectively ban all weapons simply by forbidding magazines … This argument's logic would abrogate all Second Amendment protections.").

Contra Professor Baron, the issue is not whether a magazine is analogous to an 18th-century box. Rather, the issue is whether they fit within the 18th-century meaning of the word "arms." The meaning of that word in the 18th century is no different from the meaning today.

*Heller*, 554 U.S. at 581. Importantly, the State admits the Court's analysis in *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), was correct. The Second Amendment protects those items that are "*necessary* to operate a firearm." Resp. 13 (emphasis in original). Thus, whether a magazine falls within the definition of "arms" involves a functional analysis – i.e., is a magazine necessary for a semi-automatic firearm to function? *See Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) ("[T]he right to keep and bear arms "protect[s] those closely related acts necessary to their exercise.").

Detachable magazines are necessary to make semi-automatic firearms operate safely and effectively. Declaration of Mark Passamaneck ¶ 6. Without such magazines, semi-automatic firearms are inoperable. *Id*. A magazine is not merely a box in which ammunition is stored. *Id*. ¶ 7. Rather, it is a dynamic component that performs a function in any semi-automatic firearm. *Id*. The magazine holds cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger. *Id*. If there is no magazine pushing cartridges up into the action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon. *Id*. Thus, without magazines as a designed dynamic component, semi-automatic firearms would not exist.

In *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175 (D.R.I. 2022), apparently acting as its own firearms expert, the district court asserted that a "a firearm can fire bullets without a detachable magazine." *Id*. *12 (citing no expert). As Plaintiffs' expert has demonstrated, this is a dubious proposition. Passamaneck Dec. ¶ 8. But even assuming

17

*arguendo* the court were correct, the statement has no constitutional relevance. As discussed above, in order for a semi-automatic firearm to operate qua semi-automatic firearm, a magazine must be inserted. Passamaneck Dec. ¶ 7. This is just common sense. If cartridges are not being fed from a magazine, semi-automatic fire is impossible because the cartridges would have to be fed manually after each shot. In other words, without a magazine, a semi-automatic firearm is reduced to a single-shot firearm. Thus, *Ocean State Tactical* effectively holds that the State could constitutionally outlaw multi-shot firearms by outlawing magazines. That is obviously inconsistent with *Heller*, to say the least. As even a case cited by the State recognizes, a magazine, in general, is necessary. *See Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, *9 (D. Or. 2022) ("magazines in general **are necessary** to the use of firearms for self-defense").

The State's confusion regarding this issue results from conflating the first step of the *Heller/Bruen* test (text) with the second step (history).[12] Under the first step, a magazine is a bearable arm and thus presumptively protected. Does this mean that the State cannot ban so-called large capacity magazines? Not necessarily. Just like any arm, if the State can demonstrate that a regulation banning large capacity magazines is "consistent with the Nation's historical tradition of firearm regulation," it can ban them (though, as discussed above, it cannot make such a demonstration).

In summary, a magazine of some size is necessary to make the Second Amendment right to keep and bear semi-automatic firearms effective. Therefore, magazines, in general,

---

[12] The Courts in *Brown* and *Ocean State Tactical* are also confused in this regard. That is why those cases are patently erroneous.

constitute bearable arms that are prima facie protected by the Second Amendment under prong one (text) of the *Heller/Bruen* test. Whether magazines of a particular size can be banned is a different question that must be resolved under prong two (history) of that test. As discussed in detail above, the banned magazines are commonly possessed by law-abiding citizens for lawful purposes, and therefore may not be subjected to a categorical ban. Therefore, the State's categorical ban is unconstitutional.

X.      **The Court Should Reject the State's Efforts to Distort the *Heller/Bruen* "Common Use" Analysis**

According to the State, an arm is not protected unless it is in fact frequently **actually** used for self-defense. Resp. 16. The State's interpretation flies in the face of *Heller's* plain language. In *Heller* the Supreme Court did not focus on "use" in isolation; the Court held that the Second Amendment conferred an individual right to **keep** and bear arms. *Id.*, 554 U.S. at 595 (emphasis added). The Court held that "keep arms" means "possessing arms." *Id.*, 554 U.S. at 583. And the Court held that banning "the most preferred firearm in the nation to **keep** and use for protection of one's home and family [fails] constitutional muster." *Id.*, 554 U.S. at 628–29 (cleaned up; emphasis added). The conjunctive is important. If the State's interpretation of *Heller* were correct, the word "keep" in that sentence would be superfluous. It is not. *Heller* held that the Second Amendment protects both the right to possess (i.e., keep) arms and the right to use those arms should the occasion arise. To be constitutionally protected, it is enough if the arms are "typically **possessed** by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added). Nowhere in *Heller* did the Court suggest that it is necessary to show that a weapon's actual use in self-defense meets some threshold the State has not identified. Instead, the Court wrote: "Whatever the reason, handguns are the most popular

19

weapon chosen by Americans for self-defense in the home, and a complete prohibition on their use is invalid." *Id*.

The State also argues that the banned arms are not "suitable" for self-defense. Resp. 22-24. The State goes so far as to denigrate the choices of the American people when it asserts that the arms they have chosen are a "poor choice" for self-defense. *Id*. The State seems to be under the impression that the American people are obliged to demonstrate to its satisfaction that the arms they have chosen are somehow "suitable." That is not the law. The State is attempting to recast the issue in this case as a policy question: Does the average citizen really need arms like those it has banned? But the premise of this question was rejected by *Heller*. In that case, D.C., like the State here, believed the arms that it banned were not "suitable" self-defense by law-abiding citizens. But D.C.'s beliefs about the suitability of the banned arms was constitutionally irrelevant. The Court held that it is the choice of the American people that settles the question of whether an arm is protected under the Second Amendment, and the government has no power to evaluate or second-guess that choice.

## XI.     The State's Effort to Distort the Common Use Metric Fails

Next, the State cites four abrogated cases (though its citations do not acknowledge that fact) for the proposition that commonality is not measured by, well, commonality. Resp. 17. The State insists that merely because an arm is commonly possessed, that does not mean it is commonly possessed within the meaning of *Heller* and *Bruen*. The State never suggests how one would determine whether an arm is commonly possessed other than with data about whether it is commonly possessed. It just asserts that "sheer numbers" won't do. One is left to wonder what would do if not "numbers." Notwithstanding the State's protests, the common use

inquiry is based on numbers. For example, in *Friedman*, *supra*, Justice Thomas noted that

millions of Americans own AR-style rifles for lawful purposes. *Id*. (Thomas, J., dissenting from

denial of cert.). That bare fact, standing alone, was sufficient to establish common use. *Id*.

Justice Alito concurs. In *Caetano* he wrote that in determining whether the arms at issue (i.e.,

stun guns and Tasers) are commonly used, the relevant statistic is that over 200,000 Tasers and

stun guns have been sold to private citizens who may lawfully possess them in 45 States. *Id*.,

577 U.S. at 420 (internal citations and quotation marks omitted).[13] Other courts are in accord.

*See Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (analyzing commonality by reviewing

raw number percentage and jurisdiction counting) and *Duncan v. Becerra ("Duncan IV")*, 970

F.3d 1133, 1147 (9th Cir. 2020)[14] ("Commonality is determined largely by statistics.").

## XII.  *Heller's* Reference to "Weapons Most Useful in Military Service" Does not Change the Analysis

The State asserts that under *Heller*, weapons "most useful in military service" may be

banned, "regardless of popularity." Resp. 18. The State added the phrase "regardless of

popularity" to the quotation and by doing so underscores the fact that it does not understand

what the Court was talking about. Two passages from *Heller* show that the State's

interpretation is the opposite of what the Court held. In both passages, the Court distinguishes

---

[13] The State says there are over 700,000 registered machineguns (Resp. 18), apparently suggesting that Justice Alito must be confused about common use. But the State does not understand the ATF report it cites. It is illegal for a private person (as opposed to government entities) to possess a machinegun built after 1986. 18 U.S.C.A. § 922(o); *See also Hollis v. Lynch*, 827 F.3d 436, 440 (5th Cir. 2016). As of 2016, the total number of pre-1986 machine guns was 175,977. *Id*., 827 F.3d at 449. *See also* Exhibit A (ATF FOIA response from which *Hollis* derived its figure). It is impossible for that number to become larger. The ATF document cited by the State reported there are 741,146 registered machineguns. Obviously, the overwhelming majority of those are owned by government entities such as police departments, not private citizens.

[14] *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

between two categories of weapons, the first of which is not protected by the Second Amendment and the second of which is. In the first passage (554 U.S. 570, 624-25), the Court refers to: (1) "[O]rdinary military equipment"; and as distinguished from (2) arms supplied by men called for militia service. The Court noted that this second category consists of arms in common use for lawful purposes. In the second passage (554 U.S. 570, 627-28), the Court refers to these same categories using slightly different terms: (1) "[W]eapons that are most useful in military service." The Court cites three examples of this type of weapon (machineguns, bombers, and tanks). (2) Arms supplied by men called for militia service. This category has the same "weapons in common use" meaning.

One thing is clear from these passages. Weapons in common use brought to militia service by members of the militia are protected by the Second Amendment. What do militia members do with those weapons when they bring them to militia service? They fight wars.[15] It would be extremely anomalous, therefore, if *Heller* were interpreted to mean simultaneously that (1) weapons in common use brought for militia service for fighting wars are protected by the Second Amendment, and (2) all weapons useful for fighting wars (which the State calls "military style weapons") are not protected by the Second Amendment. If the Court were to adopt the State's argument, this is the nonsensical result it would have to reach. This is not the law. "*Miller* and *Heller* [merely] recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." *Caetano v. Massachusetts*, 577 U.S. 411, 419 (2016) (Alito, J.,

---

[15] *See* U.S. Const. amend. V (referring to "the Militia, when in actual service in time of War").

concurring). In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (*abrogated on other grounds by Bruen*), Judge Traxler made this same point. He wrote that just calling an arm a "weapon of war" is irrelevant, because under *Heller* "weapons that are most useful for military service" does not include "weapons typically possessed by law-abiding citizens." *Id.*, 849 F.3d at156 (Traxler, J., dissenting).

**XIII.   The State's Position is Contrary to *Caetano***

A recurring theme of the State's brief is that its firearms ban should be upheld because it bans only some firearms and leaves many others available. *See, e.g.*, Resp. 27. But this argument cannot be reconciled with *Caetano v. Massachusetts*, 577 U.S. 411 (2016). In that case the Court held that Tasers and stun guns are protected arms. The Court reached this holding even though the Massachusetts statute did not ban **any** firearm. It is clear from *Heller* and *Caetano* that the relevant issue is not whether the State has left other firearms available for possession. Indeed, in *Caetano*, the arms ban was unconstitutional even though it left all firearms available for possession. The issue is whether the banned arms are commonly possessed by law-abiding citizens for lawful purposes. If they are, it does not matter that the State has not banned other arms. *Heller*, 554 U.S. at 629.

**XIV.   Plaintiffs have Established the Other Elements for a Preliminary Injunction**

In *Bruen*, the Court rejected the means-end analysis that had been applied by several circuit courts to Second Amendment regulations. The Court stated: "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Thus, "the Second Amendment does

not permit – let alone require – judges to assess the costs and benefits of firearms restrictions under means-end scrutiny." *Id*. (cleaned up). Perhaps recognizing that states would push back at this holding, the Court warned reviewing courts not to engage in means-end scrutiny through the back door, as it were, under the "guise" of a different inquiry. *Id*., 142 S. Ct. at 2133, n.7.

This is exactly what the State has done here by using its discussion of the other preliminary injunction factors as an avenue for arguing for a back door means-end analysis of the kind expressly prohibited by *Bruen*. The State gives the game away when it asserts that the banned arms "present grave public safety concerns." Resp. 42. The State then launches into an extended discussion in which it attempts to justify its arms ban because it "promotes an important interest" (i.e., public safety). No one disputes that the banned firearms are dangerous. All firearms are dangerous. But, again, the only issue in this case is whether the banned arms are commonly possessed by law-abiding citizens for lawful purposes. They are, as demonstrated above. It follows that the "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano*, 577 U.S. at 418 (Alito, J., concurring). Therefore, the Court should reject the State's attempt to inject means-end scrutiny into this matter under the guise of applying the preliminary injunction factors.

The issue is not, as the State would have it, whether banning these arms is a good policy decision. The issue is whether the preliminary injunction factors are met. In this regard, *Fisher v. Kealoha*, 2012 WL 2526923 (D. Haw. 2012), is very instructive. In that case, this Court reviewed a Second Amendment challenge to the County of Honolulu's denial of a firearm permit. The plaintiff moved for a preliminary injunction, which the Court granted. The Court

24

held that the plaintiff was likely to succeed on the merits of his Second Amendment claim. *Id.*, *10. Obviously, the merits inquiry in that case was different from the merits inquiry in this case. The case is, however, relevant to this matter with respect to the other preliminary injunction factors. With respect to the irreparable injury factor, the Court stated that "deprivation of that constitutional right **requires** a finding of irreparable injury." *Id.*, at *11 (emphasis added). Turning to the "public interest" inquiry, the Court stated: "The Court concludes that it is in the public interest to uphold Plaintiff's Constitutional right to bear arms in self-defense within the home, and accordingly finds that this factor weighs in favor of granting the preliminary injunction." *Id.*, at *12. Finally, the Court wrote "that the balance of the equities tips in Plaintiff's favor. … [T]he Court observes that granting the preliminary injunction would not allow Plaintiff to carry a loaded firearm in public without obtaining a separate license to do so, thereby avoiding the safety risks that play a central role in cases involving the right to obtain a license for open or concealed carry of a firearm outside the home." *Id.*

All of the factors discussed in *Fischer* apply equally in this case. A finding of a violation of Plaintiffs' Second Amendment rights "requires a finding of irreparable injury." It "is in the public interest to uphold Plaintiff[s'] Constitutional right to bear arms in self-defense within the home." And finally, the balance of equities tips in favor of Plaintiffs. Merely allowing them to acquire commonly possessed and constitutionally protected firearms for the defense of their homes does not impose any public safety risk that could not be more effectively addressed through licensing regulations.

*/s/ Barry K. Arrington*
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard

25

Wheat Ridge, Colorado 80033
Phone:  (303) 205-7870
Email:  barry@arringtonpc.com
*Pro Hac Vice*

Gatlin Voelker
Sebastian D. Torres
50 E Rivercenter Boulevard #1275
Covington, Kentucky 41011
Phone: (859) 781-9100
STorres@GatlinVoelker.com

ATTORNEYS FOR FREEDOM LAW FIRM
1003 Bishop Street, Suite 1260
Pauahi Tower
Honolulu, HI 96813
Phone: (808) 647-2423
Fax: (480) 857-0150
Marc J. Victor - Bar. No. 011090
Jody L. Broaddus - Bar No. 011229
Caroline M. Elliot - Bar No. 011541
Marc@AttorneysForFreedom.com
Jody@AttorneysForFreedom.com
Caroline@AttorneysForFreedom.com
*Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2023, a copy of foregoing was filed electronically. Notice of this filing will be sent by e-mail to all appearing parties by operation of the Court's electronic filing. Parties may access this filing through the Court's system.

*/s/ Barry K. Arrington*
Barry K. Arrington