2023 WL 2077392
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Robert BEVIS, et al., Plaintiffs,
v.
CITY OF NAPERVILLE, ILLINOIS, and Jason Arres, in his official capacity as Chief of Police, Defendants.

No. 22 C 4775
|
Signed February 17, 2023

**Attorneys and Law Firms**

Barry Kevin Arrington, Pro Hac Vice, Arrington Law Firm, Denver, CO, Jason R. Craddock, Sr., Law Office of Jason R. Craddock, Oak Brook, IL, for Plaintiffs.

Christopher B. Wilson, Gabriel Tong, Micaela Snashall, Perkins Coie LLC, Chicago, IL, Shira Lauren Feldman, Pro Hac Vice, Brady Center to Prevent Gun Violence, Washington, DC, for Defendant City of Naperville, Illinois.

### MEMORANDUM OPINION AND ORDER

Virginia M. Kendall, United States District Judge

*1 After several mass shootings nationwide, the City of Naperville enacted an Ordinance prohibiting the sale of assault weapons. Illinois followed shortly after with the Protect Illinois Communities Act, which bans the sale of both assault weapons and high-capacity magazines. Robert Bevis, who owns a local gun store in Naperville, Law Weapons, and the National Association of Gun Rights sued the state and city, alleging their laws violate the Second Amendment. (Dkt. 48). They now move for a temporary restraining order and a preliminary injunction alleging that their constitutional rights are being violated by the bans. (Dkts. 10, 50). For the following reasons, the motions are denied. (*Id.*)

### BACKGROUND

Mass shootings have become common in America. They have occurred in cities from San Bernadino, California to Newtown, Connecticut, and recently, Highland Park, Illinois. (Dkt. 12-1 at 1–3). In response, several states —California, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, New Jersey, and New York—along with many local municipalities have enacted bans on the possession, sale, and manufacture of assault weapons and high-capacity magazines. (*Id.*) Illinois and the city of Naperville decided to put similar restrictions in place.

On August 17, 2022, Naperville's City Council passed its Ordinance banning the sale of "assault rifles" within the city.[1] (Dkt. 12 at 2). Section 3-19-2 declares "[t]he Commercial Sale of Assault Rifles within the City is unlawful and is hereby prohibited." (Dkt. 12-1 at 8). Violators are subject to fines ranging between $1,000 and $2,500. (*Id.* at 9). Section 3-19-1 provides both a general definition of an "assault rifle" as well as specific examples of prohibited guns. (*Id.* at 4). The general definition is as follows:

(1) A semiautomatic rifle that has a magazine that is not a fixed magazine and has any of the following:

(A) A pistol grip.

(B) A forward grip.

(C) A folding, telescoping, or detachable stock, or is otherwise foldable or adjustable in a manner that operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability, of the weapon.

(D) A grenade launcher.

(E) A barrel shroud.

(F) A threaded barrel.

(2) A semiautomatic rifle that has a fixed magazine with the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

(3) Any part, combination of parts, component, device, attachment, or accessory that is designed or functions to accelerate the rate of fire of a semiautomatic rifle but not convert the semiautomatic rifle into a machinegun.

(*Id.* at 5). Additionally, twenty-six categories of weapons are specifically banned, including AK-47 and AR-15 rifles. (*Id.* at 5–6). The Ordinance was set to go into effect on January 1, 2023. (*Id.* at 10).

EXHIBIT A

**\*2** On January 10, 2023, Illinois enacted the Protect Illinois Communities Act, HB 5471. (Dkt. 57 at 1). The statute renders it unlawful "for any person within this State to knowingly manufacture, deliver, sell, or purchase or cause to be manufactured, delivered, sold, or purchased or cause to be possessed by another, an assault weapon," defined by a list of enumerated guns, including the AR-15 and AK-47. 720 ILCS 5/24-1.9(b). Additionally, the law bans the sale of "large capacity ammunition feeding device[s]," which are "magazine[s], belt[s], drum[s], [and] feed strip[s] ... that can be readily restored or converted to accept[ ] more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns." 720 ILCS 5/24-1.10(a). Both state prohibitions went into immediate effect upon the passage of the act (in contrast, the regulations banning assault-weapon and large-capacity magazine ownership and imposing registration requirements have a later effective date and are not being challenged). (Dkt. 57 at 2).

Robert Bevis owns Law Weapons, a firearm store in Naperville. (Dkt. 48 ¶¶ 7–8). He attests, "I and my customers desire to exercise our Second Amendment right to acquire the Banned Firearms ... for lawful purposes, including, but not limited to, the defense of our homes." (Dkt. 10-2 ¶ 4). Furthermore, he claims that the prohibition means he and his business will go bankrupt, and "the citizens of Naperville will be left as sitting ducks for criminals who will still get guns." (*Id.* ¶ 5). National Association for Gun Rights ("NAGR") is a nonprofit organization dedicated to "defend[ing] the right of all law-abiding individuals to keep and bear arms" and seeks to represent "the interests of its members who reside in the City of Naperville." (Dkt. 10-1 ¶ 2; *see also* Dkt. 48 ¶ 6).

Before Illinois enacted the Protect Illinois Communities Act, the plaintiffs—Bevis, Law Weapons, and NAGR—sued Naperville alleging its Ordinance violates the Second Amendment. (Dkt. 1). They moved for a temporary restraining order and preliminary injunction preventing its enforcement. (Dkt. 10). The city agreed to stay the Ordinance pending the disposition of the motion. (Dkt. 29). Shortly thereafter, Illinois passed the Protect Illinois Communities Act, and this Court granted the plaintiffs leave to amend their complaint to add the state as a party. (Dkts. 41, 47). The plaintiffs promptly filed their Amended Complaint, adding Jason Arres, Naperville's Chief of Police, as a defendant and asserting that both Naperville's Ordinance and Illinois's Protect Illinois Communities Act violate the Second Amendment. (Dkt. 48). They then notified the Illinois Attorney General of their constitutional challenge and moved for a temporary restraining order and preliminary injunction against both laws.[2] (Dkts. 49, 50). The Court held oral argument on January 27, 2023. (Dkt. 55).

## DISCUSSION

**\*3** The standards for issuing a temporary restraining order and a preliminary injunction are identical. *Mays v. Dart*, 453 F. Supp. 3d 1074, 1087 (N.D. Ill. 2020). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1324 (7th Cir. 2022) (quoting *Winter*, 555 U.S. at 20).

### I. Likelihood of Success on the Merits

A plaintiff must "demonstrate that [his] claim has some likelihood of success on the merits, not merely a better than negligible chance." *Doe*, 43 F.4th at 791 (quoting *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020)). Analyzing the likelihood of success, the Seventh Circuit has stressed, is "often decisive"—as it is here. *Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022). As set forth below, although the plaintiffs have standing to bring this lawsuit, they are unlikely to succeed on the merits of their claim because Naperville's Ordinance and the Protect Illinois Communities Act are consistent with the Second Amendment's text, history, and tradition.

#### A. Jurisdiction

Before proceeding to the merits, the Court must be confident in its jurisdiction. *N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 420 (7th Cir. 2022). Article III grants the federal courts jurisdiction only over "cases" and "controversies." U.S. Const. art. III § 2. As such, any person or party "invoking the power of a federal court must demonstrate standing to do so." *Hero v. Lake Cnty. Election Bd.*, 42 F.4th 768, 772 (7th

Cir. 2022) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)). The three familiar elements for standing are (1) a concrete and particularized injury actually suffered by the plaintiff that (2) is traceable to the defendant's conduct and (3) can be remedied by judicial relief. *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 937 (7th Cir. 2022). All three plaintiffs here have satisfied the standing requirements to bring their lawsuit.

### 1. Individual Standing

Direct monetary harm is a textbook "injury in fact," and Bevis alleges that, as a gun-store owner in the business of selling the banned weapons, he has lost money in sales, an allegation that clearly establishes harm at this stage. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). Illinois's and Naperville's gun laws undeniably caused the harm.

The only wrinkle here relates to the third element: redressability. Before Illinois enacted the Protect Illinois Communities Act, the plaintiffs sued only Naperville. Municipalities do not enjoy sovereign immunity, so this Court could have redressed the plaintiffs' alleged injury by enjoining the enforcement of a law without issue; the standing inquiry would have been easy. See *Lincoln County v. Luning*, 133 U.S. 529 (1890). Then, Illinois enacted its own gun regulation that, like Naperville's ordinance, banned the sale of assault weapons. The plaintiffs—likely recognizing that, without the state as a party, this Court could not remedy their harm because the state law would still proscribe their conduct—amended their complaint to add Jason Arres, Naperville's Chief of Police. But as Naperville points out, several other parties, such as the state police or other county officials, also must enforce Illinois's gun laws, raising the possibility that relief would be ineffective.

 **\*4** Unlike local governments, state governments are generally immune from suit. *See, e.g., Lukaszczyk v. Cook County*, 47 F.4th 587, 604 (7th Cir. 2022); *Hans v. Louisiana*, 134 U.S. 1, 20–21 (1890). The *Ex parte Young* doctrine is, however, one exception to this rule, and it "allows private parties to sue individual state officials for prospective relief to enjoin ongoing violations of federal law." *Council 31 of the Am. Fed'n of State, Cnty & Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012) (quoting *MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 337 (7th Cir. 2000)). The doctrine represents a legal fiction: a plaintiff can for all intents and purposes sue the state provided the complaint lists a state officer instead of the state itself. Little, then, is gained by imposing hyper-technical pleading requirements about which state official is named. A complaint must only be consistent with the legal framework laid out in *Ex parte Young*. In short, it must include a state official with a "connection" to the enforcement of the law instead of the state itself. *Fitts v. McGhee*, 172 U.S. 516, 529 (1899).[3] This inclusion avoids the sovereign-immunity issue that prevents a direct suit but still allows appropriate injunctive relief. Forcing parties to name *every* possible agent that could enforce a state law would be onerous if not impossible. Cf. *Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 78 (1978) ("Nothing in our prior cases requires a party seeking to invoke federal jurisdiction to negate ... speculative and hypothetical possibilities ... in order to demonstrate the likely effectiveness of judicial relief.").

Arres, as Chief of Police, enforces both municipal and state laws, including the Ordinance and the Protect Illinois Communities Act. Naperville, IL., Mun. Code ch 8, art. A, §§ 2, 3 (2022). His duty to enforce both laws makes him a state official with the requisite "connection" for an official-capacity suit against Illinois. See *Fitts*, 172 U.S. at 529. If the plaintiffs succeed, this Court could enjoin the enforcement of the Protect Illinois Communities Act against any state actor who seeks to prevent Bevis from selling assault weapons or high-capacity magazines. Because Bevis and, by extension, Law Weapons have an effective remedy, they have standing to sue.

### 2. Organizational Standing

NAGR's standing presents a different question. Organizations can have standing to sue by either showing a direct harm or borrowing the standing of their members, known as associational or representational standing. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). NAGR chooses the latter method, as neither challenged law has directly harmed the group. "To sue on behalf of its members, an association must show that: (1) at least one of its members would 'have standing to sue in their

own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members.' " *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (quoting *Hunt*, 432 U.S. at 343).

**\*5** NAGR asserts that several members live in Naperville, an Illinois city.[4] (Dkt. 48 ¶ 6). Unlike Bevis, who owns a business selling assault weapons and high-capacity magazines, NAGR's members are not identified as business owners and, therefore, have not lost money. (*Id.*) Instead, they claim the prohibitions deprive them of a constitutional right. (*Id.*) This harm suffices for standing. The alleged deprivation of a constitutional right is another "textbook harm." See *Doe v. Sch. Bd. of Ouachita Par.*, 274 F.3d 289, 292 (5th Cir. 2001) ("Impairments to constitutional rights are generally deemed adequate to support a finding of 'injury' for purposes of standing."). The Second Amendment differs from many other amendments in that it protects access to a tangible item, as opposed to an intangible right. *Compare* U.S Const. amend. II. (protecting "the right of the people to keep and bear Arms"), *with id.* amend. I ("Congress shall make no law ... abridging the freedom of speech...."), and *id.* amend. V ("No person ... shall be compelled in any criminal case to be a witness against himself...."). But individuals deprived of an *in rem* right are not penalized because of this difference. The First Amendment furnishes a close analogue: individuals can sue when the government bans protected books or attempts to close a bookstore based on content censorship. See *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 349 (2010) ("If [the government is] correct, [it] could prohibit a corporation from expressing political views in media beyond those presented here, such as by printing books.... This troubling assertion of brooding governmental power cannot be reconciled with the confidence and stability in civic discourse that the First Amendment must secure."); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (emphasizing "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom"). So too, residents can sue the government under a similar Second Amendment theory.

NAGR has also satisfied the remaining elements. The organization "seeks to defend the right of all law-abiding individuals to keep and bear arms." (Dkt. 10 ¶ 2). That interest is certainly furthered by joining a lawsuit to challenge gun regulations. The group, together with Bevis and Law Weapons, seeks equitable relief through a temporary restraining order and an injunction, neither of which "requires the participation of individual members." *Prairie Rivers*, 2 F.4th at 1008 (quoting *Hunt*, 432 U.S. at 333). Member participation is typically required only when the party seeks damages, and NAGR explicitly disclaimed compensatory or nominal damages. (Dkt. 48 ¶ 37).

### B. Federal Rule of Civil Procedure 5.1

Turning from standing to civil procedure, a party challenging a statute must "file a notice of constitutional question stating the question and identifying the paper that raises it ... if a state statute is questioned and the parties do not include the state ... or one of its officers or employees in an official capacity" and "serve the notice and paper ... on the state attorney general if a state statute is question—either by certified or registered mail or by sending it to [a designated] electronic address." Fed. R. Civ. P. 5.1(a). The court then certifies that the statute has been questioned to the "appropriate attorney general." *Id.* 5.1(b); *see also* 28 U.S.C. § 2403. The attorney general "may intervene within 60 days," and until the intervention deadline, a court "may not enter a final judgment holding the statute unconstitutional." Fed. R. Civ. P. 5.1(c).

The plaintiffs represent, and Naperville agrees, that they filed the appropriate notice with Illinois's attorney general that a constitutional challenge was being raised to the Protect Illinois Communities Act. (Dkts. 49; 50 at 2; *see also* Dkt. 57 at 5). This Court then promptly certified the question to the appropriate attorney general. (Dkt. 56). Illinois now *may* intervene—but is not required to. The statute is permissive. In the interim, this Court is free to consider the constitutionality of the law and any preliminary relief, such as a temporary restraining order or a preliminary injunction. *See* Fed. R. Civ. P. 5.1 advisory committee's note to 2006 adoption ("Pretrial activities may continue without interruption during the intervention period, and the court retains authority to grant interlocutory relief. The court may reject a constitutional challenge to a statute at any time.").

### C. Second Amendment

#### 1. Existing Jurisprudence

**\*6** The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the

right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court first recognized that this provision enshrines an individual's right to keep and bear arms for the purpose of self-defense in *District of Columbia v. Heller*, 554 U.S. 570 (2008), a challenge to D.C.'s prohibition on handgun ownership. In interpreting the Amendment, the Court began with the text and its original meaning as "understood by the voters" at the time of ratification. *Id.* at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). The textual elements— including the unambiguous language stating a right to "keep and bear arms"—protects "the individual right to possess and carry weapons in case of confrontation," a meaning "strongly confirmed by the historical background." *Id.* at 592. Several states adopted similar measures in their respective state constitutions, *id.* at 600–01, and post-ratification commentary confirmed this understanding. *Id.* at 605–09.

The Court recognized, however, that the "right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court gave two limiting examples: (1) as *United States v. Miller*, 307 U.S. 174 (1939), explained, "those weapons not typically possessed by law-abiding citizens for lawful purposes" are unprotected, *Heller*, 554 U.S. at 625; and (2) measures related to "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" are presumptively lawful, *id.* at 626–27. So interpreted, a categorical ban on handgun possession in the home was unconstitutional "under any of the standards of scrutiny ... applied to enumerated constitutional rights." *Id.* at 628. Indeed, "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." *Id.* at 629.

*McDonald v. City of Chicago*, 561 U.S. 742 (2010), decided two years later, incorporated the Second Amendment right against the states with a similar emphasis on text and history. Under the Due Process Clause, a right that is "fundamental to our scheme of ordered liberty," that is, "deeply rooted in this Nation's history and tradition," restrains the states just as it does for the federal government. *Id.* at 767 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). "Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and ... is 'the *central component*' of the Second Amendment right." *Id.* (quoting *Heller*, 554 U.S. at 599). Thus, the Court had little trouble concluding the right recognized in *Heller* was "deeply rooted" in history and tradition. *Id.* at 791.

In handing down *Heller* and *McDonald*, the Supreme Court left the question of how to evaluate gun regulations unresolved. *See* Joseph Blocher & Darrell A. H. Miller, *The Positive Second Amendment: Rights, Regulation, and the Future of* Heller 102 (2018) ("*Heller* had opened a 'vast *terra incognita*,' and gave judges the job of mapping it." (internal citation omitted)). Eventually, the lower courts coalesced around a two-part test: the first question asked "whether the regulated activity falls within the scope of the Second Amendment" based on text and history. *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019) (quoting *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017) (*Ezell II*)); *see also* Blocher & Miller, *supra*, at 110 ("In the decade since *Heller*, the federal courts of appeals have widely adopted the two-part approach."). If so, the second inquiry "looked into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights" and evaluated "the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Kanter*, 919 F.3d at 441 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)). In practice, step two did the heavy lifting. Courts regularly assumed without deciding the Second Amendment covered the regulated conduct and proceeded to analyze the regulation under the chosen means-end scrutiny (most often, intermediate scrutiny). *See* Blocher & Miller, *supra*, at 110–12.

**\*7** Recently, the Supreme Court rejected the two-step approach in *New York State Rifle & Pistol Association, Inc. v. Bruen* and set forth a new standard for applying the Second Amendment. 142 S. Ct. 2111 (2022). In 1911, New York had enacted the so-called "Sullivan Law" that permitted public carry only if an applicant could prove "good moral character" and "proper cause." *Id.* at 2122 (quoting Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. Laws 1627, 1629). The plaintiffs were denied the licenses sought, and they

sued for declaratory and injunctive relief. *Id.* at 2124–25. "Despite the popularity of this two-step approach," the Court concluded, "it is one step too many." *Id.* at 2127. "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. The appropriate standard now is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.* at 2129–30. Even accepting that standard, as Justice Kavanaugh emphasized in his concurrence (joined by Chief Justice Roberts), the Second Amendment still permits "a 'variety' of gun regulations," such as the examples already announced in *Heller*. *Id.* at 2162 (Kavanaugh, J., concurring). But the majority opinion—which six justices joined—found the New York licensing scheme to be unconstitutional: the text covered the right to carry a handgun outside of the home for self-defense, and the state could not demonstrate a historical tradition of firearm regulation to support its law. *Id.* at 2156.

Before *Bruen*, every circuit court, including the Seventh Circuit, presented with a challenge to an assault-weapons or high-capacity magazine ban determined such bans were constitutional. *Worman v. Healey*, 922 F.3d 26, 38–39 (1st Cir. 2019); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015); *Kolbe v. Hogan*, 849 F.3d 114, 124 (4th Cir. 2017) (en banc); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) (*Heller II*). The reasoning was similar. The inquiry asked, "whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny." *Heller II*, 670 F.3d at 1252. Most courts assumed without deciding that the Second Amendment covered the regulations. [5] *See, e.g.*, *Worman*, 922 F.3d at 33–35; *Heller II*, 670 F.3d at 1260–61. Intermediate scrutiny, not strict scrutiny, was appropriate because the prohibitions left a person free to possess many lawful firearms. *Heller II*, 670 F.3d at 1262 (citing *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010)). The regulations survived intermediate scrutiny "because semiautomatic assault weapons have been understood to pose unusual risks. When used, these weapons tend to result in more numerous wounds, more serious wounds, and more victims." *NYSRPA*, 804 F.3d at 262. The "same logic" applied to large-capacity magazines. *Id.* at 263. "Large-capacity magazines are disproportionately used in mass shootings," and they result in "more shots fired, persons wounded, and wounds per victim than do other gun attacks." *Id.* at 263–64 (quoting *Heller II*, 670 F.3d at 1263).

**\*8** The Seventh Circuit was one of the circuits to uphold such a ban. In *Friedman v. City of Highland Park*, the city enacted an ordinance prohibiting the possession of assault weapons and large-capacity magazines. 784 F.3d at 407. Several plaintiffs sued seeking an injunction against the ordinance. *Id.* The district court denied them relief, and the Seventh Circuit affirmed. *See generally id.*

The question after *Bruen* is whether *Friedman* is still good law. *See United States v. Rahimi*, No. 21-11001, 2023 WL 1459240, at \*2 (5th Cir. 2023) ("The Supreme Court need not expressly overrule [ ] precedent ... where an intervening Supreme Court decision fundamentally changes the focus of the relevant analysis." (cleaned up)). As an initial observation, the opinion lacks some clarity. The two-part test was the law of the Seventh Circuit for at least five years, *see, e.g.*, *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc), *Ezell*, 651 F.3d 684, yet the Court did not engage with it. Instead, it explained,

> we think it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or

efficiency of a well regulated militia' and whether law-abiding citizens retain adequate means of self-defense.

*Friedman*, 784 F.3d at 410 (quoting *Heller*, 544 U.S. at 622–25) (internal citation omitted). This reframed test complicates the task of determining if the case was decided under the now-defunct step two—which Naperville concedes would render it bad law—or step one—which would make it binding precedent that dictates the outcome here. Without the benefit of a clear statement, this Court must examine the opinion's reasoning.

The Seventh Circuit observed first, "[t]he features prohibited by Highland Park's ordinance were not common in 1791. Most guns available then could not fire more than one shot without being reloaded; revolvers with rotating cylinders weren't widely available until the early 19th century." *Id.* at 410. The weapons banned, it continued, "are commonly used for military and police functions," and states enjoy leeway "to decide when civilians can possess military-grade firearms, so as to have them available when the militia is called to duty." *Id.* The main consideration, though, was whether the ordinance left residents with ample means to access weapons for self-defense. *Id.* at 411. The Court answered in the affirmative. The concern was principally allayed by the availability of handguns and other rifles. *Id.* "If criminals can find substitutes for banned assault weapons, then so can law-abiding homeowners." *Id.* Moreover, data showed that assault weapons are used in a greater share of gun crimes, and "some evidence" links their availability with gun-related homicides. *Id.* "The best way to evaluate the relation among assault weapons, crime, and self-defense is through the political process and scholarly debate," not a judicial decree. *Id.* at 412.

*Friedman* cannot be reconciled with *Bruen*.[6] The explanation that semiautomatic weapons were not common in 1791 is of no consequence. The Second Amendment "extends ... to ... arms ... that were not in existence at the time of the founding." *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (quoting *Heller*, 554 U.S. at 582). Relatedly, the Supreme Court has unequivocally dismissed the argument that "only those weapons useful in warfare are protected." *Id.* (quoting *Heller*, 554 U.S. at 624–25). To the extent that the Seventh Circuit classified the weapon as either "civilian" or "military," the classification has little relevance. And the arguments that other weapons are available and that fewer assault weapons lower the risk of violence are tied to means-end scrutiny—now impermissible and unconnected to text, history, and tradition. *See Bruen*, 142 S. Ct. at 2127. Accordingly, this Court must consider the challenged assault-weapon regulations on a *tabula rasa*.

### 2. Challenged Laws

**\*9** *Bruen* is now the starting point. Courts must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2129–30. If not, the regulation is constitutional because the regulation falls outside the scope of protection. But if the text covers "an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. The analogue need not be "a historical twin" or "a dead ringer for historical precursors," so long it is sufficiently analogous "to pass constitutional muster." *Id.* at 2133. Relevant history includes English history from the late 1600s, American colonial views, Revolutionary- and Founding-era sources, and post-ratification practices, particularly from the late 18th and early 19th centuries. *Id.* at 2135–56; *see also Rahimi*, 2023 WL 1459240, at \*8–10; *Frein v. Pa. State Police*, 47 F.4th 247, 254–56 (3d Cir. 2022).

"[T]he Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at 2133; *see also id.* at 2162 (Kavanaugh, J., concurring). *Bruen* does not displace the limiting examples provided in *Heller*. States remain free to enact (1) "prohibitions on the possession of firearms by felons and the mentally ill"; (2) "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"; (3) "laws imposing conditions and qualifications on the commercial sale of arms"; and (4) bans on weapons that are not "in common use." *Id.* at 2162 (Kavanaugh, J., concurring) (citation omitted). The Court in the majority opinion never specifies how these examples fit into the doctrine, but *Heller* and Justice Kavanaugh's concurrence reinforce their continued vitality.[7] And most importantly, the

"list does not purport to be exhaustive." *Heller*, 554 U.S. at 626 n.26. Additional categories exist—provided they are consistent with the text, history, and tradition of the Second Amendment. See *Bruen*, 142 S. Ct. at 2129–30.

Under this framework, Naperville's Ordinance and the Protect Illinois Communities Act are constitutionally sound.[8] The text of the Second Amendment is limited to only certain arms, and history and tradition demonstrate that particularly "dangerous" weapons are unprotected.[9] *See* U.S. Const. amend. II; *Heller*, 554 U.S. at 627.

### i. History and Tradition

**\*10** William Blackstone, whose writings the Court relied on in *Heller*, drew a clear line between traditional arms for self-defense and "dangerous" weapons. He proclaimed, "[t]he offense of riding or going armed, with *dangerous* or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." 4 William Blackstone, *Commentaries on the Laws of England* 148–49 (emphasis added). And over two centuries of American law has built upon this fundamental distinction. (*See* Dkt. 57-10 ¶ 8 ("From the 1600s through the early twentieth century, the colonies, states, and localities enacted [ ] thousands of gun laws of every imaginable variety.... [I]t is a tradition that can be traced back throughout the Nation's history.")).

Gun ownership and gun regulation have evolved since the passage of the Second Amendment. In the 18th century, violent crime was at historic lows; the rate at which adult colonists were killed by violent crime was one per 100,000 in New England and, on the high end, five per 100,000 in Tidewater, Virginia.[10] The "pressing problem" for minimizing violence in the colonies was not guns. (Dkt. 34-7 ¶ 9). A musket took, at best, half a minute to load a single shot—the user had to pour powder down the barrel, compress the charge, and drop or ram the ball onto the charge—and the accuracy of the weapon was poor. (Dkt. 34-3 ¶ 27; Dkt. 34-7 ¶ 11). Nor did people keep guns loaded. The black powder used to fire a musket was corrosive and prone to attract moisture, which rendered it ineffective. (Dkt. 34-3 ¶ 27). That is also why guns hung over the fireplace mantle—it was the warmest and driest place in the home.[11] This combination of limitations meant that guns were seldom "the primary weapon of choice for those with evil intent." (Dkt. 34-3 ¶ 28).[12]

Citizens did not go to the town square armed with muskets for self-protection, and only a small group of wealthy, elite men owned pistols, primarily a dueling weapon (Alexander Hamilton being perhaps the most infamous example).[13] Other arms, though, were prevalent—as were laws governing the most dangerous of them.

An early example of these regulations concerned the "Bowie knife," originally defined as a single-edged, straight blade between nine and ten inches long and one-and-half inches wide.[14] In the early 19th century, the Bowie knife gained notoriety as a "fighting knife" after it was supposedly used in the Vidalia Sandbar Fight, a violent brawl that occurred in central Louisiana.[15] Shortly afterwards, many southerners began carrying the knife in public because it offered a better chance to stop an assailant than the more cumbersome guns of the era, which were unreliable and inaccurate.[16] They were also popular in fights and duels over the single-shot pistols.[17] Responding to the growing prevalence and danger posed by Bowie knives, states quickly enacted laws regulating them. Alabama was first, placing a prohibitively expensive tax of one hundred dollars on "selling, giving or disposing" the weapon, in an Act appropriately called "An Act to Suppress the Use of Bowie Knives," followed two years later by a law banning the concealed carry of the knife and other deadly weapons.[18] Georgia followed suit the same year, making it unlawful "for any merchant ... to sell, or offer to sell, or to keep ... Bowie, or any other kinds of knives."[19] By 1839, Tennessee, Florida, and Virginia passed similar laws.[20] The trend continued. At the start of the twentieth century, every state except one regulated Bowie knives; thirty-eighty states did so by explicitly naming the weapon,[21] and twelve more states barred the category of knives encompassing them.[22] (Dkt. 34-4 ¶ 39).

**\*11** State-court decisions uniformly upheld these laws. The Tennessee Supreme Court declared, "The Legislature, therefore, have a right to prohibit the wearing or keeping *weapons dangerous* to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence [sic]." *Aymette v. State*, 21 Tenn. 154, 159 (1840) (emphasis added).[23] "To hold that the Legislature could pass no law upon this subject by which to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce," it continued, "would be to pervert a great political

right to the worst of purposes." *Id.* The Texas Supreme Court expressed similar concern, noting that a Bowie knife "is an exceeding[ly] *destructive weapon*," "difficult to defend against," more dangerous than a pistol or sword, and an "instrument of almost certain death." *Cockrum v. State*, 24 Tex. 394, 402 (1859) (emphasis added).

Laws regulating melee weapons also targeted more than just the Bowie knife. As early guns proved unreliable, many citizens resorted to clubs and other blunt weapons. (Dkt. 34-4 ¶ 40). Popular instruments included the billy (or billie) club, a heavy, hand-held club usually made of wood, plastic, or metal, and a slungshot, a striking weapon that had a piece of metal or stone attached to a flexible strip or handle. (*Id.* at ¶¶ 41–44). States responded to the proliferation of these weapons. The colony of New York enacted the first "anti-club" law in 1664,[24] with sixteen states following suit, the latest being Indiana in 1905, which proscribed the use of clubs in sensitive places of transportation.[25] The city of Leavenworth, Kansas passed the first law regulating the billy club in 1862.[26] By the early 1900s, almost half of states and some municipalities had laws relating to billy clubs.[27] (Dkt. 34-4 ¶ 42). Many, such as North Dakota and the city of Johnstown, Pennsylvania,[28] banned their concealed carry, while others outlawed them entirely.[29] "Anti-slungshot" carry laws proved the most ubiquitous though.[30] Forty-three states limited slungshots,[31] which "were widely used by criminals and street gang members in the 19th Century" because "[t]hey had the advantage of being easy to make silent, and very effective, particularly against an unsuspecting opponent." (Dkt. 34-4 ¶ 44). (Then-lawyer Abraham Lincoln defended a man accused of killing another with a slungshot in the 1858 William "Duff" Armstrong case.) (*Id.* ¶ 45).

**\*12** States continued to regulate particularly dangerous weapons from the 18th century through the late 19th and early 20th centuries. Five years before the Revolution and three decades before the ratification of the Second Amendment, New Jersey banned "any loaded Gun ... intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance."[32] After the Civil War, Minnesota, Michigan, Vermont, and North Dakota passed nearly identical laws.[33] Eight states—South Carolina, Maine, Vermont, Minnesota, New York, Massachusetts, Michigan, and Rhode Island—banned gun silencers in the 1900s.[34] Notably, semiautomatic weapons themselves, which assault weapons fall under, were directly controlled in the early 20th century. Rhode Island prohibited the manufacture, sale, purchase, and possession of "any weapon which shoots more than twelve shots semi-automatically without reloading."[35] Michigan regulated guns that could fire "more than sixteen times without reloading."[36] In total, nine states passed semiautomatic-weapon regulations,[37] along with Congress, which criminalized the possession of a "machine gun" in D.C., defined as "any firearm which shoots ... semiautomatically more than twelve shots without reloading."[38] Twenty-three states imposed some limitation on ammunition magazine capacity, restricting the number of rounds from anywhere between one (Massachusetts and Minnesota) and eighteen (Ohio).[39]

**\*13** Concealed-carry laws were also replete with references to "dangerous" weapons. For two early examples, in 1859, Ohio outlawed the carry of "any other dangerous weapon,"[40] and five years later, California prohibited carrying any concealed "dangerous or deadly weapon," followed by a similar law in 1917 with the same "dangerous or deadly" language.[41] By the 1930s, most states had similar regulations on "dangerous weapons."[42] At the federal level, the District of Columbia also made it unlawful "for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons."[43]

**\*14** The history of firearm regulation, then, establishes that governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories). The final question is whether assault weapons and large-capacity magazines fall under this category. They do.

*ii. Application*

Assaults weapons pose an exceptional danger, more so than standard self-defense weapons such as handguns.[44] *See NYSRPA*, 804 F.3d at 262 ("When used, these weapons tend to result in more numerous wounds, more serious wounds, and more victims."). They fire quickly: a shooter using a semiautomatic weapon can launch thirty rounds in as little as six seconds, with an effective rate of about a bullet per second for each minute of firing,[45] meeting the U.S. Army definition for "rapid fire."[46] The bullets hit fast and penetrate deep into the body. The muzzle velocity of an assault weapon is four times higher than a high-powered

semiautomatic firearm.[47] A bullet striking a body causes cavitation, meaning, in the words of a trauma surgeon, "that as the projectile passes through tissue, it creates a large cavity."[48] "It does not have to actually hit an artery to damage it and cause catastrophic bleeding. Exit wounds can be the size of an orange."[49] Children are even more vulnerable because "the surface area of their organs and arteries are smaller."[50] Additionally, "[t]he injury along the path of the bullet from an AR-15 is vastly different from a low-velocity handgun injury...."[51] Measured by injury per shooting, there is an average of about 30 injuries for assault weapons compared to 7.7 injuries for semiautomatic handguns.[52] In a mass shooting involving a non-semiautomatic firearm, 5.4 people are killed and 3.9 people are wounded on average; in a mass shooting with a semiautomatic handgun, the numbers climb to 6.5 people killed and 5.8 people wounded on average; and in a mass shooting with a semiautomatic rifle, the average number of people rises to 9.2 killed and 11 wounded on average. (Dkt. 57-8 ¶ 54).

**\*15** Assault rifles can also be easily converted to increase their lethality and mimic military-grade machine guns. Some of these "fixes" are as simple as "stretching a rubber band from the trigger to the trigger guard of an AR-15." (*Id.* ¶ 53). Two conversion devices stick out though: bump stocks and trigger cranks, both of which allow an assault weapon to fire at a rate several times higher than it could otherwise. As the Fourth Circuit summarized, "[t]he very features that qualify a firearm as a banned assault weapon—such as flash suppressors, barrel shrouds, folding and telescoping stocks, pistol grips, grenade launchers, night sights, and the ability to accept bayonets and large-capacity magazines—'serve specific, combat-functional ends.' " *Kolbe,* 849 F.3d at 137.

Moreover, assault weapons are used disproportionately in mass shootings, police killings, and gang activity. Of the sixty-two mass shootings from 1982 to 2012, a thirty-year period, one-third involved an assault weapon.[53] Between 1999 and 2013, the number was 27 percent,[54] and the most recent review placed the figure at 25 percent in active-shooter incidents between 2000 and 2017.[55] While 25 percent may be about half that of semiautomatic handguns, it is greatly overrepresented "compared with all gun crime and the percentage of assault weapons in society."[56] The statistics also reveal a grim picture for police killings and gang activity. About 20 percent of officers were killed with assault weapons from 1998 to 2001 and again from 2016 to 2017.[57] Even conservative estimates calculate that assault weapons are involved in 13 to 16 percent of police murders.[58] Additionally, just under 45 percent of all gang members own an assault rifle (compared to, at most, 15 percent of non-gang members), and gang members are seven times more likely to use the weapons in the commission of a crime.[59]

High-capacity magazines share similar dangers. The numbers tell a familiar grim story. An eight-year study of mass shootings from 2009 to 2018 found that high-capacity magazines led to five times the number of people shot and more than twice as many deaths.[60] More recently, researchers examining almost thirty years of mass-shooting data determined that high-capacity magazines resulted in a 62 percent higher death toll.[61] It is little wonder why mass murderers and criminals favor these magazines. Thirty-one of sixty-two mass shootings studied involved the gun accessory.[62] Also, extended magazines, one expert estimates, allow semiautomatic weapons to become more lethal: by themselves, semiautomatic weapons cause "an average of 40 percent more deaths and injuries in mass shooting than regular firearms, and 26 percent more than semiautomatic handguns." (Dkt. 57-8 ¶ 56). Add in extended magazines and "semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semiautomatic handguns." (*Id.*)

**\*16** Assault-weapons and high-capacity magazines regulations are not "unusual," *Bruen,* 142 S. Ct. at 2129 (Kavanaugh, concurring), or "severe," *Heller,* 554 U.S. at 629. The federal government banned assault weapons for ten years. Today, eight states, the District of Columbia, and numerous municipalities, maintain assault-weapons and high-capacity magazine bans—as more jurisdictions weigh similar measures. Because assault weapons are particularly dangerous weapons and high-capacity magazines are particularly dangerous weapon accessories, their regulation accords with history and tradition. Naperville and Illinois lawfully exercised their authority to control their possession, transfer, sale, and manufacture by enacting a ban on commercial sales. That decision comports with the Second Amendment, and as a result, the plaintiffs have not shown the "likelihood of success on the merits" necessary for relief. *See Braam,* 37 F.4th at 1272 ("The district court may issue a preliminary injunction *only if* the plaintiff demonstrates

'some' likelihood of success on the merits." (emphasis added)); *Camelot Bonquet Rooms, Inc. v. United States Small Business Administration*, 24 F.4th 640, 644 (7th Cir. 2022) ("Plaintiffs who seek a preliminary injunction must show that ... they have some likelihood of success on the merits.").

**II. Remaining Preliminary-Injunction Factors**

**A. Irreparable Harm**

For thoroughness, the Court addresses the remaining preliminary-injunction factors. The party seeking a preliminary injunction must show, in addition to a likelihood of success on the merits, that absent an injunction, irreparable harm will ensue. *Int'l Ass'n of Fire Fighters, Local 365 v. City of East Chicago*, 56 F.4th 437, 450 (7th Cir. 2022). "Harm is irreparable if legal remedies are inadequate to cure it," meaning "the remedy must be seriously deficient as compared to the harm suffered." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). Deprivations of constitutional rights often—but do not always—amount to "irreparable harm." *See* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 1998) ("When an alleged deprivation of a constitutional right is involved ... most courts hold that no further showing of irreparable harm is necessary."). This principle certainly applies for the First Amendment. The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also Int'l Ass'n of Fire Fighters*, 56 F.4th at 450–51 ("Under Seventh Circuit law, irreparable harm is presumed in First Amendment cases.").

No binding precedent, however, establishes that a deprivation of *any* constitutional right is presumed to cause irreparable harm. *Cf. Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 682 (7th Cir. 2012) ("The judge was right to say that equitable relief depends on irreparable harm, even when constitutional rights are at stake."). *Ezell* does draw upon First Amendment principles. *See* 651 F.3d at 697. For example, the argument that a Second Amendment harm is mitigated "by the extent to which it can be exercised in another jurisdiction" cannot pass muster because a city could never ban "the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs." *Id.* The opinion also acknowledges that "[t]he loss of a First Amendment right is frequently presumed to cause irreparable harms" and that "[t]he Second Amendment protects similarly intangible and unquantifiable interests." *Id.* at 699. But the Seventh Circuit stopped short of holding that injury in the Second Amendment context "unquestionably constitutes irreparable harm." *Elrod*, 427 U.S. at 373.

Absent this presumption, the plaintiffs have not demonstrated that they will suffer irreparable harm. Bevis has not furnished any evidence that he will lose substantial sales, and he can still sell almost any other type of gun. While a high number of assault weapons are in circulation, only 5 percent of firearms are assault weapons, 24 million out of an estimated 462 million firearms. (Dkt. 57-4 ¶ 36; Dkt. 57-7 ¶ 27.) As a percentage of the total population, less than 2 percent of all Americans own assault weapons. (Dkt. 57-7 ¶ 27). NAGR's members also retain other effective weapons for self-defense. Most law enforcement agencies design their firearm training qualification courses around close-quarter shootings, those shooting that occur between the range of three to ten yards, where handguns are most useful. (Dkt. 57-4 ¶ 59). Firearms are certainly effective, necessary tools for protecting law enforcement and civilians alike. But, as one Federal Bureau of Investigation agent describes, "the best insights indicate that shotguns and 9mm pistols are generally recognized as the most suitable and effective choices for armed defense." (*Id.* ¶ 61).

**\*17** Assuming, though, the deprivation of any constitutional right rises to *per se* irreparable harm, the plaintiffs have still not shown that they are likely to succeed on the merits. *See Winter*, 555 U.S. at 20. A plaintiff need not demonstrate "absolute success," but the chances of success must be "better than negligible." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (quoting *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017)) (cleaned up). "If it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused...." *Id.* (quoting *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir. 1993)); *see also Braam*, 37 F.4th at 1272. It is plain here—the plaintiffs have "no case on the merits." *Valencia*, 883 F.3d at 966 (quoting *Green River Bottling*, 997 F.2d at 361). The analysis could end there because that failure is dispositive. *See Higher Soc'y of Ind. v. Tippecanoe County*, 858 F.3d 1113, 1116 (7th Cir. 2017).

**B. The Balance of Equities and the Public Interest**

Neither the balance of equities nor the public interest decisively favors the plaintiffs. On the one hand, they suffer an alleged deprivation of a constitutional right. Again though, the financial burden and loss of access to effective firearms would be minimal. On the other side, Illinois and Naperville compellingly argue their laws protect public safety by removing particularly dangerous weapons from circulation. The protection of public safety is also unmistakably a "public interest," one both laws further. *Cf. Metalcraft of Mayville, Inc. v. The Toro Company*, 848 F.3d 1358, 1369 (Fed. Cir. 2017) ("[T]he district court should focus on whether a *critical* public interest would be injured by the grant of injunctive relief." (emphasis added)). Therefore, the plaintiffs have not made a "clear showing" that they are entitled to the "extraordinary and drastic" remedy of an injunction. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2948 (2d ed.1995)).

## CONCLUSION

For these reasons, the motions for a temporary restraining order and a preliminary injunction are denied. (Dkt. 10, 50).

**All Citations**

Slip Copy, 2023 WL 2077392

## Footnotes

1  The parties dispute whether the terms "assault rifle," "assault pistol," and "assault weapon" are appropriate. Proponents of bans believe the language accurately links the class of weapons to military weaponry. Indeed, the gun industry itself used "the terms 'assault weapons' and 'assault rifles' [ ] in the early 1980s, before political efforts to regulate them emerged in the late 1980s. The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public." Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231, 234 (2020). Opponents now consider the label misleading because the often-included guns, the argument goes, share no similar set of characteristics beyond the fact that they look intimidating. The Court will use the terms, as they are widely accepted in modern parlance and effectively convey the substance of the bans.

2  During this litigation, other plaintiffs have challenged the Illinois law in both state and federal court. On January 20, 2023, an Illinois circuit court entered a temporary restraining order enjoining the law based on a violation of the three-readings rule, and the Illinois Appellate Court for the Fifth District affirmed. *Accuracy Firearms, LLC v. Pritzker*, 2023 IL App (5th) 230035 (Jan. 31, 2023). Neither party has raised the possibility of abstention under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941). *Pullman* abstention requires federal courts to stay cases while state courts adjudicate "unsettled state-law issues." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 76 (1997). While abstention doctrines can be raised sua sponte, *International College of Surgeons v. City of Chicago*, 153 F.3d 356, 360 (7th Cir. 1998), doing so here would be inappropriate. "Attractive in theory because it placed state-law questions in courts equipped to rule authoritatively on them, *Pullman* abstention proved protracted and expensive in practice, for it entailed a full round of litigation in the state court system before any resumption of proceedings in federal court." *Arizonans for Off. Eng.*, 520 U.S. at 76. The Protect Illinois Communities Act needs no clarification—it clearly prohibits the sale of assault weapons and high-capacity magazines. No unsettled state-law issue

complicates this Court's review of the Act's constitutionality. Moreover, even without the state law, Naperville's Ordinance would still be in effect.

3   See also *Diamond v. Charles*, 476 U.S. 54, 64 (1986) (focusing on "the state officials who were charged with enforcing the [law]"); *Camreta v. Greene*, 563 U.S. 692, 727 (2011) (Kennedy, J., dissenting) ("[T]he proper defendant in a suit for prospective relief is the party prepared to enforce the relevant legal rule against the plaintiff."); *Am. C.L. Union v. The Fl. Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993) ("[W]hen a plaintiff challenges the constitutionality of a rule of law, it is the state official designated to enforce that rule who is the proper defendant...."); *Weinstein v. Edgar*, 826 F. Supp. 1165, 1166 (N.D. Ill. 1993) ("The rule embodied by *Ex parte Young* and its progeny is informed by a familiar fiction. This fiction ... is premised on the notion that a State cannot act unconstitutionally, so that any state official who violates anyone's constitutional rights is perforce stripped of his or her official character."); *Southerland v. Escapa*, No. 14-3094, 2015 WL 1329969 at *2 (C.D. Ill. Mar. 20, 2015) ("In *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007), the Supreme Court touched on the question of which parties are proper to a lawsuit when it reiterated that courts must determine whether 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' "); *Allied Artists Pictures Corp. v. Rhodes*, 473 F. Supp. 560, 566 (S.D. Ohio 1979) ("All that *Young* requires, as plaintiffs point out, is that the official have 'some connection with the enforcement of the act.' ").

4   NAGR identifies its members only by their initials: B.S., D.B., G.S., G.K., L.J., and R.K. (Dkt. 48 ¶ 6). The Court assumes the complaint's accuracy, though the group may need to later establish these facts, likely by filing an addendum under seal.

5   The Fourth Circuit was the only court to clearly hold, as one of two alternative holdings, that the scope of the Second Amendment did not extend to assault weapons. *Kolbe*, 849 F.3d at 135. In its view, *Heller* offered a "dispositive and relatively easy inquiry: Are the banned assault weapons ... 'like' 'M-16 rifles,' i.e., 'weapons that are most useful in military service,' and thus outside the ambit of the Second Amendment?" *Id.* at 136. AR-15 rifles share similar rates of fire and are actually "more accurate and lethal." *Id.* The weapons can also have the "very features that qualify a firearm as a banned assault weapon—such as flash suppressors, barrel shrouds, folding and telescoping stocks, pistol grips, grenade launchers, night sights, and the ability to accept bayonets and large-capacity magazines." *Id.* at 137. The "net effect" is "a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." *Id.* Because the weapons "are clearly most useful in military service," the Fourth Circuit felt "compelled by *Heller* to recognize that those weapons ... are not constitutionally protected." *Id.*

6   Recognizing *Friedman* was no longer good law, this Court ordered supplemental briefing on the application of *Bruen*. (Dkts. 15, 18, 30, 33). Naperville marshalled an admirable historical record. It protested, though, that "it [had] been unable to conduct primary source research or to retain and disclose an expert under FRCP 26(a)(2)." (Dkt. 34 at 19). On the first point, again, plaintiffs seek preliminary and emergency relief. Naperville may have agreed to stay its Ordinance, but Illinois has made no such guarantees. Supplemental briefing for a TRO is naturally rushed because plaintiffs allege a deprivation of a constitutional right. Naperville will, nevertheless, be able to continue assembling support for its positions as the case proceeds. On the second point, *Bruen* indicates that judges, not party-selected experts, will assess the Second Amendment's history; there was no summary-judgment record before the Court—the district court dismissed the complaint—and no mention of experts. The only two cases Naperville cites in support are the *dissenting* opinion in *State v. Philpotts*, 194 N.E.3d 371, 372 (Ohio 2022) (Brunner, J., dissenting), which contains rejected legal arguments, and the nonbinding district-court opinion in *United States v. Bullock*, 3:18-cr-165, 2022 WL 16649175 (S.D. Miss.

| | |
|---|---|
| | Oct. 27, 2022), which the government itself rejected, *id.* Dkt. 71 ("If ... this Court were to deem it necessary to delve into text and history ..., it should look to the parties for argument and evidence on that point, directing the parties to supplement their prior filings as necessary."). |
| 7 | These categories may fit into the new doctrinal test in different ways. For instance, bans on weapons not in common use fall outside the Second Amendment's text only protecting certain "arms." In contrast, sensitive-place regulations are better justified by a robust history of keeping arms out of high-risk areas, such as government buildings or schools. The formulation for the standard resembles a rigid two-step test (text, then history), but it boils down to a basic idea: "Gun bans and gun regulations that are longstanding ... are consistent with the Second Amendment individual right. Gun bans and gun regulations that are not longstanding or sufficiently rooted in text, history, and tradition are not consistent with the Second Amendment individual right." *Heller II*, 670 F.3d at 355 (Kavanaugh, J., dissenting). |
| 8 | Today, the challenged laws ban only the sale of assault weapons and high-capacity magazines, not their possession. Nonetheless, the Court considers the state's general authority to regulate assault weapons because logically if a state can prohibit the weapons altogether, it can also control their sales. Inversely, a right to own a weapon that can never be purchased would be meaningless. *See Drummond v. Robinson Township*, 9 F.4th 217, 229 (3d Cir. 2021) ("[I]mmunizing the Township's atypical [gun-sales] rules would relegate the Second Amendment to a 'second-class right'—the precise outcome the Supreme Court has instructed us to avoid." (internal citation omitted)); *cf. Ezell*, 651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."). It may be that governments are afforded more leeway in regulating gun commerce than gun possession, but that argument is for another day. |
| 9 | Weapons associated with criminality may also be unprotected, but given the strength of the historical evidence regarding "particularly dangerous" weapons, there is no need to consider this alternative ground. |
| 10 | Randolph Roth, *American Homicide* 61–63 (2009). |
| 11 | Randolph Roth, *Why Is the United States the Most Homicidal in the Affluent World*, National Institute for Justice (Dec. 1, 2023), https://nij.ojp.gov/media/video/24061#transcript--0. |
| 12 | *See also* Dkt. 34-7 ¶ 12 ("The infrequent use of guns in homicides in colonial America reflected these limitations. Family and household homicides—most of which were caused by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives. It did not matter whether the type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery. Guns were not the weapons of choice in homicides that grew out of the tensions of daily life."). |
| 13 | Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (2001). |
| 14 | *See* David B. Kopel et al., *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 179 (2013). |
| 15 | *Id.* |
| 16 | *Id.* at 185. The knife's inventor, Jim Bowie, died fighting at the Alamo, fueling the "Bowie legend." (Dkt. 34-4 ¶ 35). |
| 17 | Norm Flayderman, *The Bowie Knife* 485 (2004). |

18  Act of Jun. 30, 1837, ch. 77, § 2, 1837 Ala. Laws 7, 7; An Act to Suppress the Evil Practice of Carrying Weapons Secretly, ch. 77, § 1, 1839 Ala. Laws 67, 67.

19  Act of December 25, 1837, § 1, 1837 Ga. Laws 90, 91.

20  Act of January 27, 1837, ch. 137, § 4,1837–1838 Tenn. Pub. Acts 200, 200–01; Act of February 10, 1838, Pub. L. No. 24 § 1,1838 Fla. Laws 36, 36; Act of February 2, 1838, ch. 101, § 1, 1838 Va. Acts 76, 76.

21  *See, e.g.*, Act of June 30, 1837, No. 11, § 1, 2, 1837 Ala. Acts 7, 7 ("[I]f any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought. ... for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury...."); Act of Aug. 14, 1862, § 1, 1862 Colo. Sess. Laws 56, 56 ("If any person or persons shall ... carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof ... be fined in a sum not less than five, nor more than thirty-five dollars."); Act of Feb. 26, 1872, ch. 42, § 246, 1872 Md. Laws 56, 57 ("It shall not be lawful for any person to carry concealed ... any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case....").

22  *See, e.g.*, Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442, 442 ("A person who ... carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony."); Act of Apr. 18, 1905, ch. 172, § 1, 1905 N.J. Laws 324, 324 ("Any person who shall carry ... any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor...."); Act of March 8, 1915, ch. 83, § 1, 1915 N.D. Laws 96, 96 ("Any person other than a public officer, who carries concealed in his clothes ... any sharp or dangerous weapon usually employed in attack or defense of the person ... shall be guilty of a felony....").

23  *Heller* distinguished its holding from *Aymette*'s "middle position" that "citizens were permitted to carry arms openly, unconnected with any service in a formal militia, but were given the right to use them only for the military purpose of banding together to oppose tyranny." 554 U.S. at 613. It did not, however, cast any doubt on the conclusion reached by the *Aymette* court that the legislature could prohibit "weapons dangerous to the peace." 21 Tenn. at 159.

24  The Colonial Laws of New York from the Year 1664 to the Revolution (1894).

25  Act of March 10, 1905, ch. 169, § 410, 1905 Ind. Acts 584, 677.

26  C.B. Pierce, Charter and Ordinances of the City of Leavenworth, An Ordinance Relating to Misdemeanors, § 23 (1862).

27  *See, e.g.*, Act of May 4, 1917, ch. 145, §§ 1, 2, 5, 1917 Cal. Sess. Laws 221, 221–22 (making the manufacture, possession, or use of a "billy" a felony); Act of Feb. 26, 1872, ch. 42, § 1, 1872 Md. Laws 56, 57 (prohibiting the concealed carrying of a "billy"); Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144, 144 (making unlawful the concealed carrying of a "pocket-billie").

28  *See, e.g.*, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7311–13, 1895 N.D. Rev. Codes 1292, 1292–93; Act of May 23, 1889, Laws of the City of Johnstown, Pa.

| | |
|---|---|
| 29 | *See, e.g.*, Act of February 21, 1917, ch. 377, §§ 7-8 1917 Or. Laws 804, 804–808; Act of June 13, 1923, ch. 339, § 1, 1923 Cal. Stat. 695, 695–96 ("[E]very person who within the State of California manufactures or causes to be manufactures, or who imports into the state, or who keeps for sale ... any instrument or weapon ... commonly known as a ... billy ... shall be guilty of a felony...."). |
| 30 | *See, e.g.*, Act of May 25, 1852, §§ 1–3, 1845–70 Haw. Sess. Laws 19, 19; Act of January 12, 1860, § 23, 1859 Ky. Acts 245, 245–46; Act of March 5, 1883, sec. 1, § 1224, 1883 Mo. Laws 76, 76. |
| 31 | *See, e.g.*, Act of March 18, 1889, No. 13, § 1, 1889 Ariz. Sess. Laws 16, 16 (prohibiting the carrying of a "slung shot"); Act of March 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159, 159 (prohibiting the sale and possession of a "slung shot"); Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss. Laws 175, 175 (prohibiting the concealed carrying of a "slung shot"). |
| 32 | Act of December 21, 1771, ch. 539, § 10, 1763-1775 N.J. Laws 343, 346. |
| 33 | Act of February 27, 1869, ch. 39, §§ 1–3, 1869 Minn. Laws 50, 50–51; Act of April 22, 1875, Pub. L. No. 97 § 1, 1875 Mich. Pub. Acts 136, 136; Act of November 25, 1884, Pub. Law No. 76 §§ 1–2, 1884 Vt. Acts & Resolves 74, 74–75; Penal Code, Crimes Against the Public Health and Safety, ch. 40, § 7094, 1895 N.D. Rev. Codes 1259, 1259. |
| 34 | 1869 Minn. Laws 50-51, ch. 39 § 1; 1875 Mich. Pub. Acts 136, No. 97 § 1; 1884 Vt. Acts & Resolves 74-75, No. 76, § 1; The Revised Codes of North Dakota 1259, § 7094 (1895); 1903 S.C. Acts 127-23, No. 86 § 1; 1909 Me. Laws 141, ch. 129; 1912 Vt. Acts & Resolves 310, No. 237; 1916 N.Y. Laws 338-39, ch. 137, § 1; 1926 Mass. Acts 256, ch. 261; 1927 Mich. Pub. Acts 888-89, ch. 372 § 3; 1927 R.I. Pub. Laws 259, ch. 1052 § 8. |
| 35 | 1927 R.I. Pub. Laws 256-57, ch. 1052 §§ 1, 4. |
| 36 | 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3. |
| 37 | 1933 Minn. Laws 231-32, ch. 190; 1933 Ohio Laws 189-90; 1933 S.D. Sess. Laws 245-47, ch. 206, §§ 1-8; 1934 Va. Acts 137-40, ch. 96. |
| 38 | 47 Stat. 650, H.R. 8754, 72d Cong. §§ 1, 14 (1932). |
| 39 | Act of May 20, 1933, ch. 450, § 2, 1933 Cal. Stat. 1169, 1170 ("ten cartridges"); Act of July 8, 1932, ch. 465, § 1, 47 Stat. 650, 650 ("more than twelve shots without reloading"); Act of July 7, 1932, No. 80, § 1, 1932 La. Acts 336, 337 ("more than eight cartridges successively without reloading"); Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413, 413 ("a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged"); Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 887, 888–89 ("more than sixteen times without reloading"); Act of Apr. 10, 1933, ch. 190, § 1, 1933 Minn. Laws 231, 232 ("Any firearm capable of automatically reloading after each shot is fired"); Act of March 22, 1920, ch. 31, § 9, 1920 N.J. Laws 62, 67 ("any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading"); Act of Jan. 9, 1917, ch. 209, § 1, 1917 N.C. Sess. Laws 309, 309 ("any gun or guns that shoot over two times before reloading"); Act of March 30, 1933, No. 64, § 1, 1933 Ohio Laws 189, 189 ("more than eighteen shots"); Act of Apr. 22, 1927, ch. 1052, § 1, 1927 R.I. Pub. Laws 256, 256 ("more than twelve shots"); Act of March 2, 1934, No. 731, § 1, 1934 S.C. Acts 1288, 1288 ("more than eight cartridges"); Act of Feb. 28, 1933, ch. 206, § 1, 1933 S.D. Sess. Laws 245, 245 ("more than five shots or bullets"); Act of March 7, 1934, ch. 96, § 1, 1934 Va. Acts 137, 137 ("more than seven shots or bullets ... discharged from a magazine"); Act of July 2, 1931, No. 18, § 1, 1931 Ill. Laws 452, 452 ("more than eight cartridges"); Act of March 9, 1931, ch. 178, § 1, 1931 N.D. Laws 305, 305–06 (firearms "not requiring the trigger be pressed for each shot and having a reservoir, belt |

or other means of storing and carrying ammunition"); Act of March 10, 1933, ch. 315, § 2, 1933 Or. Laws 488, 488 ("a weapon of any description by whatever name known, loaded or unloaded, from which two or more shots may be fired by a single pressure upon the trigger device"); Act of Apr. 25, 1929, No. 329, § 1, 1929 Pa. Laws 777, 777 ("any firearm that fires two or more shots consecutively at a single function of the trigger or firing device"); Act of Oct. 25, 1933, ch. 82, § 1, 1933 Tex. Gen. Laws 219, 219 ("more than five (5) shots or bullets ... from a magazine by a single functioning of the firing device"); Act of March 22, 1923, No. 130, § 1, 1923 Vt. Acts and Resolves 127, 127 ("a magazine capacity of over six cartridges"); Act of Apr. 13, 1933, ch. 76, § 1, 1931–1933 Wis. Sess. Laws 245, 245–46 ("a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device"); Act of Apr. 27, 1933, No. 120, § 2, 1933 Haw. Sess. Laws 117, 118 ("capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device"); Act of June 1, 1929, § 2, 1929 Mo. Laws 170, 170 (guns "capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device"); Act of March 6, 1933, ch. 64, § 2, 1933 Wash. Sess. Laws 335, 335 (any firearm "not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second").

40  1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1.

41  An Act to Prohibit the Carrying of Concealed Weapons, § 1; 1917 Cal. Sess. 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.

42  Act to Prevent the Carrying of Deadly Weapons, § 1, 1852 Haw. Sess. Laws 19; Act of Feb. 17, 1909, No. 62, § 1; 1909 Id. Sess. Laws 6; Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village, at 61, §§ 6, 8, (1876); Act of Feb. 23, 1859, ch. 79, § 1, 1859 Ind. Acts 129; S.J. Quincy, Revised Ordinances of the City of Sioux City, Iowa 62 (1882); ch. 169, § 16, 1841 Me. Laws 709; John Prentiss Poe, Maryland Code. Public General Laws 468-69, § 30 (1888); Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836, at 750, § 16 (1836); Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144; The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884, at 289, §§ 1-3 (1884); Act of Jan. 3, 1888, sec. 1, § 1274, Mo. Rev. Stat., 1883 Mo. Laws 76; Ordinance No. 20, Compiled Ordinances of the City of Fairfield, Clay County, Nebraska, at 34 (1899); Act of Feb. 18, 1887, §§ 1-5, 8-10, 1887 N.M. Laws 55, 58; George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5, at 172, § 410 (1885); N.D. Pen. Code §§ 7312-13 (1895); Act of Dec. 25, 1890, art. 47, § 8, 1890 Okla. Sess. Laws 495; Act of Feb. 21, 1917, § 7, 1917 Or. Sess. Laws 807; S.D. Terr. Pen. Code § 457 (1877), as codified in S.D. Rev. Code, Penal Code § 471 (1903); William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 44, § 4753 (1867); Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879); Dangerous and Concealed Weapons, Feb. 14, 1888, reprinted

| | |
|---|---|
| | in The Revised Ordinances of Salt Lake City, Utah, at 283, § 14 (1893); Act of Mar. 29, 1882, ch. 135, § 7, 1882 W. Va. Acts 421–22; Act of Feb. 14, 1883, ch. 183, § 3, pt. 56 1883 Wis. Sess. Laws 713. |
| 43 | An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872). |
| 44 | Again, this case is at a preliminary posture: plaintiffs remain free to present evidence discounting the body of literature relied on by the Court. |
| 45 | E. Gregory Wallace, *Assault Weapon Myth*, 43 S. Ill. U. L. J. 193, 218 (2018). |
| 46 | Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24 (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in TC 3-22.9 Rifle and Carbine Manual, Headquarters, Department of the Army (May 2016). Available at the Army Publishing Directorate Site (https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf), accessed October 4, 2022. |
| 47 | Peter M. Rhee et al., *Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths*, 80 J. Trauma & Acute Care Surgery 853, 855 (2016). |
| 48 | Emma Bowman, *This Is How Handguns and Assault Weapons Affect the Human Body*, NPR (June 6, 2022, 5:58 AM), https://www.npr.org/2022/06/06/1103177032/gun-violence-mass-shootings-assault-weapons-victims. |
| 49 | Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from-parkland-should-change-the-debate-on-guns/553937. |
| 50 | Bowman, *supra.* |
| 51 | Sher, *supra.* |
| 52 | Joshua D. Brown & Amie J. Goodin, *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States, 1982–2018*, 108 Am. J. of Pub. Health 1385, 1386 (2018). |
| 53 | Spitzer, *supra*, at 240. |
| 54 | William J. Krouse & Daniel J. Richardson, Cong. Rsch. Serv., R44126, *Mass Murder with Firearms: Incidents and Victims, 1999-2013* 29 (2015), https://sgp.fas.org/crs/misc/R44126.pdf. |
| 55 | Elzerie de Jager et al., *Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States*, 320 J. Am. Med. Ass'n 1034, 1034–35 (2018). |
| 56 | Spitzer, *supra*, at 241. |
| 57 | Violence Pol'y Ctr., *"Officer Down" Assault Weapons and the War on Law Enforcement* 5 (2003), https://www.vpc.org/studies/officer%20down.pdf; *New Data Shows One in Five Law Enforcement Officers Slain in the Line of Duty in 2016 and 2017 Were Felled by an Assault Weapon*, Violence Pol'y Ctr. (Sept. 25, 2019), https://vpc.org/press/new-data-shows-one-in-five-law-enforcement-officers-slain-in-the-line-of-duty-in-2016-and-2017-were-felled-by-an-assault-weapon/. |
| 58 | George W. Knox et al., Nat'l Gang Crime Rsch. Ctr., *Gangs and Guns: A Task Force Report From the National Gang Crime Research Center* 35–36 (2001), https://www.ojp.gov/ncjrs/virtual-library/abstracts/gangs-and-guns-task-force-report-national-gang-crime-research. |

| | |
|---|---|
| 59 | George W. Knox et al., *Gangs and Guns: A Task Force Report*, National Gang Crime Research Center 36 (2001), https://www.ojp.gov/ncjrs/virtual-library/abstracts/gangs-and-guns-task-force-report-national-gang-crime-research. |
| 60 | Everytown For Gun Safety, *Twelve Years of Mass Shootings in the United States* (June 4, 2021), https://everytownresearch.org/maps/mass-shootings-in-america/. |
| 61 | Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 1990–2017, 109 Am. J. Pub. Health 1754, 1755 (2019); *see also* Worman, 922 F.3d at 39 ("It is, therefore, not surprising that AR-15s equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history, including horrific events in Pittsburgh (2018), Parkland (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and Aurora (2012)."); NYSRPA, 804 F.3d at 263 ("Large-capacity magazines are disproportionately used in mass shootings, like the one in Newtown, in which the shooter used multiple large-capacity magazines to fire 154 rounds in less than five minutes."). |
| 62 | Spitzer, *supra*, at 242. |

---

**End of Document**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.