```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3
    NATIONAL ASSOCIATION FOR     ) CIVIL NO. 22-00404DKW-RT
 4  GUN RIGHTS; RONDELLE AYAU;   )
    JEFFREY BRYANT,              ) Honolulu, Hawaii
 5                               ) April 7, 2023
                 Plaintiffs,     )
 6                               )
             vs.                 ) [24] PLAINTIFFS' MOTION FOR
 7                               )  PRELIMINARY INJUNCTION
    ANNE E. LOPEZ, in her official)
 8  capacity as Attorney General )
    for the State of Hawaii,     )
 9                               )
                 Defendant.      )
10  _____ )

11
                   TRANSCRIPT OF PROCEEDINGS
12         BEFORE THE HONORABLE DEREK K. WATSON,
            CHIEF UNITED STATES DISTRICT JUDGE
13
    APPEARANCES:
14
       For the Plaintiffs:      BARRY K. ARRINGTON, ESQ.
15                              Arrington Law Firm
                                4195 Wadsworth Boulevard
16                              Wheat Ridge, Colorado  80033

17
       For the Defendant:       KALIKO'ONALANI D. FERNANDES, ESQ.
18                              Deputy Attorney General
                                Department of the Attorney
19                               General, State of Hawai'i
                                425 Queen Street
20                              Honolulu, Hawai'i  96813

21                              WILLIAM J. TAYLOR, JR., ESQ.
                                Special Deputy Attorney General
22                              Everytown Law
                                450 Lexington Avenue
23                              P.O.  Box 4184
                                New York, New York  10017
24

25
```

1

2    Official Court              Cynthia Fazio, RMR, CRR, CRC
     Reporter:                   United States District Court
3                                300 Ala Moana Blvd., C-270
                                 Honolulu, Hawaii  96850
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).

```
 1   FRIDAY, APRIL 7, 2023                          10:09 A.M.
 2            THE COURTROOM MANAGER:  Civil Number 22-00404DKW-RT,
 3   National Association for Gun Rights, et al., versus Anne E.
 4   Lopez, et al.
 5            This case has been called for Motion for Preliminary
 6   Injunction.
 7            Counsel, please make your appearances for the record.
 8            MR. ARRINGTON:  Good morning, Your Honor.  Barry
 9   Arrington appearing for plaintiffs.  On my left is Dudley
10   Brown, who is the president of the National Association for Gun
11   Rights.
12            THE COURT:  Good morning to both of you.
13            MR. TAYLOR:  Good morning, Your Honor.  William
14   Taylor, Special Deputy Attorney General, for the defendant
15   Attorney General Lopez.
16            MS. FERNANDES:  Kaliko'onalani Fernandes, Deputy
17   Attorney General, for defendant Lopez.
18            THE COURT:  Good morning to both of you as well.  You
19   may be seated.
20            MR. TAYLOR:  Thank you, Your Honor.
21            MS. FERNANDES:  Thank you.
22            THE COURT:  Well, it is the plaintiffs' Motion for
23   Preliminary Injunction.  Mr. Arrington, I assume that means
24   you.
25            MR. ARRINGTON:  Thank you.
```

1          Thank you, Your Honor.  Time limit?

2          THE COURT:  No time limit.

3          MR. ARRINGTON:  Okay.  Thank you.  So I --

4          THE COURT:  If I get concerned about time I'll let you

5     know.

6          MR. ARRINGTON:  By dinnertime I should be finished.

7          THE COURT:  Good.  You'll be talking to an empty

8     courtroom, but that's fine.

9          MR. ARRINGTON:  Okay.  May it please the Court, my

10    name is Barry Arrington.  I represent the plaintiffs in this

11    matter.  And I would like to start with going back to basics.

12    And the basics in this case start with the fact that even

13    before the Constitution was enacted there was a preexisting

14    right to keep and bear arms for self-defense.  And in *McDonald*,

15    the Supreme Court said that that right to keep and bear arms is

16    a fundamental right necessary to our system of ordered liberty.

17         THE COURT:  Can I interrupt you just for one second?

18         The -- you can argue, emphasize whatever you wish.

19    That said, there are two things that I'd like both sides to

20    address that are at the top of my mind.  So, at some point if

21    you could address these two questions, it doesn't need to be

22    right at the outset, I'd appreciate it.

23         The first inquiry is this:  *Bruen* obviously has

24    changed the landscape in terms of Second Amendment rights.

25    The, what I'll refer to as step one of *Bruen* has been presented

 1    in any number of different ways.  Not necessarily just in this
 2    case but in the cases that I have -- that I have read such that
 3    whether the Second Amendment covers the regulation of LCMs
 4    or -- or assault pistols depends on a different framework that
 5    I'm not clear on.  More specifically, the briefing uses these
 6    phrases alternatively, whether the regulated item is in common
 7    use, whether the regulated item is in common use for
 8    self-defense, whether the regulated item is dangerous and
 9    unusual, whether the regulated item is dangerous or unusual,
10    and it is unclear to me which, if any, of those tests apply.
11    Okay.  So that's the first question.
12         The second inquiry is one that I think you all are
13    probably in a bit better position to answer than I am.  Over
14    the last couple of weeks we have been made aware, both through
15    the AG's submission of its supplemental authorities, together
16    with, just I think yesterday if I'm not mistaken, a Ninth
17    Circuit advance sheet.  These submissions, these references
18    concern other cases post-*Bruen* that deal with regulations of
19    one type or another.  They don't necessarily mimic what is at
20    issue here in the HRS provisions that have been challenged.
21    For example, the decision that Judge Sabraw in SD Cal just
22    recently made has to do with manufacturing limitations,
23    including microstamping.  Judge Carney's decision in Central
24    District of California is similar in that respect.  But there
25    are other cases, like the Delaware case that the AG provided,

1    like the Naperville, Illinois case that the AG provided, that

2    are similar, more similar I'll say to what we're talking about

3    here.

4            In any case, I think at some point we all expect, I

5    think, these Courts of Appeals from across the land to start

6    speaking to what *Bruen* means.  And there's an awful lot of

7    questions, I think, that we all have in the post-*Bruen* world

8    that could use some additional guidance and hopefully

9    eventually binding guidance.

10           So my question is this:  Are there other cases that

11   you are aware of that concern, let's confine it to assault

12   weapons of some sort and magazine bans of some sort that are

13   pending in federal courts throughout the country that have not

14   yet been brought to my attention?  And in particular obviously

15   courts in our circuit.  And to the extent you can identify

16   those additional cases, perhaps describe where they are

17   procedurally.  I would be interested in that.  And if you can

18   do that today, that's fine.  If you can do that in a

19   supplemental submission following the conclusion of this

20   morning's hearing, that would be acceptable as well.  So those

21   are my two areas of inquiry.

22           MR. ARRINGTON:  I'll start with the second one.

23   Everyone is waiting, everyone across the country in the Second

24   Amendment community is waiting for Judge Benitez to rule.  Are

25   you familiar with his cases?

1            THE COURT:  I am.  I did not mention his but I am.

2            MR. ARRINGTON:  Yeah.  So one of his cases involves

3     magazine bans, one of his cases involve assault weapon bans.

4            THE COURT:  So separate cases.

5            MR. ARRINGTON:  One is *Duncan*, one is *Miller versus*

6     *Bonta* of course.  I will give you a brief overview of the

7     procedural posture of those cases.

8            So, *Duncan* went up to the Ninth Circuit.  His original

9     ruling was affirmed by the Ninth Circuit.  It was reviewed en

10    banc by the Ninth Circuit who reversed and therefore overruled

11    the district court, and that went up to the Supreme Court.

12    While that was pending *Bruen* came out and the Supreme Court

13    basically vacated those cases and said, Okay, Ninth Circuit,

14    look at *Bruen*.

15            THE COURT:  Start all over.

16            MR. ARRINGTON:  Start -- well, yes.  And how much they

17    had to start over was one of the issues, do we do a completely

18    new trial or do we just evaluate the evidence differently.

19            And so it came back down to district court, both

20    cases, and California submitted literally thousands of pages of

21    material.  And -- and the judge said, Okay, this is what I want

22    you to do, this was in December:  I want you to do a

23    spreadsheet.  And you can go look at these spreadsheets --

24    they're on the court's docket -- of every single historic

25    precedent that you think supports your statutes.  And,

1   plaintiffs, you get to respond to that.  And so California

2   submitted a spreadsheet with hundreds, hundreds of statutes,

3   and the plaintiffs responded in January, and then there was a

4   little bit more back and forth.

5          Long story short, that is now ripe and everybody is on

6   tenterhooks waiting for that because that's -- I think

7   everybody recognizes that that's one of the key, if not the

8   key, those two cases, Second Amendment cases because I think

9   the judge in those cases has done a really, really deep dive

10  into this area of law, and so he's very well respected.  No

11  matter whether you agree with him or not, people believe that

12  he's taken a long hard look at these.

13         THE COURT:  So these are, you said *Duncan* was one of

14  the cases.  What was the name --

15         MR. ARRINGTON:  *Duncan* and *Miller*.

16         THE COURT:  *Miller*.

17         MR. ARRINGTON:  Yes, I can get you cites.

18         THE COURT:  And Judge Benitez is, just for the record,

19  Southern District of California.

20         MR. ARRINGTON:  Yes, yes.  And those may come out

21  today for all I know, or next week.  I think everybody kind of

22  expected him to already have ruled by now.

23         THE COURT:  Was there oral argument scheduled as well?

24         MR. ARRINGTON:  No.  It's all going to be on the

25  paper.  And so I think the idea is, show me the statutes,

 1   because you don't need to tell me what the statutes say, I can

 2   read them, right?  And either they're analogous or they're not.

 3   And of course, the California is saying, Well, we've got

 4   hundreds of analogous statutes, and the plaintiffs are saying,

 5   Well, you don't have any analogous statutes.  And so kind of

 6   like what we're doing, right?

 7          THE COURT:  Yup.

 8          MR. ARRINGTON:  And so I think that whether you agree

 9   with Judge Benitez or not, the court's comments would say to me

10   you really need to wait and see what he does and see how he

11   analyzes it before you come out with a ruling in this case.

12   This is my suggestion.

13          THE COURT:  Well, and that's -- I mean to be plain,

14   that's one of the considerations is why I'm asking the question

15   is, the historical review that the Supreme Court is apparently

16   expecting district courts to do in the first instance in the

17   wake of their *Bruen* guidance is hugely time consuming, among

18   many other things, challenging.  And it makes -- I don't know

19   if the word is -- what the right word is -- little sense, I

20   guess, in some ways for district courts across the country,

21   because these are national historical reviews that *Bruen* speaks

22   of, not what Hawaii or California or Wyoming or Texas or Ohio

23   have done as far as states go.  That's not what the standard

24   is.  It's national.  And so for multiple district courts within

25   any given circuit to do the same review and for litigants to

1    have to submit the same kind of record, because I know this is

2    happening, you know, we're getting -- these declarations that

3    I've gotten here are likely not -- were not created solely for

4    Hawaii, I suspect.

5            MR. ARRINGTON:  I've seen them several times, Your

6    Honor, myself, yes.

7            THE COURT:  Doesn't surprise me.

8            MR. ARRINGTON:  Yeah.

9            THE COURT:  And likely maybe in jurisdictions that

10   you're not perhaps familiar with, too.  So it just makes little

11   sense in terms of judicial efficiency and economy for, I don't

12   know how many states, frankly, are even in our own circuit,

13   something like 12, you have district judges in all these

14   different jurisdictions essentially looking at similar

15   challenges to a magazine and assault-type style weapon

16   limitations, all looking at the same history of whether there

17   are national comparables with all of that to funnel to what we

18   know to be one place.

19           MR. ARRINGTON:  Right.

20           THE COURT:  I don't know that that's the best thing

21   for us to do.  Now, if I have to, of course I will, I mean

22   that's what I'm here for after all.  But anyway, you know what

23   I'm thinking in that regard, does that make a lot of sense.

24   Should we wait for additional guidance and how far is that

25   additional guidance down the road, because I know it's not fair

 1    to you all for us to just sit here forever, but if it's

 2    something that's on the horizon, like perhaps Judge Benitez's

 3    decision is, maybe it does make sense for us to stand down and

 4    await some additional guidance.  I know it's not binding on me,

 5    but the outgrowth of that, I assume, is going to be the circuit

 6    at some point, that is obviously going to be binding on me.

 7    And there may be guidance from the circuit with regard to

 8    Second Amendment rights more generally in some of these other

 9    decisions, like, what's that one, *Boland*, the case that the

10    circuit just recently stayed.

11          So, that's my thinking.

12          MR. ARRINGTON:  Okay.  So, in terms of timing, the

13    status quo is what it is.  So I'm certain that, the State can

14    correct me if I'm wrong, but they're not in a hurry, I would

15    expect.  Plaintiffs would prefer better over quicker.  And so

16    we're not in a hurry.  We would definitely urge the Court to

17    wait on Judge Benitez before ruling.

18          THE COURT:  Okay.  I appreciate that input.

19          MR. ARRINGTON:  Okay.  The first question, and it's

20    a -- I can tell you've done your homework because that is where

21    these cases are coming all over the place.  And -- well, before

22    I leave the second question, let me tell you that I believe

23    that the court has already answered the question, the Supreme

24    Court has already answered the question for you.  You don't

25    really have to look at any statutory history because *Heller*

1    said there is no Founding Era precedent for -- that would

2    justify a absolute ban of a commonly possessed firearm.  And of

3    course that was in 2008.  Well, here we are in 2022.  Nobody

4    has found any -- I mean D.C. looked hard and they -- and they

5    gave some suggestions, and there's been some other laws that

6    have come to light.  Still we're in the same spot.  There's

7    been no Founding Era precedent identified that burdens the

8    right to keep and bear arms anywhere near as much as a absolute

9    ban on a commonly possessed firearm or firearm implement like a

10   magazine which is necessary to make these work.

11        And so I think my argument to you, Your Honor, is that

12   *Heller* shortcut that entire analysis when it comes to bans.

13   There is a difference between a ban and a regulation.  There

14   are a lot of regulations short of a ban that you can look for

15   Founding Era precedents and find them.  *Heller* itself said

16   that.  You can't find anything for a ban.  And so I'll get into

17   that in a little more detail in a moment.

18        As far as the first question that you had, I think the

19   answer to this has been convoluted and there's been some

20   confusion, but it actually turns out to be pretty simple.

21   You've got a bearable arm, it's covered by the plain text.

22   Just that simple.  And, now, whether any particular bearable

23   arm is also protected by the Second Amendment is not the same

24   thing as being covered by the Second Amendment.  The

25   distinction being, for example, let's start with firearms.

```
 1   Every single firearm is -- is protected or covered by the plain
 2   text of the Second Amendment.  It's an arm, right?  Nobody can
 3   argue it's not an arm.  Does that mean every single firearm is
 4   protected by the Second Amendment?  No, that's the second
 5   analysis under Bruen.  For example, dangerous and unusual arms
 6   are not protected.  So step one, there's a presumption created.
 7   Step two, the government has an opportunity to rebut that
 8   presumption.  Okay.
 9           THE COURT:  So you think the dangerous and unusual
10   test is part of step two?  I've seen it used as part of step
11   one.
12           MR. ARRINGTON:  I have too.
13           THE COURT:  I think you have too.
14           MR. ARRINGTON:  I have too.  And I think it makes no
15   sense to try to use -- try to wrap it into step one.  There are
16   actually some cases, Harrison for example, which I think I
17   quoted in the briefs, which caught the government, I think it's
18   in Texas -- oh, no, it was Oklahoma, saying, Well, no, wait a
19   minute, you're trying to shoehorn that into an empirical
20   analysis, into a textual analysis.  You can't do that.  That's
21   step two.
22           And I think that from an analytical perspective a --
23   an eleganceness -- analytics, which I hope to be able to
24   demonstrate in a moment, that's the only way that makes sense,
25   that presumption is created, step one, or not, and then you can
```

```
 1   rebut the presumption under step two.  That's the government's
 2   job.
 3              THE COURT:  Okay.
 4              MR. ARRINGTON:  Okay.  Is there water?  Didn't
 5   realize --
 6              THE COURT:  Do we have --
 7              THE COURTROOM MANAGER:  Sorry.  Normally we don't
 8   because of COVID, but I will give you this one.
 9              MR. ARRINGTON:  Oh, you're very kind.  Thank you.
10              THE COURT:  We used to prepare pitchers of water,
11   but --
12              MR. ARRINGTON:  Which is what I was expecting.  I'm
13   sorry for not being prepared.
14              THE COURT:  That's fine.
15              MR. ARRINGTON:  So, fundamental right necessary for
16   our ordered liberty, *McDonald*.  And that reason it -- it's
17   incorporated and applied to the states through the Fourteenth
18   Amendment.  Very basic incorporation analysis that *McDonald*
19   went through and found that Second Amendment is incorporated.
20              So the next question is, now that we have this
21   fundamental right, what is the scope of the Court's review if
22   there's a burden on this fundamental right?
23              I would -- the Court said something earlier that *Bruen*
24   has upset the landscape or -- of Second Amendment law, and I
25   think that's true and it's not true at the same time.  It's --
```

1    it's not true because under *Bruen* itself they're saying, Wait a

2    minute, we're not saying something new, we're saying what we

3    said in *Heller* all along and which was ignored.  And so Justice

4    Thomas was not purporting to develop a new test.  He was just

5    saying, No, you guys misinterpreted *Heller* and this is what it

6    really means.  And so it -- I agree, it really has upset the

7    apple cart, but Justice Thomas did not have a self-conception

8    of creating a new test.

9          And what does he say under this -- the scope of

10   analysis for Second Amendment burdens?  And the Court's already

11   talked about two steps and I think that's good.  Let's talk

12   about the first step.

13         The first step creates a presumption of

14   unconstitutionality.  And let me tell you how that works.  The

15   court held when the Second Amendment's plain text covers an

16   individual's conduct, the Constitution presumptively protects

17   that conduct.  Pincite -- all these are on to the Supreme

18   Court -- 142 Supreme Court, my *Bruen* pincites, pincite 2126.

19         So, the court held just as the First Amendment

20   protects modern forms of communication, the Second Amendment

21   extends prima facie -- and this is the important part for your

22   question, Your Honor -- the text of the Second Amendment

23   extends prima facie to all instruments that constitute bearable

24   arms.  Let me repeat that, all instruments that constitute

25   bearable arms, even those that were not in existence at the

1    time of the Founding, pincite 2132.

2         And so the presumption does not -- is not established

3    just for weapons in common use.  The presumption is not

4    established just for weapons that are not dangerous and

5    unusual, or dangerous or unusual.  The presumption is for all

6    instruments that could constitute bearable arms without

7    exception.

8         Now, obviously that doesn't mean all instruments that

9    constitute bearable arms are protected.  It just means that's

10   step one that creates the presumption.  And so the -- have

11   plaintiffs met their burden, so to speak, under step one?  Yes,

12   the semiautomatic firearms, rifles, pistols are obviously arms,

13   bearable arms.  The magazines are bearable arms.  We'll talk

14   about -- more of that later.  These are instruments that

15   constitute bearable arms, therefore the text of the Second

16   Amendment extends prima facie, I think it's important to say

17   prima facie, to those arms.  That means you can go beyond the

18   face under step two, but at step one, if it's a bearable arm,

19   it's covered.  And so another way of saying that the

20   Constitution presumptively protects the conduct of plaintiffs

21   in this case is that the statute that's under review or the

22   statutes that are under review to date, Your Honor, are

23   presumptively unconstitutional.

24        It's like a First Amendment case where you have a

25   prior restraint or a viewpoint-based discrimination or

1    content-based discrimination.  Those sorts of statutes are

2    presumptively unconstitutional.  And that doesn't mean that's

3    the end of the analysis, but you begin with the people have a

4    right to keep and bear arms.  And when the government steps in

5    and burdens that right, I don't have to come in and prove my

6    right to keep and bear those arms.  It's on the government to

7    prove that they have a right under the history and tradition to

8    do this particular regulation or ban.

9         So let's turn to the government's burden here.  Step

10   one, presumption of unconstitutionality.  Step two, how does

11   the government rebut its burden?

12        Before I talk about how the government rebuts its

13   burden, let me talk about how it cannot rebut its burden.  And

14   I think it's important because we'll see in a moment, because I

15   don't think the State understands this, but *Bruen* explained

16   that you had this -- that to -- this history and tradition

17   standard, and it emphatically, I counted, there's like seven

18   times said no means ends -- means-end scrutiny, no interest

19   balancing.  That's off the table.

20        And pardon for the long quotation, but I think it's

21   just vitally important to understand this:  Pincite 2126 in

22   *Bruen*:  If the last decade of the Second Amendment litigation

23   has taught this court anything is that federal courts tasked

24   with making difficult empirical judgments regarding firearm

25   regulations under the banner of intermediate scrutiny --

1    talking about all the courts had gone and said, Yeah,

2    intermediate scrutiny, government always wins.  Right?  So

3    these difficult empirical judgments regarding firearm

4    regulations under the banner of intermediate scrutiny often

5    defer to the determination of legislators.  But while that

6    judicial deference to legislative interest balancing is

7    understandable, and elsewhere appropriate, it is not deference

8    that the Constitution demands here.

9         The Second Amendment is the very product of an

10   interest balancing by the people and it surely elevates above

11   all other interests the right of law-abiding, responsible

12   citizens to use arms for self-defense.  It is this balance --

13   this balance struck by the Second Amendment -- struck by the

14   traditions of the American people that demands our unqualified

15   deference.

16        *Bruen* did two things in my view.  The first thing it

17   did, it says, Circuit Courts, almost invariably -- actually

18   invariably, you got it wrong.  I mean abrogated all of the

19   cases that had engaged in this interest balancing inquiry.  And

20   the other thing it did is it said, and it's kind of related to

21   the first, Yeah, the government is going to come in and say

22   these are very important policies.  But we don't get to say

23   that, it says.  We already have a policy, it's the Second

24   Amendment, and it overrides your policy no matter how

25   important, how vital you think it is.

1          Court said the same thing in *Heller* 2008 and I quoted

2     it in my brief.  It says:  We're aware of firearm violence in

3     the District of Columbia.  And we're aware -- they focused on

4     the amici, I don't know why it didn't focus on the party -- but

5     it says, The amici said, This handgun bans are a way to deal

6     with this.  And the court said, No, the Second Amendment takes

7     certain policy positions the government -- even compelling, in

8     their view, policy positions off the table, is the words the

9     court used, and one of them is banning handguns, which it

10    already said the reason that you can't ban handguns is because

11    they're commonly held for lawful purposes.

12          And so the whole issue that we have to start, before

13    we get anywhere with the government is means-end scrutiny,

14    interest balancing is off the table.  All those cases were

15    abrogated because the -- one more quote from *Heller*:  The

16    enshrinement of constitutional rights necessarily take certain

17    policy choices off the table.  And that's 554 U.S. 636 is the

18    pin.

19          So if the government cannot justify its statute by

20    positing it promotes an important interest like public safety,

21    how does it rebut the presumption?  *Bruen* held that the

22    government has the burden in rebutting this presumption of

23    showing, demonstrating is the word they used, that the

24    regulation is consistent with this nation's historical

25    tradition of firearms regulation.  Pincite 2126.

1          The court held that reliance on history and tradition

2     is in our view more legitimate and more administrable than

3     asking judges to make difficult empirical judgments about the

4     cost and benefits of firearms restrictions.

5          The judgment -- the -- basically saying to the -- you

6     don't get to decide whether it's a good idea or not when

7     you're -- when you're regulating -- reviewing a firearm

8     statute.

9          So, in summary, you've got a presumption based on the

10    plain text, which the plaintiffs have met because they

11    presented bearable arms that they would like to acquire, keep

12    and bear.  Cut the statute as presumptively unconstitutional.

13    The government has an opportunity to rebut that Constitution --

14    unconstitutional presumption by showing that the regulation is

15    consistent with history and tradition.

16          Next step, it's impossible for them to do that in this

17    case, and here's why --

18          THE COURT:  So before you get there.

19          MR. ARRINGTON:  Oh, go ahead.

20          THE COURT:  The -- at least one of the arguments that

21    the State makes before you get to the presumption applies is

22    that insofar as the LCM is concerned, that's not an arm.

23          MR. ARRINGTON:  Exactly.  And I will get to that.  You

24    want me to address that now or --

25          THE COURT:  Well, it seemed like you were moving to

1    step two.  So I thought I'd back you up to step one.

2              MR. ARRINGTON:  Okay.

3              THE COURT:  If you're going to look at it in some --

4              MR. ARRINGTON:  In just a moment.

5              THE COURT:  -- in your argument, it's fine.  As long

6    as you get to it.

7              MR. ARRINGTON:  I'll get to it.  But it's -- actually

8    they do say that and so let's talk about that in a moment.

9              But before we get there, let's talk about whether

10   they're able to meet their burden of showing that their ban is

11   consistent with Founding Era history and tradition.

12             Well, *Bruen* and *Heller* have already told us, no

13   Founding Era precedent, and the pincite here is 2128, no

14   Founding Era precedent remotely burden, is the word that the

15   court used, the right to keep and bear arms for self-defense as

16   much as an absolute ban of commonly possessed arms such as the

17   handguns at issue in *Heller.*

18             The court's already told us, there's nothing there.

19   And of course that was 2008.  There's still nothing there.

20   Nothing has been presented.  How do we know this?  If there

21   were a statute from the Founding Era that banned a commonly

22   possessed arm from that time, surely the State would have said,

23   Look at this statute, statute X bans commonly possessed arm Y

24   from the Founding Era.  The fact that they were unable to do

25   that means they couldn't find any such statute either.  Now

1    they're trying to throw in a bunch of gunpowder regulations.

2    *Heller* already threw out gunpowder regulations.  I don't know

3    why that came in.  But we know that.

4            And why is that the case?  This is interesting.  When

5    it comes to commonly possessed arms and the Founding Era, not

6    only were there never ever any bans of commonly possessed arms,

7    everybody was required to possess these commonly possessed

8    arms.  What do I mean by that?  Militia Acts.  The Militia

9    Acts, there was a national Militia Act, every state had a

10   Militia Act.  It required every single, to our shame, White

11   man, but, you know, the point is every person who was eligible,

12   it required everyone to always have commonly possessed arms,

13   like muskets, ammunition, powder, bayonets, and to show up

14   ready to use those weapons.  And if you didn't, Your Honor,

15   what happened?  You got fined.  There was -- there were fines

16   for not possessing commonly possessed arms.

17           And so what -- what were they -- Militia Acts required

18   you to do?  That was for the defense of the people.  And so

19   interestingly enough, take the AR-15, it's the most popular

20   rifle in America.  If the AR-15 had existed in the Founding

21   Era, the Militia Acts would have required people to possess it

22   and show up with it and fine them if they didn't.  And so

23   that's why *Heller* says it's basically impossible for the State

24   to demonstrate that there was a ban on commonly possessed

25   weapons because they were required to be possessed.

1          And so, that's how -- I told you we can shortcut the

2    whole historical inquiry.  That's how you do it.  Show me a

3    single statute that bans a historical -- or a commonly

4    possessed weapon, absolute ban in the home for self-defense.

5    It's never been shown anywhere in the country.

6          And so I would like to talk about what the Seventh

7    Circuit held in *Ezell* versus City of Chicago.  It looked at the

8    landscape and it said that -- well, I'll quote it:  Both *Heller*

9    and *McDonald* suggest that broadly prohibitory laws restricting

10   the core Second Amendment right -- the handgun bans at issue in

11   those cases -- are categorically unconstitutional, close quote.

12   Pincite is 651 F.3d 703.

13         In a similar case out of Illinois, *People v. Webb*, the

14   court held that Tasers, commonly possessed weapon, a ban on

15   those were, quote, necessarily, close quote, unconstitutional

16   because of this dynamic that I've just been talking about.

17         Now, counsel was saying, Well, wait a minute, that's

18   not the Seventh Circuit precedent with respect to assault

19   weapon bans.  That's *Friedman*.  And of course they're right,

20   that is *Friedman*.  Couple years later in a case called *Friedman*

21   *versus City of Highland Park*, the Seventh Circuit kind of

22   reversed course and upheld a ban of commonly possessed weapons.

23   Even the court said that, Yeah, these are commonly possessed.

24   It went into a interest balancing test and upheld the statute.

25         Justice Thomas took the Seventh Circuit to task in his

1    dissent from denial of cert. in that case and I would like to

2    read from his dissent.  Says:  The scope of the Second

3    Amendment is defined by, quote, what private citizens commonly

4    possess, close quote.  Pincite 577 U.S. 1039.  Justice

5    Thomas -- and I think this is very important for the Court's

6    determination.  Justice Thomas gave us some guidance about

7    assault weapons in particular.  Justice Thomas said --

8    remember, he's the author of *Bruen*.  He was joined in this

9    dissent by Justice Scalia, who was the author of *Heller*.  So

10   what did the author of *Bruen* and Scalia say about assault

11   weapons in this dissent?  But they said:  The semiautomatic

12   firearms like the AR-15 are commonly possessed by law-abiding

13   Americans.  I mean basically they pointed to the fact that

14   millions of them are out there, and here's the quote, quote:

15   Under our precedents, that is all that is needed.  Under our

16   precedents, that is all that is needed for citizens to have a

17   right under the Second Amendment to keep such weapons.

18          Justice Thomas didn't get cert. in *Friedman*.  You

19   could tell he was upset.  I mean he would -- howling with

20   indignation about how the Circuit Courts were treating the

21   Second Amendment as a second class right.

22          He did get cert. in *Bruen*.  And it's clear that the --

23   what he was talking about and -- what he and Justice Scalia

24   were talking about is the law and it's -- it's a -- post-*Bruen*,

25   it's clearer than ever.  You don't get to do this interest

1    balancing test.  If it's commonly possessed, that's all that's

2    needed.  End of inquiry.  Categorically unconstitutional, in

3    Ezell's words, necessarily unconstitutional in the Supreme

4    Court's -- Illinois Supreme Court's word in *People v. Webb*.

5           THE COURT:  And does it matter, assuming I put as much

6    weight into Justice Thomas' dissent as you do, does it matter

7    that Hawaii's restrictions relate to assault pistols as opposed

8    to assault weapons generally?

9           MR. ARRINGTON:  And that's a very interesting question

10   that I -- I will address now.

11          The plaintiffs have come in and they've demonstrated

12   that the banned arms, the arms that Hawaii bans are commonly

13   possessed by law-abiding citizens for lawful purposes.  Keep in

14   mind, the *Heller* test is not just self-defense.  State often

15   focuses on self-defense, but it's not just self-defense.

16   Lawful purposes is the word -- is the phrase.  And obviously

17   self-defense is the core of that right, but any lawful

18   purposes, target shooting, hunting, recreation, whatever lawful

19   purpose is.  And the materials I provided you show that it's

20   been demonstrated that these are used for lawful purposes.

21          But let's talk about the firearms that you've just

22   mentioned and the magazines that you've just mentioned, what

23   does the State say?

24          Well, the first thing that's interesting about the

25   firearms that are to be regulated in this statute is that they

1    regulate pistols.  That's important.  Why is that important?

2    Pistol is a synonym for handgun, right?  Look it up in the

3    dictionary.  I gave you a dictionary cite.  Pistol, handgun,

4    means the same thing.  What did *Heller* say?  *Heller* said an

5    absolute ban on pistols, or handguns, same thing, is

6    unconstitutional.  So why is it that the statute is not just

7    unconstitutional right on its face?  Why isn't it

8    unconstitutional by a plain reading of *Heller*?

9         Well, if you look at the response, the State's

10   response, they say, Well, they're not really pistols.  We call

11   them pistols, but they're really just AR-15s.  They're just

12   smaller AR-15s.  Okay?  All right.  Well, they're on the horns

13   of a dilemma, Your Honor.  If they're pistols, *Heller* applies,

14   easy case.  I think it's an easy case anyway, but easier case.

15   If they're AR-15s, *Heller* still applies.  Why?  Because they're

16   still commonly possessed weapons.  AR-15s, 24 million of them

17   out there by the last count and it's going up.  It's the second

18   most popular rifle in America.  Or actually the second most

19   popular, second best selling weapon in America after

20   semiautomatic handguns.

21        Think of it this way:  If the most popular weapon

22   being sold right now is a semiautomatic handgun, and the second

23   most popular weapon being sold right now is an AR-15, we know

24   *Heller* protects that first one.  The State is saying it doesn't

25   protect the second one.  Wait a minute, does *Heller* limit it

 1   just to its facts and nothing else is protected by the Second

 2   Amendment?  That's what the State's saying.

 3            I don't think the Supreme Court meant for *Heller* to be

 4   limited to its facts.  Matter of fact, Justice Thomas said that

 5   emphatically in his dissent in the *Friedman* case.

 6            So, the horns of the dilemma are on the one side is

 7   the pistol, ban is unconstitutional under *Heller*.  Period.  End

 8   of story.  Let's go home.  On the other hand, millions of

 9   millions, tens of millions out there, ban is unconstitutional

10   because it's commonly possessed.  State still loses.  So any

11   way you look at it the State loses on the firearm regulation.

12            Now, we've given you some -- some data.  Well, let's

13   carve this area out of assault pistols and -- and even then,

14   even if you -- this is a limited stand alone category.  It's

15   neither fish nor fowl so to speak.  There's a million of them,

16   at least a million at which we know from *Caetano* is enough to

17   meet the -- the commonly possessed standard.  No way the State

18   can come in here and say that the arms they ban are not

19   commonly possessed for lawful purposes.

20            The State did mention that -- that there were 700,000

21   machine guns and therefore that can't possibly be the standard.

22   You remember this from their brief.  And I dropped a footnote

23   responding to that.  The State did not understand the report

24   they were quoting from.  If the Court's interested, I can go

25   into that in more detail.  But when it comes to machine guns,

1    there are two types.  There are pre-'86 machine guns.  Why

2    pre-'86, why is that important?  In 1986 Congress passed a law,

3    no more machine guns by private citizens.  Only machine guns

4    that existed in 1986 and prior can be privately owned from now

5    into eternity.  So that number is never going to get bigger.

6    It might get smaller if these are lost or destroyed or

7    whatever.  It never gets bigger.

8         But there's other machine guns owned by governments,

9    and in particular law enforcement, and there are a lot of

10   those.  And so what is the difference?  The 700 includes both

11   categories.  700,000 includes both categories.  And I gave you

12   a cite, *Lynch* out of the Fifth Circuit which actually dug the

13   numbers up, and the pre-'86 number is about 170,000.  And so

14   that's way down here.  And so it's not the 700,000 that the

15   State is representing to the Court.

16        Any way you look at it, over a million is commonly

17   possessed when you look at -- well, for example, *Caetano* where

18   the court basically said Tasers, commonly possessed, protected

19   by the First Amendment.  It's important for two reasons.

20   Nobody knew what a Taser was in 1791.  New weapons are

21   protected.  Two, there are only few hundred thousand of them.

22   Well, that's enough, according to the court.

23        Magazines.  Magazines are an interesting case.  And I

24   will tell the Court, you don't have to decide this issue.

25   Ninth Circuit has already decided it for you.  Binding

1    precedent.  And the cite is F-Y-O-C-K, I don't know how to say

2    that, *versus Sunnyvale*, I think it's *Fyock*, *Fyock*, but I'm

3    going to say *Sunnyvale*, 439 F.3d pincite is 998.  And so that

4    was the original mag ban case out of the Ninth Circuit.  And

5    remember, there were two steps in the original step.  Only the

6    second step got abrogated by *Bruen*.  First step is still law.

7    And what's still law under *Sunnyvale*?  Magazines are arms

8    protected by the Second Amendment.

9           So basically, in *Sunnyvale* -- take your pick, -- the

10   court said magazines are necessary to make semiautomatic

11   firearms work.  It analogized to *Jackson*, another Ninth Circuit

12   case which said ammunition which is necessary to make firearms

13   work is protected by the Second Amendment.  It says anything

14   that's necessary to make a firearm work, natural enough, is

15   protected by the Second Amendment.  And the court said that

16   these semiautomatic firearms won't work unless they have a

17   magazine.  Which only makes sense, Your Honor.

18          What is a semiautomatic firearm?  Semiautomatic

19   firearm has a -- it's an arm where you pull a trigger and

20   automatically another round is inserted into the action.  You

21   pull the trigger, you don't have to cock it, reload it every --

22   it's not a single shot.  What is necessary for that to happen?

23   Well, you have to have a supply of ammunition being fed into

24   the action.  And where is that supply of ammunition fed from?

25   Starts from a magazine of course.  There are fixed magazines,

1    there are detachable magazines.  This -- a magazine basically

2    keeps the ammunition under spring tension.  And when a

3    cartridge is fired, the ejector throws it out of the rifle, or

4    the pistol or whatever the arm is, and the spring pushes

5    another cartridge up into the action, which is then available

6    to shoot.  Well, what if that magazine is not there?  Well,

7    there's not another round available by definition to be fed

8    into the action.

9              The point of it, the point of *Sunnyvale*, the Ninth

10   Circuit in *Sunnyvale* and the point of just common sense is that

11   magazines are necessary by definition for semiautomatic weapons

12   to operate and therefore they're protected.  *Sunnyvale* said

13   some level of magazines are necessarily protected by this --

14   the Second Amendment, I quoted it in my brief.

15             It went on to say, Well, 11-plus rounds are -- we'll

16   interest balance on 11-plus rounds.  They're out.  And so you

17   got the second part wrong.  Got the first part right.  And the

18   first part was not abrogated by *Bruen*, and therefore Court does

19   not have to make a determination.

20             I will note there's a Ninth Circuit case that got --

21   just went off the rails on this issue and -- out of Oregon.  I

22   don't know if the Court's read that or not.  The court failed

23   to distinguish between step one and step two.  And you're

24   right, there's a lot of confusion.

25             Step one is, is a magazine a bearable arm?  Well, yes,

1    it is, according to Ninth Circuit, because it's necessary to

2    make semiautomatic firearms work.  Semiautomatic firearms would

3    not exist if you didn't have magazines.

4         Okay.  Step one, plain text covers it.  Does that mean

5    that all magazines are necessarily then protected by the Second

6    Amendment?  You might be surprised to learn that my answer is

7    not necessarily.  The State can still come in and say, Yeah,

8    they're bearable arms.  We admit that.  But there's a history

9    and tradition of banning them.  And if they're able to

10   demonstrate that there's a history and tradition of banning

11   magazines that are 11-plus rounds, they win.  Problem is,

12   absolutely no way they can do that.  That's why I'm so

13   confident, right?  There's absolutely no way they can do that

14   because there's a hundred -- you think ARs are commonly

15   possessed at 24 million, the State does not dispute that

16   there's over 150 million of these out there in circulation

17   amongst law-abiding American citizens who use them for lawful

18   purposes, including self-defense in the home.

19        So this is where it's very important to keep your eye

20   on the two parts of the test where the Oregon court and the

21   Rhode Island court, in particular *Brown*, *Ocean State* and *Brown*

22   are the names of those cases, both went off the rails.  They

23   failed to distinguish between step one, plain text, and step

24   two, history and tradition.

25        Step one, Ninth Circuit has already told you, they are

```
1    arms.  Step two, common use.  State can't demonstrate they're

2    not in common use.  Heller rule applies.

3              THE COURT:  We're about an hour in, so.

4              MR. ARRINGTON:  I'm sorry?

5              THE COURT:  I said we're about an hour in.  And I know

6    I said there's no time limit necessarily but at some point

7    there will be.

8              MR. ARRINGTON:  Okay.

9              THE COURT:  And we're getting close.

10              MR. ARRINGTON:  Okay.  I will -- I will -- I'm coming

11    to the end, Your Honor.

12              THE COURT:  I appreciate it.

13              MR. ARRINGTON:  Okay.  So State can't win.  I think

14    the State knows it can't win under a -- kind of a

15    straightforward Heller/Bruen analysis.  And so what it's done

16    is ask the Court to return to means-end scrutiny.  How do I

17    know this?  Well, what is means-end scrutiny?  It's the State

18    posits an end, public safety -- and in this case it's public

19    safety in the context of shootings, mass shootings -- and it's

20    saying the end that we have posited is justified, the means --

21    by the means that we've chosen, which is absolute ban of these

22    weapons.  Means that.

23              I'm reading from Page 3 of the State's response where

24    they say the injunction should be denied because, quote,

25    plaintiffs' alleged harm pales in comparison to the unspeakable
```

1    devastation caused by mass shooters.  What is that?  The means
2    that they've chosen, the ends that they've chosen outweighs the
3    burden on plaintiffs' rights.  That's interest balancing, Your
4    Honor.  There's no other way to look at it.  The Court has --
5    they've asked the Court to go back to interest balancing and
6    means-end scrutiny.

7          And I sympathize with the State in this respect, they
8    are very dedicated to their statute.  And just like Justice
9    Kavanaugh in *Heller 2*, we said we understand, emotions run high
10   in these cases and as a citizen I might -- I might even be in
11   support of what the district's done, but the Constitution
12   doesn't -- it takes certain policy choices off the table and
13   one of them is banning commonly possessed arms.

14         And so even if you agree with the State's policy
15   position, even if you have a -- you think they've advanced a
16   strong policy position, which a lot of courts do, that's why we
17   always lost under interest balancing, the whole point of *Bruen*
18   is that doesn't matter anymore.  If -- they either can justify
19   it under history and tradition or they can't.  The fact that
20   they think it's a strong policy position, even if they're right
21   is irrelevant to the Court's analysis.

22         The State focuses on societal problems.  There's been
23   a, We should be able to do this because, you know, *Bruen* talked
24   about new societal problems and it talks about advances in
25   technology, State brings both of those up.  Neither of those

1    distinguishes this case from *Heller*.  And *Heller*, decided in

2    2008, was decided just months after the Virginia Tech mass

3    shooting.  I don't know if the Court remembers that; I do.  Man

4    comes into Virginia Tech campus, two handguns, kills 32 people

5    in nine minutes.  *Heller* was decided a few months later and the

6    District of Columbia in their brief said, Look, look what --

7    we're banning handguns.  Look what -- the reason we're banning

8    handguns, look what can happen with handguns.  And if the

9    ability to use a weapon in a mass shooting was the type of

10   societal problem and advance technology that justified a ban on

11   commonly used weapons, *Heller* would have come out the other

12   way, 'cause Virginia Tech was just down the road.  Supreme

13   Court was keenly aware that the weapons that it was protecting,

14   these high-tech semiautomatic handguns could be used just

15   exactly this way.  And that's the last paragraph that I've

16   already quoted, we're aware of this violence, absolute bans are

17   off the table.

18          Here's -- here's the bottom line in *Heller*:  Yes,

19   criminals do bad things with handguns, but we're not going

20   to -- we're not going to disarm law-abiding citizens as a

21   result of that.  That's -- that's just the bottom line.  And

22   how is that -- criminals might do bad things with the weapons

23   that the State bans.  Supreme Court says you can't ban their

24   use by a law-abiding citizen for that reason if they're

25   commonly possessed.

1          Now, I'll talk about history, the history test.  The

2     State kind of gives a perfunctory -- I mean that's -- that's

3     their whole burden.  I think it's telling that the fact that

4     they only use four, five pages of a 50-page brief to -- to show

5     the Court why they should win under the history and tradition,

6     because they got -- well, grammatically, correctly, they have

7     nothing.  We've known since *Heller*, there's no Founding Era

8     precedent that's going to justify this ban.

9          Finally, I'll end with dangerous and unusual.  *Heller*

10    said -- well, first we talked about *Miller*.  *Miller versus*

11    *United States*, 1930s case which established originally the

12    common-use test.  *Heller* said that *Miller's* common-use test is

13    supported by the historical tradition of banning carrying

14    dangerous and unusual firearms.  And it cited *Blackstone* and 11

15    other authorities for that.  All 12 of those authorities talked

16    about the common law sense of affray.  What's affray?  Affray

17    is carrying weapons in public in a way that's intentionally

18    going to terrorize the people.  It didn't -- none of those

19    authorities talked about banning a particular category of

20    weapons.  They talked about a manner of using that category of

21    weapons.

22          But -- but you got -- *Heller* did in fact distinguish

23    between two categories of weapons.  Commonly used weapons,

24    *Miller* says it's protected.  Dangerous and unusual weapons,

25    which are not protected, got a historical tradition for that.

1          Well, what's the difference between these two

2     categories?  It can't be the fact that they're dangerous,

3     right?  Commonly used weapons are dangerous, dangerous and

4     unusual weapons, or dangerous or unusual weapons are dangerous.

5     So if it's not the danger part that's setting -- distinguishing

6     them, what does distinguish them?  It's the unusual part.  And

7     I'm not making this up.  This is Justice Alito in *Caetano* who's

8     basically saying it's a conjunctive test, otherwise it doesn't

9     make sense.  If you can ban a weapon just because it's

10    dangerous, Second Amendment means nothing because all weapons

11    are dangerous, right?

12          THE COURT:  So does the word "weapon."

13          MR. ARRINGTON:  Beg your pardon?

14          THE COURT:  So does the word "weapon."  What weapon

15    isn't dangerous?

16          MR. ARRINGTON:  That's my point.

17          THE COURT:  How do you identify one.

18          MR. ARRINGTON:  That's right.  If you can ban any

19    weapon merely because it's dangerous, the Second Amendment

20    means nothing.  And so if it's not the dangerousness part that

21    distinguishes the two categories, what is it?  It's the unusual

22    part.  And that's why Justice Alito said in *Caetano,* he said

23    it's a conjunctive test.  It must be both, and he emphasized in

24    the text, both dangerous and unusual in order to ban it.  And

25    he went on to say, The relative dangerousness of a weapon is

 1    irrelevant to the analysis if the weapon is in common use.

 2            So the fact -- the State has come in and their experts

 3    have come in and says, Well, you know, *Blackstone* says

 4    dangerous or unusual.  And if you actually look at the 12

 5    cites, which I've done, 12 -- there's 12 of them, six of them

 6    say dangerous and unusual, six of them say dangerous or

 7    unusual.  You're missing the point if you're focusing on what

 8    the authorities were talking about in terms of dysjunction or

 9    conjunction.  What was being contrasted was weapons that are

10    unusual and weapons that are in common use.  That's the point.

11    That's the whole point of *Heller*'s statement about dangerous

12    and unusual weapons, which is why Justice Alito said, You got

13    to have that unusual part in there because if -- otherwise it's

14    meaningless, right?

15            THE COURT:  So is unusual measured by prevalence?

16            MR. ARRINGTON:  That's a good question, and the State

17    and I disagree on that issue too.  Justice Thomas and Justice

18    Scalia certainly think it's a number counting game.  They say

19    millions of AR-15s are owned by law-abiding citizens, that's

20    enough.  They didn't ask for how those AR-15s were used, they

21    didn't ask for whether they were suitable for -- for

22    self-defense.  It's just the numbers.  Go back to *Heller*.

23    *Heller* said handguns are popular, for whatever reason, that's

24    the key text.  For whatever reason, Americans have chosen

25    handguns.  That's enough.  *Heller* did not require an inquiry

1    into how they're actually used.  It did not require an

2    empirical judgment about whether they're suitable.

3          The State wants to come in and say, The citizens of

4    Hawaii's use of particular weapons is dependent upon whether

5    the State believes it's suitable.  That's the whole point of

6    *Bruen*, the State doesn't -- in *Bruen* it's you don't have to

7    prove to the state that you need to carry.  Here, you don't

8    have to prove to the State that the weapon that you've chosen

9    for self-defense in your home is suitable.  The mere fact that

10   they're -- they're chosen in overwhelming numbers, commonly

11   used is sufficient.  That's what *Heller* says, that's what *Bruen*

12   says, that's what *Caetano* says, that's what Justice Thomas says

13   in *Friedman*.  And so it's a statistical inquiry.

14         I think the -- the *Duncan* cases also talk about this

15   before they were vacated in the Supreme Court.  They conceded

16   that these were commonly used within the meaning of *Heller*.

17         THE COURT:  Okay.

18         MR. ARRINGTON:  So, I appreciate the Court's

19   indulgence for my discussion.  If you have any questions, I'll

20   be happy to answer those.  Otherwise, that's my presentation.

21         THE COURT:  All right, Mr. Arrington, I appreciate it.

22         MR. ARRINGTON:  Okay.  Thank you.

23         THE COURT:  Mr. Taylor?

24         MR. TAYLOR:  Good morning, Your Honor.

25         THE COURT:  Good morning.

1          MR. TAYLOR:  William Taylor, Special Deputy Attorney

2    General, for the defendant Attorney General Lopez.

3          I'd like to begin today by addressing an argument we

4    just heard from plaintiffs' counsel repeatedly and also he

5    emphasized in his briefing.  He claims the Supreme Court's

6    decision in *District of Columbia versus Heller* by striking down

7    Washington, D.C.'s complete prohibition on all handguns somehow

8    precludes Hawaii's very different law prohibiting assault

9    pistols, because he asserts assault pistols are simply handguns

10   just like any others.

11         Now, that is just flatly wrong.  Assault pistols are

12   nothing like conventional handguns.  They weren't at issue in

13   *Heller* or in *Bruen*, and Hawaii's law doesn't prohibit all

14   handguns.  What Hawaii's law prohibits is a narrow set of

15   semiautomatic pistols with features that make them especially

16   lethal and especially attractive to mass shooters and to

17   criminals.

18         So let's be clear about the differences here.  Assault

19   pistols typically fire much higher velocity rounds than

20   conventional handguns, rounds that do devastating damage inside

21   a victim's body, and in a self-defense situation can go through

22   walls and hit innocent bystanders.  Assault pistols have a much

23   longer range than conventional handguns, which is important for

24   a soldier but not for self-defense.  Assault pistols have

25   features like a second hand grip or a barrel shroud that allow

1    for rapid, sustained and more lethal firing and they have

2    features like threaded barrels for flash suppressors and

3    silencers that conceal a shooter's position.

4         So, this is an assault pistol, Your Honor.  This is

5    Page 44 of the Yurgealitis declaration.  He's a former ATF

6    special agent.  This is a TEC-9.  And this is an assault

7    pistol.  It's from Page 41 of the Busse declaration, the former

8    gun industry executive.  This is an AR-15 pistol, the most

9    popular of assault pistols.  And these are weapons of combat

10   and they're favorites of mass shooters, as we saw just last

11   week in the deadly attack in Nashville, Tennessee, as well as

12   in recent deadly attacks in Monterey Park, California; Boulder,

13   Colorado; Dayton, Ohio, and elsewhere.

14        But unlike the conventional handguns that were in

15   issue in *Heller* and more recently in *Bruen*, these are not

16   weapons of self-defense.

17        Now, Hawaii's law also prohibits detachable

18   large-capacity magazines capable of holding more than ten

19   rounds of ammunition.  These are accessories that allow a

20   shooter to rapidly kill large numbers of people.  They also

21   weren't at issue in *Heller* or in *Bruen*.  And like assault

22   pistols, they're not suitable, necessary, or commonly used for

23   self-defense.

24        Now, recognizing the dangers of these weapons and

25   accessories, Hawaii took action to protect its public from them

1    over 30 years ago.  Plaintiffs today seek to undo that 30-year

2    status quo and open the floodgates to firearms and magazines

3    that haven't been seen on these islands in a generation.  The

4    resulting risk of harm would be severe and extremely difficult

5    to reverse.  Once that door is opened, it will not be easy to

6    close.

7           So, as Your Honor is aware, we've discussed with

8    plaintiffs' counsel the Supreme Court's decision last June in

9    *Bruen* sets the governing Second Amendment framework for

10   considering both parts of Hawaii's law.  And he's also

11   discussed with plaintiffs' counsel this is not the first case

12   since *Bruen* to assess a Motion for a Preliminary Injunction

13   against state laws prohibiting these types of weapons and

14   magazines.

15          In recent months there have been four courts have

16   decided similar questions after full briefing and argument,

17   including the District of Oregon here in the Ninth Circuit, as

18   well as district courts in Delaware, Rhode Island, and

19   Illinois.  All four courts have found the plaintiffs there

20   could not satisfy the requirements for preliminary injunctive

21   or temporary restraining order.  They were not likely to

22   succeed on the merits of their claims, could not show any

23   irreparable harm, and the balance of equities and public

24   interest did not support upending these important public safety

25   measures.  So this Court, we submit, should find the same here

1   and should deny plaintiffs' preliminary injunction motion.

2          I am going to discuss today the three key reasons why

3   the Court should deny plaintiffs' motion.  First is the text.

4   Plaintiffs' motion fails at *Bruen*'s threshold textual step

5   because neither assault weapons nor large-capacity magazines

6   are in common use for self-defense.  And that is the textual

7   argument, and I'll discuss that in more detail, Your Honor, it

8   is about common use for self-defense.  And large-capacity

9   magazines are not arms at all, they are accessories not needed

10  to operate any firearm.

11         Second, history.  Even if plaintiffs have met their

12  textual burden, Hawaii's law is constitutional under *Bruen*

13  because it is consistent with this nation's historical

14  tradition of firearms regulation.  Throughout history, weapons,

15  weapon features, and accessories that pose extreme dangers to

16  public safety but offer limited defensive value have been

17  consistently subject to government restriction.  Hawaii's law

18  sits comfortably within that historical tradition.

19         Third and finally, plaintiffs' motion fails for the

20  independent reason that they cannot satisfy the other

21  non-merits elements for this extraordinary remedy.  Plaintiffs

22  have not even attempted to show real irreparable harm, and the

23  balance of equities and public interest weigh heavily against

24  preliminary injunctive relief and in favor of letting Hawaii's

25  lifesaving three-decade-old law remain in place.

1          So I'll begin with the textual inquiry, Your Honor, as

2    *Bruen* directs.  Plaintiffs have the burden at the textual

3    stage.  Case law makes that clear and plaintiffs don't appear

4    to contest that.  And plaintiffs do not and cannot meet their

5    burden here.

6          Now, there are two reasons I want to highlight for why

7    this Court should rule for the Attorney General on the textual

8    inquiry.  One, is with respect to large-capacity magazines.  As

9    I said they are not arms because they are not weapons at all,

10   nor are they necessary for the operation of a firearm.

11         Now, the declaration of Professor Dennis Baron who we

12   put in with our papers who is an expert in the historical use

13   of language is compelling here on this first point.  Professor

14   Baron analyzed a number of historical -- a number of electronic

15   databases of historical texts and concluded that during the

16   Founding and Reconstruction Eras, the term "arms" meant

17   weapons, such as swords, knives, and firearms, but did not

18   include ammunition containers analogous to modern magazines or

19   large-capacity magazines.  So the District of Rhode Island *in*

20   *the Ocean State Tactical* case relied on Professor Baron's

21   analysis in denying plaintiffs' preliminary injunction motion

22   against that state's large-capacity magazine law.  We submit

23   that was correct and this Court should do the same here.

24         And this understanding that a large-capacity magazine

25   is not itself an arm is consistent with Ninth Circuit

1    authority.  It is consistent with the en banc Ninth

2    Circuit's -- found pre-*Bruen* in the *Duncan versus Bonta* case.

3    So there seven of the 11 judges determined that a law

4    prohibiting large-capacity magazines, as they put it, outlaws

5    no weapon but rather is a much narrower ban on an accessory

6    that is a feature of some weapons.  And as we've talked about,

7    the *Duncan* opinion was vacated post-*Bruen*, but its findings on

8    this point, and that was because of applying intermediate

9    scrutiny, its findings on this point relating to whether

10   large-capacity magazines are arms are consistent with *Bruen*,

11   they fit squarely within the *Bruen* analysis, and they remain

12   persuasive authority, very persuasive authority we would

13   submit.

14         Now, you just heard plaintiffs' counsel --

15         THE COURT:  You both tell me the question has been

16   answered, right?  I mean Mr. Arrington cited this --

17         MR. TAYLOR:  The *Fyock* case.  I'm going to get to the

18   *Fyock* case.

19         THE COURT:  Okay.

20         MR. TAYLOR:  It doesn't say what he says it says.  The

21   *Duncan* case has technically been vacated, so it's not binding

22   precedent on this Court.  It is instructive that seven Ninth

23   Circuit judges concluded this, seven of the 11 judges on a

24   panel concluded what they did.  I think that's, you know,

25   persuasive authority as much as any.

1          So you just heard plaintiffs' counsel, I was going to

2     get to the point about *Fyock*, try to dispute this to contend

3     that large-capacity magazines are arms because he argues they

4     are necessary to operate a firearm.  Now, the *Fyock versus City*

5     *of Sunnyvale* case, that's F-Y-O-C-K, what that court said there

6     was that magazines -- there may be a corollary right for the

7     magazines necessary to operate a firearm.  But plaintiffs'

8     problem is large-capacity magazines are not necessary to

9     operate any firearm.

10         Now, a firearm might require some magazine to operate,

11    we don't dispute that, but Hawaii's law doesn't prohibit all

12    magazines.  It prohibits only detachable large-capacity

13    magazines capable of holding more than ten rounds of

14    ammunition.  And the unrebutted declarations we put in of

15    Mr. Yurgealitis, again, the former ATF special agent;

16    Mr. Busse, the former gun industry sales executive, both show

17    no firearm needs a detachable large-capacity magazine to

18    operate.  With his reply, plaintiffs presented a declaration

19    which talks about how magazines are necessary to operate

20    semiautomatic firearms.  That's really beside the point.  We're

21    not disputing that.  We're talking about what this law actually

22    regulates and prohibits, which is large-capacity magazines.

23         So again, *Duncan* is instructive here.  Seven Ninth

24    Circuit judges there found that as well, that large-capacity

25    magazines weren't necessary to operate a firearm, called it a

 1    false premise that a prohibition on large-capacity magazines
 2    affected the operational nature of a firearm and also stated no
 3    firearm needs a large-capacity magazine to operate.  All
 4    firearms can operate without one.
 5            And this is also the conclusion that the District of
 6    Oregon, applying Ninth Circuit law, including pointing to the
 7    *Duncan* case, recently -- and the *Fyock* case, recently reached
 8    in denying a TRO against that state's large-capacity magazine
 9    law.  This is the Oregon Firearms Federation case.  The court
10    here should conclude the same and really need go no further to
11    deny plaintiffs' motion as to Hawaii's large-capacity magazine
12    prohibition.
13            Now, the second reason plaintiffs' motion fails the
14    textual step is that neither large-capacity magazines nor
15    assault pistols are in common use for self-defense.  So
16    plaintiffs seem to acknowledge that common use fits somewhere
17    within the Second Amendment analysis, but they raise two
18    arguments for why they think this requirement doesn't defeat
19    their motion at *Bruen*'s textual step.  And neither of those
20    arguments has any merit, Your Honor.
21            First, plaintiffs argue that common use, as you've
22    heard, is not a part of the textual inquiry, so it's not their
23    burden to show.  But that's just simply not right.  It's not
24    how the Supreme Court analyzed the issue at *Bruen*.  The *Bruen*
25    court in its opinion, this is 3(a) of the opinion, discussed

1    and confirmed that the traditional handguns at issue there

2    were, quote, weapons in common use today for self-defense in

3    its analysis of the text of the Second Amendment.  And

4    before -- it did that before it got to any discussion of

5    history.  And courts since *Bruen* --

6              THE COURT:  Can I interrupt you one second?

7              MR. TAYLOR:  Sure.

8              THE COURT:  Am I hearing voices?

9              MR. TAYLOR:  Yes.

10             THE COURTROOM MANAGER:  Can I check, Judge?

11             THE COURT:  Yes.  Would you mind, please?  Thank you.

12             MR. TAYLOR:  May I continue, Your Honor, or wait?

13             THE COURT:  Just wait one second, please.  It's

14   distracting.

15             MR. TAYLOR:  Yes.

16             THE COURT:  I apologize.  I don't know what that is.

17             MR. TAYLOR:  No worries, Your Honor.

18                  (Pause in the proceedings.)

19             THE COURT:  Thank you for your patience.

20             MR. TAYLOR:  Of course, Your Honor.

21             So they're saying that the second reason is about

22   common use, that plaintiffs' motion fails because neither

23   large-capacity magazines nor assault pistols are in common use

24   for self-defense.  And as I said, they seem to acknowledge that

25   common use is part of the Second Amendment analysis, but argue

1    that there's -- it doesn't defeat their motion of the textual

2    step.

3         So first, as I said, they're saying common use is not

4    part of the textual inquiry, and so it's not their burden.  And

5    as I was saying, *Bruen* disproves this.  *Bruen* did its analysis

6    of whether the traditional handgun at issue there were in

7    common use for self-defense today in the portion of its opinion

8    about the plain text analysis of the Second Amendment before it

9    got into any discussion of the historical inquiry.  And courts

10   since *Bruen* have addressed this in the same way.  So the Oregon

11   district court and the Oregon's firearm federation case I spoke

12   about, the Rhode Island district court and the *Ocean State*

13   *Tactical* case I spoke about likewise determined that whether

14   the large-capacity magazines at issue in those cases were in

15   common use for self-defense was questioned at *Bruen*'s textual

16   step and it was plaintiffs' burden to show.

17        So the Oregon court, for example, talked about, you

18   know -- didn't really dispute the numbers that there may be

19   millions of large-capacity magazines, but the plaintiffs didn't

20   show anything about whether these magazines were used for

21   self-defense.  And so it's their burden to do so, they didn't

22   do it, and the evidence is much like the evidence we put in

23   this case, the evidence that the state put in in that case

24   showed they weren't used in self-defense purposes, but rather

25   were useful for military offensive purposes and that no one

1    needed a large-capacity magazine to defend themselves in

2    self-defense and that there were no evidence or incidents

3    showing that more than ten rounds were needed for self-defense.

4         So, that's the -- that's the burden question.  And

5    then plaintiffs also dispute what the common-use question is.

6    To them, as I said, they seem to believe this is just a numbers

7    game.  That since there are sufficient number, in their view,

8    of assault pistols and large-capacity magazines in existence,

9    that's all they need to show that they're protected under the

10   Second Amendment.

11        Now, we don't believe plaintiffs have really even met

12   an in-common-existence standard.  They submitted no evidence on

13   this with their motion.  They -- the declarations they

14   improperly tried to put in with their reply, since it's their

15   burden, don't really help them either.  By plaintiffs' own

16   calculations, assault pistols, he talks about there are a

17   million of them, that's less than 1 percent, perhaps less than

18   one-half of 1 percent of all firearms.  But be that as it may,

19   that's not the law in any event, Your Honor.  That's not the

20   scope of the common-use inquiry.  *Bruen* makes clear and before

21   that *Heller* made clear, but the question is whether the weapon

22   at issue is in common use for the purposes of self-defense.

23   And that involves determining both the suitability of the

24   weapon for self-defense and whether it's actually commonly used

25   for self-defense.

1             So, in *Bruen* the court talked about what arms are

2     protected, and it said arms that facilitate self-defense.  It

3     talked about arms suited for self-defense.  It talked about

4     arms commonly used in self-defense.  *Heller*, when it talked

5     about handguns, went through a list of reasons, functional

6     reasons handguns were suitable for self-defense.  Because you

7     could hold them with one hand and dial 911.  Because they were,

8     you know, difficult to take away from you.  Because you could

9     keep them easily near you in case of a need in a self-defense

10    situation.  And then went on to say whatever reasons, referring

11    back to those reasons, we would submit they were the most

12    commonly used handgun -- used firearm for self-defense, not

13    just that there were a lot of them.

14            So, this also aligns, again, with what six Ninth

15    Circuit judges found in the en banc *Duncan* decision.  There

16    those six judges said that a proper analysis -- this is

17    post-*Heller* obviously, they're interpreting *Heller* -- a proper

18    analysis of what arms are protected under the Second Amendment

19    must account for the purpose and use of a weapon along with its

20    current popularity.

21            And it's also consistent with, again, how the Oregon

22    and Rhode Island district courts, which have rejected similar

23    challenges to large-capacity magazine laws, have assessed the

24    common-use inquiries, focused on suitability and actual use for

25    self-defense.

1           So, Your Honor, that is the common-use question.  Have

2   plaintiffs shown, it's their burden, that assault pistols and

3   large-capacity magazines are suitable for self-defense and

4   actually commonly used in self-defense.  They haven't.  And

5   truthfully they haven't even really tried.  They've put in

6   nothing in the record on this issue.  As I said, it's their

7   burden to do so.  They haven't put -- he talked about lawful

8   purposes, they didn't put anything about any purposes that the

9   plaintiffs or anyone else has ever used these weapons and

10  magazines or even desire to use these weapons and magazines.

11  They all say we desire to acquire, you know, assault pistols,

12  we desire to acquire large-capacity magazines, never speaking

13  of the purpose.  The Supreme Court has been clear, *McDonald* in

14  describing what the right was in *Heller*, said it's a right to

15  keep and bear arms for the purposes of self-defense.  *Bruen*

16  describing what *Heller* and *McDonald* said, it's a right to keep

17  and bear arms for the purposes of self-defense.  It's not just

18  some right to collect, you know, curiosities.  It's related

19  to -- it's related to self-defense.

20          So, what does the record before the Court actually

21  show?  It shows that neither large-capacity magazines nor

22  assault pistols were designed for, are suitable for, or

23  actually used in self-defense.  But instead they're most useful

24  for military applications and tragically mass shootings.  So

25  that's shown by the Attorney General in our unchallenged

1    submissions by Mr. Yurgealitis, Mr. Busse, and Mr. Klarevas,

2    Professor Klaveras.  The en banc Ninth Circuit, again, in

3    *Duncan*, seven judges there found significant merit to the

4    argument that large-capacity magazines are not commonly used

5    for self-defense, but instead provide significant benefits in a

6    military setting.  And it's what the Oregon and Rhode Island

7    district courts recently found examining very similar questions

8    and rejecting challenges to those states' large-capacity

9    magazine laws.

10          So, Your Honor, plaintiffs have simply failed to meet

11   their burden at *Bruen*'s threshold textual step.  And the Court

12   really need go no further and for that reason alone can deny

13   plaintiffs' motion.

14          But, Your Honor, even if the Court were to find that

15   assault pistols and large-capacity magazines are arms within

16   the scope of the Second Amendment's plain text, it should not

17   for the reasons I've discussed, but even if it were, plaintiffs

18   still lose under the second part of the *Bruen* test that's a

19   historical inquiry.  Hawaii's prohibitions on assault pistols

20   and large-capacity magazines are consistent with this nation's

21   historical tradition of firearms and weapons regulation and

22   therefore constitutional under *Bruen*.

23          Now, plaintiff talked about how we didn't put much in

24   on history.  The Attorney General has demonstrated this through

25   voluminous submissions in opposition, including the

 1    declarations of three expert historians and citations that

 2    references to multitudes of historical laws restricting certain

 3    weapons, weapon features or accessories viewed to be

 4    particularly dangerous or associated with criminal activity,

 5    from trap guns and gunpowder in the 18th century to pocket

 6    pistols and bowie knives in the 19th century, to automatic and

 7    rapid-fire high capacity semiautomatic weapons in the 20th

 8    century, to Hawaii's law and the others like it today.  And

 9    that's more than enough to satisfy the *Bruen* standard and to

10    make clear that plaintiffs have no likelihood of success on the

11    merits here.

12         So I would like to highlight just a few points about

13    the historic -- the Attorney General's historical arguments and

14    also respond to a few things we heard from plaintiff.

15         So first, I think it's important to think about the

16    standard the court set forth or how to do the historical

17    inquiry.  The Supreme Court told us that the Second Amendment

18    historical inquiry is not a regulatory straightjacket.  It's

19    not a search for a historical twin or a dead ringer.  It

20    instead asks only whether a modern law is relevantly similar or

21    analogous enough to historical weapons restrictions.  And then

22    *Bruen* further stressed that cases implicating unprecedented

23    societal concerns --

24         THE COURT:  This is the easier analysis, according to

25    the Supreme Court, the district courts can employ?

1          MR. TAYLOR:  Yes, the more nuanced analysis.  You -- I
2     guess you would judge whether -- what you think is easier when
3     you do the analysis, but a more nuanced analysis that does
4     allow for a broader search for analogies, Your Honor.  So --
5          THE COURT:  This is the favor the Supreme Court thinks
6     it's doing for district courts, right?
7          MR. TAYLOR:  I believe they -- I believe that might be
8     what they're thinking, Your Honor.
9          So, as I said, they said cases implicating
10     unprecedented societal concerns or dramatic technological
11     changes allow for this more nuanced approach, a broader search
12     for analogies.  So that's precisely what we have here.  That's
13     what the courts that have considered the similar questions
14     since *Bruen* have determined.  The Oregon court and the Oregon
15     Firearms Federation case.  The Delaware court just recently, in
16     that case that laws like this, like Hawaii's law, addresses a
17     dramatic technological change.  The development of rapid-fire
18     semiautomatic firearms and detachable large-capacity magazines,
19     and it responds to an unprecedented societal concern, the
20     modern problem of mass shootings.  So this more nuanced
21     approach, the favor that Your Honor spoke about, is the correct
22     historical analysis here.
23          And so you just heard plaintiffs' counsel try to argue
24     that somehow, I believe *Heller*, in his view somehow decided
25     this question already in his favor.  That, Your Honor, just

1    makes no sense.  *Heller* didn't involve assault pistols or

2    large-capacity magazines.  It involved a total prohibition of

3    all handguns.  And the Supreme Court has told us that the

4    societal concern at issue in *Heller* was not mass shootings, but

5    firearm violence in densely populated communities.  I found it

6    interesting he quoted this portion of *Bruen* and then they used

7    an ellipse to take out that portion of when they described what

8    the societal concern they were addressing in *Heller* was.

9         So he mentioned the Virginia Tech mass shooting, that

10   that was somehow a major part of the *Heller* decision.  There

11   was one sentence in the District of Columbia's 59-page brief

12   that mentioned this in its discussion of the sort of scrutiny

13   analysis that the court didn't even do in *Heller*.  And the

14   court didn't mention it at all in its opinion.  So that's the

15   standard for the historical inquiry, Your Honor.

16        Then the history itself.  Plaintiffs, you know,

17   themselves concede, as they must, that there is a tradition in

18   this country consistent with the Second Amendment of laws

19   restricting dangerous and unusual weapons.  And Hawaii's law

20   fits squarely within that tradition.  And I want to -- Your

21   Honor raised, and I think I've addressed your question about

22   what's the framework between common use or common use in

23   self-defense, but also about dangerous and unusual, or

24   dangerous or unusual.  I think the best way, and the Supreme

25   Court itself, as you're probably aware, hasn't been entirely

 1    clear about where these all fit and what they all mean.  I

 2    think the best way to understand dangerous and unusual, or

 3    dangerous or unusual, or unusually dangerous, that it's

 4    descriptive of the historical laws that we're pointing to of

 5    restrictions and prohibitions on types of weapons.  They then

 6    can support the types of weapons restrictions that Hawaii has

 7    put in place and that the courts that -- the states where

 8    they've upheld, Oregon, Illinois, Delaware, those -- that those

 9    states have put in place.  So that, I think, is the best way to

10    think about dangerous and unusual.

11          But, Your Honor, if this is, you know, if it's

12    dangerous or unusual, you know, that's a separate analysis.

13    Obviously we would prevail if it's dangerous and unusual, we

14    would prevail because the unusual is not, again, referring back

15    to common use, it's not about are there a lot of them.

16    That's -- you know, it raises -- that raises questions of, you

17    know, as *Duncan,* the seven judges there, again, talked about

18    that raises questions of circularity.  If it was just a

19    question of there are a lot of weapons, we don't act fast

20    enough to regulate them, that's a problem.  That can't be what

21    the court meant.

22          He mentioned machine guns.  You know, the Delaware

23    court talked about the 176,000.  And so said that's very close

24    to the 200,000 that maybe was suggested in the -- and that was

25    Justice Alito's concurrence in *Caetano*, not the law, the

1    Supreme Court in *Caetano*.  But even if you accepted plaintiffs'

2    position that 200,000 is enough to at least the prevalence part

3    of the common-use test before you get to self-defense, if that

4    were enough, then 176,000 is pretty close, does that mean

5    machine guns are somehow protected under the Second Amendment

6    unless we have historical -- that would be his view, right?

7    Then we'd had to have historical evidence that show machine

8    guns are unprotected.  Well, that's the same historical

9    evidence that would show that these weapons are unprotected,

10    Your Honor.  So unless there's a reason why machine guns are

11    different, which there is not under the history, there has to

12    be the same analysis and same outcome.

13           So they said, Our expert historians explain about the

14    history, that there's a well-established pattern to America's

15    history stretching back centuries of legislative restrictions

16    on particular types of weapons.  So from the Founding Era until

17    the 19th century to reconstruction into the 20th century and up

18    until today, restrictions on specific types of weapons occur

19    when the proliferation of those weapons coincides with

20    escalating or novel forms of violence.  So, somewhat -- you

21    know, his argument that common use is different from the

22    weapons that could be restricted, there's actually -- you have

23    to have enough of this is what our historians showed and what

24    other courts who have looked at this have accepted looking at

25    this history, you didn't have enough of the weapons in

1    existence and then causing a problem for governments to

2    reasonably have a reason to act.  And that's what the history

3    of weapons regulation shows.  You don't act -- you know,

4    governments don't act on hypotheticals, they act when there's a

5    problem to address.  So that's what the historical restrictions

6    show and that's what we have with these sorts of laws today.

7         And so we've laid out that history in the Attorney

8    General's opposition papers.  It includes 18th and 19th century

9    restrictions on blunt weapons, trap guns, bowie knives, and

10   concealable pistols and revolvers.  It also includes really

11   20th century restrictions on automatic and high-capacity

12   semiautomatic weapons.

13        Now, you've heard some arguments from plaintiffs'

14   counsel about there needs to be a Founding Era law.  It's the

15   only thing that matters, 19th century and 20th century history

16   are irrelevant.  And that's just not what *Bruen* said.  And

17   that's not the law here.  So, first, as between the Founding

18   and Reconstruction Eras, *Bruen* expressly didn't decide that

19   question at all.  And the Eleventh Circuit recently held in the

20   *National Rifle Association versus Bondi* case, which we

21   submitted to Your Honor in our supplemental submission, that of

22   those two periods, it's the Reconstruction Era that's the more

23   relevant to the *Bruen* analysis because that's when the

24   Fourteenth Amendment made the Second Amendment applicable to

25   the state.  So if you were going to start anywhere, the

1    Eleventh Circuit would tell us, it should be the Reconstruction

2    Era.

3            And as for late 19th century and 20th century history,

4    plaintiffs simply have misstated *Bruen*.  The Supreme Court

5    didn't rule out consideration of late 19th or 20th century

6    history, but it only disregarded it there where that history is

7    inconsistent with affirmative evidence from an earlier period.

8    But here, as we've demonstrated, the historical record is

9    consistent throughout.  Restrictions on specific categories of

10   weapons occur when the proliferation of those weapons coincides

11   with escalating or novel forms of violence.

12           So that's why the courts in Delaware, in Illinois, and

13   in Oregon, who have done this historical inquiry in Delaware

14   and Illinois for both assault weapons and assault pistols which

15   were part of the laws in those case, and Oregon for

16   large-capacity magazines, that have all considered this history

17   and rejecting similar challenges to assault weapons and

18   large-capacity magazine laws.  Hawaii's law aligns with that

19   same historical tradition.

20           So, Your Honor, the application -- so that's the

21   history.  And the application of the history, and this is going

22   to address a little bit his point about we're just doing, you

23   know, means-end scrutiny.  It's absolutely not what we're

24   doing.  The question under *Bruen* is whether Hawaii's law

25   prohibiting assault pistols and large-capacity magazines is

 1   relevantly similar to these historical laws restricting
 2   particularly dangerous weapons and accessories.  So it is and
 3   that's why it's constitutional.
 4         So, how does *Bruen* tell us how to do this?  It tells
 5   us that modern and historical gun laws are relevantly similar
 6   when they impose comparable burdens on the right of armed
 7   self-defense and when they share comparable justifications.
 8   And that's exactly what we have here.  Like historical weapons
 9   restrictions, Hawaii's law covers only certain unusually
10   dangerous weapons and accessories not well suited for
11   self-defense.  And it leaves a wide array of alternative
12   self-defense weapons available, including the traditional
13   handguns at issue in *Heller* and *Bruen*.
14         So the burden here on armed self-defense is at most a
15   comparably minimal one.  If anything, the historical
16   restrictions that we're pointing to are more burdensome than
17   Hawaii's law because they typically included more categories of
18   weapons.  And the early gunpowder restrictions we pointed to
19   limited the total amount of ammunition a person could own or
20   access.  That's nothing like what -- the restrictions Hawaii's
21   law does, much more restrictive historically.
22         In addition, as I discussed earlier, Your Honor, the
23   record here shows the unrebutted record that assault pistols
24   and large-capacity magazines are not self-defense weapons at
25   all.  They're instead military-style firearms and accessories

1   that aren't suitable for self-defense and aren't actually used

2   in self-defense.  So plaintiffs continue to have no answer to

3   that and that, again, shows the minimal burden comparable to

4   the historical burdens and even less burdensome.

5          And Hawaii's law is also comparably justified to these

6   historical restrictions.  So like the historical law, Hawaii's

7   law is driven by the State's responsibility to protect against

8   emerging threats to public safety caused by certain

9   particularly dangerous weapons and accessories.  So

10  historically, the laws we pointed to targeted the specific

11  types of weapons such as bowie knives and pocket pistols, for

12  example, that were commonly used in murders, in serious

13  assaults that caused an alarming rise in homicides at the time.

14  So that was the justification for those historical laws.  Today

15  Hawaii's law prohibiting assault pistols and large-capacity

16  magazines is designed to combat the modern problem of mass

17  shootings, the emerging problem today from new weaponry.  So as

18  the record here shows, it has worked to do that successfully

19  for over 30 years.

20         Now, you heard plaintiffs argue that these historical

21  laws don't count, he put in his brief, because they only

22  restrict carrying, and laws that restrict carrying simply

23  cannot be analogous to Hawaii's law because Hawaii's law also

24  restricts sale and possession.  So, a few points in response,

25  Your Honor.

1          First, that's asking for exactly the sort of, you

2    know, historical twin regulatory -- putting the sort of

3    regulatory straightjacket that the *Bruen* court said we should

4    not do.  The -- and, Your Honor, discussed in addition here,

5    unlike in *Heller* and *Bruen*, which the court said there was a

6    straightforward approach, we have a more nuanced approach where

7    a broader search for analogies is appropriate and required.

8    And *Heller* and *Bruen* actually, he mentioned this a bit but I

9    think missed the point in talking about it, *Heller* and *Bruen*

10   support and actually, you know, speak to this issue when they

11   talked about historical tradition of prohibitions on carrying

12   dangerous and unusual weapons fairly support limits on keeping,

13   that is possessing and not only carrying types of arms.  So

14   *Bruen* and *Heller* tell us you can make that analogy, that a

15   carrying restriction historically does fairly support a

16   restriction that would also limit and prohibit possession.  And

17   that's what other courts post-*Bruen* that have analyzed this

18   have decided and done.  They've relied on this very history to

19   deny preliminary injunction and temporary restraining order

20   challenges to similar laws.

21          So in Oregon, that was a temporary restraining order

22   against Oregon's ten-round large-capacity magazine law, which

23   is actually more burdensome than Hawaii's laws.  They're

24   applied to fixed magazines, not just detachable.  Illinois

25   denied -- used this -- relied on the same history to deny a

1   preliminary injunction against Illinois' assault weapon,

2   including assault pistols and large-capacity magazine law.  The

3   assault pistol law that Illinois had, more burdensome than

4   Hawaii's, more restrictive, had a one-feature test instead of

5   Hawaii's two-feature test.  Delaware, again, used -- relied on

6   the same history denying a preliminary injunction against that

7   state's assault weapon, including assault pistol, one-feature

8   test in Delaware as well and large-capacity magazine law.

9           So that's what other courts have done.  And the

10  historical record here, Your Honor might imagine, very similar

11  to the records in those cases, contains restrictions on

12  carrying, restrictions on sale, and restrictions on possession

13  that fairly support Hawaii's law and are analogous to it.

14          THE COURT:  Well, we are talking about the same nation

15  after all, right?

16          MR. TAYLOR:  We are, Your Honor.

17          So, I did want to discuss briefly, Your Honor,

18  plaintiffs' point about how we're doing, you know, intermediate

19  scrutiny a little more, you know, directly.  And this is --

20  this is improper, that we're asking the Court to do the same

21  sort of weighing of interests as *Bruen* ruled out.  That's not

22  what we're doing at all.

23          So, and I said there are really four reasons why the

24  Court can still consider and needs to consider public safety

25  concerns and considerations in doing the *Bruen* analysis and

1    doing the analysis in this case.

2           First, as I talked about, *Bruen* told us what we need

3    to do is a comparable analysis, right, a comparative analysis.

4    Examine the historical law, the historical tradition to the

5    modern law that we're trying to see whether or not it's

6    constitutional or not.  And to do that we have to look at the

7    historical burdens and justifications, and the modern burdens

8    and justifications.  And how do you determine modern burdens

9    and particularly modern justifications?  You have to look at

10   modern contemporary evidence to determine what those modern

11   burdens and justifications are.

12          So that's why the Delaware court and the Oregon court

13   explicitly said, We have to look at public considerations today

14   to determine whether it's analogous to the public safety

15   justifications or the justifications of the historical law.  So

16   that's what they said, that's what they did, that's what the

17   Illinois court did entirely properly, entirely required by

18   *Bruen*.

19          Second, this sort of evidence is required for, you

20   know, what Your Honor talked about, the easier approach to the

21   analysis to determine whether or not that applies.  To

22   determine whether or not this is an unprecedented societal

23   concern, to determine whether or not this is a dramatic

24   technological change obviously requires something different

25   from just historical evidence.  You have to look at the

1    contemporary evidence today to determine what the change is,
2    what the unprecedented societal concern is.  And the Delaware
3    court talked about that too, said, I have to look at that
4    evidence to determine that as well.  And then, you know, talked
5    about commonly used in self-defense.  That's not exactly public
6    interest information, but it is empirical data to determine
7    whether or not these weapons are suitable for self-defense,
8    whether or not they're commonly used in self-defense.  So that
9    comes into play there in the textual analysis of whether these
10   weapons are commonly used for self-defense.
11           And then the quote he had from Page 3 of our brief I
12   thought was interesting because this is a preliminary
13   injunction case.  And so that quote was from the Rhode Island
14   decision talking about the balance of the equities and public
15   interest prong of a preliminary injunction motion, which of
16   course was not -- *Bruen* didn't say anything about the
17   preliminary injunction standard, it was a Motion to Dismiss
18   case.  Preliminary injunction still includes four requirements,
19   you know, and balance of the equities and public interest are
20   part of that.  And to determine that, quite naturally, you have
21   to look at, you know, public safety concerns for today.  And
22   the fact that Hawaii's law works and has worked for more than
23   30 years to keep Hawaii safe from these sorts of mass shootings
24   and mass gun violence that has plagued the rest of this nation
25   is an important public safety concern that the courts and other

 1   jurisdictions, including the Rhode Island court who looked at

 2   it in their situation to deny those motions.

 3         So, Your Honor, I'm just -- if you have any questions,

 4   I'm looking to see if there's anything else I want to address.

 5         Oh, about Your Honor's question about -- your second

 6   question about the state of the litigations across the country.

 7         So plaintiffs' counsel talked about -- so what's going

 8   on in the Ninth Circuit.  I talked about the Oregon case.

 9   That -- so they had a temporary restraining order that was

10   denied.  The -- there was another action in state court, not

11   under the Second Amendment, under the State Constitution, which

12   the court -- that law is currently enjoined under the state --

13   under the State Constitution.  A different analysis in the

14   Second Amendment as the court there said, I'm not -- Oregon

15   actually has a very sort of different way to look at their

16   constitutional right than the -- than the Second Amendment.  So

17   that -- that law is currently, you know, temporarily enjoined

18   or preliminarily enjoined by the state law.  So the federal

19   case is sort of ongoing not for a preliminary injunction but

20   for sort of decision on the merits -- sorry about that.  Too

21   much hand gesturing -- so that eventually will go up on appeal

22   there and that will get worked out.

23         Washington has large-capacity magazine prohibitions.

24   There are two challenges there.  I think one in the Eastern

25   District and one in the Western District.  One is called

1    *Brumback*, one is called *Sullivan*.  I believe that there is a

2    preliminary injunction motion pending in at least one of those

3    cases where they had argument a while ago but no decision yet.

4    Washington, again, is also ten-round magazines.

5           California, he talked about the *Duncan* and the *Miller*

6    case, which are in the Southern District of California.  There

7    are also cases in other districts.  The *Rupp* case, which also

8    came back from the Ninth Circuit, is a challenge to

9    California's assault weapon ban.  I don't recall if it's in the

10   Central District or Southern District of California.  I'd have

11   to check.  We can -- if Your Honor would like, we could send

12   you a submission on the sort of pending actions around the

13   country and what's going on with them.  Would be helpful?

14          THE COURT:  It would be actually, if you wouldn't mind

15   doing that?

16          MR. TAYLOR:  Yes, Your Honor.

17          THE COURT:  And I certainly would give both sides that

18   opportunity.  I don't want, you know, anyone to say one side is

19   citing only the cases in their favor, so.

20          MR. TAYLOR:  No, no, no.  And I mean --

21          THE COURT:  If either of you wish to do that, I would

22   say within the next week or so, is that sufficient time?

23          MR. TAYLOR:  Sure, Your Honor.

24          THE COURT:  Or do you need more time than that?

25          MR. TAYLOR:  No, that's fine.  I mean so I'm giving

1    you the cases that actually have decisions are the four I

2    talked about, the Oregon, Delaware, Illinois, and Rhode Island.

3    The others are sort of waiting for decision.

4            THE COURT:  And I don't need you to argue these cases,

5    and just citations --

6            MR. TAYLOR:  Sure.

7            THE COURT:  -- would be fine and we can pull dockets

8    and cases.

9            MR. TAYLOR:  Yeah, there are -- there are -- I mean I

10   can tell you, the First Circuit -- in the First Circuit, the

11   Rhode Island case, there's also preliminary injunction pending

12   in Massachusetts against their similar laws.  In the Second

13   Circuit, there's a Connecticut action, preliminary injunction

14   motion pending.  There's also challenges to New York's similar

15   laws pending.  No preliminary injunction motion filed so far in

16   that case as I'm aware.  The Third Circuit, we talked about the

17   Delaware case.  There's also a New Jersey, has a bunch of both

18   assault weapon and large-capacity magazine cases that are sort

19   of being consolidated together in district court.  No motions

20   yet.  Sort of working out the sort of discovery process there.

21           The Fourth Circuit actually there's a case, the

22   *Bianchi* case that came back from the Supreme Court after *Bruen*,

23   one of the cases that was -- cert. was vacated and remanded,

24   stayed with the Fourth Circuit, they didn't, like many courts

25   did, send it back down to the district courts in the first

 1    instance.  So there was oral argument there in December.  And

 2    so the -- you know, the state asked for it to be remanded, that

 3    could be what the Fourth Circuit does, or that could be the

 4    first, you know, appellate decision there.

 5         The Seventh Circuit, there is the Illinois case we

 6    talked about.  There are also a number of other challenges in

 7    the district court in Illinois that -- the *Bevis v. City of*

 8    *Naperville* case is now on appeal.  The -- and back to the First

 9    Circuit, the *Ocean State* Tactical case is now on appeal.  The

10    Delaware case has also been appealed to the Third Circuit.  So

11    we could have, you know, appellate decisions in these cases.

12    There's also the -- in D.C., there's a district court of D.C.

13    case, a preliminary injunction motion pending against their --

14    against their large-capacity magazine law.  So, that's -- I'll

15    put in the letter, Your Honor.

16         THE COURT:  All right, I appreciate that.  I was

17    taking notes earlier, but since you're going to put it into

18    some kind of written submission, I stopped.  So I'll wait

19    that --

20         MR. TAYLOR:  Yes.  I'm just looking if there's any --

21    I just wanted just to -- plaintiffs' counsel made the argument

22    about how it's impossible for the government to meet its burden

23    in this case.  I think we sort of demonstrated how we do meet

24    that burden.  But the idea that, you know, *Heller* and *Bruen* or

25    he -- he, you know, quoted, you know, the -- the, you know,

1    dissents from denial of certiorari or concurring opinions,

2    which aren't the law, from Justice Thomas and Justice Alito,

3    but what *Heller* and *Bruen* tell us is that -- that -- you know,

4    whether a weapon is commonly used in self-defense is only the

5    first step of the analysis.  That -- that doesn't mean there's

6    no history that can support it if we prohibit a weapon that's,

7    you know, commonly used for self-defense.  That means we then

8    go to the historical analysis to determine whether or not the

9    historical tradition supports that.  And so in Heller, in *Bruen*

10   they found that that was too much of a burden.  That the burden

11   on self-defense there wasn't comparable to the sorts -- you

12   know, to the sorts of laws we had historically.

13          So he mentioned, you know, oh, why don't we talk about

14   gunpowder restrictions.  You know, *Heller* said we can't --

15   those aren't comparable to complete prohibitions on, you know,

16   handguns.  Well, that's because it's a different burden here.

17   This is not a complete prohibition on handguns.  It's not a

18   prohibition on the quintessential self-defense weapon as in

19   *Heller*.  So the burden analysis and the comparative analysis is

20   a different one.  So *Heller* and *Bruen*, you know, *Bruen* did the

21   analysis explicitly and then explained that was what *Heller* was

22   doing, it was looking at, you know, after it found something

23   was commonly used for self-defense, then it was doing the

24   historical inquiry there and those two cases found history

25   wasn't met.

1          But, for example, the Delaware case that we talked

2     about, there the court we think, you know, actually at the

3     first step incorrectly found that those, you know, assault

4     pistols were found were not in common use for self-defense and

5     did fail under the textual prong.  But for the assault rifles

6     in that case and the large-capacity magazines, they found that

7     they were in common use for self-defense and didn't stop the

8     analysis there, rejected the argument that meant the analysis

9     was over, said that's just the beginning, that's the first

10    part, then I go to the history.  And then, of course, the

11    Delaware court looked at the history, the same history we put

12    before Your Honor and said, That tradition of, you know,

13    historical restrictions on particularly dangerous types of

14    weapons, weapons that are associated with criminal activity,

15    when they proliferate, when they, you know, lead to escalating

16    violence, new forms of violence, governments regulated them

17    historically, we've seen that, you know, throughout the 18th

18    century, 19th century, into the 20th century, I can consider

19    all that and I can uphold this law.

20         And so, Your Honor, I also say, you know, should we

21    wait for Judge Benitez, I don't -- you know, Judge Benitez is

22    one district judge.  He was -- you know, he was reversed before

23    by the Ninth Circuit.  I don't know that we can, you know, look

24    to him as the ultimate authority on any of this.  Judge

25    Immergut in the District of Oregon, another Ninth Circuit

1   judge, I think did a really excellent analysis of this.  We're

2   dealing with a preliminary injunction motion here.  A

3   preliminary injunction motion against a law that was enacted

4   over 30 years ago that plaintiffs now after all that time

5   claims has, you know, immediate, imminent irreparable harm and

6   needs to have this law undone.  So I think all that needs to be

7   taken into consideration.

8           Unless Your Honor has any further questions, we ask

9   that you deny plaintiffs' motion.

10          THE COURT:  All right.

11          MR. TAYLOR:  Thank you, Your Honor.

12          THE COURT:  I don't have any further questions for

13  you.  Thank you, Mr. Taylor.

14          MR. TAYLOR:  Thank you, Your Honor.

15          THE COURT:  Mr. Arrington?

16          MR. ARRINGTON:  Thank you, Your Honor.

17          THE COURT:  It's your motion, you get the last word,

18  but please try to be brief.

19          MR. ARRINGTON:  I will -- I will definitely be mindful

20  of that, Your Honor.

21          THE COURT:  It's now after noon after all.

22          MR. ARRINGTON:  I will tell you I just saw the first

23  thing I've ever seen.  I've been doing this for 36 years.  A

24  defendant coming in and saying, You really need to jump on this

25  preliminary injunction motion.  I've never seen that before,

1    but I think we can understand why.

2         Benitez is just one judge, but -- but I think that if

3    you read his decisions, he predicted *Bruen*.  He said this

4    balancing means-end scrutiny stuff is not the way we should be

5    doing this.  And he basically wrote *Bruen* before *Bruen*.  And so

6    that's why I would suggest that he is very, very knowledgeable

7    in this area and would ask the Court to evaluate this case in

8    light of his ruling, which I understand are imminent.  It could

9    happen any moment.

10        Do you know whether these weapons are suitable for

11   self-defense?  I'm not a firearms expert.  I could call

12   Mr. Brown and he would sit on the stand and say, They're

13   eminently suitable for self-defense for a variety of reasons.

14   I'm not going to do that.  Why?  Because what counsel is asking

15   the Court to do is decide a difficult empirical question about

16   firearms regulation, which is the very thing that *Bruen* said

17   courts are not to do.  We're not -- we don't get -- if *Bruen*

18   stands for nothing else, it stands for the fact that courts

19   don't get to -- don't evaluate these empirical questions about

20   whether firearms are suitable, whether this is a good idea.

21        And I would -- I would also say that counsel stood up,

22   the first thing he did was go through a laundry list of why he

23   thinks this is a good policy.  Hawaii statute is a good policy.

24   What's -- where are policy arguments appropriate?  In a

25   means-end scrutiny analysis.  The State is still to this day

1   asking the Court to go into a interest balancing inquiry with

2   respect to these questions, which we would posit as we have

3   under -- already under -- in our briefs is inappropriate.

4          The State admits that the statute bans pistols.  How's

5   it tried to square that with *Heller*?  Well, *Heller* only upheld

6   traditional pistols, it didn't held -- uphold these really

7   scary, We're going to call them assault pistols.  *Heller* didn't

8   say that, it said handguns.  Period.  Full stop.  End of story.

9   It didn't differentiate between revolvers and semiautomatics,

10  didn't talk about the size of the handguns or whether the State

11  thinks they're particularly ominous handguns.  Period.  And so

12  when the State stands up and admits that the statute bans

13  pistols, that should be the end of this case under *Heller* with

14  respect to that.

15         Talks about Mr. Baron, Professor Baron and the corpus

16  linguistics argument that they've made.  The test under *Bruen*

17  and *Heller* is not a linguistic test with respect to the Second

18  Amendment.  It's a functional test.  How do I know this?

19  Because this is what *Jackson* says.  This is what *Sunnyvale*

20  says.  Second Amendment protects something based upon its

21  functionality.  Ammunition is necessary for a weapon to

22  operate.  That's a functional test.  A magazine is necessary

23  for a weapon to operate.  That's a functional test.  The fact

24  that Professor Bruen [sic] went back in time and said, Well,

25  magazine meant a building where ammunition is stored in 1791,

1    sure can't mean that today.  That's really not relevant to the

2    Court's inquiry.

3         Here's how the Court can resolve the magazine as arms

4    test.  Ask yourself a simple question:  Can the State ban all

5    magazines under the Second Amendment?  Obviously it can't.

6    Counsel stood up here and said that a magazine of sub size is

7    necessary for the operation of a weapon.  We don't dispute

8    that.  He just gave away the store.  If it can't ban all

9    magazines, which mag -- why can't it ban all magazines?  If

10   they're not arms, they're not covered by the Second Amendment.

11   You can ban them all.  Well, some -- the magazines are arms

12   because they are necessary just like ammunition.  A

13   semiautomatic rifle doesn't work without a magazine.  And so

14   all magazines are arms.  Maybe, just maybe some magazines are

15   not protected by the Second Amendment if there's a history

16   of -- and tradition of banning those types of magazines.  Of

17   course there's not.  And so the only way the Rhode Island court

18   and the Oregon court were able to uphold the magazine ban was

19   by conflating and confusing the first and second step.

20        The moment you say you can't ban all magazines, story

21   is -- it's the end of the story on first step, right?  Why

22   can't you ban them if they're not an arm?  Second Amendment

23   only protects arms and things that are necessary for the use of

24   arms.  If you can't ban them all, it's only because they are in

25   fact covered by the plain text.

1           The State says, Well, we've given you hundreds of --
2    of laws to look at.  City of New York did a similar thing in
3    *Bruen* and said, Well, look at our papers, our affidavits and
4    things.  There's a bunch of stuff in there, we just haven't
5    mentioned it in the brief.  Justice Thomas said, Well, it's not
6    our job to parse your materials.  If the state thinks that
7    there is a statute from the Founding Era that -- that bans
8    commonly used weapons like the ones that are at issue here, you
9    should have mentioned it in its briefs.  Just saying there's a
10   bunch of statutes out there doesn't carry its burden.
11          It's still trying to defend -- so here's the State
12   trying desperately to limit *Heller* to its facts.  Well, *Heller*
13   said the whole -- the very statutes they're deciding not
14   relevant to the statutory -- to the constitutional inquiry,
15   well, we're citing them again.  Why are they relevant?  Well,
16   this is different.  *Heller* only dealt with those particular
17   weapons.  Well, no, *Heller* -- the constitutional principle is
18   weapons in common use, not just handguns.  So the court could
19   say *Heller* only meant handguns and no other weapon is
20   protected.  I don't think *Heller* stands for that, but that's
21   basically what the State is arguing to the extent that they're
22   saying that these other -- it should be limited to its facts.
23          Which -- what's -- what's the relevant historical era?
24   Justice Thomas in *Bruen* basically said 1791 is the Founding Era
25   and the scope of a right is determined by the people who

1    enacted it.  That was in 1791, that's when the Second Amendment

2    was enacted.  Justice Thomas did mention a scholarly debate

3    about whether Ratification Era history was relevant.  He said

4    it doesn't matter because none of the Ratification Era history

5    supports the laws anyway.  So we're not going to decide that.

6    So it wasn't decided.  But what he did say, it's wrong to give

7    post-ratification history more weight than it can bear.

8         But let me point you to a court that does decide this

9    history.  Well, first of all, 20th century, *Bruen* did flat out

10   say, We're not looking at your 20 -- we're going to ignore all

11   your 20th century stuff because it's not relevant under either

12   scenario because it's obviously too far from 1791, it's even

13   too far from 1868.  And so whatever -- the 20th century cannot

14   eliminate the Ratification.  That's -- that's very clear.  I

15   give you the pincite of that in my papers.

16        What about late 18th century?  I will cite the Court

17   to *Espinoza*, 140 Supreme Court 2258-59 is the pincite.  What

18   was *Espinoza*?  So *Espinoza* was a case where the plaintiff

19   challenged Montana's decision to refuse to allow the state to

20   financially assist schools, religious schools under their

21   Blaine Amendment which said you can't do that.  And the court

22   said, Well, you know, no, that's unconstitutional, that's a

23   violation of the free exercise clause.  Montana argued, Well,

24   wait a minute, 30 states enacted Blaine Amendments in the

25   second half of the 19th century.  And the court in the pincite

1   that I've given you, 2258 to 59, said, It doesn't matter.  Even

2   if the overwhelming number of states enacted something in the

3   second half of the 18 -- or 19th century, it doesn't impact our

4   analysis of a provision of the Bill of Rights, in that case the

5   free exercise clause, because it's way too late.  So even if --

6   even if all of the states had passed laws because it was 30 or

7   40 had passed laws saying you couldn't do it, the court said

8   irrelevant, way too late.

9            Comparable burden.  The court -- the State says that

10   the laws that they pointed to have a comparable burden.  Well,

11   what did *Heller* and *Bruen* say?  Absolute bans are in a

12   different category from other regulations.  Counsel kept

13   looking, Well, bowie knives were restricted, blunt objects were

14   restricted, and gunpowder was restricted.  "Restricted" is the

15   key word.  There were regulations.  Counsel did not stand up

16   and say, to his credit, We've identified a law that bans, flat

17   out bans a commonly used weapon from the Founding period.  From

18   either 1791 or later.  In that sense, kind of like *Bruen* here,

19   it doesn't matter which time period you look at because the

20   law's the -- it's the same in both periods.  No Reconstruction

21   Era law, no Founding Era law bans a weapon that's in common use

22   for lawful purposes.  Again, I will point to the Militia Acts,

23   just the opposite occurred.  They required the possession of

24   arms that were common use.

25            And so when you're talking about comparable burdens,

1    the burden that's comparable is an absolute ban on possession

2    in the home for purposes of self-defense.  That's what *Heller*

3    said.  If they -- if they knew about such a law, surely they

4    would have told us, and they haven't.

5         There are -- there have been a couple of district

6    court cases granting TROs on assault weapon bans.  Rocky

7    Mountain Gun Owners versus Town of Superior and Rocky Mountain

8    Gun Owners versus Town of Louisville -- I think it's

9    Louisville, might have been Boulder.  I can point this out

10   later.  Both of those granted TROs on those -- those towns'

11   assault weapons bans.  I would -- I would cite the Court again

12   to, on the other factors, the Kealoha case, 2012 Westlaw

13   2526923.

14        Counsel says we haven't even tried to make a showing

15   on the other issues.  Well, of course we have.  I hope I'm

16   saying this right, Kealoha stands for the proposition that when

17   there's a burden -- this is Hawaii district court -- stands for

18   the proposition when there's a -- it's been demonstrated that a

19   law probably violates the Second Amendment, that necessarily,

20   quote/unquote, constitutes irreparable harm.  And so we have

21   made a showing on that.  Lots of courts say that in a

22   constitutional case, probable success on the merits is the ball

23   game because, you know, like in *Ezell*, it said -- also which

24   quoted Wright and Miller for this proposition, when you find a

25   violation of -- that it probably violates the Constitution,

1    that's all that's necessary because even short deprivations of

2    constitutional rights necessarily constitutes irreparable harm.

3         Public interest.  Well, the State wants you to go into

4    your -- the means-end scrutiny and say, Well, the means we've

5    chosen, public safety, outweigh their asserted right to carry

6    arms under the Constitution.  Well, that can't be.  It is never

7    in the public interest, in this case, it's never in the public

8    interest for the State to enforce a law that is probably

9    unconstitutional.  And similarly -- well, the public interest

10   and hardship factors merge when the government is and -- and

11   the defendant.  And so when a plaintiff against the government

12   has demonstrated probable success on the merits, which we have,

13   irreparable harm falls into place under Kealoha, public

14   interest falls -- and -- and hardship fall into place.  I would

15   also cite the *Doe* case, 878 F.3d 718, and a *California Chamber*

16   *of Commerce* case, 29 F.4th 482, which talk about the state

17   suffers no harm when it's restrained from enforcing a probably

18   unconstitutional statute.  And it's always in the public

19   interest for the state to be enjoined against enforcing a law

20   that's probably unconstitutional.

21        It gets right back around to *Bruen* and how you can't

22   slip these means-end scrutiny analysis in through the backdoor.

23   *Heller* -- or *Bruen* actually anticipated this.  It basically

24   said that for courts to be careful not to apply means-end

25   scrutiny under the guise of an analytical inquiry, historical

1   analogue inquiry.  Just similarly it could have said you can't

2   engage in means-end scrutiny under the guise of applying the

3   injunction factors.  Means-end scrutiny is just no longer

4   applicable because, again, no matter how strong the State feels

5   its public safety interest is, it never has an interest in

6   enforcing an unconstitutional law to achieve that interest.

7          Thank you very much, Your Honor.

8          THE COURT:  All right.  Gentlemen, thank you.  Matter

9   is submitted.  I will await your submissions of the comparable

10  cases a week or so.  I'm not going to hold anyone strictly to

11  that, but roughly a week would be helpful.  And we will issue

12  an order thereafter.

13         MR. TAYLOR:  Thank you, Your Honor.  On that

14  submission can I just -- just the cases and sort of the status

15  of the cases is what you're looking for?

16         THE COURT:  Yes.  I'm not looking for argument.  I

17  don't want to reopen the briefing in this case.  I don't think

18  that's what we're -- that's going to help anything.  So if you

19  want to have a parenthetical of some sort just describing what

20  statute is being challenged, for example, high-capacity

21  magazines or whether it's the microstamping or chambers load

22  mechanisms, indicators that were at issue in a couple of the

23  California cases, something along those lines is fine, but I

24  think everyone would appreciate an objective as opposed to a

25  advocacy piece.

1          MR. TAYLOR:  Yes, Your Honor, I was thinking just

2   the -- just the assault weapon, large-capacity magazine and not

3   getting into some of the different cases.

4          THE COURT:  Yeah, that's fine.  Those would be the

5   most --

6          MR. TAYLOR:  Yeah, just like the *Boland* case being a

7   different issue.  If we start going into sort of different

8   Second Amendment issues we might never end.

9          THE COURT:  Fair enough.  I appreciate that.

10          MR. TAYLOR:  Thank you, Your Honor.

11          THE COURT:  All right.  Have a good weekend, both of

12   you.  Happy Easter.

13          (The proceedings concluded at 12:23 p.m.,

14   April 7, 2023.)

15

16

17

18

19

20

21

22

23

24

25

1                  COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA FAZIO, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing pages is a

6    complete, true, and correct transcript of the stenographically

7    reported proceedings held in the above-entitled matter and that

8    the transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10         DATED at Honolulu, Hawaii, April 12, 2023.

11

12

13                       */s/ Cynthia Fazio*
                         CYNTHIA FAZIO, RMR, CRR, CRC
14

15

16

17

18

19

20

21

22

23

24

25